IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, L.L.C., | § | |
|  *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:22-CV-3730 |
| | § | |
| GRANT MEADOWS, LLC and SHAHIN | § | |
| JAMEA, | § | |
|  *Defendants.* | § | |

## PLAINTIFF'S MOTION TO COMPEL AND FOR DISCOVERY SANCTIONS

**MATTHEW BAUMGARTNER**,
Attorney in Charge
Texas State Bar No. 24062605
Southern District of Texas No. 1626953
mbaumgartner@abaustin.com
(512) 435-2308
**DAVID KING,** Of Counsel
Texas State Bar No. 24083310
Southern District of Texas No. 2414517
dking@abaustin.com
(512) 436-2305
**GUILLERMO ALARCON**, Of Counsel
Texas State Bar No.  24099176
Southern District of Texas No. 3122674
galarcon@abaustin.com
(512) 435-2383
**ARMBRUST & BROWN**, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

INDEX OF AUTHORITIES..........................................................................iii

MOTION TO COMPEL AND FOR DISCOVERY SANCTIONS..........................1

 I.  INTRODUCTION AND SUMMARY................................................1

 II.  BACKGROUND.........................................................................4

   A.  The Parties' Agreement.................................................4

   B.  Grant Meadows's business plans for the
      property start falling apart............................................5

   C.  Grant Meadows manufactures a title objection
      and purports to terminate the contract........................7

   D.  In discovery, Grant Meadows denied having
      any involvement with the power pole's removal
      or communications with the neighbor..........................8

 III.  ARGUMENT............................................................................11

   A.  Grant Meadows concealed evidence of its
      involvement with the power-pole removal..................12

   B.  Grant Meadows concealed communications with
      the neighbor................................................................13

   C.  Grant Meadows has not searched all sources
      reasonably likely to contain responsive documents....15

   D.  Grant Meadows has searched only Jamea's emails....15

   E.  Grant Meadows did not search Jamea's sent folder....16

 IV.  ATTORNEYS' FEES AND COSTS INCURRED
    DUE TO GRANT MEADOWS AND JAMEA'S DISCOVERY MISCONDUCT....17

CONCLUSION AND PRAYER...............................................................18

CERTIFICATE OF CONFERENCE.......................................................19

CERTIFICATE OF SERVICE..............................................................19

# INDEX OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Davis v. Signal Int'l Tex. GP, LLC,*
No. 1-11-CV-300, 2012 WL 13036255 (E.D. Tex. Oct. 22, 2012)......................... 11, 12

*Duarte v St. Paul Fire & Marine Ins.,*
No. EP-14-CV-305-KC, 2015 WL 7709433 (W.D. Tex. Sept. 25, 2015) .................... 11

**Rules**

Fed. R. Civ. P. 30 ...................................................................................................... 11

Fed. R. Civ. P. 34 ...................................................................................................... 11

Fed. R. Civ. P. 37 ...................................................................................................... 11

## PLAINTIFF'S MOTION TO COMPEL AND FOR DISCOVERY SANCTIONS

TO THE HONORABLE KEITH P. ELLISON:

Plaintiff KH-REIT Funding XXII, LLC ("Knighthead") files this motion to compel and for discovery sanctions against Defendant Grant Meadows, and would respectfully show the following:

## I.    INTRODUCTION AND SUMMARY

Grant Meadows's refusal to search and produce relevant documents within its control has frustrated this case's progress, despite Knighthead's best efforts. Knighthead has for many months patiently requested from, and worked with, Grant Meadows' counsel to obtain voluntarily compliance with Grant Meadows' discovery obligations.[1] Indeed, the parties have already amended the scheduling order once because of Grant Meadows's failure to produce document on time.[2]

Knighthead's efforts to obtain discovery have failed, and it is now clear that Shahin Jamea, Grant Meadows's controlling person, cannot be controlled by his lawyers, and that Grant Meadows never intended to cooperate – and will never cooperate – in discovery absent Court order and sanctions.

Jamea knows better. As a former litigator, he understands civil discovery. As a business person, he and his entities have been involved in "20 to 40" lawsuits.[3] The facts of this case illustrate why. As explained below, this lawsuit arises from a particularly obvious scheme to drum up invalid title exceptions to give Grant Meadows a pretext to avoid its closing obligations and retain the $650,000 in

---

[1] *See* Exhibit 1 (conferral emails and letters).
[2] Agreed Mot. to Amend Scheduling Order (Doc. 18).
[3] Exhibit 2 (Jamea Deposition), at 11:14–18.

earnest money it put up to keep Knighthead from selling the property to another buyer. Grant Meadows's discovery abuse is designed to further conceal those lies and the scheme they advanced.

At bottom, Grant Meadows is required make a reasonable search of all sources with its possession, custody, or control that are likely to contain discoverable documents. Grant Meadows has plainly failed to adequately search its records. This is clear for several reasons.

*First*, Grant Meadows has produced only emails and attachments. It has not produced any other sort of document. In other words, Grant Meadows has searched for responsive documents in only one place: its email account. But Grant Meadows is required to search for responsive documents wherever they may be, including its hard drives and any hard copies it may have.

*Second*, even with respect to its email account, Grant Meadows's search for documents has been inadequate because Grant Meadows has produced only emails from the inbox of Shahin Jamea (Grant Meadows's principal member). Grant Meadows has not produced emails from Jamea's "sent" folder. In other words, Grant Meadows has produced emails that Jamea received, but not emails that he sent. There are several key emails that requested a response from Jamea, but because he did not produce his sent emails it is unclear whether he in fact responded. This appears to be a deliberate attempt by Jamea to avoid producing his own statements relevant to this case.

*Third*, Grant Meadows has improperly withheld documents. Knighthead asked Grant Meadows to produce its communications with key witnesses. Grant Meadows produced none. Knighthead was forced to subpoena the witnesses. Lo and behold, those witnesses produced communications with Jamea. Those communications should have been produced by Grant Meadows, but were not--and still have not been.

On multiple occasions, Knighthead has attempted to confer about Grant Meadows's discovery shortcomings, but to no avail. Tired of getting the runaround from Grant Meadows, Knighthead went ahead with Jamea's deposition. At his deposition, Jamea repeatedly blamed Grant Meadows's e-discovery vendor for failing to search in the right places. Jamea's excuses strain credulity. He is a licensed attorney and former litigator. And he has been involved in "20 to 40" lawsuits as a party. This leads to only one conclusion: Grant Meadows's discovery failures are deliberate.

Knighthead therefore asks the Court to: (1) compel Grant Meadows to search for and produce discoverable documents; (2) order Jamea to sit for another deposition at the offices of Knighthead's counsel; (3) and order Grant Meadows to reimburse Knighthead for the attorneys' fees it incurred in taking the first deposition and in preparing this motion.

## II.    BACKGROUND

### A.    The parties' agreement.

In March 2022, Knighthead (as seller) and Grant Meadows (as purchaser) entered into a purchase and sale agreement ("PSA") for two tracts of land in Houston, Texas.[4] Knighthead filed this lawsuit because, two days before closing, Grant Meadows purported to terminate the contract. This lawsuit is over the earnest money Grant Meadows placed in escrow.

One of the tracts had a power pole on it, which had a transformer and a transmission line servicing a neighboring property. Grant Meadows wanted the transmission line and a power pole relocated or removed. And before executing the contract, Jamea told Knighthead's agent that he and "the next door neighbor (with the easement)" had "everything ironed out."[5]

Shortly after executing the PSA, in May, Grant Meadows insisted that Knighthead enter into an amendment to address the power pole and transmission line. The amendment made clear that the power pole and transmission line was an issue that Grant Meadows would assume responsibility for, whether before or after closing. If before closing—*i.e.*, when Knighthead still owned the property—Grant Meadows could have it removed only under certain conditions.[6] Specifically, before removing the power pole, Grant Meadows had to "provide to Seller, for Seller's prior review and approval, appropriate plans for removal or relocation of the power

---

[4] Exhibit 3 (Purchase and Sale Agreement).
[5] Exhibit 4 (March 2, 2022 email).
[6] Exhibit 5 (First Amendment to PSA).

pole."[7] Grant Meadows was also required to purchase insurance.[8] The parties made clear that "removal or relocation of the power pole is not a condition to closing under the terms of the Agreement."[9]

## B. Grant Meadows's business plans for the property start falling apart.

In the summer of 2022, Grant Meadows's plans for the property began unraveling. Grant Meadows looked for a way to renegotiate the contract. The parties agreed to extend the closing date by several months, but Grant Meadows's problems continued, so it eventually backed out of the contract anyway.

Grant Meadows's initial projections for development costs were way off. In December 2022, Grant Meadows estimated development costs at $16 million. But by June 2022, it revised its calculation to $26 million.[10] Further complicating matters were the "recent interest hikes" and "threat of a looming recession." *Id.* Jamea advised Knighthead that Grant Meadows "would not be able to proceed with the purchase as outline[d] in our contract." *Id.* Jamea added that "it has become clear to us that the adjoining neighbor will file suit (frivolous or not) regarding his right to put a transformer on your land." *Id.*

Because of Jamea's attempts to renegotiate the contract, the parties entered into another amendment to the contract on June 29, 2022.[11] The parties agreed to extend the closing date, from August to late October. *Id.* The parties further agreed

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] Exhibit 6 (June 17, 2022 email).
[11] Exhibit 7 (Second Amendment to PSA).

that, "except in the event of default by Seller under the Agreement, or following a casualty or condemnation event . . . Purchaser shall have no further right to terminate the Agreement." *Id.*

But the problems kept mounting for Grant Meadows. Its potential lenders were not showing interest in funding the development. On June 20, 2022, Grant Meadows's debt broker, CBRE, emailed Jamea saying that a common response it was getting from potential lenders was: "[w]e have 5-10 similar MF [multifamily] requests on our desk . . . why should we do your deal?"[12] The next day, CBRE sent another email stating: "[w]e did not get good feedback from Plains Capital today."[13]

Several weeks later, a potential lender ordered an appraisal of Grant Meadows's proposed development for the property.[14] The appraisal was devastating to Grant Meadows's plans for the property. It concluded that because of a lack of parking, "there would be no demand to prospective tenants," and therefore, "there would be no market demand for the building."[15] The appraisal concluded that Grant Meadows's planned development was "not financially feasible."[16]

In September 2022, one of Grant Meadows's equity investors informed Grant Meadows that it would not be investing in the project because he was "not too bullish on the proposed development."[17]

---

[12] Exhibit 8 (June 20, 2022 email).
[13] Exhibit 9 (June 21, 2022 email).
[14] Exhibit 10 (appraisal excerpts).
[15] *Id.*
[16] *Id.*
[17] Exhibit 11 (September 16, 2022 email).

### C. Grant Meadows manufactures a title objection and purports to terminate the contract.

On October 19, 2022—nine days before closing—Grant Meadows's attorney told the title company that the owner of an adjoining tract of land claimed that it owned an easement over the property at issue. That supposed easement related to the power pole and transmission line on the property.

There is no recorded easement. And Grant Meadows has known about the power pole and transmission line since before signing the PSA with Knighthead. Again, in March 2022, Jamea told Knighthead that he and the neighbor had "everything ironed out."[18] And in June 2022, before signing the second amendment, Jamea raised the neighbor's claims as an issue.[19] Despite knowing about those claims, Grant Meadows signed an amendment saying it would have no further right to terminate the Agreement.[20]

In his October 19, 2022 email, Grant Meadows's attorney asked the title company: "will any exceptions be added to title based off the [neighbor's] demand letters."[21]

Two days later, the title company advised the parties that it had conducted an inspection of the property and "[t]he service lines and two poles that are the subject of ongoing conversations are gone and the splinters of the bottom of the poles remain in the holes."[22] This was the first Knighthead heard of the power pole

---

[18] Exhibit 4.
[19] Exhibit 6.
[20] Exhibit 7.
[21] Exhibit 12 (October 19, 2022 email)
[22] Exhibit 13 (October 21, 2022 email).

and transmission lines' removal—Jamea had that work done without informing Knighthead of his plans or getting its approval (and, Knighthead believes, without obtaining insurance), all as required under the PSA. The title company then amended its title commitment and added an exception because of the power pole and transmission line's removal.[23] Grant Meadows used that exception as a pretext for terminating the contract.

### D. In discovery, Grant Meadows denied having any involvement with the power pole's removal or communications with the neighbor.

As this case progressed, it became apparent to Knighthead that Grant Meadows ginned up a controversy with the neighbor in order to create a pretext for terminating the contract (having waived all its termination rights, Grant Meadows needed a pretext because its business model had collapsed). So, Knighthead served discovery regarding those issues.

For example, Knighthead asked Grant Meadows to produce "[a]ll documents and communications regarding the Power Pole between you and any neighbors or owners of the lots adjacent to the Property."[24] Grant Meadows has produced none.

Knighthead also asked Grant Meadows to produce all "evidence of consent from CenterPoint Energy and/or the City of Houston, Texas related to the removal or relocation of the power pole."[25] Grant Meadows has produced no documents or communications from Center Point Energy.

---

[23] Exhibit 14 (revised title commitment excerpt)
[24] Exhibit 15 (Grant Meadows RFP Responses) at RFP no. 30.
[25] *Id.* at RFP no. 32.

Knighthead asked for "communications between you and any investors regarding the Property."[26] Before his deposition, Jamea produced no such documents, and failed to respond to multiple attempts by Knighthead's counsel to clarify whether such communications existed.[27] At his deposition, Jamea identified two potential investors.[28] The plan was for one of them to "contribute all of the initial equity upfront."[29] And yet Grant Meadows has not produced a single communication with the investors nor any documents that were given to the investors.  For a month after the deposition, despite additional requests to supplement its production,[30] Grant Meadows/Jamea have failed to produce even a single additional document.

Knighthead also asked Grant Meadows to admit that it removed the power pole—*i.e.*, the event that led to the revised title commitment on the eve of the closing. Grant Meadows denied having any involvement with the power pole's removal:

> **1.**     Admit you removed, or caused to be removed, the Power Pole.
>
> **RESPONSE:** Denied.

Exhibit 17 (Grant Meadows RFA Responses).

---

[26] *Id.* at RFP no. 13.
[27] Exhibit 1.
[28] Exhibit 2 at 22:15–20.
[29] Exhibit 16 (June 7, 2022 email).
[30] Exhibit 1.

And as noted above, Grant Meadows produced no documents concerning the removal of the power pole. As explained in further detail below, evidence obtained from CenterPoint Energy revealed that, contrary to Grant Meadows's denial, Grant Meadow asked CenterPoint to remove the power pole. And in so doing, Jamea falsely told CenterPoint that he was authorized to sign on behalf of Knighthead.[31] Jamea never communicated this to Knighthead and he failed to submit plans for approval (as required by the First Amendment) before the power pole's removal.

As also noted above, Jamea has also produced no communications with the neighbor. Knighthead subpoenaed the neighbor, and its documents show that Jamea and the neighbor did in fact communicate regarding the power pole—including texts and emails, none of which have been produced by Grant Meadows (not before or after the deposition).  In addition, Jamea told the neighbor that Knighthead had removed the power pole—an abject lie. Jamea then encouraged the neighbor to have his lawyer send a demand letter. This all happened in the days leading up to Grant Meadows's termination of the contract.

Lastly, Grant Meadows has produced documents from only Jamea's inbox. Grant Meadows has not produced any emails from Jamea's "sent" folder or outbox. And it appears that Jamea has withheld all communications with his potential investors.

---

[31]  After being confronted with evidence obtained from third parties, Grant Meadows amended in responses and now admits it caused the power pole's removal.

## III.  ARGUMENT

Under Rule 34, a party may serve requests for production requiring an opposing party to produce documents or tangible things that are within "the party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Rule 34's definition of possession, custody, or control includes more than actual possession or control; it also contemplates a party's legal right or practical ability to obtain the documents from a non-party. *See Duarte v St. Paul Fire & Marine Ins.*, No. EP-14-CV-305-KC, 2015 WL 7709433, at *5 (W.D. Tex. Sept. 25, 2015). Thus, Grant Meadows must produce its own documents and those held by its agents (including Jamea) and employees.

A party "must make a reasonable search of all sources reasonably likely to contain responsive documents." *Id.* When a party fails to adequately search for and produce documents, the party seeking discovery "may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3)(B)(iv).

Rule 37 also requires the Court to order the party whose conduct necessitated the motion to pay the reasonable expenses the movant incurred in bringing a motion to compel. Fed. R. Civ. P. 37(a)(5)(A).

In addition, the Court may order sanctions when a party impedes, delays, or frustrates the fair examination of the deponent. Fed. R. Civ. P. 30(d)(2). When a party fails to produce documents before a deposition, a court may impose monetary sanctions and require the witness to appear at a second deposition. *Davis v. Signal*

*Int'l Tex. GP, LLC*, No. 1-11-CV-300, 2012 WL 13036255, at *3 (E.D. Tex. Oct. 22, 2012).

Here, the Court should order a monetary sanction against Jamea, compel Grant Meadows to search for and produce responsive documents, and compel Jamea to attend a second deposition at the undersigned's offices. The following are but a few examples of Grant Meadows's discovery abuse.

### A. Grant Meadows concealed evidence of its involvement with the power-pole removal.

As noted above, Grant Meadows denied having any responsibility for the removal of the power pole. And when it produced documents, Grant Meadows did not produce a single document that would have linked it to the power pole's removal.

Knighthead sent a third-party subpoena to CenterPoint Energy. CenterPoint produced documents showing that Jamea asked CenterPoint to remove the power pole and paid for its removal.[32] Perhaps most egregious, Jamea falsely told CenterPoint that he had authority to sign on Knighthead's behalf:[33]



---

[32] Exhibit 18 (CenterPoint Documents).
[33] *Id.*

Grant Meadows did not inform Knighthead that it had made these plans with CenterPoint, even though the parties' agreement required Grant Meadows to submit such plans to Knighthead for its approval. After being confronted with this evidence, Grant Meadows changed its response to Knighthead's request for admissions.

At his deposition, Jamea said he does not delete documents.[34] So, there is no excuse for Grant Meadow's failure to produce these documents.

**B.      Grant Meadows concealed communications with the neighbor.**

Grant Meadows did not produce a single communication with the owner of the neighboring property. So, Knighthead subpoenaed the neighbor.

The neighbor produced both emails and text messages with Jamea. Grant Meadows has still not produced those documents. Again, Jamea testified that he does not delete documents.[35]

As Grant Meadows controlling person, Jamea's communications are highly relevant to the parties' dispute. Those communications show that Jamea and the neighbor had in fact been in discussions regarding the power pole as early as April 2022:[36]

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Thursday, April 21, 2022 4:38 PM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Cc:** becky@currentstanding.com
**Subject:** Re: Surveys. [GSB]

Thanks Brent. Same here.

Please send me the agreement regarding electricity and transformer. We don't find anything on the title commitment as a recorded instrument.

---

[34] Exhibit 2 at 21:1–4.
[35] *Id.*
[36] Exhibit 19 (emails produced by neighbor).

The neighbor also produced contemporaneous notes regarding his phone calls with Jamea. Those notes demonstrate that Jamea was attempting to gin up a controversy between the neighbor and Knighthead so he could have a way out of the agreement. They state that on September 26, 2022, Jamea called the neighbor and told him that "the seller [Knighthead] has recently removed the T-poles in the parking lot."[37] This was of course a lie—as noted above, Jamea removed the power pole and did not tell Knighthead about it. The notes say that Jamea "reiterated about the seller having recently removed the T-poles, in a way seeming to suggest that this removal would mark the end of any post-closing obligations."[38] Jamea told the neighbor that, based on his understanding, Knighthead was not authorized to remove the power pole, "and that the Seller doing so indicated that they (Seller) believed they were not concerned about these obligations."[39] The neighbor said he was "happy to reach out to" his attorneys.[40] And Jamea encouraged him to do so.

Several weeks later, on the eve of closing, Jamea texted the neighbor and asked for a copy of the neighbor's demand letter.[41] The next day, Jamea's lawyer asked the title company whether there would be any revisions to the title commitment based on "the neighbor's demand letter."[42]

---

[37] Exhibit 20 (notes produced by neighbor).
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] Exhibit 21 (text messages produced by neighbor).
[42] Exhibit 12.

When confronted with these communications at his deposition, Jamea stated he could not remember his communications with the neighbor.[43] These communications were not all he claimed to have forgotten; indeed, Jamea claimed not to remember more than 60 times during his deposition. He could not explain why Grant Meadows has not produced any of his communications with the neighbor.

**C.    Grant Meadows has not searched all sources reasonably likely to contain responsive documents.**

Grant Meadows has produced 969 documents. Those documents consist entirely of emails (698) and their attachments (271).[44] In other words, the entirety of Grant Meadows's production has come from one source: email accounts. Grant Meadows has not produced any documents saved on its hard drives. It has not produced paper copies of documents. It has not produced any text messages, such as the ones Jamea exchanged with the neighbor.

**D.    Grant Meadows has searched only Jamea's emails**.

Grant Meadows has two members: Jamea and his brother, Pejman.[45] It also has one employee: Barry Espinosa.[46] Thus, Grant Meadows was required to search at least the email accounts of these three individuals. A close review of Grant Meadows's production shows that it has not.

---

[43] Exhibit 2 at 86:11–13; 127:11–18; 129:8–16; 130:1–8; 132:6–10; 133:2–12.
[44] Exhibit 22 (Aff. J. Lyons).
[45] Exhibit 2 at 15:9–16.
[46] *Id.* at 115:13–20.

Of the 698 emails Grant Meadows produced, 697 had Jamea in either the "To" line or the "CC" line.[47] Grant Meadows did not produce a single email that had Pejman in the "To" or "CC" lines that did not also include Jamea. It produced only one such email from Espinosa. Jamea is the common denominator, which means that all the emails came from his inbox.[48] Had Grant Meadows searched Pejman or Espinosa's email accounts, it would have produced many of their emails as well.

### E. Grant Meadows did not search Jamea's sent folder.

Each of the 698 emails Grant Meadows produced included Jamea in either the "To" line or the "CC" line.[49] Grant Meadows did not produce emails in which Jamea is in the "From" line. That is, Grant Meadows produced emails from Jamea's inbox, but it did not produce any emails Jamea sent.[50] This stratagem conveniently omits many, if not most, of Jamea's own statements.

Many emails in Grant Meadows's production requested a response from Jamea. For example, on October 20, 2022, Grant Meadows's debt broker emailed Jamea about ways to "avoid suspicion" about the fact that they were no longer interested in closing on the closing date:[51]

> **To:** Shahin Jamea[sjamea@oxberrygroup.com]
> **Cc:** Stein, Jeff @ Houston[Jeff.Stein@cbre.com]
> **From:** Hudson, Brock @ Houston[Brock.Hudson@cbre.com]
> **Sent:** Thur 10/20/2022 2:52:52 PM (UTC)
> **Subject:** Sonder Midtown
>
> Good morning Sean,
> Per our conversation from yesterday, we are going to slow play Plains on this deal.
> However, I wanted to check and see if you were still comfortable moving forward with the appraisal. Moving forward with the appraisal may be a good way to avoid any suspicion from the lender and keep the ball rolling albeit at a slower pace. Just let us know what you are comfortable with.

---

[47] Exhibit 22
[48] *Id.*
[49] *Id.*
[50] Grant Meadows did produce one email that Jamea sent—*because he sent it to himself.*
[51] Exhibit 23 (October 20, 2022 email).

This was *before* the title company issued its revised title commitment. Because Jamea did not produce emails from his "sent" folder, we do not know if Jamea responded to this email.

When asked why he had not produced emails from his "sent" folder, Jamea blamed Grant Meadows's e-discovery vendor.[52] Jamea's excuse is not plausible. Jamea is a former litigator.[53] He and his companies have been involved in "20 to 40" lawsuits as parties.[54]

Tellingly, after his deposition, despite his lawyers' assurance that it would do so, Grant Meadows has still not supplemented its productions.

## IV. Attorneys' Fees and Costs Incurred Due to Grant Meadows and Jamea's Discovery Misconduct.

To date, Knighthead has incurred $26,613 in attorney's fees trying to get Grant meadows to comply with its discovery obligations.[55] These fees include time spent attempting to confer with opposing counsel, preparing for and taking Jamea's deposition, and drafting this motion.

Knighthead requests that the Court sanction both Grant Meadows and Jamea, individually. Grant Meadows is an entity that is completely controlled by Jamea. Jamea uses it to close on transactions and temporarily hold assets until they are transferred to another entity.[56] Grant Meadows generally has no assets,

---

[52] Exhibit 2 at 20:19–25; 21:22–22:14.
[53] *Id.* at 12:18–25.
[54] *Id.* at 11:14–18.
[55] Exhibit 24 (Aff. M. Baumgartner)
[56] Exhibit 2 at 14:11–22.

and Jamea often uses that fact to escape financial obligations.[57] Thus, a sanction against Grant Meadows only will likely be unenforceable.

## CONCLUSION AND PRAYER

For these reasons, Knighthead respectfully asks the Court to: (1) compel Grant Meadows to search for and produce responsive documents wherever they may reasonably be found; (2) award Knighthead reasonable attorneys' fees incurred in presenting this motion; (3) award Knighthead reasonable attorneys' fees incurred in preparing for and taking Jamea's first deposition; and (4) order Jamea to appear at a second deposition at the offices of Knighthead's counsel.

Respectfully submitted,

*/s/ Matthew Baumgartner*
**MATTHEW BAUMGARTNER**,
Attorney in Charge
Texas State Bar No. 24062605
Southern District of Texas No. 1626953
mbaumgartner@abaustin.com
(512) 435-2308
**DAVID KING,** Of Counsel
Texas State Bar No. 24083310
Southern District of Texas No. 2414517
dking@abaustin.com
(512) 436-2305
**GUILLERMO ALARCON**, Of Counsel
Texas State Bar No. 24099176
Southern District of Texas No. 3122674
galarcon@abaustin.com
(512) 435-2383
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
*Attorneys for Plaintiff*

---

[57] *See, e.g.,* Exhibit 24 (March 1, 2023 email) ("Grant Meadows, L.L.C. doesn't have any cash to fulfill its contractual obligations to you on the remaining $100k you've invoiced.").

## CERTIFICATE OF CONFERENCE

As shown by Exhibit 1, Knighthead has attempted to confer with Grant Meadows about its discovery obligations for months. Knighthead's counsel has sent emails and letters, and each party's counsel has conferred by phone. In addition, Guillermo Alarcon (counsel for Knighthead) and Robert MacNaughton (counsel for Grant Meadows) conferred in person on July 26, 2023 (during and after Jamea's deposition). The attempts to resolve this discovery dispute without court intervention have failed.

*/s/ Guillermo A. Alarcón*
Guillermo A. Alarcón

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, a true and correct copy of the foregoing was served on all counsel of record.

*/s/ Guillermo A. Alarcón*
Guillermo A. Alarcón