APPENDIX

| Exhibit | Document | PDF Page Number |
|---------|----------|-----------------|
| 1. | Attempts to Confer | 3 |
| 2 | Jamea Deposition Excerpts | 21 |
| 3 | Purchase and Sale Agreement | 40 |
| 4 | March 2, 2022 email | 85 |
| 5 | First Amendment to PSA | 88 |
| 6 | June 17, 2022 email | 93 |
| 7 | Second Amendment to PSA | 95 |
| 8 | June 20, 2022 email | 99 |
| 9 | June 21, 2022 email | 102 |
| 10 | Appraisal Excerpts | 106 |
| 11 | September 16, 2022 email | 112 |
| 12 | October 19, 2022 email | 114 |
| 13 | October 21, 2022 email | 122 |
| 14. | Revised Title Commitment excerpt | 124 |
| 15 | Grant Meadows RFP Responses | 128 |
| 16 | June 7, 2022 email | 135 |
| 17 | Grant Meadows RFA Responses | 138 |
| 18 | CenterPoint documents | 143 |
| 19 | Emails produced by neighbor | 150 |
| 20 | Notes produced by neighbor | 155 |

{W1256485.1}

| 21 | Text messages produced by neighbor | 157 |
| 22 | Declaration of John Lyons | 159 |
| 23 | October 20, 2022 email | 162 |
| 24 | Affidavit of Matthew Baumgartner | 164 |
| 25 | March 2, 2023 email | 180 |

# EXHIBIT 1

# ARMBRUST & BROWN, PLLC

### ATTORNEYS AND COUNSELORS

100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TEXAS 78701-2744
TELEPHONE 512-435-2300
FACSIMILE 512-435-2360

MATTHEW BAUMGARTNER
(512) 435-2308
MBAUMGARTNER@ABAUSTIN.COM

April 4, 2033

*Via email:* **robert@porterfirm.com**

J. Robert MacNaughton
Porter Law Firm
2221 Voss Road, Suite 200
Houston, Texas 77057

> **Re:**   **KH-REIT II Funding XXII, LLC v. Grant Meadows, LLC; Case No. 4:22-CV-3730; In the United States District Court for the Southern District of Texas**

Dear Mr. MacNaughton:

This letter follows our conference call on March 23, 2023 in which we discussed the need to exchange documents soon. We have still received no documents or supplemental discovery responses from Defendant in the nearly two weeks since that conference call. As you know, the Court's scheduling order sets deadlines that are fast approaching, including: May 9, 2023 (for joining new parties) and May 26, 2023 (for Plaintiff's expert witnesses). We served Plaintiff's discovery requests on February 16, 2023, shortly after the Court issued the scheduling order, so that we may meet these and other deadlines in this litigation. Unfortunately, Defendant has not responded with meaningful discovery answers and has not produced any requested documents, and has therefore jeopardized Plaintiff's ability to meet these Court-ordered deadlines. In addition to causing needless delay, Defendant's inadequate discovery responses have also caused Plaintiff to incur avoidable expenses, including for repeatedly having to request that Defendant comply with its discovery obligations.

**Defendant's Initial Disclosures**

Defendant's Initial Disclosures are inadequate. In fact, Defendant served its Initial Disclosures after Plaintiff served its Disclosures, and did no more than copy Plaintiff's Disclosures, nearly word for word. Defendant must make its own disclosures. If one party simply copies the other party's disclosures, it defeats the purpose of the parties telling each other the information within their knowledge — *e.g.*, the names of non-party fact witnesses with knowledge of the disputed issues. Please supplement Defendant's Initial Disclosures immediately based upon the information Defendant and its agents have.

{W1221684.1}

EXHIBIT 1 PAGE 1 OF 17

ARMBRUST & BROWN, PLLC
Page 2

**Defendant's Documents**

Plaintiff served requests for production in part so that we could gather the documents necessary to determine if we need to retain experts, and, if so, to provide the relevant documents to the experts. Defendant has produced nothing in response.

Defendant has lodged only two sets of objections, but neither allows Defendant to withhold requested documents—and certainly not its entire document production.

(1)   To the production of communications with, and other documents concerning, Defendant's investors and lenders in the property: As to these documents, Defendant has claimed at least some of them are not discoverable because they may contain proprietary information.  These documents are clearly discoverable. The facts show that Defendant balked at its purchase obligations after the market declined precipitously—which occurred after Defendant signed the contract but before the closing date.  Defendant's communications with investors and lenders in the property are obviously highly relevant to this issue and must all be produced. We agree that Defendant can mark any documents that contain proprietary or other confidential information as "Confidential" pending entry of a protective order.

Defendant's objections that the words "Investors" and "Lenders" are too vague to understand are not valid objections.  If necessary, please use the dictionary definitions in construing Plaintiff's requests.  *See generally*, *VeroBlue Farms USA Inc. v. Wulf*, No. 3:19-CV-764-X, 2021 WL 5176839, at *8 (N.D. Tex. Nov. 8, 2021) ("as a general matter, if an objection does not preclude or prevent a response or answer, at least in part, the objection is improper and should not be made. To make such an objection in the face of these considerations is to engage in the abusive practice of objecting to discovery requests reflexively – but not reflectively – and without a factual [or legal] basis that Federal Rule of Civil Procedure 26(g) was enacted to stop. Serving unsupported and boilerplate or stock objections does not preserve or accomplish anything other than waiver and subjecting the responding party to sanctions," including – on a party's motion or even a court's own motion – under Federal Rule of Civil Procedure 26(g)(3)….) (internal citation omitted).

(2) To "internal" communications, Defendant has claimed that such communications are attorney-client privileged and may constitute attorney work product.  To clarify, the Requests that seek Defendant's internal communications do not seek the privileged communications between Defendant and its lawyers. Defendant should not delay the production of its discoverable communications based on this objection. To the extent Defendant is withholding its employees', agents' and owners' communications with each other based on any privilege, Defendant is requested to produce a privilege log that meets the requirements of Federal Rule of Civil Procedure 26(b)(5).

Defendant also states in response to Request No. 31 that it does not know of any liability insurance (relating to the power line pole) that the First Amendment to the purchase contract required Defendant to purchase.  This response is inconsistent with Defendant's answer to Request for Admission No. 6 in which Defendant denied that it did not obtain such insurance, presumably

EXHIBIT 1 PAGE 2 OF 17

ARMBRUST & BROWN, PLLC
Page 3

meaning that it did obtain such insurance.  This insurance policy must be produced as it is a document specifically contemplated by the Purchase Contract.

Please confirm that Defendant will produce all required and requested documents by no later than April 14, 2023, or Plaintiff will move to compel.

**Defendant's Responses to Requests for Admission**

Defendant appears to have simply denied every Request for Admission without serious consideration, including those asking for admissions to what Plaintiff believes to be undisputed contract language.

Simply denying all RFAs without any explanation is not acceptable. *See VeroBlue Farms USA, supra,* 2021 WL 5176839, at *4 ("Rule 36(a)(4) requires that, "[i]f a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. Fed. R. Civ. P. 36(a)(4). A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest. *Id.* Further, the answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny. And Rule 36(a)(5) requires that "[t]he grounds for objecting to a request must be stated.") (internal citations omitted).

We look forward to receiving Defendant's documents, its privilege log, and its amended discovery responses promptly, so that a motion to compel may be avoided.  Please provide all such materials by April 14, 2023.

Sincerely,

ARMBRUST & BROWN, PLLC

By: */s/ Matthew Baumgartner*
   Matthew Baumgartner

Cc:   Guillermo Alarcon (firm)
      Rebecca Brown (client)
      Laura Torrado (client)

EXHIBIT 1 PAGE 3 OF 17

**Guillermo Alarcon**

| | |
|---|---|
| **From:** | Weston Ray <weston@porterfirm.com> |
| **Sent:** | Friday, June 2, 2023 3:22 PM |
| **To:** | Matthew Baumgartner |
| **Subject:** | RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you. |

Matthew, the vendor actually said June 9th, my misunderstanding.

Best regards,

**Weston Ray**
Attorney



**d** 713.533.1933 | **c** 512.563.8114
2221 S. Voss | Houston, TX 77057

   PorterFirm.com

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

**From:** Weston Ray
**Sent:** Friday, June 2, 2023 12:14 PM
**To:** 'Matthew Baumgartner'
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Good afternoon Matthew, the vendor responded with June 16th.

Best regards,

**Weston Ray**
Attorney



EXHIBIT 1 PAGE 4 OF 17

**d** 713.533.1933 | **c** 512.563.8114
2221 S. Voss | Houston, TX 77057

   PorterFirm.com

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

**From:** Weston Ray
**Sent:** Wednesday, May 31, 2023 4:36 PM
**To:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Good afternoon Matthew, I'll get a hard date from the e-service vendor for you.

Best regards,

**Weston Ray**
Attorney



**d** 713.533.1933 | **c** 512.563.8114
2221 S. Voss | Houston, TX 77057

   PorterFirm.com

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

EXHIBIT 1 PAGE 5 OF 17

**From:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Sent:** Tuesday, May 30, 2023 10:33 AM
**To:** Weston Ray <weston@porterfirm.com>; Robert MacNaughton <robert@porterfirm.com>; John Lyons <John@gorainmaker.com>
**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Weston-

Thank you for confirming on our call last week that you intend to reproduce Grant Meadows's documents with the metadata intact. As we are now well past the agreed production date, we need a firm commitment as to **when** Grant Meadows will produce its documents with their original data. As we discussed, your e-discovery vendor is familiar with the issues raised below and this should not take long at all. And, my client is at this point extremely unhappy with the delays and has instructed me to seek court relief if the issues with Grant Meadows' production are not corrected immediately. Please advise.

Thank you,
Matt

---

**From:** Weston Ray <weston@porterfirm.com>
**Sent:** Monday, May 22, 2023 5:07 PM
**To:** Matthew Baumgartner <MBaumgartner@abaustin.com>; Robert MacNaughton <robert@porterfirm.com>; John Lyons <John@gorainmaker.com>
**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Thank you for the clarification Matt, I'll get back to you as soon as possible.

Best regards,

**Weston Ray**
Attorney



**d** 713.533.1933 | **c** 512.563.8114
2221 S. Voss | Houston, TX 77057

 PorterFirm.com

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or

3

EXHIBIT 1 PAGE 6 OF 17

principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

---

**From:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Sent:** Monday, May 22, 2023 5:00 PM
**To:** Weston Ray <weston@porterfirm.com>; Robert MacNaughton <robert@porterfirm.com>; John Lyons <John@gorainmaker.com>
**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Hi Weston-

Thanks, please do confirm a time so we can hopefully get this resolved sooner rather than later.

To answer your clarification question, we don't think we're asking for more than the rules require. Fed. R. Civ. P. 34(b)(2)(E)(ii) says: "If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable for or forms." Grant Meadows's production is not in the form in which the information is ordinarily maintained (i.e., native format) nor is it in a reasonably usable form because it excludes information that was in the original document (i.e., metadata and attachments). *See Gutierrez v. State Farm Lloyds*, No. 7:14-CV-430, 2015 WL 13188353, at *3 (S.D. Tex. Jan. 22, 2015) (a party may not "convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in litigation.").

We tried to preserve the metadata that you'd want to use to sort and search our documents, and we're just asking that your production be the same in that respect.

Looking forward to working through this with you.

-Matt



Matthew Baumgartner
Armbrust & Brown, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701-2744
(512) 435-2308 - Direct
(512) 435-2360 - Facsimile
mbaumgartner@abaustin.com
www.abaustin.com

---

**From:** Weston Ray <weston@porterfirm.com>
**Sent:** Monday, May 22, 2023 3:53 PM
**To:** Matthew Baumgartner <MBaumgartner@abaustin.com>; Robert MacNaughton <robert@porterfirm.com>; John Lyons <John@gorainmaker.com>

EXHIBIT 1 PAGE 7 OF 17

**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Good afternoon Matthew, Robert is out of the office. I'll confirm a time with him as soon as he is available.

To clarify, are you amending your discovery requests to incorporate the heightened production formatting requirements? I don't see any minimum standards pertaining to metadata in the requests or local rules.

Best regards,

**Weston Ray**
Attorney



**d** 713.533.1933 | **c** 512.563.8114
**2221 S. Voss | Houston, TX 77057**

   **PorterFirm.com**

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

**From:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Sent:** Monday, May 22, 2023 11:37 AM
**To:** Robert MacNaughton <robert@porterfirm.com>; John Lyons <John@gorainmaker.com>
**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>; Weston Ray <weston@porterfirm.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Robert-

I'm out Friday but Thursday works. How about 10:00 am? I will circulate a calendar invite.

-Matt

**From:** Robert MacNaughton <robert@porterfirm.com>
**Sent:** Friday, May 19, 2023 10:51 AM
**To:** John Lyons <John@gorainmaker.com>

EXHIBIT 1 PAGE 8 OF 17

**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>; Weston Ray <weston@porterfirm.com>; Matthew Baumgartner <MBaumgartner@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Matt and John

I am out of the state and in limited communications Monday through Wednesday next week. We are trying to verify authority with our client however he has said that he is out of reach until next week, but will get to us on this when he gets back. Can we tentatively set this up for Thursday or Friday of next week? With the idea that by that time we will have confirmed both John and our authority and are quickly ready to get this addressed directly by that time.

**J. Robert MacNaughton**
Attorney



**m** 713.621.0700 | **f** 713.621.0709
**d** 713.600.4314 | **c** 713.417.4066
**2221 S. Voss Rd., Suite 200, Houston, Texas 77057**

in  **PorterFirm.com**

The contents of this email message are confidential and may be attorney-client privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction, or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately **notify** the sender by reply email or phone and **delete** this message and its attachments, if any. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means or to constitute an electronic signature. As required by the United States Treasury Regulations, this communication is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding penalties that may be imposed under the United States federal tax laws.

**From:** John Lyons <John@gorainmaker.com>
**Sent:** Friday, May 19, 2023 10:39 AM
**To:** Robert MacNaughton <robert@porterfirm.com>
**Cc:** Martha Adams <MAdams@abaustin.com>; Brooke Wilhelm <lawclerklit@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>; Weston Ray <weston@porterfirm.com>; Matthew Baumgartner <MBaumgartner@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Robert,

I am available Monday and Tuesday as well.

Thanks,
John

EXHIBIT 1 PAGE 9 OF 17

**From:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Sent:** Friday, May 19, 2023 10:07 AM
**To:** Matthew Baumgartner <MBaumgartner@abaustin.com>; 'robert@porterfirm.com'
<robert@porterfirm.com>; 'lawclerklit@porterfirm.com' <lawclerklit@porterfirm.com>;
'weston@porterfirm.com' <weston@porterfirm.com>; Guillermo Alarcon <GAlarcon@abaustin.com>
**Cc:** John Lyons <John@gorainmaker.com>; Martha Adams <MAdams@abaustin.com>
**Subject:** RE: RE: Robert MacNaughton shared "2627 Main Discovery" with you.
**Importance:** High

Robert-

Following up on this. Can we set up a call between your e-discovery vendor and John Lyons to discuss your production? We need to do this fairly quickly since we can't really use your production. I'm generally free Monday and Tuesday. John can weigh on with his availability.

Thanks for your attention to this.

-Matt

**From:** Matthew Baumgartner <MBaumgartner@abaustin.com>
**Sent:** Tuesday, May 16, 2023 3:51 PM
**To:** robert@porterfirm.com; lawclerklit@porterfirm.com; weston@porterfirm.com; Guillermo Alarcon
<GAlarcon@abaustin.com>
**Cc:** John@gorainmaker.com; Martha Adams <MAdams@abaustin.com>
**Subject:** RE: Robert MacNaughton shared "2627 Main Discovery" with you.

Robert-
Unfortunately, Defendant's document production is not usable and we need to request that the documents be reproduced in a way that preserves the documents' original content (including the metadata and families). The manner in which Defendant has produced documents does not preserve the metadata and does not (unless we attempt to keep them together on our end) keep the families (emails and their attachments) together in the Bates numbering.
As an example, if you open the attached production PDF you can view the email and it is Bates endorsed, but the filename does not contain the Bates number. You can then click on the attachment icon (paper clip) and view the attachment and it is not Bates endorsed.
Defendant's production did not include a file containing the Bates numbers and metadata.
In contrast, the KH production contains the following metadata fields:
- BegBates
- EndBates
- BegAttach
- EndAttach
- SortDate (this date is populated the same for parent emails and any attachments)
- SentDate
- ReceivedDate
- LastModifiedDate
- From
- To
- CC
- BCC
- Subject
- FileName
- FileExt
- Author
- NativeLink (Link to the produced native files)

7

EXHIBIT 1 PAGE 10 OF 17

If possible, it would be best to receive Defendant's production in the same format as KH's, which meets the minimum standards for production of electronically stored documents.

I have cc'd John Lyons to work with whomever is creating Defendant's production to ensure it is received as expected. Please provide the best contact for John to work with on this.

Sincerely,

**Matthew Baumgartner**
Armbrust & Brown, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701-2744
(512) 435-2308 - Direct
(512) 435-2360 - Facsimile
mbaumgartner@abaustin.com
www.abaustin.com



**From:** Robert MacNaughton
**Sent:** Monday, May 15, 2023 7:30 PM
**To:** Brooke Wilhelm ; Robert MacNaughton ; Weston Ray ; Guillermo Alarcon ; Matthew Baumgartner
**Subject:** Robert MacNaughton shared "2627 Main Discovery" with you.



**Robert MacNaughton shared a file with you**

Defendant Document Production Cause No. 4:22-CV-3730
If you have an issue let me know. Bates Labels are without prefix identifiers - wanting to get the documents to you timely.



2627 Main Discovery

🌐 This link will work for anyone.





Privacy Statement

EXHIBIT 1 PAGE 11 OF 17

# ARMBRUST & BROWN, PLLC

### ATTORNEYS AND COUNSELORS

100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TEXAS 78701-2744
TELEPHONE 512-435-2300
FACSIMILE 512-435-2360

MATTHEW BAUMGARTNER
(512) 435-2308
*mbaumgartner@abaustin.com*

June 27, 2023

*Via email:* **robert@porterfirm.com;**
**weston@porterfirm.com**

J. Robert MacNaughton
Weston Ray
Porter Law Firm
2221 Voss Road, Suite 200
Houston, Texas 77057

> Re:   ***KH-REIT II Funding XXII, LLC v. Grant Meadows, LLC***; **Case No. 4:22-CV-3730; In the United States District Court for the Southern District of Texas**

Dear Mssrs. MacNaughton and Ray:

This letter follows our review of Grant Meadows' document production, which appears to be deficient in several respects. This letter is an attempt to confer as to the apparent deficiencies before seeking relief from the Court.  Please let me know if you would like to schedule a conference to confer as to any of the requests at issue.

As a general matter, nearly all Word, .pdf and Excel documents contained in Grant Meadows' production are attachments to emails. This leads us to believe that Grant Meadows's document production may not include documents kept outside of email accounts. Plaintiff's requests seek not just communications but also other documents. Grant Meadows' complete business file on this Property should be produced.

As to other specific categories of documents requested, but which Grant Meadows' production appears to be incomplete:

Plaintiff's RFP Nos. 1-6 seek communications and documents with the Title Company, including as to the removal of the Power Pole that Defendant made the basis of his title objection. However, there are no direct communications between Grant Meadows and the Title Company—all communications appear to have come from Grant Meadows' attorney Travis Huehlefeld. Please confirm there are no such direct communications (or any communications to and from Grant Meadows' attorneys) that are being withheld.

{W1241581.1}

EXHIBIT 1 PAGE 12 OF 17

ARMBRUST & BROWN, PLLC
Page 2

Plaintiff's RFP Nos. 7-12 seek communications between Grant Meadows and "any person" concerning the property, including the Power Pole. We believe that people with whom Grant Meadows had communications with, but who do not appear in Grant Meadows' production, include (but are not limited to): the neighbor (Main 2601 Partners, LLC), Davis Adams of JLL Capital Markets, and Riverway Title Company. We ask that Grant Meadows determine what persons it had communications with concerning this Property, conduct a sufficient search for such documents and communications, and produce them promptly.

Plaintiff's RFP Nos. 13-18 seek communications with investors in the property, including communications concerning the Power Pole and the contract amendment that addresses that issue, as well as the Title Commitment. Grant Meadows' production appears to contain no such communications. Please confirm that Grant Meadows had no communications with any investors in this project. If such communications have not been produced, please explain why they have been withheld.

Plaintiff's RFP Nos. 19-24 seek communications concerning the Property, the Power Pole and the contract and Title Commitment with any lenders. Grant Meadows' production appears to contain only very limited, initial inquiries concerning a loan for the purchase of this property. Please confirm that Grant Meadows has not withheld any communications with lenders, or, if it has, please explain the basis for withholding such communications.

Plaintiff's RFP Nos. 25-26 seek internal communications concerning the Property, but Grant Meadows' production contains mostly immaterial internal communications and is completely devoid of documents that we would expect to see, including communications relating to whether to purchase the Property, at what price, the source of funds to be used to purchase the Property, the decisions to renegotiate the contract through a series of amendments, and Grant Meadows' ultimate decision not to purchase the Property at the closing date.

Similarly, Plaintiff's RFP Nos. 27 and 28 seek documents and communications relating to the Property's value and market conditions.  A mere two weeks after Grant Meadows was supposed to close on the Property, it offered to purchase it for $6 million less than the contract price it had agreed to, so it has obviously done work to place a valuation on the Property.  Please produce all such documents, or, if they are being withheld, please explain the basis for withholding them.

Plaintiffs' RFP Nos. 29-33 seek every possible category of documents relating to the Power Pole, including all documents and communications, liability insurance required by the First Amendment (and which Grant Meadows has denied failing to purchase—*see* RFA Nos. 5 and 6), documents and communications with CenterPoint Energy and the City, and plans and proposals for the Power Pole's removal.  No insurance related documents were produced.  Grant Meadows' production includes some emails authorizing Center Point to remove the Power Pole, but even that category of documents appears to be incomplete. Please be sure that Grant Meadows has conducted a comprehensive search for documents and communications relating to this critical issue and supplement the production accordingly. If any such documents are being withheld, please explain the basis for withholding them.

EXHIBIT 1 PAGE 13 OF 17

ARMBRUST & BROWN, PLLC
Page 3

As this case has already been delayed by the several months it took Grant Meadows to produce documents, Plaintiff requests a prompt response and supplementation of Grant Meadows' document production, but in any event not later than July 7, 2023.

Please contact me if you would like to discuss any of the matters addressed here.

Sincerely,

ARMBRUST & BROWN, PLLC

By: /s/ Matthew Baumgartner
Matthew Baumgartner

Cc:    Guillermo Alarcon (firm)
Rebecca Brown (client)
Laura Torrado (client)

EXHIBIT 1 PAGE 14 OF 17

# ARMBRUST & BROWN, PLLC

ATTORNEYS AND COUNSELORS

100 Congress Avenue, Suite 1300
Austin, Texas  78701-2744
512-435-2300
512-435-2360 (Fax)

Matthew Baumgartner
(512) 435-2308
mbaumgartner@abaustin.com

August 15, 2023

*Via email:* **robert@porterfirm.com;**
**weston@porterfirm.com**

J. Robert MacNaughton
Weston Ray
Porter Law Firm
2221 Voss Road, Suite 200
Houston, Texas 77057

Re:  *KH-REIT II Funding XXII, LLC v. Grant Meadows, LLC*; Case No. 4:22-CV-3730; In the United States District Court for the Southern District of Texas

Dear Mssrs. MacNaughton and Ray:

This letter follows our call yesterday evening concerning the state of discovery, and an alternative to settle this dispute before we are forced to seek relief from the Court concerning your client's obstruction of discovery.

I will not again describe in detail our efforts to obtain your client's compliance with its discovery obligations. Briefly: as you know, we wrote you on June 27, 2023 pointing out several deficiencies in your client's document production. We received no response, and took his deposition on the basis of the existing discovery. Mr. Jamea's discovery obstructionism was then confirmed at his deposition.  To name a few notable examples of the discovery misconduct to date:

- Your client has failed to produce emails that its principals and agents (including Mr. Jamea) sent — the production included only emails from his "inbox" and not sent emails. Thus, your client's discovery conveniently omitted nearly all of his own statements to anyone about the subject matter of this case. That cannot have been an accident, or the fault of the discovery vendor, as you and Mr. Jamea have asserted. (Incidentally, that assertion opens the door to seeking this information from the vendor.)

- Because of your client's failure to produce relevant communications, we have had to subpoena third parties (the neighbor and the power company). Those third parties produced communications that your client should have produced but failed to do so.  It is now apparent that we will have to subpoena additional third parties, which

{W1252244.1}

EXHIBIT 1 PAGE 15 OF 17

ARMBRUST & BROWN, PLLC
Page 2

will almost certainly reveal even more improperly withheld documents and communications.

- Your client has failed to produce communications and other documents with lenders, investors, and agents—to which Mr. Jamea admitted at his deposition; and

- Your client has served false RFA denials, including its denial that it had the power line pole on Knighthead's property removed, which Mr. Jamea also admitted to in the deposition (but only after we obtained documents from the power company showing that he falsely told the power company he was Knighthead's agent.)

This is far from an exhaustive list. Mr. Jamea has been involved in several lawsuits—indeed, he seems to end up in litigation on many of his deals; he certainly knows how to comply with discovery, as do you. In fact, you committed to remedying the discovery shortcomings that were exposed during the deposition, but still have not done so.

This turn of events has left Knighthead no choice but to seek discovery sanctions, including against Mr. Jamea personally, since it is clear at this point that he is personally obstructing the discovery process. After obtaining compelled document production, we intend to take his deposition again since the first deposition was rendered a waste of time. We also note that Mr. Jamea's repeated claim to not remember virtually any facts may also subject him to penalties and sanctions.

It is unfortunate that the case has proceeded in this fashion. As I mentioned, we simply wish to gather the facts and present them to the Court for a ruling on the merits, but almost all of our time in the last few months has had to be devoted to exposing Mr. Jamea's discovery misconduct. If Mr. Jamea expects to benefit from his obstruction of discovery, Knighthead assures you that will not be the case.

However, as we discussed, Knighthead has authorized me to extend an offer of settlement in lieu of any further work on this case. To that end, Knighthead offers to settle this dispute with Grant Meadows and Mr. Jamea for a payment to Grant Meadows of $50,000 out of the earnest money currently with Fidelity. This offer of settlement reflects Knighthead's desire to end this case without further expenditure of resources or court intervention. Due to the looming deadlines and Mr. Jamea's obstruction of discovery to date, Knighthead must move for appropriate discovery sanctions quickly. **Knighthead therefore requests Grant Meadows/Mr. Jamea's response no later than Friday, August 18, 2023, after which this offer of settlement will expire.**

Sincerely,

ARMBRUST & BROWN, PLLC

By: /s/ Matthew Baumgartner
　　Matthew Baumgartner

EXHIBIT 1 PAGE 16 OF 17

ARMBRUST & BROWN, PLLC
Page 3

Cc:   Guillermo Alarcon (firm)
       Rebecca Brown (client)
       Laura Torrado (client)

EXHIBIT 1 PAGE 17 OF 17

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   KH-REIT II FUNDING XXII,      )
     LLC                           )
 4        Plaintiff,               )
                                   )
 5   v.                            ) CAUSE NO.: 4:22-CV-03730
                                   )
 6   GRANT MEADOWS, L.L.C          )
          Defendant                )

 7

 8         ------------------------------------

 9         ORAL AND VIDEOTAPED DEPOSITION OF

10             SHAHIN "SEAN" JAMEA

11               JULY 26, 2023

12         ------------------------------------

13       ORAL AND VIDEOTAPED DEPOSITION OF SHAHIN "SEAN"

14   JAMEA, produced as a witness at the instance of the

15   PLAINTIFF, and duly sworn, was taken in the above-styled

16   and numbered cause on the 26th of July, 2023, from 10:03

17   a.m. to 1:39 p.m., before Velma C. LaChausse, Shorthand

18   Reporter and Notary Public in and for the State of

19   Texas, reported by machine shorthand, at the law offices

20   of The Porter Law Firm, 2221 South Voss Road, Suite 200,

21   Houston, Texas 77057, pursuant to the Federal Rules of

22   Civil Procedure and the provisions stated on the record

23   or attached hereto.

24

25
```

EXHIBIT 2 PAGE 1 OF 18

Shahin Jamea
July 26, 2023                                                    2

```
 1              A P P E A R A N C E S

 2

 3
    FOR THE PLAINTIFF:
 4       Mr. Guillermo Alarcon
         ARMBRUST & BROWN, PLLC
 5       100 Congress Avenue, Suite 1300
         Austin, Texas 78701
 6       Phone: (512)435-2300
         E-mail:  galarcon@abaustin.com
 7

 8  FOR THE DEFENDANT:
         Mr. J. Robert MacNaughton
 9       PORTER LAW FIRM
         2221 South Voss Road, Suite 200
10       Houston, Texas 77057
         Phone: 713)600-4314
11       E-mail: robert@porterfirm.com

12
    ALSO PRESENT:
13       Mr. Corey LaBorde, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT 2 PAGE 2 OF 18

Shahin Jamea
July 26, 2023

11

1  in Harris County District Court.

2      Q.  Is that still pending?

3      A.  We've resolved it.  The case is still open.

4  We've resolved it.  We're waiting for an action to

5  happen before dismissing it.

6      Q.  Okay.  What about in the past five years?

7      A.  What's your question?

8      Q.  How many times have you been deposed in the

9  past five years?

10     A.  I couldn't tell you.

11     Q.  So many that you can't remember?

12     A.  I just don't really have the memory of how many

13  depositions.

14     Q.  Okay.  Well, how many times have you or an

15  entity that you control been sued?

16     A.  I don't have an exact count.

17     Q.  Can you give me an approximate count?

18     A.  20 to 40.

19     Q.  Okay.  And those were 20 to 40 in which you

20  were or one of your entities were a defendant?

21     A.  Or plaintiff.

22     Q.  How many were you a defendant?

23     A.  I don't know.  I don't know the breakdown.

24     Q.  Approximate?

25     A.  No approximation.

EXHIBIT 2 PAGE 3 OF 18

Shahin Jamea
July 26, 2023                                                          12

1      Q.  Have you been sued more times than you have

2  sued?

3      A.  I don't know.

4      Q.  Okay.  What law firms have represented you in

5  those 20 to 40 lawsuits?

6      A.  Porter Hedges, Wilson Cribbs, AZA, Porter Law

7  Firm, Fetner Thompson; some of that I can think of.

8      Q.  Okay.  So how long have you been in business?

9      A.  My brother and I started Oxberry Group 2004 or

10  2005.

11      Q.  And those 20 to 40 lawsuits have all been after

12  you started Oxberry Group?

13      A.  No.  Before -- before and after.

14      Q.  What were you doing before Oxberry Group?

15      A.  I was a practicing attorney for a few years,

16  and before that my brother and I had a number of

17  restaurants.

18      Q.  Okay.  When you were -- what years were you a

19  practicing attorney?

20      A.  I got my license in 2001.  I would say between

21  2001 and 2006 or '07.

22      Q.  Was that with a law firm?

23      A.  No.  By myself.

24      Q.  What kind of law did you practice?

25      A.  Business, both transactional and litigation.

Shahin Jamea
July 26, 2023

14

1           MR. MACNAUGHTON:  Objection; 401,

2   relevance.

3      A.  Yes.

4      Q.  (BY MR. ALARCON)  When did you form Grant

5   Meadows, LLC?

6      A.  I don't recall.

7      Q.  Was -- did you create Grant Meadows, LLC, for

8   the purpose of entering into this transaction with my

9   client?

10      A.  No.

11      Q.  Okay.  So what -- what sort of business was

12   Grant Meadows doing before it entered into this

13   transaction with my client?

14      A.  Grant Meadows -- Grant Meadows is a holding

15   company that we use for transactions to enter into

16   contracts before we form the -- the entity that's

17   actually going to take an assignment of the contract and

18   close on the parcel.

19      Q.  I see.  Does Grant Meadows hold any assets long

20   term or is it just kind of a holding house for each

21   transaction until it all gets papered up?

22      A.  What you said.

23      Q.  Okay.  Did you form the transaction that would

24   have taken over this deal for the property that you were

25   buying from my client?

Shahin Jamea
July 26, 2023                                                    15

1      A.  You mean did I form the entity?

2      Q.  Yes.

3      A.  I believe we formed an entity called Ox

4  Midtown [sic] QOF, LLC, I think.  I'm not sure if that's

5  exactly right.

6      Q.  Ox Midtown what?

7      A.  I think it's Ox, O-X, Mid, M-I-D, QOF, LLC.

8  It's a Texas LLC.

9      Q.  Okay.  Who are the members of Grant Meadows,

10  LLC?

11      A.  I believe it's me and my brother.

12      Q.  Individually?

13      A.  Yes.

14      Q.  Your brother is PJ Jamea?

15      A.  His legal name is Pejman, P-E-J-M-A-N, same

16  last name.  He goes by PJ.

17      Q.  And who are the members of Ox Midtown [sic]

18  QOF, LLC?

19          MR. MACNAUGHTON:  Objection; relevance,

20  401.

21      A.  It -- it is just me.

22      Q.  (BY MR. ALARCON)  You said before you were an

23  attorney, you and your brother owned restaurants?

24      A.  Yes.

25      Q.  Are you still in the restaurant business?

EXHIBIT 2 PAGE 6 OF 18

Shahin Jamea
July 26, 2023                                                          20



1      Q.  I have a question about this e-mail before we

2   get back to the transaction.

3           So if you see at the top of this e-mail

4   chain, it is a response or a reply that you got from

5   Mr. Leong at IBC.  Right?  And then lower in the e-mail

6   chain is an e-mail from you to Mr. Leong.  Right?

7           MR. MACNAUGHTON:  So --

8      Q.  (BY MR. ALARCON)  And then even lower in the

9   e-mail chain is an e-mail from you to George Lee and

10  Sunny Bathija?

11     A.  Right.

12     Q.  Right.  So my question is -- well, I'll

13  represent to you that you only produced the top e-mail,

14  the one from Peter Leong to you.  You didn't produce the

15  e-mail from you to Mr. Leong or the e-mail from you to

16  George Lee and Sunny Bathija.  Do you know why those

17  e-mails weren't produced?

18     A.  I don't.

19     Q.  Did you do a search of your e-mails?

20     A.  We hired a company per your request to do the

21  search.

22     Q.  And who was the company?

23          MR. MACNAUGHTON:  Indexed, I-N-D-E-X-E-D.

24     A.  Indexed I/O.

25          MR. MACNAUGHTON:  Yeah, Indexed I/O.



1     Q.  (BY MR. ALARCON)  Do you have a practice of

2  deleting e-mails?

3            MR. MACNAUGHTON:  Objection; argumentative.

4     A.  No.

5     Q.  (BY MR. ALARCON)  So you wouldn't have deleted

6  these e-mails that you sent to George Lee and Sunny

7  Bathija and Peter Leong?

8            MR. MACNAUGHTON:  Objection; argumentative.

9     A.  Probably not.

10     Q.  (BY MR. ALARCON)  Okay.  So they should have

11  been produced?

12            MR. MACNAUGHTON:  Objection; argumentative.

13     A.  I guess it depends on your discovery request

14  but --

15     Q.  (BY MR. ALARCON)   So --

16            MR. MACNAUGHTON:  Objection; calls for

17  speculation as to the process.  Objection;

18  argumentative.

19     Q.  (BY MR. ALARCON)  So I don't know if you're

20  aware, but you produced approximately 960 e-mails.

21     A.  (Nodding head.)

22     Q.  You didn't produce a single e-mail in which you

23  were the sender.  Do you know why?

24            MR. MACNAUGHTON:  Objection; 701, calls for

25  speculation.

Shahin Jamea
July 26, 2023

22



1      A.  I don't.  Again, we just gave the search

2  parameters that you had to the Indexed company, and then

3  we just forwarded you the results.

4      Q.  (BY MR. ALARCON)  Okay.  You agree with me that

5  those e-mails should have been produced?

6            MR. MACNAUGHTON:  Objection; non- --

7  argumentative.

8      A.  Again, we gave your search terms to the company

9  that specializes in it, and whatever the response was,

10  we gave it to you.

11      Q.  (BY MR. ALARCON)  You gave them search terms?

12      A.  Whatever your request for production was, we

13  gave it to them, and we gave them access to my e-mail

14  account and they produced the documents they produced.

15      Q.  Okay.  Who are George Lee and Sunny Bathija?

16      A.  They're real estate investors that have

17  invested with us before.

18      Q.  Were you communicating with them so that they

19  would invest in this transaction?

20      A.  Yes.

21      Q.  Was this the only communication with them?

22      A.  I don't know.

23      Q.  Well, how extensive were the discussions about

24  them investing in this transaction?

25      A.  I don't recall.

1  the seller, and I understood he had some kind of an

2  issue with some access rights and something about

3  electricity, providing some kind of electricity by the

4  borrowers to your lender.

5     Q.  Right.  Okay.  So you don't remember when that

6  conversation took place?

7     A.  No.

8     Q.  Was it close to closing?

9     A.  I don't recall.  No, it was -- it was not close

10  to closing.  It was earlier.

11     Q.  Earlier, okay.  Did you exchange any e-mails

12  with the neighbor?

13     A.  I don't recall.

14     Q.  Okay.  So you didn't produce any e-mails with

15  the neighbor, but we subpoenaed the neighbor and he gave

16  us some e-mails that he had with you.  I'm going to --

17          MR. MACNAUGHTON:  So can we go off the

18  record for a second?

19          MR. ALARCON:  Sure.

20          THE VIDEOGRAPHER:  We're off the record at

21  12:02.

22          (Off the record.)

23          THE VIDEOGRAPHER:  We're back on the record

24  at 12:03.

25     Q.  (BY MR. ALARCON)  So as I was saying, we

Shahin Jamea
July 26, 2023

115

1      A.  Yes.

2      Q.  Is that your entity?

3      A.  Yes.

4      Q.  And the amount on the check matches the

5   invoice.  Right?

6      A.  Yes.

7      Q.  The third page is another invoice, and in the

8   description it says, "Cost to remove additional

9   facility."  Right?

10      A.  Yes.

11      Q.  The third page is an agreement.  This agreement

12   purports to be -- well, it says between Barry Espinosa.

13   Barry Espinosa works for you.  Right?

14      A.  Yes.

15      Q.  Is he your employee?

16      A.  Yes.

17      Q.  Okay.  Does he have any ownership?

18      A.  No.

19      Q.  Just a W-2 employee?

20      A.  Yes.

21      Q.  So that was scratched out, and my client's name

22   was written in.  Do you know if you did that?

23      A.  That looks like my handwriting.

24      Q.  Okay.  And then on the next page it was signed.

25   It says here that you're signing on behalf of my client.

Shahin Jamea
July 26, 2023

127

1      A.  No.

2      Q.  Do you remember if you had a conversation with

3   him on that day?

4      A.  No.

5      Q.  You don't know if he called you?

6      A.  No.

7      Q.  Do you remember having a phone call with him at

8   all around this time?

9      A.  I remember meeting him for coffee in Rice

10  Village.  I don't remember a phone call.

11      Q.  Did you tell Mr. Friedman that my client

12  removed the power pole?

13      A.  I don't recall.

14      Q.  Would you -- I mean, why would you have told

15  him that if you did?

16      A.  I don't recall.  I don't recall having a

17  conversation.  I definitely don't recall the content of

18  the conversation.

19      Q.  Okay.  Well, Mr. Friedman made notes of that

20  phone call.  I'm marking that as Exhibit 23 [sic].

21            (Exhibit No. 22 was marked.)

22            MR. MACNAUGHTON:  Object to this exhibit.

23  How is he going to prove the contents of this exhibit,

24  whether he's recognized it.  This, he was on a text

25  message on.  Those are notes with Mr. Friedman.  That's

1   applied to.

2      A.  No.

3      Q.  (BY MR. ALARCON)  He said you were hoping it

4   had been resolved because the last thing he, meaning

5   you, wants is to get into a situation where he's adverse

6   to us.

7      A.  Right.

8      Q.  Do you remember talking about that with

9   Mr. Friedman?

10     A.  No.

11     Q.  Okay.  You deny that this phone call took

12   place?

13     A.  (Shaking head.)

14        MR. MACNAUGHTON:  Objection; this document

15   does not state that there was a phone call that took

16   place.  Mischaracterization of the exhibit.

17     A.  I don't have a recollection of a phone call.

18     Q.  (BY MR. ALARCON)  Okay.  It says, "He said that

19   would be great, but asked what I knew about the

20   obligations in general because as he understands it, the

21   seller has recently removed the T-poles in the parking

22   lot."  That means transmission poles?

23        MR. MACNAUGHTON:  Objection; asks this guy

24   to speculate as to what these notes are from somebody

25   else.

Shahin Jamea
July 26, 2023

130

1     Q.  (BY MR. ALARCON)  Did you tell Mr. Friedman

2  that the seller had recently removed the T-poles?

3           MR. MACNAUGHTON:  Objection; it calls for

4  speculation as to this, and relates to the concept of

5  whatever these notes are for.

6     A.  I don't have a recollection.  I don't have a

7  recollection of a call.  I definitely don't have a

8  recollection of the content of the call.

9     Q.  (BY MR. ALARCON)  Okay.  The next bullet point

10  says, "I said I'd tell him everything I know on it,

11  which is," and he talks about certain obligations.

12  Okay?  And then the next bullet point down says, "Sean

13  reiterated about the seller having recently removed the

14  T-poles, in a way seeming to suggest that this removal

15  would mark the end of any post-closing obligations.  So

16  I asked him what the connection was between this removal

17  and these obligations."

18           Did you reiterate that my client had

19  recently removed T-poles?

20           MR. MACNAUGHTON:  Objection; this calls for

21  speculation.  It doesn't identify your client, it

22  doesn't identify the transaction that was involved, or

23  the property that was involved, and asks him to testify

24  about notes prepared by somebody else out of an

25  unexplained conversation or made-up conversation.

EXHIBIT 2 PAGE 14 OF 18

1   a running objection.

2           MR. ALARCON:  Okay.

3           THE WITNESS:  Robert, just in the interest

4   of time, let's agree to a running objection.

5      A.  Okay.

6      Q.  (BY MR. ALARCON)  So did you reiterate about

7   the seller having recently removed the T-poles?

8      A.  I don't recall having a conversation with this

9   guy.  I definitely don't recall the content of the

10  conversation.

11     Q.  Do you think Mr. Friedman would make something

12  like this up?

13     A.  I really don't know the guy that well.  I met

14  him twice.

15     Q.  Okay.

16     A.  No.  I met him three times.

17     Q.  The second to last bullet point says, "I said

18  that I wouldn't think removing the pole would remove

19  this obligation, and they would still be obligated to

20  provide temporary service when our building needs it.

21  But again, I'm happy to reach out to our attorneys for

22  an update.  He said, 'Great.  Please, and let me know.'"

23           You don't remember that?

24     A.  No.

25     Q.  Okay.  Can we go back to the text messages?

Shahin Jamea
July 26, 2023

133

1    A.  Yeah.

2    Q.  So, again, these notes are dated September 26,

3  2022, the day that you asked Mr. Friedman to call you

4  according to these text messages, and then a couple of

5  weeks later on October 12th, Mr. Friedman texts you,

6  Morning.  I've not been able to tie off with lawyer per

7  our discussion.  I was traveling, and this week he's had

8  big closings, but plan to talk late tomorrow.  Just

9  FYI."

10    A.  Okay.

11    Q.  Do you remember this?

12    A.  No.

13    Q.  Okay.  And then two days later he says, "Hey, I

14  talked to lawyer (Max).  He explained why obligations

15  run with property and responsibility of bank

16  (Knighthead?), even though foreclosed.  I asked him to

17  send in a letter to their lawyer.  Just FYI."

18    A.  That's what he says.

19    Q.  Right.  And then four days later, you asked him

20  to forward you the letter when it's out.  Right?

21    A.  Yes.

22    Q.  Do you know if he ever forwarded you that

23  letter?

24    A.  I don't.

25    Q.  You don't know, or no, he didn't?

EXHIBIT 2 PAGE 16 OF 18

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3  KH-REIT II FUNDING XXII,    )
    LLC                         )
 4       Plaintiff,             )
                                )
 5  v.                          ) CAUSE NO.: 4:22-CV-03730
                                )
 6  GRANT MEADOWS, L.L.C        )
       Defendant                )
 7

 8       ----------------------------------

 9           REPORTER'S CERTIFICATION

10       ORAL AND VIDEOTAPED DEPOSITION OF

11           SHAHIN "SEAN" JAMEA

12              JULY 26, 2023

13       ----------------------------------

14       I, Velma C. LaChausse, a Shorthand Reporter

15  and Notary Public in and for the State of Texas, do

16  hereby certify that the facts as stated by me in the

17  caption hereto are true; that the above and foregoing

18  answers of the witness, SHAHIN "SEAN" JAMEA, to the

19  interrogatories as indicated were made before me by the

20  said witness after being first duly sworn to testify the

21  truth, and same were reduced to typewriting under my

22  direction; that the above and foregoing deposition as

23  set forth in typewriting is a full, true, and correct

24  transcript of the proceedings had at the time of taking

25  of said deposition.
```

EXHIBIT 2 PAGE 17 OF 18

1        I further certify that I am not, in any

2   capacity, a regular employee of the party in whose

3   behalf this deposition is taken, nor in the regular

4   employ of his attorney; and I certify that I am not

5   interested in the cause, nor of kin or counsel to either

6   of the parties;

7        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

8   this, the 8th day of August, 2023.

9

10   _____

            Velma C. LaChausse

11            Notary Public in and for

         The State of Texas

12            My Commission Expires: 03-22-2026

         U.S. Legal Support, Inc.

13            Firm Registration No. 122

         16825 Northchase Drive

14            Suite 800

         Houston, Texas 77060

15            Phone: (713)653-7100

16

17

18

19

20

21

22

23

24

25

EXHIBIT 2 PAGE 18 OF 18

# EXHIBIT 3

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**SALE AGREEMENT**

**THIS SALE AGREEMENT** (the "**Agreement**"), dated as of March 31, 2022 (the "**Effective Date**"), is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows, L.L.C., a Texas limited liability company ("**Purchaser**").

**IN CONSIDERATION** of the respective agreements and covenants hereinafter set forth and for other good and valuable consideration, the receipt and the adequacy of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.    PURCHASE AND SALE

(a)    Property. Subject to the terms and conditions set forth herein, Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, for the Purchase Price, Seller's right, title and interest, if any, in and to the following:

(i)    Land. That certain real property located in the City of Houston, Harris County, Texas, being more particularly described on **Exhibit A** attached hereto, together with all rights, easements and interests appurtenant thereto and Seller's right, title and interest, if any, in any land lying in the bed of any streets or other public ways in front of or adjacent to said real property to the center line thereof (all of such property being hereinafter referred to as the "**Land**").

(ii)    Improvements. All improvements located on or under the Land, including, without limitation, any and all buildings, structures, facilities, amenities and other improvements constructed or located on or under the Land (all such improvements being hereinafter referred to collectively as the "**Improvements**").

(iii)    Intangible Property. All of the right, title and interest of Seller, if any, to plans, entitlements, site plans, surveys and specifications, architectural drawings, and permits issued in connection with the construction, use or occupancy of the Improvements, and any assignable warranties ("**Intangible Property**").

(iv)    All of Seller's right, title and interest in and to any other property interests belonging or appurtenant to the Land (all of the foregoing items, together with the Land, Improvements and Intangible Property are referred to herein collectively as the "**Property**").

2.    PURCHASE PRICE

(a)    Amount; Payment. The purchase price for the Property is FOURTEEN MILLION THREE HUNDRED SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($14,375,000.00) (the "**Purchase Price**"). The Purchase Price shall be payable as follows:

(i)    An initial deposit in an amount equal to ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00) (the "**Initial Deposit**") shall be paid by Purchaser to Escrow Agent, as provided in Section 3;

(ii)    A second deposit in an amount equal to FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) shall be paid by Purchaser to Escrow Agent, as provided in Section 3 (the "**Second Deposit**"); and

**EXHIBIT 3 PAGE 1 OF 44**

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(iii)    the balance of the Purchase Price shall be paid by Purchaser to Seller at the Closing (as defined herein) in immediately available funds.

3.    <u>DEPOSIT; ESCROW TERMS</u>

(a)    <u>Deposit</u>.  Within two (2) business days after the Effective Date, Purchaser shall wire the Initial Deposit in immediately available funds to the account of Fidelity National Title Insurance Company ("**Escrow Agent**"), whereupon Escrow Agent shall receipt the Initial Deposit and then immediately release it to Seller (it being acknowledged and agreed that, upon its release to Seller, the Initial Deposit shall be non-refundable for all purposes except as expressly provided herein). Additionally,  no later than ninety (90) days after the Effective Date, Purchaser shall wire the Second Deposit in immediately available  funds to the account of Escrow Agent.  Both the Initial Deposit and the Second Deposit (collectively, the "**Deposit**") shall be earnest money hereunder, and Escrow Agent shall deposit the Second Deposit in an interest-bearing escrow account.  TIME IS OF THE ESSENCE WITH RESPECT TO THE DELIVERY OF BOTH THE INITIAL DEPOSIT AND THE SECOND DEPOSIT UNDER THIS AGREEMENT.  The Deposit, in its entirety, shall be non-refundable, except as expressly otherwise set forth in this Agreement.

(b)    <u>Escrow Terms</u>:

(i)    <u>General</u>.  Escrow Agent shall have no duties or responsibilities  except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement, unless the same is in writing and signed by both Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, by Escrow Agent.  Any fees of Escrow Agent shall be borne equally by Seller and Purchaser.

(ii)    <u>Delivery</u>.  Escrow Agent shall disburse or apply the Deposit in accordance with this Agreement.

(iii)    <u>Holding Deposit Pending a Dispute</u>.  Except as expressly provided in this Agreement, if the Closing has not timely occurred, Escrow Agent shall not pay any portion of the Deposit to either party unless (1) the party claiming to be entitled thereto gives notice of such entitlement to Escrow Agent and to the other party, including an affidavit containing the facts on which such claim is based, and (2) the other party does not, within five (5) days after receipt (or deemed receipt) of such notice, give notice to Escrow Agent that it disputes the claim of the first party.  If Escrow Agent receives notice within such five-day period of a dispute regarding the claim of entitlement to the Deposit, Escrow Agent shall continue to hold the Deposit in escrow and shall not pay such amounts to either party until such dispute is finally resolved by written agreement signed by both parties or by final unappealable order of a court of competent jurisdiction.  When such dispute is so resolved, Escrow Agent shall pay the Deposit, to the party or parties entitled thereto pursuant to such final resolution.  However, Escrow Agent shall also have the right, at any time after a claim of entitlement is disputed, to deposit the Deposit, with the applicable court of competent jurisdiction, in which event Escrow Agent shall give notice of such deposit into court to Seller and Purchaser and Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(iv)    <u>Stakeholder</u>.  Escrow Agent is acting solely as stakeholder at the request of Seller and Purchaser and for their convenience, and Escrow Agent shall not be deemed to be the agent of either of the parties.

(v)    <u>Reliance upon Instruments</u>.  Escrow Agent may rely and act upon any instrument or other writing believed by it to be genuine and purporting to be signed and presented by any person purporting to have authority to act on behalf of Seller or Purchaser, as the case may be.

- 2 -

EXHIBIT 3 PAGE 2 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(vi)   Responsibility.  Escrow Agent shall not be responsible in any manner for the validity or sufficiency of any securities, cash, instruments, letters of credit, documents, or any other property delivered hereunder, or for the value or collectability of any note, check, letter of credit or other instrument or security so delivered, or for any diminution in value of any investment made by Escrow Agent.  Nothing herein contained shall be deemed to obligate Escrow Agent to deliver any securities, cash instruments, letters of credit, documents or any other property referred to herein, unless the same shall have been received by Escrow Agent pursuant to this Agreement or a separate written agreement.

(c)   Resignation.  Escrow Agent may at any time resign upon five (5) business days' notice to Seller and Purchaser.  Seller and Purchaser shall jointly select a successor escrow agent and shall notify Escrow Agent of the name and address of such successor within five (5) business days after receipt of notice of Escrow Agent's intent to resign.  If Escrow Agent has not received notice of the name and address of its successor within such period, Escrow Agent may select on behalf of Seller and Purchaser a bank or trust company to act as its successor, for such compensation as such bank or trust company shall reasonably require of Seller and Purchaser.  At any time after such five-business day period, Escrow Agent shall deliver the Deposit to its successor as selected hereunder, and upon such delivery the successor escrow agent shall become Escrow Agent for all purposes of this Agreement and it shall have all the rights and obligations of Escrow Agent pursuant to this Agreement, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(d)   Acknowledgment.  By execution of this Agreement, Escrow Agent only agrees to the terms of this Section 3 and is not binding itself otherwise as a party to this Agreement.

(e)   Survival.  The provisions of this Section 3 shall survive the Closing or the earlier termination of this Agreement.

4.   THIRD-PARTY MATERIALS; ACCESS

(a)   Responsibility for Materials Prepared by Third Parties.  Purchaser acknowledges Seller, its agents, and/or its attorneys have not made and will not make, nor shall Seller, its agents, its brokers, its principals and/or its attorneys be deemed to have made, any warranty or representation, express or implied, as to the accuracy or completeness of any materials provided from Seller to Purchaser which have been prepared by third parties; provided, however, that Seller represents and warrants that it is providing true and correct copies of such materials in its actual possession. Without limiting the generality of the foregoing provisions, Purchaser acknowledges and agrees that (i) any environmental or other report with respect to the Property which is delivered by Seller to Purchaser shall be for general informational purposes only, (ii) Purchaser shall not have any right to rely on any such report delivered by Seller to Purchaser, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Purchaser with respect thereto, and (iii) neither Seller, any affiliate of Seller nor the person or entity which prepared any such report delivered by Seller to Purchaser shall have any liability  to Purchaser for any inaccuracy in or omission from any such report.

(b)   Access. Purchaser shall not be permitted to enter upon the Property unless Purchaser has first delivered written notice to Seller at least one (1) business day in advance of Purchaser's intended visit.  Prior to any entry by Purchaser or its agents, representatives or contractors onto the Property, Purchaser shall provide or cause to be provided to Seller evidence reasonably satisfactory to Seller that Purchaser or its agents, representatives or contractors has in force adequate liability  and worker's compensation insurance with coverage of not less than One Million Dollars ($1,000,000), to protect Seller against any and all liability, claims, demands, damages and costs (including attorneys' fees, costs and expenses) which may occur as a result of any activity of Purchaser or its agents, representatives or contractors. Purchaser shall (i) immediately pay or cause to be removed any liens filed against the Property as a result of any actions taken above by or on

EXHIBIT 3 PAGE 3 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

behalf of Purchaser; (ii) immediately repair and restore the Property to its condition existing immediately prior to the entry thereon by Purchaser or any of Purchaser's agents, representatives or contractors; and (iii) shall indemnify, defend and hold Seller harmless from and against all claims, damages, or losses incurred to the Property or to or by anyone on the Property ("**Claims**") as a result of the actions taken above by Purchaser, or any of Purchaser's agents, representatives or contractors, or any persons performing inspection activities or other activities on their behalf, provided, however, Purchaser shall not indemnify Seller against any (1) Claims caused by Seller or any of its agents', employees' or representative's negligence or willful misconduct, (2) Claims arising out of conditions that were present before Purchaser or Purchaser's agents, representatives or contractors entered the Property, (3) the results or finding of any inspection, unless such claim, demand, cause of action, loss, cost, liability, and/or expense is caused by Purchaser or any of Purchaser's agents, representatives or contractors activities on the Property, (4) the diminution in value in the Property arising from or relating to matters merely discovered by Purchaser or any of Purchaser's agents, representatives or contractors or to the extent that it becomes necessary for Purchaser or any of Purchaser's agents, representatives or contractors to report such discovered environmental findings to any public agency as may be required by any applicable environmental laws or regulations, or (5) damage to the Property or any portion thereof caused by anyone other than Purchaser or any of Purchaser's agents, representatives or contractors. The terms, conditions and obligations of this subsection (b) shall survive any termination of this Agreement.

5.    <u>CLOSING</u>

(a)    <u>Closing Date</u>.  The consummation of the transactions described herein (the "**Closing**") shall occur on the date that is one-hundred fifty (150) days following the Effective Date (such date on which the Closing occurs, the "**Closing Date**").  The Closing shall occur through an "escrow closing", in the offices of Escrow Agent, utilizing overnight courier delivery of originally executed documents to Escrow Agent. **TIME SHALL BE OF THE ESSENCE** with respect to Purchaser's obligation to close the transaction contemplated hereunder on or before the Closing Date.

(b)    <u>Purchaser Deliveries</u>.  At the Closing, Purchaser shall fully execute and acknowledge, if necessary, and deliver to Seller the following:

(i)    the balance of the Purchase Price, after giving effect to the cost allocations specified in this Agreement, by confirmed wire transfer of immediately available funds to Escrow Agent;

(ii)    a Bill of Sale and Assignment of Warranties substantially in the form attached hereto as **Exhibit D**;

(iii)    a settlement statement detailing the allocation of costs, expenses, and applicable credits between Seller and Purchaser as provided in this Agreement; and

(iv)    any additional documents that Escrow Agent may reasonably require for the consummation of the transaction contemplated by this Agreement.

(c)    <u>Seller Deliveries</u>.  At the Closing, Seller shall fully execute and acknowledge, if necessary, and deliver to Purchaser the following:

(i)    a deed for the Property, in the form attached hereto as **Exhibit B** (the "**Deed**"), conveying the Property to Purchaser;

(ii)    a certificate, substantially in the form attached hereto as **Exhibit C**, with respect to Section 1445(a) of the Internal Revenue Code of 1986, as amended, relating to the Foreign Investors Real Property Tax Act;

- 4 -

EXHIBIT 3 PAGE 4 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(iii)     counterparts of the Bill of Sale and Assignment of Warranties;

(iv)     an owner's title affidavit in customary form reasonably acceptable to Seller and Escrow Agent (the "**Title Affidavit**");

(v)     a settlement statement detailing the allocation of costs, expenses, and applicable credits between Seller and Purchaser as provided in this Agreement; and

(vi)     any additional documents that Escrow Agent may reasonably require for the consummation of the transaction contemplated by this Agreement.

(d)     <u>Exceptions to Title</u>.  Purchaser is in receipt of a commitment for title insurance relating to the Property, dated effective March 21, 2022, a copy of which is attached hereto and incorporated herein by reference as <u>Schedule 5(d)</u> (the "**Title Commitment**").  Purchaser shall have the right, on or before the twenty-fifth (25th) day after the Effective Date, to provide written notification to Seller and Escrow Agent ("**Objection Notice**") of any objections it has to the Title Commitment and survey, if any, of the Property (a "**Title Objection**").  If Purchaser fails to timely deliver an Objection Notice as provided above, all exceptions and other matters appearing on any survey of the Property or existing of record shall be deemed accepted by Purchaser and included as Permitted Title Exceptions.  If Purchaser timely delivers an Objection Notice, Seller, in Seller's sole discretion, may elect (but shall have no obligation to, attempt to remove or cure such Title Objections or matters on or prior to Closing.  Seller shall be deemed to have given notice to Purchaser that Seller refuses to attempt to cure any such Title Objection or matter, which Seller may so do in its sole discretion, unless Seller, within five (5) days after Seller's receipt of an Objection Notice for the Property, notifies Purchaser in writing (each, a "**Seller's Title Notice**") that Seller will either attempt or refuse to cure such Title Objections or matters.  If any Seller's Title Notice indicates that Seller refuses to cure said Title Objections (or if Seller does not deliver a Seller's Title Notice, such failure being deemed a refusal), Purchaser may, at its option and as its sole and exclusive remedy, (i) terminate this Agreement by giving written notice thereof to Seller and Escrow Agent (provided that notice of termination is given not later than two (2) business days after the earlier of its receipt of Seller's Title Notices or the expiration of the date by which Seller's Title Notice was to otherwise be provided, time being of the essence as to such date), and in such event, the Deposit shall be returned to Purchaser and this Agreement shall be of no further force and effect (subject, however, to any obligations expressly stated to survive the termination or expiration of this Agreement); or (ii) waive such Title Objections and accept that title to the Property is subject thereto, in which event there shall be no reduction in the Purchase Price.  If Purchaser does not give such notice within such 2- business day period, time being of the essence with respect to the giving of such notice, Purchaser shall be deemed to have waived its right to object to such Title Objection or matter and shall be obligated to close in accordance with this Agreement.  Any Title Objections or matters so waived (or deemed waived) by Purchaser shall be deemed to constitute Permitted Title Exceptions.  Notwithstanding whether or not Purchaser provides any Objection Notice, Seller shall be obligated to provide to the Title Company a Title Affidavit acceptable for purposes of causing Item 6 of Schedule C to be removed from the Title Commitment.  Whether or not Purchaser furnishes any Objection Notice to Seller pursuant this Section 5(d), Purchaser may, at or prior to Closing, obtain updates of the Title Commitment and Survey and notify Seller in writing of any objections to the Title Commitment or Survey first raised by (i) the surveyor between the effective date of the Survey and Closing, or (ii) the Escrow Agent the effective date of the Title Commitment and Closing.  With respect to any Objection Notice to the Title Commitment or Survey set forth in any such notice, Seller will have the same option to cure and Purchaser will have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any Objection made by Purchaser before Closing.

EXHIBIT 3 PAGE 5 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(e)    Condition of Property.  At the Closing and except as expressly provided in this Agreement to the contrary, the Property and possession thereof shall be delivered to Purchaser "AS IS, WHERE IS AND WITH ALL FAULTS".

6.    CONDITIONS OF CLOSING

(a)    Seller's Obligation to Close.  Seller's obligation to close hereunder is conditioned on all of the following, which may be waived by Seller by an express written waiver, at its sole option:

(i)    Representations and Warranties.  All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects on and as of the Effective Date and on the Closing Date, as if made on and as of such date; and

(ii)    Purchaser's Deliveries Complete.  Purchaser shall have delivered the funds required hereunder and all of the documents to be executed by Purchaser set forth in Section 5(b) and shall have performed all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement, to be performed or complied with by Purchaser at or prior to the Closing.

(b)    Purchaser's Obligation to Close.  Purchaser's obligation to close hereunder is conditioned on all of the following, which may be waived by Purchaser by an express written waiver, at its sole option:

(i)    Representations and Warranties.  All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of the Effective Date and on the Closing Date, as if made on and as of such date;

(ii)    Title Policy.  Escrow Agent shall be unconditionally committed to issue a title insurance policy in the amount of the Purchase Price insuring good and indefeasible title to the Property, subject only to the Permitted Title Exceptions; and

(iii)    Seller's Deliveries Complete.  Seller shall have delivered all of the documents and other items required under Section 5(c) and shall have performed all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement, to be performed or complied with by Seller at or prior to the Closing.

If any of the above-described conditions precedent to Purchaser's obligations hereunder is not satisfied, Purchaser may, at its option, (1) waive such condition and close this transaction, (2) extend Closing for a period of time not to exceed five (5) days in the aggregate in order to satisfy the conditions precedent, or (3) terminate this Agreement by notice in writing to Seller, in which event Purchaser shall be refunded the Deposit, this Agreement shall terminate, and, except as otherwise provided in this Agreement, neither Purchaser nor Seller shall have any further liability or obligation under this Agreement.

7.    REMEDIES

(a)    Breach

(i)    If there is a material breach by Seller of this Agreement which remains uncured for more than ten (10) days after receipt of written notice from Purchaser describing the default, then Purchaser's sole and exclusive remedy shall be to either, at Purchaser's election: (1) seek specific performance of any of Seller's obligations under this Agreement, or (2) terminate this Agreement by notifying Seller thereof, whereupon neither party hereto shall have any further rights or obligations hereunder.  Upon any such termination, the Deposit shall be promptly refunded to Purchaser, and except as

- 6 -

EXHIBIT 3 PAGE 6 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

otherwise expressly provided herein, no party hereto shall have any further rights or obligations under this Agreement. IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER FOR PUNITIVE, SPECULATIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES.

(ii)     If there is a material breach by Purchaser of this Agreement which remains uncured for more than ten (10) days after receipt of written notice from Seller describing the default, then Seller's sole and exclusive remedy shall be to terminate this Agreement upon notice to Purchaser and Escrow Agent, whereupon the Deposit shall be paid to Seller and Seller shall have no other rights or remedies against Purchaser hereunder except as expressly set forth herein.  Purchaser agrees that the delivery of the Deposit to Seller is liquidated damages to recompense Seller for time expended, labor and services performed and the loss of its bargain, and Seller waives any and all equitable remedies, including without limitation the right to specific performance of this Agreement. Purchaser and Seller agree that it would be impractical or extremely difficult to affix damages if Purchaser so defaults and that the Deposit, together with interest thereon, represents a reasonable estimate of Seller's damages.  Seller agrees to accept the Deposit as Seller's total damages and relief if Purchaser defaults in its obligations hereunder. If Purchaser does so default, Purchaser shall have no further right, title, or interest in or to the Property.

(b)     Survival.  This Section 7 shall survive the termination of this Agreement.

8.     WARRANTIES, REPRESENTATIONS AND COVENANTS

(a)     Purchaser's Representations.  Purchaser warrants, represents and covenants to Seller as of the date hereof and on and as of the Closing Date that Purchaser (i) is a duly constituted limited liability company, validly existing and in good standing in the State of its organization; (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action to authorize the execution and performance of this Agreement and the consummation of the transactions contemplated herein; (iii)  has the financial resources to consummate the transaction contemplated herein and pay the Purchase Price; and (iv) is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

(b)     Seller's Representations.  Seller warrants, represents and covenants to Purchaser as of the date hereof and on and as of the Closing Date that:

(i)     Seller is a duly constituted limited liability company validly existing and in good standing in the State of its organization;

(ii)     Seller has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action to authorize the execution and performance of this Agreement and the consummation of the transactions contemplated herein;

(iii)     the execution and performance of this Agreement does not in any manner conflict with any other agreement to which Seller is a party;

(iv)     Seller is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States;

- 7 -

EXHIBIT 3 PAGE 7 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(v)     Seller has not received written notice regarding any condemnation or similar proceeding affecting the Property, and, to the best of Seller's knowledge, no such proceeding is contemplated; and

(vi)     Seller has not sold, transferred, conveyed, or entered into any agreement regarding air rights, utility rights (including capacity, credits, or reimbursements) or development rights or restrictions relating to the Property, except as may be provided in the Property Documents or as shown in the Title Report.

(vii)     To the current, actual knowledge of Seller, without duty of inquiry or investigation, there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws contemplated or filed by Seller, or pending against Seller; and

(viii)     The City of Houston ("**City**") has notified Seller that a portion of the construction fence surrounding the Property encroaches onto the City right-of-way and that the City has required removal of such fence. Seller shall remedy such encroachment, at its sole cost and expense, prior to the Closing Date. In the event that Seller has not received written notice from the City evidencing the City's satisfaction of the removed encroachment, Purchaser shall receive a $25,000.00 credit at Closing in order to remedy the encroachment post-Closing.

(c)     Purchaser's Acknowledgments.  As a material part of the consideration for this Agreement, Purchaser acknowledges that it is accepting the Property as of the Closing Date subject to the foregoing representations and warranties of Seller, the conveyance documents and this Agreement, but otherwise "AS IS, WHERE IS AND WITH ALL FAULTS."  Purchaser acknowledges that except as otherwise expressly provided in this Agreement or the conveyance documents, Seller, its agents, its principals, its brokers and/or its attorneys have not made and will not make, nor shall Seller, its agents, its principals, its brokers and/or its attorneys be deemed to have made, any warranty or representation, express or implied as to any matter including, without limitation, (i) the fitness, design or condition of the Property for any particular use or purpose, (ii) the quality of the material or workmanship therein, (iii) the existence of any defect, latent or patent, (iv) except as may be expressly provided herein to the contrary, Seller's title thereto which is being conveyed subject to the Permitted Title Exceptions, (v) value, (vi) compliance with specifications, (vii) location, (viii) use, (ix) condition, (x) merchantability, (xi) quality, (xii) description, (xiii) durability, (xiv) operation, or (xv) the existence of any hazardous substance.  Subject to the foregoing representations and warranties of Seller, Purchaser further acknowledges that Seller, its agents, its principals, its brokers and/or its attorneys have not made any representations or warranties with respect to environmental conditions on or affecting the Property, including (1) whether the Property has been or is contaminated by or with, or has or is contaminating or has or is contributing to the contamination of any other property with, any substance in any manner which could require remediation under any law or regulation, including local, state, federal or common law, (2) whether the Property contains or has ever contained any environmentally sensitive areas in which development could be precluded or limited under any law or regulation, including local, state, federal or common law, or wetlands or flood plains regulations or laws, (3) whether the Property contains or has ever contained any underground tanks or substances of any kind, including asbestos or polychlorinated biphenyls, whose removal or disposal is subject to or has ever been subject to special regulations under any law or regulation, including local, state, federal or common law, or (4) whether any activities on the Property have been conducted or are being conducted in violation of any laws concerning the handling of any materials by reason of the hazardous or toxic characteristics of such materials or the disposal of any wastes, the discharge of any materials into the soil, air, surface, water, or groundwater, or the conducting of activities in environmentally sensitive areas. If any defect or deficiency in any portion of the Property of any nature, whether latent or patent, Seller, its agents, its principals, its brokers and/or its attorneys shall not have any responsibility or liability with respect thereto or for any incidental or

- 8 -

EXHIBIT 3 PAGE 8 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

consequential damages (including strict liability in tort), unless directly caused or arising from the acts or omissions of Seller, its agents, its principals, its brokers and/or its attorneys. Subject to Seller's express obligations under this Agreement, Purchaser, for itself and any entity affiliated with Purchaser, hereby waives and releases Seller, its agents, its brokers, its principals and/or its attorneys from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, existing and future, contingent or otherwise (INCLUDING ANY ACTION OR PROCEEDING, BROUGHT OR THREATENED, OR ORDERED BY ANY APPROPRIATE GOVERNMENTAL ENTITY) MADE, INCURRED, OR SUFFERED BY PURCHASER OR ANY ENTITY AFFILIATED WITH PURCHASER RELATING TO THE PRESENCE, MISUSE, USE, DISPOSAL, RELEASE OR THREATENED RELEASE OF ANY HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTES AT THE PROPERTY AND ANY LIABILITY OR CLAIM RELATED TO THE PROPERTY ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, THE RESOURCE CONSERVATION AND RECOVERY ACT, AND THE TOXIC SUBSTANCE CONTROL ACT, ALL AS AMENDED, OR ANY OTHER CAUSE OF ACTION BASED ON ANY OTHER STATE, LOCAL, OR FEDERAL ENVIRONMENTAL LAWS, RULE OR REGULATION, EXCEPT TO THE EXTENT DIRECTLY CAUSED OR ARISING FROM THE ACTS OR OMMISSION OF SELLER, ITS AGENTS, ITS PRINCIPALS, ITS BROKERS AND/OR ITS ATTORNEYS.

Purchaser acknowledges that Seller may or may not have undertaken an independent analysis of the historical and projected financial condition and performance of the Property ("**Seller's Financial Analysis**") and that Seller's Financial Analysis, if any, constitutes proprietary and confidential information of Seller. Purchaser therefore acknowledges that Seller has not provided Seller's Financial Analysis, if any, to Purchaser. Purchaser has conducted to its satisfaction its own independent analysis of the historical and projected financial condition and performance of the Property and, in making the determination to proceed with the transactions contemplated by this Agreement, has relied solely on the results of its own independent analysis and the representations and warranties of Seller expressly set forth in this Agreement. Purchaser acknowledges and agrees that neither Seller nor any other person has made any guarantee, representation or warranty, express or implied, as to the historical or projected financial condition or performance of the Property (or any part thereof) or other matters that are not included in this Agreement. Except as otherwise provided in this Agreement or the conveyance documents, neither Seller nor any other person shall have any liability or responsibility whatsoever to Purchaser or its members, managers, directors, officers, employees, affiliates, controlling persons, agents, advisors or representatives, or any other person, on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made, to Purchaser or its directors, officers, employees, affiliates, controlling persons, advisors, agents or representatives (or any omissions therefrom).

(d)     Seller Covenants. Seller agrees that it shall continue to operate and manage the Property in substantially the same manner in which Seller has previously operated and managed the Property. Seller further agrees that, from and after the Effective Date and continuing through Closing, Seller shall reasonably cooperate with Purchaser (at Purchaser's sole liability and expense) in connection with Purchaser's applications for and pursuit of utility capacity letters, pre-plat approval requests, and building permit applications relating to the Property, and Seller shall join in such applications, as necessary, so long as the sought-after entitlements do not become effective until Closing. Seller shall respond to such request within forty-eight (48) hours prior notice from Purchaser. Prior to Closing, Seller shall not: (i) enter into any leases, licenses, or other occupancy agreements; or (ii) enter into any service contract or other contract or agreement pertaining to the Property, or any portion thereof which cannot be terminated without premium or penalty on or before the Closing Date without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

- 9 -

EXHIBIT 3 PAGE 9 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(e)     Limitation of Liability.

(i)     Notice is hereby given that all persons dealing with Seller shall look solely to the assets of Seller for the enforcement of any claim against Seller and none of the members, directors, trustees, officers, employees, agents, shareholders or principals of Seller or its affiliates assume any personal liability for obligations entered into by or on behalf of Seller. Likewise, notice is hereby given that all persons dealing with Purchaser shall look solely to the assets of Purchaser for the enforcement of any claim against Purchaser and none of the directors, trustees, officers, employees, shareholders or principals of Purchaser assume any personal liability for obligations entered into by or on behalf of Purchaser.

(ii)    Subject to Seller's notice and cure rights as provided in Section 7(a) of this agreement, Purchaser's sole remedy with respect to a violation of a representation or warranty by Seller contained in Section 8 of this Agreement of which Purchaser has knowledge prior to the Closing shall be either (1) to terminate this Agreement by delivering written notice to Seller and Escrow Agent, whereupon the Deposit shall be returned to Purchaser, this Agreement shall terminate, and none of the parties to this Agreement shall have any further rights or obligations hereunder (other than any such rights or obligations that are expressly stated in this Agreement to survive the termination thereof), or (2) to close the transaction contemplated hereby (without any abatement of the Purchase Price or allowance of any kind), in which event Purchaser shall be deemed to have waived any violation of such representation. If Purchaser fails to deliver a termination notice to Seller and Escrow Agent on or prior to the Closing Date, then Purchaser shall proceed to Closing in accordance with the terms hereof and Seller shall not have any liability whatsoever to Purchaser with respect to any such misrepresentation of which Purchaser has knowledge, or is deemed to have knowledge, as of the Closing Date. For purposes of this Section 8, Purchaser shall be deemed to have "knowledge" of any information relating to the Property that is delivered to Purchaser or its representatives in writing or is otherwise made available to Purchaser or its representatives in writing or electronically (including via any website or e-room on which documents and other information may be viewed), at any time prior to the Closing Date, either by or on behalf of Seller, or any partner, member, director, officer, employee, agent or counsel of Seller.

(iii)    With respect to a violation of a representation by Seller contained herein or made pursuant hereto of which Purchaser does not have knowledge until after the Closing, Purchaser may exercise any rights and remedies available at law or in equity; provided, however, that Seller's liability hereunder shall in no event exceed $50,000.00, and all claims by Purchaser against Seller hereunder shall be made no later than sixty (60) days after the Closing Date; and, provided, further, in no event shall Purchaser have the right to make a claim for or collect any consequential, punitive or indirect damages from Seller and Purchaser waives any and all such rights.

9.     CASUALTY AND CONDEMNATION

If all or any portion of the Property is destroyed or materially damaged, or if condemnation proceedings are commenced against any portion of the Property, Purchaser may elect to terminate this Agreement by notifying Seller in writing of such electing within five (5) business days after receipt of notice of such event from Seller in which event the Deposit shall be returned to Purchaser. If Purchaser elects to proceed with the transaction, all proceeds of insurance or condemnation awards payable to Seller by reason of such damage or condemnation, if any, shall be paid or assigned to Purchaser at Closing. This Section 9 shall contain Purchaser's sole remedies as against Seller in the event of any casualty or condemnation.

EXHIBIT 3 PAGE 10 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

10.   <u>BROKERS</u>

     Purchaser and Seller each represents to the other that it has not dealt with any party acting as a broker or sales agent in connection with the transactions described in this Agreement other than Oxberry Group, as a representative of Purchaser ("**Purchaser's Broker**"), and Jones Lang Lasalle, as a representative of Seller ("**Seller's Broker**"). Purchaser's principals may have an ownership and/or managerial interest in Purchaser's Broker. Seller shall pay a commission to Seller's Broker pursuant to a separate written agreement between Seller and Seller's Broker. Additionally, Seller shall pay a commission to Purchaser's Broker in an amount equal to four percent (4%) of the Purchase Price.  No commission will be earned if the transaction fails to close and neither broker will be entitled to any portion of the Deposit that may be retained by Seller. Seller's Broker and Purchaser's Broker shall have no third-party rights and under no circumstances shall Seller have any obligations to Seller's Broker or Purchaser's Broker, except as provided herein. If any other person shall assert a claim to a finder's fee, brokerage commission or other compensation on account of alleged employment as a finder or broker or performance of services as a finder or broker in connection with the transaction, the party under whom the finder or broker is claiming shall indemnify, defend, and hold harmless the other party and such party's affiliates for, from and against any and all losses, all claims, expenses, fees or costs, including reasonable attorneys' fees and disbursements, in connection with such claim or any action or proceeding brought on such claim. The provisions of this <u>Section 10</u> shall survive the Closing or termination of this Agreement.

11.   <u>NOTICES</u>

     Any notice, demand, request or other communication required to be given pursuant to the terms hereunder shall be in writing and (i) sent by certified mail, return receipt requested, (ii) hand-delivered, with receipt acknowledged, (iii) sent by overnight courier, with receipt acknowledged, or (iv) transmitted by electronic mail (e.g. email), and addressed to the party to receive the notice at the following addresses:

| | |
|---|---|
| If to Seller: | KH-REIT II FUNDING XXII, LLC |
| | 777 W. Putnam Ave. |
| | 3rd Floor, Suite B-2 |
| | Greenwich, CT 06830 |
| | Attention: Jonathan Daniel and Laura Torrado |
| | Email: jdaniel@knightheadfunding.com |
| | ltorrado@knighthead.com |
| | |
| with copies to: | Hajjar Peters LLP |
| | 3144 Bee Caves Road |
| | Austin, TX 78746 |
| | Attention: Josh Bernstein |
| | Telephone: (512) 637-4956 |
| | Email: jbernstein@legalstrategy.com |
| | |
| If to Purchaser: | Grant Meadows, L.L.C. |
| | 2429 Bissonnet Street Suite 615 |
| | Houston, TX 77005 |
| | Attention: Shahin "Sean" Jamea |
| | Telephone: 713-343-6152 |
| | Email: sjamea@oxberrygroup.com |
| | |
| with copies to: | Wilson Cribbs + Goren |
| | Attention: Travis L. Huehlefeld |

EXHIBIT 3 PAGE 11 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

2500 Fannin Street
Houston, TX 77002
Telephone: (713) 222-9000
Email: thuehlefeld@wcglaw.com

If to Escrow Agent:                    Fidelity National Title Insurance Company
Attn: Lolly Avant
1900 West Loop South, Suite 200
Houston, Texas 77027
Telephone: (713) 621-9960
E-mail: lavant@fnf.com

Either party (or Escrow Agent) may change its address for notices by giving written notice to the other party and Escrow Agent, or, in the case of Escrow Agent, to both parties, as aforesaid.  Any notice shall be deemed received on the day received or receipt is refused.  Inability to deliver because of changed address of which no notice was given shall be deemed a receipt of such notice.

12.    MISCELLANEOUS

(a)    Entire Agreement; Amendments.  This Agreement constitutes the complete and final expression of the agreement of the parties hereto and supersedes all previous agreements, either oral or written, with respect to the Property and the transactions described herein.  This Agreement may not be modified, amended, discharged or terminated, nor may any of the obligations of the parties hereunder be waived, except by a written instrument executed by the parties hereto.

(b)    Permitted Assignment of Agreement.   The terms, conditions and covenants of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective nominees, successors, beneficiaries and permitted assignees.  Neither Purchaser nor Seller may transfer, assign or encumber this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; provided, however, that Purchaser may assign its rights hereunder to one or more single purpose entities wholly owned or managed by Purchaser or its principals  upon written notice to Seller given at least five (5) days prior to the Closing Date. The original Purchaser shall remain primarily liable  under this Agreement notwithstanding such assignment.

(c)    No Recording.  Purchaser shall not (i) record, or attempt to record, this Agreement  or a memorandum hereof or (ii) place, or attempt to place, a vendee's lien upon the Property.  The provisions of this Section 12(c) shall survive the termination of this Agreement.

(d)    Parties' Expenses.  Seller and Purchaser shall pay their own respective expenses, costs and fees (including attorneys' fees and disbursements) incurred in connection with the negotiation, preparation, execution and delivery of this Agreement, and any third party reports, except as otherwise expressly provided herein.  Seller and Purchaser shall each pay one-half (1/2) of the fees of Escrow Agent.  Seller shall pay for the cost of the standard owner's policy of title insurance to be issued pursuant to the Title Commitment, real estate transfer taxes (if any), title search costs, and the cost to record releases of any lien created by or at the direction of Seller. Purchaser shall pay the premium for extended coverage and any title insurance endorsements desired by Purchaser, all costs in connection with its mortgage loan, if applicable, and  the cost of any Phase I environmental site  assessment, property condition assessment, and other inspections of the Property Purchaser elects to perform. All other closing costs and expenses shall be paid in accordance with the customs of the State in which the Property is located.

- 12 -

EXHIBIT 3 PAGE 12 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(e)    Prorations.  All real estate taxes, and all other public or governmental charges and public or private assessments against the Property which are or may be payable on an annual basis (including metropolitan district, sanitary commission, benefit charges, liens or encumbrances for sewer, water, drainage or other public improvements whether completed or commenced on or prior to the date hereof or subsequent thereto), shall be adjusted and prorated between the parties as of the day prior to Closing and shall thereafter be assumed and paid by Purchaser, whether or not assessments have been levied as of the date of Closing.  Any tax proration based on an estimate may be subsequently readjusted at the request of either party upon receipt of a tax bill.  The obligation to adjust shall survive Closing for one-hundred twenty (120) days.  If this sale or Purchaser's use of the Property after closing results in additional assessments for periods before Closing, including any roll back type of assessments and any penalties related thereto, the assessments will be the obligation of Purchaser.

(f)    Construction; Headings.  When used herein, the term "including" shall mean "including without limitation" unless otherwise specifically provided; all other language in this Agreement shall be construed simply according to its fair meaning, and not strictly for or against any of the parties hereto.  The headings in this Agreement are for convenience only, and are not to be utilized in construing the content or meanings of any of the provisions hereof and shall not be deemed to constitute a part of this Agreement.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

(g)    Announcements; Confidentiality.  Neither party shall make any press release or other public announcement concerning this transaction without the prior written consent of the other party. Seller and Purchaser hereby covenant and agree to keep the nature, terms and conditions of this Agreement and the transactions contemplated hereunder confidential and Purchaser hereby covenants and agrees to keep any materials delivered to it by Seller or its affiliates confidential; provided, however, that the foregoing may be disclosed (A) as required by applicable law, regulation or legal process, and (B) to Seller's or Purchaser's representatives in connection with the consummation of the transactions contemplated herein, so long as such representatives agree to act in accordance with the terms of this Section 12(g).

(h)    Severability.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or enforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of any other provision of this Agreement.

(i)    Governing Law.   This Agreement shall be construed, interpreted and governed by the internal laws (and not the conflict laws) of the State in which the Property is located.

(j)    Time of the Essence.  Time is of the essence with respect to each of Purchaser's and Seller's obligations hereunder.

(k)    WAIVER OF TRIAL BY JURY.  THE PARTIES HERETO SHALL AND THEY HEREBY DO INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OR INJURY OR DAMAGE RELATED THERETO.

(l)    Not a Joint Venture.  Seller and Purchaser each acknowledge and agree that the relationship between them is that of seller and purchaser and this Agreement does not constitute a partnership, joint venture or any other association between them.

- 13 -

EXHIBIT 3 PAGE 13 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

(m)    <u>Binding Effect of Agreement</u>.    This writing shall have no binding force or effect until executed and delivered by Purchaser and by Seller to the Escrow Agent.

(n)    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute one and the same original.  Executed copies of this Agreement may be delivered by telecopy or by email attachment and, upon receipt, shall be deemed originals and binding upon the parties hereto.  Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by telecopy, the parties will use best efforts to deliver originals as promptly as possible following execution thereof.

(o)    <u>Final Dates</u>.  If the final date of any deadline falls upon a Saturday, Sunday, or holiday recognized by the U.S. Postal Service, then in such event the time of such deadline shall be extended to the next day that is not a Saturday, Sunday, or holiday recognized by the U. S. Postal Service. Whenever the word "days" is used herein, it shall be considered to mean "calendar days" and not "business days" unless an express statement to the contrary is made

(p)    <u>Section 1031 Exchange</u>.  Seller and Purchaser may each consummate the purchase of the Property as part of a so-called like kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that: (i) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement; (ii) the exchanging party shall effect the Exchange through an assignment of its rights under this Agreement to a qualified intermediary; and (iii) the non-exchanging party shall not be required to take an assignment of the purchase agreement for the replacement property or be required to acquire or hold title to any real property for purposes of consummating the Exchange. The non-exchanging party shall not by this agreement or acquiescence to the Exchange (1) have its rights under this Agreement affected or diminished in any manner or (2) be responsible for compliance with or be deemed to have warranted to the exchanging party that the Exchange in fact complies with Section 1031 of the Code.

The provisions of this Agreement are for the benefit of Purchaser or Seller, and no other parties shall have any right or claim against Purchaser or Seller by reason of this Agreement or be entitled to benefit therefrom or to enforce any of the provisions thereof.

(q)    <u>Separate Counsel</u>.  Each party hereby represents that it has had the adequate opportunity to consult with and has consulted with legal counsel in connection with this Agreement and hereby waives any defense or claim that such party was not effectively represented in connection with this Agreement.  None of the provisions of this Agreement shall be interpreted against the interest of the party who caused the Agreement to be drafted.

[Signature page to follow]

- 14 -

EXHIBIT 3 PAGE 14 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement as of the date first above written.

Dated:  March ____, 2022          SELLER:
        4/1/2022

                               KH-REIT II FUNDING XXII, LLC,
                               a Delaware limited liability company

                               By: _____
                               Name:  Laura L. Torrado
                               Title:    Authorized Signatory

Dated:  March ____, 2022          PURCHASER:
        3/31/2022

                               GRANT MEADOWS, L.L.C.,
                               a Texas limited liability company

                               By: _____
                               Name: Shahin Jamea
                               Title: Authorized Agent

        April
Dated:  ~~March~~ 1 , 2022          ESCROW AGENT:

                               With respect to Section 3 only:

                               FIDELITY NATIONAL TITLE INSURANCE COMPANY

                               By: _____
                               Name: Lolly Avant
                               Title:  Senior Vice President

EXHIBIT 3 PAGE 15 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## EXHIBIT A

### Legal Description of Land

TRACT 1:

Being all of Unrestricted Reserve "A", Block 1, of CAYDON 2701 MAIN STREET, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Film Code No. 693477, of the Map Records of Harris County, Texas.

TRACT 2:

Being all of Unrestricted Reserve "A", Block 1, of CAYDON 2627 MAIN STREET, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Film Code No. 693664, of the Map Records of Harris County, Texas.

EXHIBIT 3 PAGE 16 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**EXHIBIT B**

**Form of Deed**

**SPECIAL WARRANTY DEED**

STATE OF TEXAS                    §

                                                    KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF HARRIS              §

That KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company ("**Grantor**"), having an address of 777 West Putnam Ave., 3rd Floor, Suite B-2, Greenwich, CT 06830, for and in consideration of $10.00 and other good and valuable consideration paid, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, AND CONVEYED and by these presents does GRANT, BARGAIN, SELL, AND CONVEY to _____ ("**Grantee**"), that certain parcel or parcels of land in the county and state referenced above, more particularly described on Exhibit A attached hereto and incorporated herein for all purposes, together with all and singular the rights, privileges, hereditaments, and appurtenances pertaining to such real property (collectively, the "**Property**").

This conveyance is made and accepted subject to current real property taxes and all unpaid non-delinquent general and special taxes, bonds and assessments; all liens, covenants, conditions, reservations, rights, easements, interests, rights of way, and restrictions of public record; all matters of public record; all leases and other occupancy agreements in effect; all zoning ordinances and regulations and any other laws, ordinances or governmental regulations restricting or regulating the use, occupancy or enjoyment of the Property; all matters visible upon or about the Property or that would be disclosed by an accurate survey of the Property ("**Permitted Encumbrances**").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor but not otherwise, subject to the Permitted Encumbrances.

Grantee's address is: _____

[SIGNATURE PAGE FOLLOWS]

SPECIAL WARRANTY DEED - PAGE 2

EXHIBIT 3 PAGE 17 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

EXECUTED as of _____, 2022.

KH-REIT II FUNDING XXII, LLC,
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title:   Authorized Signatory

STATE OF _____              §
                                                              §
COUNTY OF _____              §

    The foregoing instrument was acknowledged before me this _____ day of _____, 2022, by Laura Torrado, Authorized Signatory of KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of _____

SPECIAL WARRANTY DEED – SIGNATURE PAGE

EXHIBIT 3 PAGE 18 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

<u>EXHIBIT A</u>

<u>LEGAL DESCRIPTION</u>

EXHIBIT 3 PAGE 19 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**EXHIBIT C**

**Form of FIRPTA Certificate**

CERTIFICATE OF NONFOREIGN STATUS

PURCHASER:

SELLER:

U.S. REAL PROPERTY INTEREST:

Section 1445 of the Internal Revenue Code (the "Code") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.  For U.S. tax purposes (including Section 1445 of the Code), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law), and not the disregarded entity, will be the transferor of such property.

To inform Purchaser that withholding of tax is not required upon the disposition by Seller of the U.S. real property interest, the undersigned, on behalf of [_____] ("Owner") in its capacity as owner of Seller, certifies to Purchaser, the following:

        1.      Owner is the owner of Seller;

        2.      Seller is a disregarded entity;

        3.      Owner is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

        4.      Owner is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations promulgated thereunder);

        5.      Owner's U.S. employer identification number is _____, and its office address is: _____.

Owner understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Owner.

[Signature Page Follows]

EXHIBIT 3 PAGE 20 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

Dated: _____

[_____]

By:      _____
Name:
Title:

Sworn to me this _____ day of _____, 2022

_____
Notary Public

EXHIBIT 3 PAGE 21 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**EXHIBIT D**

**Form of Bill of Sale and Assignment of Warranties**

**BILL OF SALE AND GENERAL  ASSIGNMENT**

KNOW ALL MEN BY THESE PRESENTS, that KH-REIT II FUNDING XXII, LLC, a Delaware limited liability  company ("**Seller**"), for and in consideration of the sum of Ten Dollars and No/100 Dollars ($10.00) in hand paid by _____ ("**Purchaser**"), to or on behalf of Seller, the receipt of which is hereby acknowledged, Assignor has simultaneously herewith conveyed to the Assignee all of Assignor's right, title and interest in and to certain real property located at 2701 Main Street and 0 Main Street and 2606 Fannin Street, Houston, Texas 77002 (the "**Premises**"), and in connection therewith, Assignor does hereby sell, transfer and assign to Purchaser, its successors and assigns, all of Seller's right, title and interest, if any, in and to the following (collectively, "**Assigned Property**"): (i) all machinery, appliances, furniture, equipment, trade fixtures and other tangible  personal property (collectively, the "**Equipment**"); (ii) any warranties and/or guaranties relating to the Premises to the extent assignable (collectively, "**Warranties**"), and (iii) to the extent assignable, any transferable consents, authorizations, variances or waivers, licenses, permits, development rights, air rights, entitlements, guarantees, certificates, permits, warranties and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality relating to the Premises (collectively "**Approvals**"), (iv) all  guarantees, licenses, approvals, certificates, permits, warranties, transferable telephone exchange numbers, plans and specifications, engineering plans and studies, floor plans, landscape plans, logos, designs, trade names, trademarks, servicemarks, copyrights and other intellectual property, to the extent assignable (collectively, "**Intangible Property**").  Seller makes no warranty or representation with respect to the Assigned Property, which is conveyed on an "AS-IS, WHERE-IS, WITH ALL FAULTS" basis, without recourse to Assignor.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

EXHIBIT 3 PAGE 22 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Bill of Sale and General Assignment as of the date first above written.

Dated: _____ ___, 2022          SELLER:

                                         KH-REIT II FUNDING XXII, LLC,
                                         a Delaware limited liability company

                                         By: _____
                                         Name: Laura L. Torrado
                                         Title:  Authorized Signatory

Dated: _____ ___, 2022          PURCHASER:

                                         GRANT MEADOWS, L.L.C., a Texas limited liability company

                                         By: _____
                                         Name: _____
                                         Title: _____

EXHIBIT 3 PAGE 23 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## SCHEDULE  5(D)

**[TITLE COMMITMENT]**

EXHIBIT 3 PAGE 24 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

 **Fidelity National Title Insurance Company**

| Commitment Number: |
| --- |
| **FAH22004012** |

| THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW. |
| --- |

We (Fidelity National Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Fidelity National Title Insurance Company**
By:

**Issued By:**

**Fidelity National Title**
1900 West Loop South, Suite 200
Houston, TX 77027
lavant@fnf.com; RMB-teamavant@fnf.com

_____
Michael J. Nolan, President

Attest:

_____
Authorized Signatory

_____
Marjorie Nemzura, Secretary

**CONDITIONS AND STIPULATIONS**

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

EXHIBIT 3 PAGE 25 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

> THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

## Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data"). Title Data owns and maintains land title plants for various Texas counties. Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information. The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**

REQUIRED LANGUAGE FOR A TITLE INSURANCE COMMITMENT COVER LETTER
Letter (Title Data - Commitment) (03.27.19)

EXHIBIT 3 PAGE 26 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F



# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification.  **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

EXHIBIT 3 PAGE 27 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE A

Effective Date:  March 14, 2022 at 8:00 AM          GF No.:  FTH-18-FAH22004012
Commitment No.:  FAH22004012          Issued:  March 21, 2022 at 8:00 AM

1.  The policy or policies to be issued are:

    a.  OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
       (Not applicable for improved one-to-four family residential real estate)

       Policy Amount:          TBD
       PROPOSED INSURED:  Grant Meadows, LLC

    b.  TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
       ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

       Policy Amount:
       PROPOSED INSURED:

    c.  LOAN POLICY OF TITLE INSURANCE (Form T-2)

       Policy Amount:          TBD
       PROPOSED INSURED:  TBD
       Proposed Borrower:      Grant Meadows, LLC

    d.  TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    e.  LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    f.  OTHER

       Policy Amount:
       PROPOSED INSURED:

2.  The interest in the land covered by this Commitment is:

    Fee Simple

3.  Record title to the land on the Effective Date appears to be vested in:

    KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

EXHIBIT 3 PAGE 28 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE**                                    **Commitment No.: FAH22004012**
**COMPANY**

## SCHEDULE A
(continued)

4.   Legal description of land:

TRACT 1

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2701 MAIN STREET, a subdivision of 1.1478 acres, according to the map or plat thereof recorded under Film Code Number 693477 of the Map Records of Harris County, Texas.

TRACT 2

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2627 MAIN STREET, a subdivision of 0.9410 acres, according to the map or plat thereof recorded under Film Code Number 693664 of the Map Records of Harris County, Texas.

**END OF SCHEDULE A**

EXHIBIT 3 PAGE 29 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.:  FAH22004012                                    GF No.:  FTH-18-FAH22004012

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1.      The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

Film Code No. 693477, of the Map Records of Harris County, Texas. (Tract 1)
Film Code No. 693664, of the Map Records of Harris County, Texas. (Tract 2)

Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2.      Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.      Homestead or community property or survivorship rights, if any of any spouse of any insured.

        (Applies to the Owner Policy only.)

4.      Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

        a.      to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

        b.      to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

        c.      to filled-in lands, or artificial islands, or

        d.      to statutory water rights, including riparian rights, or

        e.      to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

                (Applies to the Owner Policy only.)

5.      Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6.      The terms and conditions of the documents creating your interest in the land.

7.      Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the

Form T-7:  Commitment for Title Insurance (01/03/14)                      TX-FT-FHST--SPS-1-22-FAH22004012

EXHIBIT 3 PAGE 30 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8.  Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

   (Applies to Mortgagee Policy (T-2) only.)

9.  The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10.  The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

   a.  Rights of parties in possession.

   b.  The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

      Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

      Note:   Upon receipt of a survey acceptable to the Title Company, this exception will be deleted. The Company reserves the right to except additional items and/or make additional requirements after reviewing said survey.

   c.  Easement(s) for the purpose(s), visibility triangle, and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at all four corners, recorded as Document No. Film Code Number 693477 Map Records Harris County, Texas. (Tract 1)

      Purpose, pedestrian realm, affects 1.0 feet wide along Main Street and 2.2 feet wide along Dennis Street.

      Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

   d.  Building set-back line, as disclosed by said plat recorded in Film Code No. 693477, of the Map Records of Harris County, Texas. (As to Tract 1)

      Affects:   2.0 feet wide along Fannin Street
      Affects: Variable width from 7.9 feet wide to 4.5 feet wide along Drew Street

   e.  Agreement ENCROACHMENT, MAINTENANCE AND ACCESS EASEMENT AGREEMENT, executed by CAYDON HOUSTON PROPERTY 2 LP, a Delaware limited partnership, Grantor and MAIN 2601 PARTNERS, LLC, a Texas limited liability company, Grantee, recorded on August 3, 2017, as Document No. Harris County Clerk's File No. RP-2017-350471, Affects as shown on Exhibit "C-2" for maintenance and on Exhibit "D-2" for access, attached thereto. (Tract 2)

   f.  Easement(s) for the purpose(s), visibility triangle , and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at the west and south corners, recorded as Film Code Number 693664 Map Records Harris County, Texas.  (Tract 2)

EXHIBIT 3 PAGE 31 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
### (continued)

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

g.      A building set-back line, as disclosed by said map/plat in Film Code No. 693664, of the Map Records of County, Texas.  (Tract 2)

Affects:   10 feet in width along the Dennis Street property line
Affects:   25 feet in width along the Main Street and Fannin Street property lines

h.      All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

i.       Rights of tenants in possession, as tenants only, under unrecorded lease agreements. ( both Tracts)

j.       If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

Owner and Loan Policy(ies):  Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of  County, Texas, prior to the date hereof.

Owner Policy(ies) Only:   Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

Loan Policy(ies) Only:   Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

k.      NOTICE OF STORM WATER QUALITY REQUIREMENTS, executed by Caydon Houston Property 2 LP ("Owner"), recorded on September 21, 2020, under Harris County Clerk's File No. RP-2020-442240. (Tract 1)

EXHIBIT 3 PAGE 32 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO.:  FAH22004012**

# SCHEDULE C

Commitment No.:  FAH22004012                                          GF No.:  FTH-18-FAH22004012

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1.      Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2.      Satisfactory evidence must be provided that:

   a.      no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b.      all standby fees, taxes, assessments and charges against the property have been paid,

   c.      all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d.      there is legal right of access to and from the land,

   e.      (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3.      You must pay the seller or borrower the agreed amount for your property or interest.

4.      Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5.      Please be advised that our search did not disclose any open mortgages of record.  If you should have knowledge of any outstanding obligation, please contact the Title Department immediately for further review prior to closing.

6.      We should have lender verify that it has not been contacted by the claimants of Mecanic's Liens filed under Harris County Clerk's File No(s) RP-2021-137391 and RP-2021-413788, seeking to be paid by the lender on some quantum meruit theory.

7.      Title to subject property is vested in KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company by virtue of (Substitute) Trustee's Deed

        Dated:                  April 6, 2021
        Recording No.:          Harris County Clerk's File No. RP-2021-191476

        The Company must be furnished with the following information reduced to recordable affidavit, pertaining to the Trustee's sale:

        Whether the defaulting mortgagor(s) was living and competent on the date of posting of notice(s) for the sale and on the date of the sale.

        Who is in possession of subject property at the present time.

        Satisfactory evidence that the seller/lender is in peaceable possession of the property.

8.      The Land lies within the boundaries of Midtown Management District and may be subject to taxes or special assessments by reason thereof.  Notice of inclusion of said Land in said district must be given and executed by

---

Form T-7:  Commitment for Title Insurance (01/03/14)                          TX-FT-FHST--SPS-1-22-FAH22004012

EXHIBIT 3 PAGE 33 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE C
### (continued)

purchaser and seller and filed of record.

9.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   KH-REIT II FUNDING XXII, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

10.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   Grant Meadows, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

11.   The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

Grantor:          Sandy Dasigenis, Substitute Trustee
Grantee:          KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

EXHIBIT 3 PAGE 34 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE C
(continued)

Recording Date:     April 9, 2021
Recording No:       Harris County Clerk's File No. RP-2021-191476

12.     Note –Important Notice

You have the right to have your funds deposited in an interest-bearing account.

If you choose to establish an interest-bearing account for your deposit, notify your escrow officer immediately. Thereafter you will be provided with a Notice of Election form which you should complete in writing by completing and returning the form, along with your taxpayer identification information, not later than five (5) days before the scheduled closing.  If you choose to establish an interest-bearing account for your deposit, an additional charge of $50.00 will be required.  This charge may exceed the amount of interest to be earned on the deposit, depending on the amount, applicable interest rate, and the duration of the deposit.

As an example, the amount of interest you can earn on a deposit of $1000.00 for a thirty-day period at an interest rate of 4% is $3.33.  Interest earned is dependent on the amount of deposit, time of deposit and the applicable interest rate.

If you do not choose to establish an interest-bearing account for your deposit, your funds will be deposited with other escrow funds in your escrow agent's general escrow account with an authorized financial institution and may be transferred to another general escrow account or accounts.  By reason of the banking relationship between our Company and the financial institution, the Company may receive an array of bank services, accommodations or other benefits.  The escrow funds will not be affected by such services, accommodations or other benefits.

Failure to notify your escrow officer and complete the additional required investment authorization form shall constitute waiver of any intention of establishing an interest-bearing account for your deposit(s).

13.     As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

• Confirmation prior to closing that the County Clerk of Harris County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

• Electronic recordation of the instruments to be insured in the Official Public Records of Harris County, Texas.

• Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

• Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

14.     Due to office closures related to COVID-19, we may be temporarily unable to record/access documents in the normal course of business. As such, we will require our AFFIDAVIT OF UNDERSTANDING AND INDEMNITY AND HOLD HARMLESS AGREEMENT DUE TO CORONAVIRUS PANDEMIC to be signed by all parties.

**EXHIBIT 3 PAGE 35 OF 44**

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE D

Commitment No.:  FAH22004012                                             GF No.:  FTH-18-FAH22004012

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1.  The issuing Title Insurance Company, **Fidelity National Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

   **Shareholders**:   Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

   **Directors**:  Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Steven G. Day

   **Officers**:   Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2.  The following disclosures are made by the Title Insurance Agent issuing this Commitment:

   **Fidelity National Title**

   (a)  A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

      **Owners**:    FNTS Holdings, LLC owns 100% of **Fidelity National Title**

   (b)  A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

      **Owners**:    FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

   (c)  If the Agent is a corporation:  (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

      **Directors**:  Raymond Randall Quirk, Anthony John Park

      **Officers**:   Laurie H. Ford (President), Paula D. Hester (President), Todd B. Rasco (President), Anthony John Park (Chief Financial Officer and Executive Vice President), Marjorie Nemzura (Secretary), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President)

   (d)  The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive.  NONE.

   (e)  For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3.  You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates.  Upon your request, such disclosure will be made to you.  Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

   You are further advised that the estimated title premium* is:

|  |  | **Total** | **$** | **0.00** |

   Of this total amount:  15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Percent/Amount | To Whom | For Services |
|---|---|---|

   *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance.  Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

EXHIBIT 3 PAGE 36 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|
| To obtain information or make a complaint: | Para obtener información o para presentar una queja: |
| You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al: |
| **1-877-862-9111** | **1-877-862-9111** |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at: | Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al: |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance: | Usted puede escribir al Departamento de Seguros de Texas a: |
| P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov | P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Sitio web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov |
| **PREMIUM OR CLAIM DISPUTES:**<br>Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**<br>Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas. |
| **ATTACH THIS NOTICE TO YOUR POLICY:**<br>This notice is for information only and does not become a part or condition of the attached document. | **ADJUNTE ESTE AVISO A SU PÓLIZA:**<br>Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto. |

EXHIBIT 3 PAGE 37 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|
| To obtain information or make a complaint: | Para obtener información o para presentar una queja: |
| You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al: |
| **1-877-862-9111** | **1-877-862-9111** |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at: | Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al: |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance: | Usted puede escribir al Departamento de Seguros de Texas a: |
| P.O. Box 149104 <br> Austin, TX  78714-9104 <br> Fax:  (512) 490-1007 <br> Web:  www.tdi.texas.gov <br> E-mail:  ConsumerProtection@tdi.texas.gov | P.O. Box 149104 <br> Austin, TX  78714-9104 <br> Fax:  (512) 490-1007 <br> Sitio web:  www.tdi.texas.gov <br> E-mail:  ConsumerProtection@tdi.texas.gov |
| **PREMIUM OR CLAIM DISPUTES:** <br> Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:** <br> Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas. |
| **ATTACH THIS NOTICE TO YOUR POLICY:** <br> This notice is for information only and does not become a part or condition of the attached document. | **ADJUNTE ESTE AVISO A SU PÓLIZA:** <br> Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto. |

Texas Form B-0023-07 Important Notice (06/01/15)

EXHIBIT 3 PAGE 38 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## DELETION OF ARBITRATION PROVISION
(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution.  It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company.  However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process.  In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below).  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity).  All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured.  Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

_____          _____
Signature                                                              Date

FORM T-7: Commitment for Title Insurance
(Deletion of Arbitration Provision) (01/03/14)

EXHIBIT 3 PAGE 39 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## TEXAS TITLE INSURANCE INFORMATION

---

Title insurance insures you against loss resulting from certain risks to your title.

The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date.

El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.

El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción.

---

Your Commitment for Title insurance is a legal contract between you and us.  The Commitment is not an opinion or report of your title.  It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable.  This determination has already been made.  Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

      **--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy.  Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them.  You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

      **---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

      **---EXCLUSIONS** are title risks that a Policy generally does not cover.  Exclusions are contained in the Policy but not shown or discussed in the Commitment.

      **---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company.  They are contained in the Policy but not shown or discussed in the Commitment.  The Policy Conditions are not the same as the Commitment Conditions.

EXHIBIT 3 PAGE 40 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

Commitment Number: FAH22004012                                                       GF#: FTH-18-FAH22004012

## TEXAS TITLE INSURANCE INFORMATION
(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment.  The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy.  Some of the changes to consider are:

    ---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2).  To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy.  Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

    ---Allow the Company to add an exception to "rights of parties in possession."  If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection.  If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued.  You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

FORM T-7: Commitment for Title Insurance
(Title Insurance Information) (01/03/14)

EXHIBIT 3 PAGE 41 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

## FIDELITY NATIONAL FINANCIAL
## PRIVACY NOTICE

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy.  This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);

- demographic information (*e.g.*, date of birth, gender, marital status);

- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);

- financial account information (*e.g.* loan or bank account information); and

- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;

- information about your transactions with FNF, our affiliates, or others; and

- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;

- browser version, language, and type;

- domain name system requests; and

- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above.  We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites.  Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

<u>Cookies</u>.  When you visit an FNF Website, a "cookie" may be sent to your computer.  A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive.  Information gathered using cookies helps us improve your user experience.  For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences.  You can choose whether or not to accept cookies by changing your Internet browser settings.  Be aware that doing so may impair or limit some functionality of the FNF Website.

<u>Web Beacons</u>.  We use web beacons to determine when and how many times a page has been viewed.  This information is used to improve our websites.

<u>Do Not Track</u>.  Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

EXHIBIT 3 PAGE 42 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

Effective Date: 5/1/2018

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.  We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you.  Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice.  We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

EXHIBIT 3 PAGE 43 OF 44

DocuSign Envelope ID: 92FD5E9A-FCC1-407B-854F-B08A2FC7F68F

Effective Date: 5/1/2018

For Nevada Residents:  You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice.  Nevada law requires that we also provide you with the following contact information:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  BCPINFO@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**

FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.<br>
601 Riverside Avenue,<br>
Jacksonville, Florida 32204<br>
Attn:  Chief Privacy Officer

EXHIBIT 3 PAGE 44 OF 44

# EXHIBIT 4

---

**Message**

---

| | |
|---|---|
| **From:** | Adams, Davis [Davis.Adams@am.jll.com] |
| **Sent:** | 3/2/2022 10:02:02 PM |
| **To:** | Henry Boeckmann [hboeckmann@knightheadfunding.com]; Rebecca Brown [Rbrown@knightheadfunding.com]; Jonathan Daniel [jdaniel@knightheadfunding.com]; Goldberg, Ethan [Ethan.Goldberg@am.jll.com] |
| **Subject:** | FW: Oxberry LOI |
| **Attachments:** | 22-0302 2.089 Acres Main LOI.pdf |

Attached is Oxberry's signed LOI with a revision to the title company.  Please see his note below related the title company as well as the survey request.  We do not have these surveys.

Thank you,

Davis

**Davis Adams**
JLL Capital Markets
4200 Westheimer Rd
Suite 1400
Houston, TX 77027
T +1 713 852 3558
M +1 713 291 1361
Davis.Adams@am.jll.com

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, March 2, 2022 3:29 PM
**To:** Adams, Davis <Davis.Adams@am.jll.com>
**Subject:** [EXTERNAL] RE: Oxberry LOI

Davis,

Attached please find final executed LOI. The only thing I changed was to revert back to Riverway Title. Since we have money going hard day one, it has to be with a title company I have a relationship with. Me and my attorneys have been working with Riverway Title and the next door neighbor (with the easement) on title matters for the last few months and have everything ironed out. As you know, title fees in Texas are statutory so seller shouldn't care about choice of title company.

On a related matter, do you have sealed surveys? The surveys you sent are draft and not sealed. We've contacted the old survey company but they are owed money from Caydon and won't release.

**OXBERRY**GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

---

**From:** Adams, Davis <Davis.Adams@am.jll.com>
**Sent:** Tuesday, March 1, 2022 1:44 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** Oxberry LOI

---

CONFIDENTIAL

EXHIBIT 4 PAGE 1 OF 2

Sean,

Please see the attached revised LOI per our discussions and emails.  Would you please execute and send back to me and we will start drafting the PSA?

Thank you,

Davis

**Davis Adams**
Managing Director
Land Group Leader
JLL Capital Markets
4200 Westheimer Rd
Suite 1400
Houston, TX 77027
T +1 713 852 3558
M +1 713 291 1361
Davis.Adams@am.jll.com

us.jll.com/capitalmarkets

Jones Lang LaSalle Americas, Inc.
a licensed real estate brokerage company.



**One of the 2021 World's Most Ethical Companies®**

Jones Lang LaSalle

For more information about how JLL processes your personal data, please click here

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

# EXHIBIT 5

DocuSign Envelope ID: 9291B866-A4A3-419D-961D-60A42FEDE0CC

**FIRST AMENDMENT TO SALE AGREEMENT**

This First Amendment to Sale Agreement (this "**First Amendment**") dated effective as of May 3rd, 2022, is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows, L.L.C., a Texas limited liability company ("**Purchaser**"). Seller and Purchaser are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

**RECITALS**

A.      Seller and Purchaser entered into that certain Sale Agreement dated effective March 31, 2022 (the "**Agreement**"), for that certain real property located in the City of Houston, Harris County, Texas, as further described in the Agreement.  All initially capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement unless the context clearly indicates otherwise.

B.      The Parties desire to amend the Agreement as provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

**AGREEMENT**

1.      **Recitals**.  The recitals above are incorporated herein by reference.

2.      **Power Pole**. Pursuant to that certain Title and Survey Objection Letter, dated April 22, 2022 from Purchaser to Seller, together with attached (i) Commitment for Title Insurance issued by Fidelity National Title Insurance Company, Commitment Number FAH22004012, and  (ii) survey, dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose Land Surveying/Platting, identified as Job No. 57547, as to Tract 2, an overhead power line runs through the center of Tract 2 of the Land with one power pole and light. Purchaser has requested, and Seller has agreed, that Purchaser, at its sole cost and expense, is permitted to remove or relocate (or cause to be removed or relocated) the power pole to a location acceptable to both Seller and Purchaser, and in accordance with applicable law. Seller consents to Purchaser coordinating with CenterPoint Energy and the City of Houston in connection with such removal or relocation. Seller shall reasonably cooperate with Purchaser in connection with the removal or relocation of the power pole and Seller shall join in such applications or agreements, as necessary, all at no liability or expense to Seller; provided, however, that Purchaser shall be obligated to provide to Seller, for Seller's prior review and approval, appropriate plans for removal or relocation of the power pole, together with (i) consent from CenterPoint and/or the City of Houston, as applicable, and (ii) certificates or other evidence of liability insurance, reasonably acceptable to Seller, for acts or omissions arising out of the removal or relocation of the power pole  (which insurance shall name Seller). Seller shall respond to such request within three (3) Business Days' prior written notice from Purchaser.

3.      **Acknowledgement**.  The Parties acknowledge and agree that removal or relocation of the power pole is not a condition to closing under the terms of the Agreement. Any permits that are obtained in Seller's name for such relocation or removal shall be assigned to Purchaser at closing without representation or warranty.

4.      **No Other Amendments**.  Except as expressly modified hereby, the Agreement shall remain unmodified and in full force and effect.

EXHIBIT 5 PAGE 1 OF 4

DocuSign Envelope ID: 9291B866-A4A3-419D-961D-60A42FEDE0CC

5.      **Counterparts**.  This First Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Each counterpart may be delivered by electronic transmission.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto.

*[Signature Page Follows]*

EXHIBIT 5 PAGE 2 OF 4

DocuSign Envelope ID: 9291B866-A4A3-419D-961D-60A42FEDE0CC

IN WITNESS WHEREOF, the Parties have executed this First Amendment to be effective as of the date first written above.

**PURCHASER:**

**GRANT MEADOWS, L.L.C.,**
a Texas limited liability company

By: _Shahin Jamea_
Name: Shahin Jamea
Its: Authorized Signatory

**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By:_____
Name: Laura L. Torrado
Title: Authorized Signatory

3

EXHIBIT 5 PAGE 3 OF 4

IN WITNESS WHEREOF, the Parties have executed this First Amendment to be effective as of the date first written above.

**PURCHASER:**

**GRANT MEADOWS, L.L.C.,**
a Texas limited liability company

By:_____
Name: Shahin Jamea
Its: Authorized Signatory


**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By:_____
Name: Laura L. Torrado
Title: Authorized Signatory

3

EXHIBIT 5 PAGE 4 OF 4

# EXHIBIT 6

**To:**     Shahin Jamea[sjamea@oxberrygroup.com]
**From:**  Barry Espinosa[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=142F784548A348A3B4EB95DF57491520-BESPINOSA]
**Sent:**   Fri 6/17/2022 12:46:30 PM (UTC)
**Subject:** Fwd: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC

Sent from my iPhone

Begin forwarded message:

> **From:** Shahin Jamea <sjamea@oxberrygroup.com>
> **Date:** June 17, 2022 at 3:52:01 AM CDT
> **To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>, Rebecca Brown <Rbrown@knightheadfunding.com>,
> Joshua Bernstein <jbernstein@legalstrategy.com>
> **Cc:** "Adams, Davis" <Davis.Adams@am.jll.com>, Jonathan Daniel <jdaniel@knightheadfunding.com>,
> Henry Boeckmann <hboeckmann@knightheadfunding.com>, Barry Espinosa
> <bespinosa@oxberrygroup.com>
> **Subject: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC**
>
>
> Dear Knighthead Team,
> Davis and I have been playing phone tag, which is mainly on me as I'm vacationing in Europe. I was hoping to talk to
> him before sending this email.
> We will not be able to proceed with the purchase as outlined in our contract. I will give you a brief synopsis below and
> would be happy to get on a call to discuss further, if there is interest.
> We have a building plan for a 5 story stick multifamily development for the partial block to the north. When we priced
> the project initially, the hard cost came in at $16M in December. A slightly modified version of the plans were priced
> at $26M in May. Then came the recent interest hikes. Despite all this and the threat of a looming recession, we are
> still interested in purchasing the partial block and moving forward with the development when the markets settle in
> the future.
> We always thought of the partial block as the inferior site. Not only is a large portion of the land under an easement,
> but it has become clear to us that the adjoining neighbor will file a lawsuit (frivolous or not) regarding his right to put
> a transformer on your land. As I told Davis from the beginning, we thought the value of partial block to be around
> $120 and justified the $150 aggregate purchase price by allocating a higher cost and resale/development value to the
> full city block.
> We are willing to proceed with the contract as modified below:
>     1. Drop the full city block and only purchase the partial block to the north;
>     2. Sales price of $120 PSF;
>     3. $500K additional hard earnest money upon execution of the amendment;
>     4. Closing date of October 1st
>
> Please let me know if you want me to send in termination notice or the amendment.
> Sincerely,
>
> **OXBERRY**GROUP
> **Shahin "Sean" Jamea, J.D.**
> Principal
>
> sjamea@oxberrygroup.com
>
> D 713.343.6152
> 2429 Bissonnet St. | No. 615 | Houston, TX 77005

EXHIBIT 6 PAGE 1 OF 1

# EXHIBIT 7

DocuSign Envelope ID: 0E5F9945-75C7-405D-9ACE-8AF4A6EA76AA

## SECOND AMENDMENT TO SALE AGREEMENT

THIS SECOND AMENDMENT TO SALE AGREEMENT (this "**Second Amendment**") dated effective as of June 29, 2022 (the "**Effective Date**"), is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows L.L.C., a Texas limited liability company ("**Purchaser**"). Seller and the Buyer are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Sale Agreement dated effective March 31, 2022, as amended by that certain First Amendment to Sale Agreement, dated May 3, 2022 (as amended, the "**Agreement**"), for that certain real property located in the City of Houston, Harris County, Texas, being more particularly described in the Agreement. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

WHEREAS, the Parties desire to amend the Agreement as provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## AGREEMENT

1.   **Recitals**. The recitals above are incorporated herein by reference.

2.   **Closing Date**. Section 5(a) of the Agreement is hereby amended to provide that the Closing Date shall occur on October 28, 2022, or such earlier date agreed upon by the Parties.

3.   **Payment of Second Deposit**. Concurrent herewith, Purchaser shall deliver the Second Deposit to the Title Company. Accordingly, the continued effectiveness of this Second Amendment, and all of Seller's obligations hereunder and pursuant to the Agreement, shall be expressly conditioned on the timely payment by Purchaser of the Second Deposit. **In the event that the Second Deposit is not timely made for any reason, this Second Amendment shall be null and void and of no further force or effect.**

4.   **Fence Encroachment**. Seller and Purchaser acknowledge and agree that Seller has remedied the fence encroachment into City of Houston right-of-way; as such, the $25,000.00 contingent payment at Closing referenced in Section 8(b)(viii) of the Agreement shall **not** be due and payable.

5.   **No Further Termination Rights**. Purchaser acknowledges and agrees that, except in the event of default by Seller under the Agreement, or following a casualty or condemnation event as provided in Section 9 of the Agreement, Purchaser shall have no further right to terminate the Agreement.

6.   **Entire Agreement**. The Agreement and this Second Amendment contain the entire integrated agreement between Seller and Buyer with respect to the subject matter of the Agreement and this Second Amendment. There are no other representations, agreements, arrangements or understandings, oral or in writing, between or among Seller and Buyer relating to this subject matter which are not fully expressed in the Agreement and this Second Amendment. The Agreement, hereby reaffirmed by the parties hereto, is and remains in full force and effect on the terms and conditions set forth therein, as amended by this Second Amendment. In the event of any conflict between the terms of this Second Amendment and the terms of the Agreement, the terms of this Second Amendment will control.

EXHIBIT 7 PAGE 1 OF 3

DocuSign Envelope ID: 0E5F9945-75C7-405D-9ACE-8AF4A6EA76AA

7.      **Counterparts**.  This Second Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Each counterpart may be delivered by electronic transmission.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto.

*[Signature Page Follows]*

2

EXHIBIT 7 PAGE 2 OF 3

DocuSign Envelope ID: 0E5F9945-75C7-405D-9ACE-8AF4A6EA76AA

IN WITNESS WHEREOF, the Parties have executed this Second Amendment to be effective as of the Effective Date.

**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title:  Authorized Signatory

**BUYER:**

**GRANT MEADOWS L.L.C.,**
a Texas limited liability company

By: _____
Name: Shahin "Sean" Jamea
Title:    President

3

EXHIBIT 7 PAGE 3 OF 3

# EXHIBIT 8

**To:** Shahin Jamea[sjamea@oxberrygroup.com]
**Cc:** Hudson, Brock @ Houston[Brock.Hudson@cbre.com]; Thompson, Michael @ Houston[Michael.Thompson3@cbre.com]
**From:** Stein, Jeff @ Houston[Jeff.Stein@cbre.com]
**Sent:** Mon 6/20/2022 2:19:29 PM (UTC)
**Subject:** Re: Midtown MF Loan

Later this week is goal.
Feedback has been slow.

Common response is: "We have 5-10 similar MF requests on our desk at 65-70% LTC with parking; why should we do your deal?"

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets

> On Jun 20, 2022, at 8:41 AM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:
>
>
> External
>
> When will you have a matrix for me to review?
>
> Sean Jamea
>
>> On Jun 20, 2022, at 4:23 PM, Stein, Jeff @ Houston <Jeff.Stein@cbre.com> wrote:
>>
>>
>> Sean,
>> Mario was maxed out at 70% and will not allow PACE based on my prior conversation with him last week. Plains Capital is competitive at 75% and going to committee to firm up terms. Don't think they will allow PACE either.
>>
>> Challenge has been finding PACE friendly lender with reasonable rates and comfort with no parking.
>>
>> Jeff Stein | Executive Vice President & Co-Head Houston DSF
>> Debt & Structured Finance
>> CBRE | Capital Markets
>> 2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
>> T 713 787 1906 | F 713 881 0999 | C 713 409 8436
>> jeff.stein@cbre.com | www.cbre.com/capitalmarkets
>>
>>> On Jun 19, 2022, at 11:55 PM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:

EXHIBIT 8 PAGE 1 OF 2

External

Morning Mario,
Is there a good time this week to discuss this deal? My preference would be mornings.

Sean Jamea

> On May 17, 2022, at 11:20 PM, FAZIO, MARIO <MarioFazio@ibc.com> wrote:
>
>
> Thanks Sean,
> Jeff, Please send me the OM and I will review it this week and get back to you with comments next week.
> Thanks
> **Mario Fazio**
> First Vice President | Commercial
> IBC Bank - Houston
> (713) 285-2160 / Ext. 22160
> <image002.png>
> <image003.png>
> <image004.png>
> <image005.png>
>
>> **From:** Shahin Jamea <sjamea@oxberrygroup.com>
>> **Sent:** Tuesday, May 17, 2022 3:18 PM
>> **To:** FAZIO, MARIO <MarioFazio@ibc.com>
>> **Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>; Hudson, Brock @ Houston <brock.hudson@cbre.com>
>> **Subject:** [EXTERNAL SENDER] Midtown MF Loan
>> Mario,
>> Per our call, I'd like to present to you my ground-up multifamily project in midtown. Jeff and Brock with CBRE are our agents on the debt side, so I'll let them make the presentation to you.
>> Thanks,
>> <image006.png>
>>
>>
>> **Shahin "Sean" Jamea, J.D.**
>> Principal
>>
>> sjamea@oxberrygroup.com
>>
>> D 713.343.6152
>> 2429 Bissonnet St. | No. 615 | Houston, TX 77005

This email and any attachments are confidential and are intended solely for the use of the named addressee. If you have received this email in error please contact the International Bank of Commerce.

EXHIBIT 8 PAGE 2 OF 2

# EXHIBIT 9

{W0802327.1}

**To:**    Shahin Jamea[sjamea@oxberrygroup.com]
**Cc:**    Hudson, Brock @ Houston[Brock.Hudson@cbre.com]; Thompson, Michael @ Houston[Michael.Thompson3@cbre.com]
**From:**    Stein, Jeff @ Houston[Jeff.Stein@cbre.com]
**Sent:**    Tue 6/21/2022 9:59:58 PM (UTC)
**Subject:**    RE: Midtown MF Loan

Sean,

We did not get good feedback from Plains Capital today after they took deal to committee. They are taking a very conservative approach on debt and interest rates over the next 24 months resulting in max 65% LTC and these terms would need to go to next committee level for final approval.

65% LTC. Breakeven is 90% occupancy
Stressing to 7% rate in 2-yrs.
Micro unit concerns – first deal in Dallas deal took some time to lease up
Lack of dedicated parking is a concern too
Prime + 25-50 with 6% floor was initial quote.

Mezz/Pref Lender: We thought we had a small balance pref lender, but they are passing. They could not get one of their partners comfortable with the lack of parking on site. The challenge is the size of the mezz/pref loan is small for a construction loan. Its too small for the usual players.

Not a lot of promising options at the moment north of 70% LTC and no lender has been open to doing PACE that expressed interest in the deal 1st lien.

Have you heard back from seller (Knighthead)?

Jeff Stein | Executive Vice President
CBRE | Capital Markets | Debt & Structured Finance
T +1 713 787 1906 | C +1 713 409 8436

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Monday, June 20, 2022 1:31 PM
**To:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Cc:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>; Thompson, Michael @ Houston <Michael.Thompson3@cbre.com>
**Subject:** RE: Midtown MF Loan

External

OK. As an update, we're working on turning drawings into the City first week of July. I also contacted the seller and asked them to split up the two parcels and let me just buy 2627 Main parcel @ $120 on October 1st. Haven't received a response yet.
Need to talk to IBC to see about a land loan for now. I'll report back.

OXBERRYGROUP
**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Sent:** Monday, June 20, 2022 9:19 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Cc:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>; Thompson, Michael @ Houston <Michael.Thompson3@cbre.com>
**Subject:** Re: Midtown MF Loan

Later this week is goal.
Feedback has been slow.
Common response is: "We have 5-10 similar MF requests on our desk at 65-70% LTC with parking; why should we do your deal?"

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets

On Jun 20, 2022, at 8:41 AM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:

EXHIBIT 9 PAGE 1 OF 3

**External**

When will you have a matrix for me to review?

Sean Jamea
> On Jun 20, 2022, at 4:23 PM, Stein, Jeff @ Houston <Jeff.Stein@cbre.com> wrote:
>
>  Sean,
> Mario was maxed out at 70% and will not allow PACE based on my prior conversation with him last week. Plains Capital is competitive at 75% and going to committee to firm up terms. Don't think they will allow PACE either.
> Challenge has been finding PACE friendly lender with reasonable rates and comfort with no parking.
> Jeff Stein | Executive Vice President & Co-Head Houston DSF
> Debt & Structured Finance
> CBRE | Capital Markets
> 2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
> T 713 787 1906 | F 713 881 0999 | C 713 409 8436
> jeff.stein@cbre.com | www.cbre.com/capitalmarkets
> 
>
> > On Jun 19, 2022, at 11:55 PM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:
> >
> >
> > **External**
> >
> > Morning Mario,
> > Is there a good time this week to discuss this deal? My preference would be mornings.
> >
> > Sean Jamea
> > > On May 17, 2022, at 11:20 PM, FAZIO, MARIO <MarioFazio@ibc.com> wrote:
> > >
> > >
> > > Thanks Sean,
> > > Jeff, Please send me the OM and I will review it this week and get back to you with comments next week.
> > > Thanks
> > > **Mario Fazio**
> > > First Vice President | Commercial
> > > IBC Bank - Houston
> > > (713) 285-2160 / Ext. 22160
> > > <image002.png>
> > > <image003.png>
> > > <image004.png>
> > > <image005.png>
> > > **From:** Shahin Jamea <sjamea@oxberrygroup.com>
> > > **Sent:** Tuesday, May 17, 2022 3:18 PM
> > > **To:** FAZIO, MARIO <MarioFazio@ibc.com>
> > > **Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>; Hudson, Brock @ Houston <brock.hudson@cbre.com>
> > > **Subject:** [EXTERNAL SENDER] Midtown MF Loan
> > > Mario,
> > > Per our call, I'd like to present to you my ground-up multifamily project in midtown. Jeff and Brock with CBRE are our agents on the debt side, so I'll let them make the presentation to you.
> > > Thanks,
> > > <image006.png>
> > > **Shahin "Sean" Jamea, J.D.**
> > > Principal

EXHIBIT 9 PAGE 2 OF 3

sjamea@oxberrygroup.com
**D** 713.343.6152
2429 Bissonnet St. | No. 615 | Houston, TX 77005

This email and any attachments are confidential and are intended solely for the use of the named addressee. If you have received this email in error please contact the International Bank of Commerce.

EXHIBIT 9 PAGE 3 OF 3

# EXHIBIT 10

{W0802327.1}

**NEWMARK VALUATION & ADVISORY**



# Oxberry Midtown

2627 Main Street
Houston, Harris County, TX 77002

Newmark Job No.: 22-0171219-1

**Appraisal Report Prepared For:**

Marvin Gonzalez
Credit Analyst
International Bank of Commerce
5615 Kirby Drive
Houston, TX  77005

**Prepared By:**

**Newmark Valuation & Advisory**
1700 Post Oak Boulevard, 2 BLVD Place, Ste. 350
Houston, TX, 77056



EXHIBIT 10 PAGE 1 OF 5

**NEWMARK VALUATION & ADVISORY**

July 28, 2022

Marvin Gonzalez
Credit Analyst
International Bank of Commerce
5615 Kirby Drive
Houston, TX  77005

RE:    Appraisal Of A Multifamily Property Known As Oxberry Midtown Located At 2627 Main
          Street, Houston, Harris County, TX 77002, Prepared By Newmark Valuation & Advisory,
          LLC (herein "Firm" or "Newmark")

Newmark Job No.:  22-0171219-1

Dear Mr. Gonzalez :

The subject is a proposed mid-rise style apartment complex that will contain 182-apartment units
between 1-multifamily building. The improvements will consist of 5-stories. Property amenities are
expected to include a courtyard with rooftop pool and outdoor lounge, business center, fitness
center and resident lounge. Unit amenities will include stainless steel appliances, built-in
microwave, slab granite countertops, steam showers, oversize walk-in closets, ceiling fans and
vinyl plank (faux wood) flooring. The subject's site area is 2.0888 acres, or 90,990 square feet,
and consists of 2-parcels.

The sponsor is planning to master lease the entire property to Sonder, a third party that will
operate the units similar to an Air B&B or extended stay hotel. Based on the letter of intent (LOI)
provided, the initial lease term is for 10-years with two 5-year options to renew. Rents will be set
at $1,200 per efficiency unit and $1,325 per one-bedroom unit, respectively, with annual rent
escalations of 2.00% through the course of the initial lease term and any applicable renewal term.
This lease will offer potential buyers predictable cash flows with stable growth going forward. The
lease to Sonder also minimizes operating costs as Sonder is responsible for the day to day
operations of the property (i.e minimal payroll/management fee, no make ready of units or
advertising required by the landlord). Also Sonder will be responsible for utility costs to the
individual units and all common areas. If Sonder wants to terminate their lease of the subject,
they must give a 180-day notice and may only occur in YR 5 of the lease.

Newmark Valuation & Advisory
1700 Post Oak Blvd, 2 BLVD Pl.,
Ste. 350

**NEWMARK**

www.nmrk.com/valuation

EXHIBIT 10 PAGE 2 OF 5

July 28, 2022
**MARVIN GONZALEZ**

---

As requested by the client, Newmark has provided prospective market values on a fee simple basis as if the Sonder lease is not in place and the subject is leased on a conventional basis. However, the subject will not include any parking to prospective tenants. The Houston metro area is a widespread market where the primary mode of transportation is the automobile. It is our opinion that there would be no demand to prospective tenants, on a conventional basis, to live in an apartment development that does not provide any parking as a car is virtually essential in this market. As such, there is no value to the subject as a conventional multifamily property without any parking. If the Sonder lease were to terminate in Year 5, there would be no market demand for the building.

### Key Value Considerations

**Strengths**

– Good location near the CBD of Houston

– In close proximity to major thoroughfares, primarily Main Street

– Light rail access with nearest station in walking distance of the subject (McGowen Station)

– Positive household population projections are forecasted according to the demographic data for the neighborhood

**Risk Factors**

– No structured parking available to tenants eliminating any demand for conventional leasing

Based on the analysis contained in the following report, the opinions of value for the subject are:

| Value Conclusions | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value "As Is" (Land Only) | Fee Simple | 7/15/2022 | $14,380,000 |
| Prospective Market Value "Upon Completion and Stabilization" | Fee Simple | 9/15/2023 | N/A |
| Prospective Market Value "Upon Stabilization" | Fee Simple | 9/15/2023 | N/A |
| Prospective Market Value "Upon Completion/Stabilization" (Sonder) | Leased Fee | 9/15/2023 | $26,560,000 |

*Compiled by Newmark*

### Extraordinary Assumptions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.



EXHIBIT 10 PAGE 3 OF 5

# Highest and Best Use

## PROCESS

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as if vacant, and as improved or proposed. By definition, the highest and best use must be:

– Physically possible

– Legally permissible under the zoning regulations and other restrictions that apply to the site

– Financially feasible

– Maximally productive, i.e., capable of producing the highest value from among the permissible, possible and financially feasible uses

## AS VACANT

### Legally Permissible

The site is not subject to zoning.  Further information and analysis about the legal restrictions to the subject property is included in the Site Analysis and Zoning and Legal Restrictions sections of this report.

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for a multifamily development. It appears that a newly developed multifamily development on the site would have a value commensurate with its cost. Therefore, multifamily use is considered financially feasible.

### Maximally Productive

The test of maximum productivity is to determine the actual use of the property that results in the highest land value and/or the highest return to the land.  It is important to consider the risk of potential uses as a use that may generate the highest returns in cash could also be the riskiest and thus not as likely for a developer to consider. In this case, the maximally productive use is a multifamily development.  The associated risk is typical and market conditions appear to be supportive.



Oxberry Midtown

EXHIBIT 10 PAGE 4 OF 5

### Highest and Best Use Conclusion – As Vacant

The highest and best use of the subject as though vacant is the development of a multifamily use.

## AS PROPOSED

The subject site is proposed to be developed with a multifamily development consisting of 182-Class A apartment units, which is consistent with the highest and best use of the site as if it were vacant.

### Physically Possible

The proposed improvements conform to the physical characteristics of the site. Therefore, multifamily use of the property is reasonably probable and appropriate.

### Legally Permissible

The proposed multifamily improvements are not subject to zoning.

### Financially Feasible

The proposed improvements are projected to be leased and produce a significant positive cash flow that we expect will continue. However, since there is no available parking for tenants, the proposed use is concluded to not be financially feasible. This is also apparent in the cost approach to value, as there is significant external obsolescence noted. Due to the risk of the Sonder lease not renewing in 5 years and the load to the capitalization rate to reflect a potentially vacant building, external depreciation exists which indicates a value below cost and is therefore not financially feasible.

### Maximally Productive

Based on our analysis, the value of the proposed improved property does not exceed the value of the site, as if vacant, and the cost to construct (including entrepreneurial profit) due to the external obsolescence noted in the cost approach. The cost feasible NOI exceeds the subject's pro form NOI and thus is not feasible to build at this time.

### Highest and Best Use – As Proposed

Therefore, the highest and best use of the subject as proposed is a multifamily use at a future data with available parking to tenants.

**Most Probable Buyer**

After consultations with investment sale brokers active in the Houston market, it has been indicated that there are no potential buyers of this property due to inadequate parking. Therefore, the most probable buyer is a developer for the future development of a residential property with adequate parking.

**NEWMARK**

Oxberry Midtown

EXHIBIT 10 PAGE 5 OF 5

# EXHIBIT 11

{W0802327.1}

**To:**     Shahin Jamea[sjamea@oxberrygroup.com]
**From:**  Brian Lai[brian@rockylai.com]
**Sent:**   Fri 9/16/2022 8:10:29 PM (UTC)
**Subject:** Re: Sonder

Hi Shahin,
Rocky is not too bullish on the proposed development. He's concerned about Sonder's credibility. How is Sonder doing in San Antonio and Dallas? Is there also zero parking for those sites?
Is George/Sunny investing in this deal?


Brian Lai
Vice President
**Rocky Lai & Associates, Inc.**

3217 Montrose Blvd. Suite 222
Houston, TX 77006
O: 281-888-1919
C: 832-755-6599
brian@rockylai.com


On Tue, Sep 13, 2022 at 10:31 AM Shahin Jamea <sjamea@oxberrygroup.com> wrote:

> Thanks Brian. Be glad to jump on a call or meet to answer any questions.
>
> **OXBERRY**GROUP
>
> **Shahin "Sean" Jamea, J.D.**
>
> Principal
> _____
> **From:** Brian Lai <brian@rockylai.com>
> **Sent:** Tuesday, September 13, 2022 10:30 AM
> **To:** Shahin Jamea <sjamea@oxberrygroup.com>
> **Subject:** Sonder
>
> Just a FYI - Rocky has been out of the country and will be back this Wednesday. We'll discuss how much we can commit once he is back, but I am thinking it will be somewhere between **$1.0m - $1.5m**
>
>
> Brian Lai
>
> Vice President
>
> **Rocky Lai & Associates, Inc.**
>
> 3217 Montrose Blvd. Suite 222
>
> Houston, TX 77006
>
> O: 281-888-1919
>
> C: 832-755-6599
>
> brian@rockylai.com

EXHIBIT 11 PAGE 1 OF 1

# EXHIBIT 12

**To:** Travis Huehlefeld[tHuehlefeld@wcglaw.com]; Montgomery, Deborah[Deborah.Montgomery@fnf.com]
**Cc:** Shahin Jamea[sjamea@oxberrygroup.com]; Avant, Alli[Alli.Avant@fnf.com]; Ebbs, Mary[Mary.Ebbs@fnf.com]; Sara Prasatik[sprasatik@wcglaw.com]; Galperin, Robert[Robert.Galperin@fnf.com]
**From:** Avant, Lolly[LAvant@fnf.com]
**Sent:** Wed 10/19/2022 6:43:23 PM (UTC)
**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

| This message was sent securely using Zix® |
|---|

My underwriter and I are reviewing the recent correspondence received from Josh Bernstein.
I have a conference call with Josh and his team tomorrow morning at 10am.
Travis, may we schedule a call at 11am or 2pm tomorrow?
Lolly Avant, SVP
National Business Development|Senior Closer
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: lavant@fnf.com
Direct: 713-621-9170
Mobile: 281-217-9517

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Wednesday, October 19, 2022 1:32 PM
**To:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>; Sara Prasatik <sprasatik@wcglaw.com>
**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Lolly – Just checking to see if you have received any feedback from your underwriter based off our call yesterday. Specifically, what affect will the neighbor's demand letter have on title's acceptance of the previously negotiated owner's affidavit and/or will any exceptions be added to title based off the demand letters or revised owner's affidavit which discloses the demand letters? Additionally, please let me know if they are available for a call today/tomorrow morning to discuss.

Thank you,
Travis

OUT OF OFFICE THURSDAY, OCTOBER 20 AND FRIDAY, OCTOBER 21
**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Travis Huehlefeld
**Sent:** Tuesday, October 18, 2022 10:06 AM
**To:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>; Sara Prasatik <sprasatik@wcglaw.com>
**Subject:** FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

Lolly - Thank you for the call. Please keep us posted after you speak with your underwriter.

Best,
Travis

OUT OF OFFICE THURSDAY, OCTOBER 20 AND FRIDAY, OCTOBER 21
**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Avant, Lolly <LAvant@fnf.com>

EXHIBIT 12 PAGE 1 OF 7

**Sent:** Tuesday, October 18, 2022 9:55 AM
**To:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>
**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

This message was sent securely using Zix®

Travis,
I left you a voice message this morning.
Based on the Notice to Seller circulated on 10/11/22, is the purchaser set to close on 10/28/22?
Thank you Travis.
Lolly Avant, SVP
National Business Development|Senior Closer
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: lavant@fnf.com
Direct: 713-621-9170
Mobile: 281-217-9517

**From:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Sent:** Friday, September 30, 2022 2:24 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Lolly <LAvant@fnf.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>
**Subject:** FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -
Attached please find the updated Hyperlinked Title Commitment for your review. No new matters were found in the update. Same has been distributed to the Seller team. We will begin preparation of the closing documents, including the Buyer's Closing Statement, for your review. Please forward any invoices that will need to be added to the closing statement. Attached is the negotiated Owner's Affidavit for your records. Please send us the Buyer's entity documents as outlined in Schedule C, Item No. 10 of the Commitment. Confirm that this is a cash transaction or if not, please provide the lender information and contact. Please let us know if there are questions. Thank you.
Deborah Montgomery
National Commercial Closer, AVP
Fidelity National Title Insurance Company
1900 West Loop South, Suite 200
Houston, TX 77027
800-879-1677;Direct Line (713) 621-9280
Fax # 713-623-4406; Mobile (832) 768-7137
Deborah.montgomery@fnf.com
Chicago Title | Commonwealth | Fidelity National Title
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Thursday, September 29, 2022 3:12 PM
**To:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>; Avant, Lolly <LAvant@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
Deborah/Lolly – As a reminder this transaction is scheduled to close on 10/28/2022. Would you mind sending me an updated title commitment and any draft title company closing documents to review, including your standard form of owner's affidavit?
Thank you!
Travis
**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs + Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified

EXHIBIT 12 PAGE 2 OF 7

that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Sent:** Wednesday, June 29, 2022 1:17 PM
**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <THuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

This message was sent securely using Zix®

We are in receipt of the second deposit in the amount of $500,000.00. Thank you.
Deborah Montgomery
National Commercial Closer, AVP
Fidelity National Title Insurance Company
1900 West Loop South, Suite 200
Houston, TX 77027
800-879-1677;Direct Line (713) 621-9280
Fax # 713-623-4406; Mobile (832) 768-7137
Deborah.montgomery@fnf.com
Chicago Title | Commonwealth | **Fidelity National Title**
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Montgomery, Deborah
**Sent:** Wednesday, June 29, 2022 11:41 AM
**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <THuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
We are in receipt of the fully executed Second Amendment and will advise once the Second Deposit has been received. Thank you.
Deborah Montgomery
National Commercial Closer, AVP
Fidelity National Title Insurance Company
1900 West Loop South, Suite 200
Houston, TX 77027
800-879-1677;Direct Line (713) 621-9280
Fax # 713-623-4406; Mobile (832) 768-7137
Deborah.montgomery@fnf.com
Chicago Title | Commonwealth | **Fidelity National Title**
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Rebecca Brown <Rbrown@knightheadfunding.com>
**Sent:** Wednesday, June 29, 2022 11:26 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.
Please see attached fully-executed Second Amendment.
Please let us know when the wire has been initiated and provide a Fed Reference number when available.
Title, please confirm receipt of the wire as soon as possible.

EXHIBIT 12 PAGE 3 OF 7



**Rebecca B. Brown**
Deputy General Counsel
Knighthead Funding, LLC
777 West Putnam Avenue
3rd Floor, Suite B-2
Greenwich, CT 06830

Tel: (203) 327-3327
Direct: (203) 489-1423
rbrown@knightheadfunding.com
www.knightheadfunding.com

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Any review, use, disclosure, distribution or copying of this e-mail and/or the attachments hereto is prohibited except by or on behalf of -the intended recipient. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy all copies of the e-mail and the attachments. Content is provided by the individual sender and does not necessarily reflect the views of Knighthead Realty Capital Management, L.L.C. or its affiliates, and does not constitute investment advice. This e-mail does not constitute an offer to sell or, the solicitation of an offer to buy any interest in any investment product or fund. Such offer or solicitation may only be made by means of delivery of a confidential private offering memorandum or other appropriate document which contains a description of the material terms (including, without limitation, risk factors, conflicts of interest, fees and charges) relating to such investment product or fund. No assurances are given that this e-mail message and its attachments (if any) are free of viruses, and Knighthead Realty Capital Management, L.L.C. accepts no liability for any damage sustained as a result of any viruses. If you reply to this email, please note that we are a public investor and do not want any material non-public information. We do not agree to keep confidential any information you provide and do not agree to any restrictions on our trading activity, except pursuant to a written confidentiality agreement executed by Knighthead Realty Capital Management, L.L.C.

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, June 29, 2022 11:31 AM
**To:** Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

See attached.

**OXBERRY**GROUP
**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Joshua Bernstein <jbernstein@legalstrategy.com>
**Sent:** Wednesday, June 29, 2022 10:28 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Please see attached seller's revised draft of the 2nd amendment to PSA (clean and PDF redline).

-Josh

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, June 29, 2022 7:57 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All,

Revised amendment with October 28th closing date. Please countersign and return.

EXHIBIT 12 PAGE 4 OF 7

**OX BERRY** GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Shahin Jamea
**Sent:** Wednesday, June 29, 2022 12:55 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Buyer executed amendment attached.

**OX BERRY** GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Tuesday, June 28, 2022 5:49 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

All – Please find attached the draft Second Amendment extending closing to 12/16/2022. This draft is being sent simultaneously to my client and remains subject to their review and comment.

Please let me know if you have any comments.

Thank you,

Travis

**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Tuesday, June 28, 2022 2:36 PM
**To:** Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Travis,

Buyer has asked the Seller for an extension of the closing date to December 16th before moving forward with the deposit of the additional $500K earnest money due tomorrow. Seller is considering the request but hasn't responded yet. In the interest of time, please draft and circulate an amendment extending the closing date for seller and their counsel to review.

**OX BERRY** GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Joshua Bernstein <jbernstein@legalstrategy.com>
**Sent:** Friday, April 29, 2022 2:29 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>

EXHIBIT 12 PAGE 5 OF 7

**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

All:

Attached is seller's response to buyer's title and survey objection letter.

-Josh

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Friday, April 22, 2022 4:52 PM
**To:** Avant, Alli <Alli.Avant@fnf.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All – Please find attached buyer's title and survey objection letter with respect to the above referenced matter. After you have a chance to review, please let me know if you have any comments or would like to discuss.

Thank you,

Travis

**OUT OF OFFICE MONDAY, APRIL 25**

**TRAVIS L. HUEHLEFELD | Attorney**
Wilson Cribbs + Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard

**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Avant, Alli <Alli.Avant@fnf.com>
**Sent:** Monday, April 4, 2022 9:23 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

> This message was sent securely using Zix®

Good morning,

Our office is in receipt of the $150,000.00 initial deposit.

Pursuant to Section 3(a) of the PSA, the title company is to immediately release the deposit to Seller. Please forward the Seller's wiring instructions and a method to confirm the instructions.

Please contact me with any questions.

Thank you,

Allison Avant
Commercial Escrow Assistant
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: alli.avant@fnf.com
Office Ph.: 713-968-7165

**From:** Avant, Alli
**Sent:** Friday, April 1, 2022 4:40 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Lolly <LAvant@fnf.com>
**Cc:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Adams, Davis <Davis.Adams@am.jll.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Good afternoon,

Attached, please find the receipted contract. The order number assigned to this transaction is FAH22004012.

We will send our wiring instructions to the buyer under separate cover.

EXHIBIT 12 PAGE 6 OF 7

Thank you,
Allison Avant
Commercial Escrow Assistant
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: alli.avant@fnf.com
Office Ph.: 713-968-7165

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Friday, April 1, 2022 4:25 PM
**To:** Avant, Lolly <LAvant@fnf.com>; Avant, Alli <Alli.Avant@fnf.com>
**Cc:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Adams, Davis <Davis.Adams@am.jll.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>
**Subject:** Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>

Lolly – I believe that you may have received the attached PSA, but sending just in case. Can you please sign and return a copy to this group and circulate wiring instructions of the Initial Deposit?

We look forward to working with you.

Thank you and have a good weekend,

Travis

**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard

**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

--------------------------------------------------------------------------
This message was secured by **Zix**®.
--------------------------------------------------------------------------
This message was secured by **Zix**®.
--------------------------------------------------------------------------
This message was secured by **Zix**®.

--------------------------------------------------------------------------
This message was secured by **Zix**®.

EXHIBIT 12 PAGE 7 OF 7

# EXHIBIT 13

**To:**     Rebecca Brown[Rbrown@knightheadfunding.com]; Brian H. Buster[bbuster@legalstrategy.com]; Joshua Bernstein[jbernstein@legalstrategy.com]; Shahin Jamea[sjamea@oxberrygroup.com]; Travis Huehlefeld[tHuehlefeld@wcglaw.com]; Sara Prasatik[sprasatik@wcglaw.com]

**Cc:**     Galperin, Robert[Robert.Galperin@fnf.com]; Ebbs, Mary[Mary.Ebbs@fnf.com]

**From:**  Avant, Lolly[LAvant@fnf.com]

**Sent:**   Fri 10/21/2022 8:35:52 PM (UTC)

**Subject:** RE: Property Inspection

| This message was sent securely using Zix® |
|---|

Good Afternoon,

Due to recent developments, I will be circulating a revised commitment/proforma revising Schedule B, Exception (f) on Monday.

Thank you,

Lolly Avant, SVP

National Business Development|Senior Closer

Fidelity National Title

National Commercial Services

1900 West Loop South, Suite 200

Houston, Texas 77027

Email: lavant@fnf.com

Direct: 713-621-9170

Mobile: 281-217-9517

**From:** Avant, Lolly

**Sent:** Thursday, October 20, 2022 2:26 PM

**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Brian H. Buster <bbuster@legalstrategy.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; 'Shahin Jamea' <sjamea@oxberrygroup.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Sara Prasatik <sprasatik@wcglaw.com>

**Cc:** Galperin, Robert <Robert.Galperin@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>

**Subject:** Property Inspection

Good afternoon,

This morning my office performed an inspection of the property.

The service lines and two poles that are the subject of ongoing conversations are gone and the splinters of the bottom of the poles remain in the holes. There is not power to the Main 2601 owner's building.

My title specialist walked around to McGowen Street and front of the building and sidewalk are boarded up and the power to the adjacent businesses adjacent to the building comes from the power poles in the McGowen Street ROW.

At some point in time between April 2022 (last survey date) and today the power line and poles were removed. Seller are you aware that the poles and line were removed?

I would think CenterPoint would have removed the utility lines. I think an electrician would not remove the service line without CenterPoint's involvement unless the service line had already been disconnected at the pole on Dennis Street. The survey would need to updated to reflect there are no power lines or poles located on the property.

Lolly Avant, SVP

National Business Development|Senior Closer

Fidelity National Title

National Commercial Services

1900 West Loop South, Suite 200

Houston, Texas 77027

Email: lavant@fnf.com

Direct: 713-621-9170

Mobile: 281-217-9517

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

------------------------------------------------------------------------

This message was secured by Zix®.

EXHIBIT 13 PAGE 1 OF 1

# EXHIBIT 14

{W0802327.1}

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **POLICY NO.:  PROFORMA-O1**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Policy No.:  PROFORMA-O1                                GF No.:  FTH-18-FAH22004012

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1.      The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

    Film Code No. 693477, of the Map Records of Harris County, Texas. (Tract 1)
    Film Code No. 693664, of the Map Records of Harris County, Texas. (Tract 2)

    Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2.      Shortages in area.

3.      Homestead or community property or survivorship rights, if any, of any spouse of any Insured.

4.      Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

    a.      to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

    b.      to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

    c.      to filled-in lands, or artificial islands, or

    d.      to statutory water rights, including riparian rights, or

    e.      to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

5.      Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years.

6.      The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

    a.      Intentionally Deleted.

    b.      Intentionally Deleted.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only.  It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein.  Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

EXHIBIT 14 PAGE 1 OF 3

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **POLICY NO.:  PROFORMA-O1**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

c.     Easement(s) for the purpose(s), visibility triangle, and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at all four corners, recorded as Document No. Film Code Number 693477 Map Records Harris County, Texas. (Tract 1)

Purpose, pedestrian realm, affects 1.0 feet wide along Main Street and 2.2 feet wide along Dennis Street.

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

d.     Building set-back line, as disclosed by said plat recorded in Film Code No. 693477, of the Map Records of Harris County, Texas. (As to Tract 1)

Affects:   2.0 feet wide along Fannin Street
Affects: Variable width from 7.9 feet wide to 4.5 feet wide along Drew Street

e.     Agreement ENCROACHMENT, MAINTENANCE AND ACCESS EASEMENT AGREEMENT, executed by CAYDON HOUSTON PROPERTY 2 LP, a Delaware limited partnership, Grantor and MAIN 2601 PARTNERS, LLC, a Texas limited liability company, Grantee, recorded on August 3, 2017, as Document No. Harris County Clerk's File No. RP-2017-350471, Affects as shown on Exhibit "C-2" for maintenance and on Exhibit "D-2" for access, attached thereto.  (Tract 2)

f.     Easement(s) for the purpose(s), visibility triangle , and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at the west and south corners, recorded as Film Code Number 693664 Map Records Harris County, Texas.  (Tract 2)

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

g.     A building set-back line, as disclosed by said map/plat in Film Code No. 693664, of the Map Records of County, Texas.  (Tract 2)

Affects:   10 feet in width along the Dennis Street property line
Affects:   25 feet in width along the Main Street and Fannin Street property lines

h.     All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

i.     Intentionally Deleted

j.     Intentionally Deleted.

k.     NOTICE OF STORM WATER QUALITY REQUIREMENTS, executed by Caydon Houston Property 2 LP ("Owner"), recorded on September 21, 2020, under Harris County Clerk's File No. RP-2020-442240. (Tract 1)

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only.  It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein.  Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

FNTIC-767

EXHIBIT 14 PAGE 2 OF 3

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **POLICY NO.:  PROFORMA-O1**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

l.          Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 25, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57646, as to Tract 1:

a) Sidewalk encumbrance by construction fence along Main, Fannin, Dennis and Drew streets;
b) Gate Posts located inside property line on Dennis Street;
c) Evidence of utilities servicing property all located within adjacent public right of ways, without benefit of recorded easements.

m.          Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 25, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57547, as to Tract 2:

a) Intentionally deleted;
b) Parking spaces encroach over boundary line along Main Street;
c) Parking spaces encroach over the access easement running from Main to Fannin streets;
d) Sidewalk encumbrance by construction fence along Main, Fannin and Dennis streets;
e) Bollards throughout the property and Gate Post & Gate Motor located inside property line on Fannin Street and outside property line on Main Street;
f) Overhead power line running through the center of the property with two power poles and lights, apparently serving improvements on adjacent property, and all consequences of the existence, removal, and/or relocation thereof."

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only.  It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein.  Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

EXHIBIT 14 PAGE 3 OF 3

# EXHIBIT 15

{W0802327.1}

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, LLC | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CAUSE NO. 4:22-CV-03730 |
| | § | |
| GRANT MEADOWS, L.L.C. | § | |
| *Defendant.* | § | |

**DEFENDANT'S OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT**

TO:     KH-REIT II FUNDING XXI, LLC, by and through its attorneys of record, Matthew Baumgartner, Armbrust & Brown, 100 Congress Avenue, Suite 1300, Austin, Texas 78701

Grant Meadows, L.L.C. ("**Grant Meadows**" or "**Respondent**"), a defendant in the above-styled and numbered cause of action and serves these Objections and Responses to Plaintiff's First Request for Production, pursuant to the Federal Rules of Civil Procedure 34.

Respectfully submitted,

By: */s/ J. Robert MacNaughton*
    J. Robert MacNaughton – *attorney in charge*
    State Bar No. 00789944
    SDTX No. 18350
    robert@porterfirm.com
    2221 S. Voss Rd.,
    Houston, Texas 77057
    713-621-0700 Telephone
    713-621-0709 Facsimile

**OF COUNSEL:**

**PORTER LAW FIRM, PLLC**
Weston P. Ray
State Bar No. 24098307
weston@porterfirm.com
2221 S. Voss Road, Suite 200

1

EXHIBIT 15 PAGE 1 OF 6

Houston, Texas 77057
Tel.: 713-621-0700
Fax: 713-621-0709

**ATTORNEYS FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

A true and correct copy of the foregoing was served on the attorneys of record or pro se party as listed on March 17, 2023.

Matthew Baumgartner
David King
Guillermo Alarcon
ARMBRUST & BROWN, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701

*/s/ J. Robert MacNaughton*
J. Robert MacNaughton

EXHIBIT 15 PAGE 2 OF 6

## OJECTIONS AND RESPONSE TO REQUESTS FOR PRODUCTION

**1.**     All communications and documents between you and the Title Company regarding the Property.

**RESPONSE:** Respondent will produce.

**2.**     All communications and documents between you and the Title Company regarding the Contract.

**RESPONSE:** Respondent will produce.

**3.**     All communications and documents between you and the Title Company regarding the First Amendment.

**RESPONSE:** Respondent will produce.

**4.**     All communications and documents between you and the Title Company regarding the Power Pole.

**RESPONSE:** Respondent will produce.

**5.**     All communications and documents between you and the Title Company regarding the Title Commitment.

**RESPONSE:** Respondent will produce.

**6.**     All communications and documents between you and the Title Company regarding the Termination Letter.

**RESPONSE:** Respondent will produce. .

**7.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the Property.

**RESPONSE:** Respondent will produce.

**8.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the Contract.

**RESPONSE:** Respondent will produce.

**9.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the First Amendment.

3

EXHIBIT 15 PAGE 3 OF 6

**RESPONSE:** Respondent will produce.

**10.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the Power Pole.

**RESPONSE:** Respondent will produce.

**11.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the Title Commitment.

**RESPONSE:** Respondent will produce.

**12.**     All communications and documents between you and any person from March 31, 2019 to the present regarding the Termination Letter.

**RESPONSE:** Respondent will produce.

**13.**     All communications and documents between you and any investors regarding the Property.

**RESPONSE:** Respondent objects to this Request as vague and overbroad in scope by not being sufficiently limited in definition. The term "investors" is not defined or limited, and is overbroad in the general meaning.  Respondent further objects to the extent this request seeks non-relevant information that will not lead to discoverable admissible evidence, potentially containing private financial information of third parties not subject to this lawsuit.

**14.**     All communications and documents between you and any investors regarding the Contract.

**RESPONSE:** See objection to Request for Production 13.

**15.**     All communications and documents between you and any investors regarding the First Amendment.

**RESPONSE:** See objection to Request for Production 13.

**16.**     All communications and documents between you and any investors regarding the Power Pole.

**RESPONSE:** See objection to Request for Production 13.

**17.**     All communications and documents between you and any investors regarding the Title Commitment.

**RESPONSE:** See objection to Request for Production 13.

**18.**     All communications and documents between you and any investors regarding the Termination Letter.

4

EXHIBIT 15 PAGE 4 OF 6

**RESPONSE:** See objection to Request for Production 13.

**19.**     All communications and documents between you and any lenders regarding the Property.

**RESPONSE:** Respondent objects to this Request as vague and overbroad in scope by not being sufficiently limited in definition. The term "lenders" is not defined or limited, and is overbroad in the general meaning.  Respondent further objects to the extent this request seeks non-relevant information that will not lead to discoverable admissible evidence, potentially containing private financial records not subject to this lawsuit.

**20.**     All communications and documents between you and any lenders regarding the Contract.

**RESPONSE:** See objection to Request for Production 20.

**21.**     All communications and documents between you and any lenders regarding the First Amendment.

**RESPONSE:** See objection to Request for Production 20.

**22.**     All communications and documents between you and any lenders regarding the Power Pole.

**RESPONSE:** See objection to Request for Production 20.

**23.**     All communications and documents between you and any lenders regarding the Title Commitment.

**RESPONSE:** See objection to Request for Production 20.

**24.**     All communications and documents between you and any lenders regarding the Termination Letter.

**RESPONSE:** See objection to Request for Production 20.

**25.**     All internal communications and documents from March 31, 2019 to October 26, 2022 regarding your decision to purchase the Property.

**RESPONSE:** Respondent objects to this Request to the extent it calls attorney client privileged information. Subject thereto: will produce.

**26.**     All internal communications and documents from March 31, 2019 to October 26, 2022 regarding your decision to the terminate the Contract.

**RESPONSE:** Respondent objects to this Request to the extent it calls attorney client privileged information. Subject thereto: will produce.

5

EXHIBIT 15 PAGE 5 OF 6

**27.**    All documents and communications from March 31, 2019 to October 26, 2022 regarding the Property's value.

**RESPONSE:** Respondent will produce.

**28.**    All documents and communications from March 31, 2019 to October 26, 2022 regarding prevailing market conditions and your decision to either purchase the Property or terminate the Contract.

**RESPONSE:** Respondent objects to this Request to the extent it calls attorney client privileged information. Subject thereto: will produce.

**29.**    All documents and communications regarding the Power Pole.

**RESPONSE:** Respondent will produce.

**30.**    All documents and communications regarding the Power Pole between you and any neighbors or owners of lots adjacent to the Property.

**RESPONSE:** Respondent objects to this Request to the extent as vague and overbroad in scope by not being sufficiently limited in definition. The term "neighbors" is not defined or limited, and is overbroad in the general meaning. Subject thereto Respondent will produce to the extent there is any such documentation.

**31.**    All certificates or other evidence of liability insurance for acts of omissions arising out of the removal or relocation of the power pole procured by you, as required by paragraph 2 of the First Amendment.

**RESPONSE:** None known of at this time.

**32.**    All evidence of consent from CenterPoint Energy and/or the City of Houston, Texas related to the removal or relocation of the power pole procured by you, as required by paragraph 2 of the First Amendment.

**RESPONSE:** Respondent will produce to the extent there is any such documentation.

**33.**    All evidence that you provided plans for the removal or relocation of the power pole procured by you, as required by paragraph 2 of the First Amendment.

**RESPONSE:** None known of at this time.

EXHIBIT 15 PAGE 6 OF 6

# EXHIBIT 16

**To:**      Barry Espinosa[bespinosa@oxberrygroup.com]; Shahin Jamea[sjamea@oxberrygroup.com]
**Cc:**      Stein, Jeff @ Houston[Jeff.Stein@cbre.com]
**From:**    Hudson, Brock @ Houston[Brock.Hudson@cbre.com]
**Sent:**    Tue 6/7/2022 8:55:19 PM (UTC)
**Subject:** RE: 2627 Main - Lender Questions

Thanks Barry.

Sean – can you confirm if the plan is still for George to contribute all of the initial equity upfront? A potential mezz/pref equity group is asking for confirmation on what Oxberry's initial equity contribution will be.

Regards,

Brock Hudson | Vice President

CBRE | Capital Markets | Debt & Structured Finance

T 713-787-1942 | C 713-430-6431

**From:** Barry Espinosa <bespinosa@oxberrygroup.com>
**Sent:** Monday, June 6, 2022 1:28 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Hudson, Brock @ Houston <Brock.Hudson@cbre.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Subject:** RE: 2627 Main - Lender Questions

External

Brock,

Please see below in red

Best Regards,

**Barry Espinosa**

Development Manager

OXBERRY GROUP

oxberrygroup.com

bespinosa@oxberrygroup.com

1 Riverway, Ste 2050

Houston, TX 77056

Ph. (832) 803-6377

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Monday, June 6, 2022 12:59 PM
**To:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>; Barry Espinosa <bespinosa@oxberrygroup.com>
**Subject:** RE: 2627 Main - Lender Questions

Barry – Please answer below.

OXBERRY GROUP

**Shahin "Sean" Jamea, J.D.**

Principal

**From:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>
**Sent:** Monday, June 6, 2022 12:10 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Subject:** 2627 Main - Lender Questions

Good afternoon Sean,

Please see 2627 Main lender questions below. Can you please assist?

- Does sponsor have all of their entitlements? Site and Building permit drawings will be submitted to the City on 7/15; permits are expected around October and December, respectively.
- Can you confirm if Element Architects will be the architect? Has Oxberry used them before? Yes, EA is the Architect of Record. They specialize in Multifamily and Senior Housing. It is our first project with them.
- Does sponsor have 100% of the CDS? 100% CDs are expected 07/01
- Can you confirm Flintco will be the GC and the budget provided is the latest and greatest? FlintCo is cooperating with us to get preliminary pricing, but the project will be hard bid once we get 100% CDs. The budget provided is the latest and greatest. FlintCo is continuing to help us get a tighter price based on the DD Set submitted 6/3.

Any insight you could provide would be greatly appreciated.

EXHIBIT 16 PAGE 1 OF 2

Regards,

**Brock Hudson**
CBRE | Capital Markets | Debt & Structured Finance
2800 Post Oak Blvd, Suite 500 | Houston, TX 77056
T +1 713 787 1942 | C +1 713 430 6431
brock.hudson@cbre.com

EXHIBIT 16 PAGE 2 OF 2

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, LLC | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CAUSE NO. 4:22-CV-03730 |
| | § | |
| GRANT MEADOWS, L.L.C. | § | |
| *Defendant.* | § | |

**DEFENDANT'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST REQUEST FOR ADMISSION TO DEFENDANT**

TO:    KH-REIT II FUNDING XXI, LLC, by and through its attorneys of record, Matthew
Baumgartner, Armbrust & Brown, 100 Congress Avenue, Suite 1300, Austin, Texas 78701

Grant Meadows, L.L.C. ("**Grant Meadows**" or "**Respondent**"), a defendant in the above-

styled and numbered cause of action and serves these Objections and Responses to Plaintiff's First

Request for Admission, pursuant to the Federal Rules of Civil Procedure 36.

Respectfully submitted,

By: */s/ J. Robert MacNaughton*
J. Robert MacNaughton – *attorney in charge*
State Bar No. 00789944
SDTX No. 18350
robert@porterfirm.com
2221 S. Voss Rd.,
Houston, Texas 77057
713-621-0700 Telephone
713-621-0709 Facsimile

**OF COUNSEL:**

**PORTER LAW FIRM, PLLC**
Weston P. Ray
State Bar No. 24098307
weston@porterfirm.com
2221 S. Voss Road, Suite 200

1

EXHIBIT 17 PAGE 1 OF 4

Houston, Texas 77057
Tel.: 713-621-0700
Fax: 713-621-0709

**ATTORNEYS FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

A true and correct copy of the foregoing was served on the attorneys of record or pro se party as listed on March 17, 2023.

Matthew Baumgartner
David King
Guillermo Alarcon
ARMBRUST & BROWN, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701

*/s/ J. Robert MacNaughton*
J. Robert MacNaughton

2

EXHIBIT 17 PAGE 2 OF 4

## RESPONSES TO REQUESTS FOR ADMISSION

**1.** Admit you removed, or caused to be removed, the Power Pole.

**RESPONSE:** Denied.

**2.** Admit that the First Amendment required you to provide appropriate plans for removal and relocation of the Power Pole to KH-REIT for review and approval before removal or relocation of the Power Pole at least three business days before removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**3.** Admit that you did not provide plans for removal or relocation of the Power Pole to KH-REIT before the Power Pole's removal.

**RESPONSE:** Denied.

**4.** Admit that the First Amendment required you to provide to KH-REIT certificates or other evidence of liability insurance for acts or omissions arising out of the removal or relocation of the Power Pole at least three business days before removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**5.** Admit you did not provide to KH-REIT certificates or other evidence of liability insurance at least three business days before removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**6.** Admit that you did not obtain liability insurance for acts or omissions arising out of the removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**7.** Admit that the First Amendment entitled KH-REIT to three business days to approve plans for removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**8.** Admit that KH-REIT was not given three business days to approve plans for removal or relocation of the Power Pole.

**RESPONSE:** Denied.

3

EXHIBIT 17 PAGE 3 OF 4

**9.**     Admit that the First Amendment required you to provide consent from CenterPoint and/or the City of Houston to KH-REIT at least three business days before removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**10.**     Admit that you did not provide consent from CenterPoint and/or the City of Houston to KH-REIT at least three business days before removal or relocation of the Power Pole.

**RESPONSE:** Denied.

**11.**     Admit that you did not give KH-REIT any notice that the Power Pole was to be removed.

**RESPONSE:** Denied.

**12.**     Admit that removal or relocation of the Power Pole was not a condition to closing under the terms of the Contract.

**RESPONSE:** Denied.

4

EXHIBIT 17 PAGE 4 OF 4

# EXHIBIT 18



**INVOICE**

CNP Houston Electric, LLC

P.O. Box 61482

Houston, Texas  77208-1482

In Account With:                                                              Date:  07/20/2022
SJPHC LLC
2429 BISSONNET ST UNT 615                                    Page:    1
HOUSTON TX  77005-1451

| Invoice No. 3001112730 | Customer No. 9338163 | Contract Acct. No. 11779850-4 | Due Date: 08/19/2022 |
|---|---|---|---|

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| 0010 | CP: CUST PAY OTHER | 1 | 7,500.00 /  1 EA | 7,500.00 |
| | SAP WO # 103371997 | | | |
| | | | | |
| | BARRY ESPINOSA | | | |
| | 2627 MAIN ST | | | |
| | | | | |
| | CHECK #: 1211 CK AMT: $7,500.00 | | | |
| | | | | |
| | JENNIFER WALTER/SERVICE CONSULTANT | | | |
| | 713-945-4298 | | | |
| | | | | |
| | AL/BEL SC | | | |

| | Total Amount Due | $ | 7,500.00 |
|---|---|---|---|

0040035840020        00030000117798504200000750000000075000020

Keep Upper Portion For Your Records

Please Mail Lower Portion With Your Payment

**REMITTANCE**                        Invoice Date:  07/20/2022            Due Date: **08/19/2022**
Please make check payable to:          Customer No.:  9338163
CNP Houston Electric, LLC              Contract Acct No.:  11779850-4       Amount:   $        7,500.00
                                       Invoice No.:  3001112730
                                       Contact Number:  (713) 207-2222

CNP Houston Electric, LLC
PO Box 61482                 SJPHC LLC
Houston, TX  77208-1482      2429 BISSONNET ST UNT 615
                             HOUSTON TX  77005-1451

0040035840020          00030000117798504200000750000000075000020

CEHE0000004

EXHIBIT 18 PAGE 1 OF 6



BP # 9338163
CA # 11779850
ARO # 48806571
DOC # 306111 2730

SJPHC LLC
2429 Bissonnet St., No. 615
Houston, TX 77005

Bank of America
ACH R/T 111000025
35-2/1130 TX:1234

1211

PAY TO THE ORDER OF    CenterPoint Energy                    7/13/2022

Seven Thousand Five Hundred and 00/100****************************    $ **7,500.00

CenterPoint Energy
PDS Admin Coordinator
4300 Bissonnet St.
Houston, Texas 77401                                                DOLLARS

MEMO  2627 Main Pole Removal W/O# 10337 1997            AUTHORIZED SIGNATURE

CEHE0000005

EXHIBIT 18 PAGE 2 OF 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4



**CenterPoint Energy**

Please make check payable to:

CenterPoint Energy

**Attn:**    PDS Admin Coordinator

*4300 Bissonnet St*
*Houston, TX 77401*

## INVOICE

Customer Info:                                            **7/13/22**

| | | | | | |
|---|---|---|---|---|---|
| **Name:** | | Barry Espinosa | | | |
| **Address:** | | 2627 Main St | | | |
| **City:** | Houston | **State:** | TX | **Zip:** | 77002 |
| **Phone:** | (832) 803-6377 | | | | |
| **Email:** | | | | | |
| **CNP Representative:** | Jennifer Walter | **Phone:** | (713)945-4298 | | |

| | Description | W/O # | Total |
|---|---|---|---|
| 1 | Cost to remove facilities | 103371997 | $  7,500.00 |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| | | | **$7,500.00** |

### PLEASE MAIL PAYMENT TO THE ABOVE ADDRESS.
### Processing of check may be delayed without the return of this invoice.

Make all checks payable to: *CenterPoint Energy*

Please send a copy of this invoice along with the check. Charges good for 1 year from date of invoice.

*Payment is required prior to release of construction work order.*

If you have any questions concerning this invoice, please contact your CNP Representative at number above.

## Thank you for using CenterPoint Energy

CEHE0000006

EXHIBIT 18 PAGE 3 OF 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4

Chapter 6: Company Specific Items

Sheet No. 6.24
Page 1 of 2

CenterPoint Energy Houston Electric, LLC
Applicable: Entire Service Area

CNP 8038

**6.3     AGREEMENTS AND FORMS**

    **6.3.1     FACILITIES EXTENSION AGREEMENTS**

        **6.3.1.1 FACILITIES EXTENSION AGREEMENT FOR DISTRIBUTION
        VOLTAGE FACILITIES**

This Facilities Extension Agreement for Distribution Voltage Facilities is entered into by and between ___KH-REIT II Funding XXII, LLC_____,
herein called "Retail Customer" and CenterPoint Energy Houston Electric, LLC, herein called "Company" (hereinafter referred to as Agreement) for the extension of Company's Delivery System distribution voltage facilities, including temporary facilities (hereinafter referred to as facilities extension or extension), as described herein.

This Agreement covers the facilities extension to Retail Customer location at ___2627 Main St_____

The Company agrees to accept payment of _____7500.00_____ Dollars to be paid by the Retail Customer, as a Non-Refundable Construction Payment in connection with the Retail Customer request to extend Company facilities to the above described location as follows: cost to remove facilities inside property

sap wo: 103371997

- Unless otherwise stated by Company in writing, the Non-Refundable Construction Payment amount above is valid for twelve months.

In consideration of said Non-Refundable Payment, to be paid to Company by Retail Customer prior to commencement of construction, Company agrees to install and operate lines and equipment necessary to distribute electric service to the identified location under the following General Conditions:

- Company shall at all times have title to and complete ownership and control over facilities installed by Company.

- Retail Customer must make satisfactory payment arrangements (if payment is required to extend Company facilities) and sign and return this Agreement before Company can proceed with the requested extension.

Revision Number: 6th

Effective: 04/23/20

CEHE0000007

EXHIBIT 18 PAGE 4 OF 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4

Chapter 6: Company Specific Items

Sheet No. 6.24
Page 2 of 2

CenterPoint Energy Houston Electric, LLC
Applicable: Entire Service Area

CNP 8038

- Extension of service facilities is contingent on acquisition of all necessary easements and rights of way.

If the facilities extension requested by Retail Customer calls for construction of underground Delivery System facilities at distribution voltages, Retail Customer must also agree to Company's additional specifications and terms and conditions determined by Company for the construction of underground electric service facilities.

The Company's Tariff for Retail Delivery Service, on file with the Public Utility Commission of Texas, is incorporated into this Agreement, including without limitation Sections 5.2.1 (limitation of liability), 5.2.4 (force majeure), and 5.2.6 (disclaimer of warranties) thereof.

Nothing herein contained within this Agreement shall be construed as a waiver or relinquishment by Company of any right that it has or may hereafter have to discontinue service for or on account of default in the payment of any bill owing or to become owing thereafter for any other reason or cause stated in Company's Tariff.

This Agreement shall not be binding upon Company unless and until it is signed by an authorized representative of the Company.

CenterPoint Energy Houston Electric, LLC

By _Jennifer Walter_
G50EE1A8F471401...
Jennifer Walter
(name printed or typed)

Title    Service Consultant

Date    July 13, 2022

KH-REIT II Funding XXII, LLC
Retail Customer

By _Shahin Jamea_
C42C060A5B7F458...
Shahin Jamea ~~Barry Espinosa~~
(name printed or typed)

Title   Authorized Agent

Date   7/13/2022

Revision Number: 6th

Effective: 04/23/20

CEHE0000008

EXHIBIT 18 PAGE 5 OF 6



# EXHIBIT 19

# <u>EMAILS</u> :: Between Brent Friedman & Sean Jamea

### [<u>Created</u>: 28-Jun-23]

---

**From:** Brent Friedman <brent@parklanecompanies.com>
**Sent:** Tuesday, April 26, 2022 10:47 PM
**To:** 'Shahin Jamea' <sjamea@oxberrygroup.com>
**Cc:** becky@currentstanding.com
**Subject:** RE: Surveys. [GSB]

Hey,

Sorry.  Yes.  The recorded deed references the PSA for all purposes.  Attached is from the PSA, related to post-closing obligation for electrical service.

---

Brent Friedman
Current Standing Developments
2322 Bissonnet Street    Suite_02
Houston, Texas  77005
(713) 332-0060  | Office
(713) 530-6564  | Cell

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Thursday, April 21, 2022 4:38 PM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Cc:** becky@currentstanding.com
**Subject:** Re: Surveys. [GSB]

Thanks Brent. Same here.

Please send me the agreement regarding electricity and transformer. We don't find anything on the title commitment as a recorded instrument.

Sean Jamea

---

**<u>On Apr 21, 2022, at 4:26 PM, Brent Friedman <brent@parklanecompanies.com> wrote:</u>**

Sean,

Thanks again for the time yesterday, and updates.  Enjoyed it.  And the project looks great.

In way of follow-ups promised:

- Lock code for auto gate on Fannin is:  **1970**.  Just to make sure you have latest.  (Or… will be.  Apparently the lock was cut and will be replaced in coming days w new lock w this code).

---

EXHIBIT 19 PAGE 1 OF 4

- Re: transformer/elec. service, note that I'd misremembered this when I pointed to the location in the easement – that location was, instead, the planned location for trash dumpsters.   You were right – according to the agmt, if a pad-mounted transformer is needed, it would not be located in the Easement area.  Instead, the owner of the Caydon ppty wld provide such location on their ppty, with an easement for service and access.

- And, re: kVa service requirement for the bdg, I looked back at my notes from mtgs and emails w Caydon, and believe the civil and MEP determined that:   Depending on the user(s)/use type(s), the requirement could be +750 kVa, on the "low-side", or perhaps 2,000 kVa on realistic "high-side" scenario.   And we'd asked Caydon:  "In the event we have to lock-in today, inasmuch as we don't yet know for sure what the exact capacity need is, do you guys know whether – if we were to go with 750 kVa, and later need to expand up to, say, 2,000 kVa – if this would just be a matter of adding 2 or 3 poles, assuming it could be pole-mounted?"   And didn't hear back on this.

Hope this helps.  Let me know if I missed anything, or you need any other info from us, on this or otherwise.

Thanks,

---

Brent Friedman
Current Standing Developments
2322 Bissonnet Street    Suite_02
Houston, Texas  77005
 (713) 332-0060  | Office
 (713) 530-6564  | Cell

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, April 13, 2022 7:50 AM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Subject:** Re: Surveys. [GSB]

Next Wednesday April 20th at 3:30? Same coffee shop in the village?


Sean Jamea

---

**On Apr 13, 2022, at 7:46 AM, Brent Friedman <brent@parklanecompanies.com> wrote:**

Morning Sean,

Just happened across this email and reminded me.  Wanted to make sure you saw below.  And, if you do still want to grab coffee maybe one day next week, shoot me a text (c: 713-530-6564).

Thanks,


Brent Friedman

EXHIBIT 19 PAGE 2 OF 4

**From:** Brent Friedman brent@parklanecompanies.com
**Sent:** Wednesday, April 6, 2022 10:35 AM
**To:** Shahin Jamea sjamea@oxberrygroup.com
**Subject:** Re: Surveys

Hey Sean,

I just happened upon this email.  Im sorry about the crickets.

Yes.  Coffee next wk is good.  I'm wide open after abt 2 on Tu.  Or, if better, have slots We - Fr.  Lmk what works.   (Ideally by text if you would, to make sure I don't miss it again.   C: 713-530-6564).

We may be going under contract soon on our property over there.   Tell you more at coffee.


Brent Friedman

---

***On Apr 4, 2022, at 12:20 PM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:***

Hi Brent,

We have the Caydon land under contract. I think your property manager was putting a lock on our gate so I asked her to stop.

I'm leaving town tomorrow and but excited to share our plans. Maybe coffee next week?


<image001.png>

**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Brent Friedman <brent@parklanecompanies.com>
**Sent:** Tuesday, November 9, 2021 9:51 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** Re: Surveys

Great.   See you then/there.

---

***On Nov 9, 2021, at 8:10 PM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:***

Yup


<image001.png>

**Shahin "Sean" Jamea, J.D.**
Principal

EXHIBIT 19 PAGE 3 OF 4

**From:** Brent Friedman <brent@parklanecompanies.com>
**Sent:** Tuesday, November 9, 2021 4:06 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** Re: Surveys

Good.   Badolinas at 10:15A on Thu?


Brent Friedman

---

***On Nov 9, 2021, at 9:07 AM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:***

 Coffee in rice village Thursday morning?

Sean Jamea

---

***On Nov 9, 2021, at 10:01 AM, Brent Friedman <brent@parklanecompanies.com> wrote:***

Hey Sean,

Agreed – hard to believe its been 6 yrs.

Contact info is below.   Feel free to call/text anytime.   Or, lmk if youd rather meet.


Brent Friedman

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Sunday, November 7, 2021 11:19 AM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Subject:** RE: Surveys

Hi Brent,

Judging by below dates, it's been a very long time. Hope all is well and that this is still a good email.

I'd like to talk to you about the Greensheet building.

Please send me your contact info and a good time to connect.

Thanks,


<image001.png>

**Shahin "Sean" Jamea, J.D.**
Principal

EXHIBIT 19 PAGE 4 OF 4

# EXHIBIT 20

# NOTES :: Call w Sean Jamea re: Post-Closing Obligations

*[26-Sep-22]*

*__NOTE:__  Text below in <span style="color:red">red font</span> are notes from the meeting/call.  Text which is also <mark>highlighted</mark> are "follow-up/action items".*

- Sean called and explained that he was interested in an update from us on the "post-closing-obligat-ions" matter with the current owner.  He said he was hoping it had been resolved because 'the last thing (he) wants' is to get into a situation where he's adverse to us.

- I explained that I hadn't heard anything about it in a couple of months, but I think last I heard our att-orney sent their attorney a letter.  And my guess is there has not been a resolution between them, as I imagine I would have heard about that.   But, I'm happy to call and get an update and let him know.

- He said that would be great, but asked what I knew about the "obligations", in general – bc, as he understands it, the seller has recently removed the T- poles in the parking lot.

- I said I'd tell him everything I know on it, which is :

  - When Caydon approached us to purchase the property, we didn't want to sell.  After months of trying, the president of Caydon ultimately convinced me to meet to discuss our reservations to see if they might be able to resolve them.

  - We met and I talked him through our 3 main reservations preventing us from selling – namely: Parking, electrical service and access to the rear of our building.   They then – over the following weeks/months – set about to resolve those concerns.  And were ultimately able to address these to our satisfaction and convince us to agree to sell.

  - On the electrical service, they committed to be solely responsible to provide consistent elec-trical service to our building, both:  (i) Initially – on an "interim" basis and during their constr-uction, until such time as they could place new transformers to service our property;  and, (ii) Then service via the permanent transformers, thereafter.   And that was where this obligation – and the others – as well as the easement-area designation, in our agreements came from.

  - Our attorneys explained to us that they were quite sure that these obligations are the obligations of any Caydon successor/assigns, regardless of the circumstances.   And I think last I heard on it, our attorney sent their attorney a letter explaining this.

- Sean reiterated about the seller having recently removed the T-poles, in a way seeming to suggest that this removal would mark the end of any post-closing obligation(s).   So I asked him what the connection was between this removal and these obligations.

- He said that his understanding was that our attorneys' letter said that they could not remove the T-poles, and that the Seller doing so indicated that they (Seller) believed that they were not concerned about these obligations, and also that they could now not provide this "interim" service.

- I said that I wouldn't think removing the pole would remove this obligation, and they would still be obligated to provide temporary service when our building needs it.   But, again, I'm happy to reach out to our attorneys for an update.   He said "Great.  Please.  And let me know."

- So, wanted to touch base w you on it.   And, sending recap by email so you have it and can review – but, feel free to call to discuss if you'd like to.

<span style="color:red">EXHIBIT 20 PAGE 1 OF 1</span>

# EXHIBIT 21

# <u>TEXTS</u>  ::  Between Brent Friedman & Sean Jamea

*<u>[Created:</u>  28-Jun-23]*



EXHIBIT 21 PAGE 1 OF 1

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

KH-REIT II FUNDING XXII, LLC,      §
    *Plaintiff,*      §
          §
v.      §        Case No. 4:22-CV-3730
          §
GRANT MEADOWS, LLC and SHAHIN      §
JAMEA,      §
    *Defendants.*      §

## DECLARATION OF JOHN LYONS

1.      My name is John Lyons. I am over the age of 21 years and am fully competent and qualified to make this declaration.  I have personal knowledge of the facts stated in this declaration, and those facts are true and correct.

2.      I am a Senior Project Manager at Rainmaker Document Technologies ("Rainmaker").  I have been in this position since September 1, 2021 and I have been employed in the electronic discovery field for more than twenty years.  My job responsibilities include managing electronic discovery in civil litigation.  Attorney Matthew Baumgartner at the law firm Armbrust & Brown, PLLC engaged Rainmaker to help manage electronic discovery in this case, and I am the project manager managing the document review database for this case.  The database includes documents produced by Defendant Grant Meadows, LLC, Plaintiff and third parties.

3.      I have reviewed the documents produced by Grant Meadows, and using the Relativity document review platform, I am able to glean information regarding the documents in the database.

4.      Defendant Grant Meadows's document production consists of 969 documents, of which 698 are emails and 271 are attachments to those emails.

EXHIBIT 22 PAGE 1 OF 2

5.      Grant Meadows has not produced any documents other than emails and attachments.

6.      Of the 698 emails, 697 contain one of Shahin "Sean" Jamea's email addresses (sjamea@oxberrygroup.com and Sean@AspenGreyHomes.com) in the "To," "CC," or "BCC" lines. This means that these are emails that were sent to Jamea or on which Jamea was copied (i.e., these emails were in Jamea's inbox). Grant Meadows has produced only one email that includes Barry Espinosa that did not also include Mr. Jamea. Grant Meadows has produced no emails that included Pejman Jamea that did not also include Shahin Jamea. Therefore, it is safe to say that these 697 emails came from Mr. Jamea's inbox.

7.      Grant Meadows has produced only one email that contains Mr. Jamea's email address in the "From" line—an email that he sent himself. Therefore, it is safe to say that Grant Meadows has not produced any emails from Mr. Jamea's sent folder.

8.      I declare under penalty of perjury that the foregoing is true and correct.


Executed on the August 31, 2023 in Harris County. Texas.


_John Lyons_ (signature)

John Lyons


{W1256197.1}                                          2

EXHIBIT 22 PAGE 2 OF 2

# EXHIBIT 23

**To:**      Shahin Jamea[sjamea@oxberrygroup.com]
**Cc:**      Stein, Jeff @ Houston[Jeff.Stein@cbre.com]
**From:**    Hudson, Brock @ Houston[Brock.Hudson@cbre.com]
**Sent:**    Thur 10/20/2022 2:52:52 PM (UTC)
**Subject:** Sonder Midtown

Good morning Sean,

Per our conversation from yesterday, we are going to slow play Plains on this deal.

However, I wanted to check and see if you were still comfortable moving forward with the appraisal. Moving forward with the appraisal may be a good way to avoid any suspicion from the lender and keep the ball rolling albeit at a slower pace. Just let us know what you are comfortable with.

Regards,

Brock Hudson | Vice President
CBRE | Capital Markets | Debt & Structured Finance
T 713-787-1942 | C 713-430-6431

EXHIBIT 23 PAGE 1 OF 1

# EXHIBIT 24

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, L.L.C., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:22-CV-3730 |
| | § | |
| GRANT MEADOWS, LLC and SHAHIN | § | |
| JAMEA, | § | |
| *Defendants.* | § | |

**AFFIDAVIT OF MATTHEW BAUMGARTNER**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant, who, being by me duly sworn, upon his oath, stated:

1.     "My name is Matthew Baumgartner.  I am over eighteen (18) years of age, and I have never been convicted of a felony.  I am of sound mind, capable of making this affidavit, and am fully competent to testify to the matters stated herein.  I have personal knowledge of the matters stated herein, and the matters stated herein are true and correct.

2.     "This Affidavit is being submitted in support of KH-REIT II Funding XXII, L.L.C.'s request for discovery sanctions.

3.     "I am a licensed attorney in good standing in the State of Texas.  I have been licensed to practice law since 2005, and I am a member of the law firm of Armbrust & Brown, PLLC ('A&B').  For all of that time my practice has been focused on civil litigation, including real estate litigation.  I am the attorney at A&B primarily responsible for representing the Plaintiff in the above-styled Lawsuit, and I have personal knowledge of the services provided by A&B to

Plaintiff in the above-styled Lawsuit.  In this litigation, I have been assisted by my colleague, Guillermo A. Alarcon, who has been licensed to practice law since 2016.

4.      "I am familiar with the fees customarily charged by lawyers in Harris County, Texas for services similar to the above-styled Lawsuit.

5.      "Since April 2023, I and Mr. Alarcon have spent a significant amount of time trying to get Defendants to comply with their discovery obligations.  Our efforts, and the time spent on those efforts, are summarized in the attached billing statements.

6.      "Through August 31, 2023, I have spent 11.4 hours conferring with opposing counsel and preparing Plaintiff's motion to compel. My hourly rate is $535.  Mr. Alarcon has spent 52.6 conferring with opposing counsel, preparing for and taking the deposition of Shahin Jamea, and preparing Plaintiff's motion to compel. Mr. Alarcon's hourly rate is $390.  It is my opinion that the time spent by Mr. Alarcon and myself for these discovery matters has been reasonable and necessary.  It is also my opinion that the hourly rates charged by Mr. Alarcon and myself is reasonable and in line with attorneys that have our experience and qualifications.  In total, Plaintiff has spent $26,613 attempting to get Defendant to comply with its discovery obligations. It is my opinion that the time expended for these services, the hourly rates charged, and the total fees charged were and are reasonable and necessary.

7.      "I have attached to Plaintiff's motion to compel and for discovery sanctions a redacted copy of A&B's time entries and the associated fees charged for the discovery matters described herein—i.e., the time and fees incurred in attempting for many months to obtain Grant Meadows' voluntary compliance with its discovery obligations.  The attached time entries have been produced from A&B's electronic files which are made and kept in the regular course of

A&B's business; they reflect time entries record at the time of the events by myself and Mr. Alarcon; and, they are true and correct copies of those contemporaneously recorded events.

8.      "In determining the reasonableness and necessity of the attorneys' fees of Plaintiff in connection with this matter, I have considered the following factors as set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–18 (5th Cir. 1974), *abrogated on other grounds as stated in Blanchard v. Bergeron*, 489 U.S. 87, 91 (1989):

    a.      The time and labor required;

    b.      The novelty and difficulty of the questions;

    c.      The skill requisite to perform the legal services properly;

    d.      The preclusion of other employment by the attorney due to acceptance of the case;

    e.      The customary fee;

    f.      Whether the fee is fixed, contingent, or hourly;

    g.      Time limitations imposed by the client or circumstances;

    h.      The amount involved; and

    i.      The experience, reputation, and ability of the attorneys."

FURTHER AFFIANT SAYETH NAUGHT.



Matthew Baumgartner

SUBSCRIBED TO AND SWORN TO before me on this 31st day of August, 2023.

DENISE L. MOTAL
Notary Public, State of Texas
Notary ID# 773093-0
My Commission Expires
SEPTEMBER 10, 2026

Notary Public, State of Texas

# ARMBRUST & BROWN, PLLC

ATTORNEYS & COUNSELORS

100 Congress Avenue

Suite 1300

Austin, TX 78701-2744

PHONE: (512) 435-2300

FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

## Billing Summary

KH-REIT II FUNDING XXII, LLC

RBROWN@KNIGHTHEADFUNDING.CO

M

,

May 08, 2023

Client:      049115

Matter:      000101

For Professional Services Rendered Through April 30, 2023

## Account Summary

| Invoice # | Matter Name | Previous Balance | Current Invoice | Credits | Total Due |
|-----------|-------------|------------------|-----------------|---------|-----------|
| 192137 | 2701 MAIN STREET (HOUSTON) | ██████ | ██████ | ████ | ██████ |

*Please return with all remittance for proper credit.*

*Total due reflects payments received as of the date of this invoice.*

*Thank you.*

*Amount of Payment:* _____

# ARMBRUST & BROWN, PLLC

ATTORNEYS & COUNSELORS

100 Congress Avenue
Suite 1300
Austin, Texas 78701-2744

PHONE: (512) 435-2300
FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

KH-REIT II FUNDING XXII, LLC
RBROWN@KNIGHTHEADFUNDING.CO
M
,

| | |
|---|---|
| May 08, 2023 | |
| Client: | 049115 |
| Matter: | 000101 |
| Invoice #: | 192137 |
| | |
| Page: | 1 |

RE:  2701 MAIN STREET (HOUSTON)

For Professional Services Rendered Through  April 30, 2023

## SERVICES

| Date | Person | Description of Services | Hours | Amount |
|---|---|---|---|---|
| 4/4/2023 | MBB | Further revisions to discovery letter; Email to R. Brown; Call with R. Brown; Draft settlement response letter. | 2.4 | $1,284.00 |
| 4/4/2023 | GAA | Review and revise discovery letter to opposing counsel. | 0.1 | $39.00 |
| ███ | ██████ | ████████████████████ ██████ | ██ | ████ |
| 4/17/2023 | MBB | Call with Robert MacNaughton regarding amending scheduling order and creating a date certain for mutual document exchange; Draft same; Emails with R. Brown regarding same. | 2.2 | $1,177.00 |
| ███ | ██████ | ████████████████████ | ██ | ████ |
| ███ | ██████ | ████████████████████ ████████████████████ ████████████████████ ████████████████████ | | ████ |
| ███ | ██████ | ████████████████████ ██████ | ██ | ████ |
| ███ | ██████ | ████████████████████ ██████████ | ██ | ████ |

May 08, 2023
Client:          049115
Matter:          000101
Invoice #:       192137

Page:            2

## SERVICES

| Date | Person | Description of Services | Hours | Amount |
|------|--------|------------------------|-------|--------|



## PERSON RECAP

| Person | | Level | Hours | Rate | Amount |
|--------|--|-------|-------|------|--------|
| MBB | MATTHEW BAUMGARTNER | PARTNERS | ▮ | $535.00 | ▮ |
| GAA | GUILLERMO A ALARCON | $395.00 ASSOCIATES | ▮ | | ▮ |

May 08, 2023
Client:          049115
Matter:         000101
Invoice #:      192137

Page:                3

Total Services                    
Total Current Charges
Previous Balance
**PAY THIS AMOUNT**

# ARMBRUST & BROWN, PLLC

ATTORNEYS & COUNSELORS

100 Congress Avenue

Suite 1300

Austin, TX 78701-2744

PHONE: (512) 435-2300

FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

## Billing Summary

KH-REIT II FUNDING XXII, LLC

RBROWN@KNIGHTHEADFUNDING.CO

M

,

June 15, 2023

Client:      049115

Matter:      000101

For Professional Services Rendered Through May 31, 2023

## Account Summary

| Invoice # | Matter Name | Previous Balance | Current Invoice | Credits | Total Due |
|-----------|-------------|------------------|-----------------|---------|-----------|
| 193198 | 2701 MAIN STREET (HOUSTON) | ██████ | ████████ | | ██████ |

*Please return with all remittance for proper credit.*

*Total due reflects payments received as of the date of this invoice.*

*Thank you.*

*Amount of Payment:* _____

# ARMBRUST & BROWN, PLLC

ATTORNEYS & COUNSELORS

100 Congress Avenue

Suite 1300

PHONE: (512) 435-2300

FACSIMILE: (512) 435-2360

Austin, TX 78701-2744

Federal Tax I.D. No.: 74-2827166

## Billing Summary

KH-REIT II FUNDING XXII, LLC

RBROWN@KNIGHTHEADFUNDING.CO

M

,

July 06, 2023

Client:          049115

Matter:          000101

For Professional Services Rendered Through June 30, 2023

## Account Summary

| Invoice # | Matter Name | Previous Balance | Current Invoice | Credits | Total Due |
|-----------|-------------|------------------|-----------------|---------|-----------|
| 193678 | 2701 MAIN STREET (HOUSTON) | ███ | ███ | ███ | ███ |

*Please return with all remittance for proper credit.*

*Total due reflects payments received as of the date of this invoice.*

*Thank you.*

*Amount of Payment:* _____

# ARMBRUST & BROWN, PLLC

ATTORNEYS & COUNSELORS

100 Congress Avenue

Suite 1300

Austin, Texas 78701-2744

PHONE: (512) 435-2300

FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

KH-REIT II FUNDING XXII, LLC
RBROWN@KNIGHTHEADFUNDING.CO
M
,

| | |
|---|---|
| July 06, 2023 | |
| Client: | 049115 |
| Matter: | 000101 |
| Invoice #: | 193678 |
| | |
| Page: | 1 |

RE:  2701 MAIN STREET (HOUSTON)

For Professional Services Rendered Through  June 30, 2023

## SERVICES

| Date | Person | Description of Services | Hours | Amount |
|---|---|---|---|---|
| ████ | ████ | ████████████ ████████ | ██ | ████ |
| ████ | ████ | ████ | ██ | ████ |
| ████ | ████ | ████████ | ██ | ████ |
| 6/26/2023 | MBB | Draft discovery letter to opposing counsel. Email to Knighthead personnel regarding same, and regarding depositions. | 2.4 | $1,284.00 |
| ████ | ████ | ████████ ████████ ███ | ██ | ████ |
| | | Total Professional Services | | ████ |

## PERSON RECAP

| Person | | Level | Hours | Rate | Amount |
|---|---|---|---|---|---|
| MBB | MATTHEW BAUMGARTNER | PARTNERS | ██ | $535.00 | ████ |
| GAA | GUILLERMO A ALARCON | ASSOCIATES | ██ | $390.00 | ████ |

July 06, 2023
Client: 049115
Matter: 000101
Invoice #: 193678

Page: 2

## DISBURSEMENTS

| Date | Description of Disbursements | Amount |
|------|------------------------------|--------|
| ███ | ████████████████ | ████ |
| ████████████ | | ████ |
| ███ | | |
| ████████████ | | ████ |
| ███ | | |
| ██████████████ | | █ |
| ████████ | | |
| ██ | | |
| | ████ | ████ |

| | | |
|---|---|---|
| Total Services | ████ | |
| Total Disbursements | ████ | |
| Total Current Charges | | ████ |
| Previous Balance | | ████ |
| **PAY THIS AMOUNT** | | ████ |

# ARMBRUST & BROWN, PLLC
ATTORNEYS & COUNSELORS
100 Congress Avenue
Suite 1300
Austin, TX 78701-2744

PHONE: (512) 435-2300
FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

## *Billing Summary*

KH-REIT II FUNDING XXII, LLC
RBROWN@KNIGHTHEADFUNDING.CO
M

,

August 15, 2023
Client:        049115
Matter:        000101

For Professional Services Rendered Through July 31, 2023

## *Account Summary*

| Invoice # | Matter Name | Previous Balance | Current Invoice | Credits | Total Due |
|-----------|-------------|------------------|-----------------|---------|-----------|
| 194959 | 2701 MAIN STREET (HOUSTON) | ███ | ███ | | ███ |

*Please return with all remittance for proper credit.*

*Total due reflects payments received as of the date of this invoice.*

*Thank you.*

*Amount of Payment:* _____

# ARMBRUST & BROWN, PLLC
### ATTORNEYS & COUNSELORS
100 Congress Avenue
Suite 1300
Austin, Texas 78701-2744

PHONE: (512) 435-2300
FACSIMILE: (512) 435-2360

Federal Tax I.D. No.: 74-2827166

KH-REIT II FUNDING XXII, LLC
RBROWN@KNIGHTHEADFUNDING.CO
M
,

| | |
|---|---|
| August 15, 2023 | |
| Client: | 049115 |
| Matter: | 000101 |
| Invoice #: | 194959 |
| | |
| Page: | 1 |

RE:  2701 MAIN STREET (HOUSTON)

For Professional Services Rendered Through   July 31, 2023

**SERVICES**

| Date | Person | Description of Services | Hours | Amount |
|---|---|---|---|---|
| ███ | ████ | █████████████████████ | ██ | ███ |
| | ██████████ | | | |
| ████ | ██████ | ██████████████ | ██ | ████ |
| ████ | ██████ | ██████████████ | ████ | ████ |
| ████ | ██████ | ████████████ | ██ | ████ |
| | | ████████████ | ██ | |
| 7/20/2023 | GAA | Meeting with M. Baumgartner regarding deposition of S. Jamea; emails with R. MacNaughton regarding deposition of B. Espinosa; prepare for deposition of S. Jamea. | 2.2 | $858.00 |
| 7/25/2023 | GAA | Review documents in preparation for deposition; prepare deposition outline; compile and prepare exhibits for deposition of S. Jamea. | 13.4 | $5,226.00 |
| 7/26/2023 | GAA | Travel to and from Houston for deposition of S. Jamea. | 10.8 | $4,212.00 |
| 7/27/2023 | MBB | Discuss deposition and post-deposition motions and third-part subpoenas with G. Alarcon. | 0.5 | $267.50 |
| | | Total Professional Services | ██ | ████ |

August 15, 2023
Client:       049115
Matter:       000101
Invoice #:    194959

Page:              2

## PERSON RECAP

| Person | | Level | Hours | Rate | Amount |
|--------|--|-------|-------|------|--------|
| MBB | MATTHEW BAUMGARTNER | PARTNERS | ██ | $535.00 | ██████ |
| GAA | GUILLERMO A ALARCON | ASSOCIATES | ██ | $390.00 | ██████ |

## DISBURSEMENTS

| Date | Description of Disbursements | Amount |
|------|-----------------------------|--------|
| | ████████████████████████ | ██████ |
| | ████████████ | |
| ██████ | ████████████████████████ | ██████ |
| | ██ | |
| | ████████ | ██████ |

| | |
|--|--|
| Total Services | ██████ |
| Total Disbursements | ██████ |
| Total Current Charges | ██████ |
| Previous Balance | ██████ |
| *Less Payments* | ███████ |
| **PAY THIS AMOUNT** | ██████ |

# Fee Transaction Listing

**Listing Order:** Timekeeper, Transaction Date, Client-Matter Code
**Client:** KH-REIT II FUNDING XXII, LLC
**Matter:** 2701 MAIN STREET (HOUSTON)
**Date:** 12/30/1899 **through** 8/31/2023

**Entry by:** All
**Person:** All
**Service:** All
**Fee State:** (Incomplete) (UnReleased) (Released)
**Fee Status:** (Selected) (Deferred)

| Record | Date | Prsn | Stat | Description | Time | Amount |
|--------|------|------|------|-------------|------|--------|
| **Client: 049115 - KH-REIT II FUNDING XXII, LLC** | | | | **Matter: 000101 - 2701 MAIN STREET (HOUSTON)** | | |
| 1509486 | 8/24/2023 | GAA | S | Draft motion to compel and for discovery sanctions. | 4.9 | $1,911.00 |
| 1509488 | 8/25/2023 | GAA | S | Draft motion to compel and for sanctions. | 6.8 | $2,652.00 |
| 1509489 | 8/29/2023 | GAA | S | Draft motion to compel and for sanctions; compile exhibits for same. | 5.2 | $2,028.00 |
| 1509490 | 8/30/2023 | GAA | S | Compile exhibits for motion to compel. | 3.7 | $1,443.00 |
| 1509491 | 8/31/2023 | GAA | S | Finalize motion to compel and exhibits. | 5.5 | $2,145.00 |
| ███████ | ████████ | ███ | █ | ████████████████████████████████ | ███ | ████████ |
| ███████ | ████████ | ███ | █ | ████████████████████████████████ | ███ | ████████ |
| 1505697 | 8/14/2023 | MBB | S | Call with Robert MacNaughton re settlement and discovery issues; Begin draft of motion to compel; | 0.4 | $214.00 |
| 1505718 | 8/14/2023 | MBB | S | Call with Robert MacNaughton re settlement and discovery issues; Draft follow-up letter re same; | 0.8 | $428.00 |
| 1506120 | 8/15/2023 | MBB | S | Draft and send settlement letter to R. MacNaughton; | 0.5 | $267.50 |
| 1508288 | 8/27/2023 | MBB | S | Review and revise motion to compel and for sanctions; send same to R. Brown for client edits and comments; | 2.2 | $1,177.00 |
| | | | | **Matter Total** | | ████████ |
| | | | | **Fee Transaction Listing Total** | | ████████ |

# EXHIBIT 25

**To:**      Shahin Jamea[sjamea@oxberrygroup.com]
**Cc:**      Amy Graham[a.graham@elementarchitects.com]; Patrick Helemann[p.helemann@elementarchitects.com]; Barry Espinosa[bespinosa@oxberrygroup.com]
**From:**    Michael Graham[graham@elementarchitects.com]
**Sent:**    Wed 3/1/2023 8:06:46 PM (UTC)
**Subject:**  RE: Oxberry Payment Plan

We understand and accept those terms. Thank you

**Michael Graham**
Partner / Principal
Architect in TX, AZ, CO, CT, FL, GA, IL, IN, KY, LA, MD, MI, ME, MN, NV, NJ, NC, OK, PA, SC, TN



1250 Wood Branch Park Dr, Suite 480, Houston, TX, 77079
832. 300. 0236 | Direct
713. 874. 0775 | Main
713. 471. 4884 | Mobile

 

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, March 1, 2023 1:44 PM
**To:** Michael Graham <graham@elementarchitects.com>
**Cc:** Amy Graham <a.graham@elementarchitects.com>; Patrick Helemann <p.helemann@elementarchitects.com>; Barry Espinosa <bespinosa@oxberrygroup.com>
**Subject:** RE: Oxberry Payment Plan

** Caution External Sender**

Michael,

First, I'm sorry that we're at this junction. As a developer, this feels like 2008 all over again with investors bailing on us and not fulfilling their promises to fund pre-development expenses.

I want to be upfront and clear with you. The development entity for this project and your contractual counter-party, Grant Meadows, L.L.C., doesn't have any cash to fulfill its contractual obligations to you on the remaining $100K you've invoiced. The land has fallen out of contract and the seller is actively marketing the property for sale. As with many of other deals, there are no buyers yet and the land still on the market. I feel that Grant Meadows, L.L.C. would be the best buyer for the property when conditions improve but cannot be certain that it will end up with the land.

I am willing to pay you $25K out of my own pocket today and another $25K on 4/1/23. This will come from me personally.

As to the last $50K remaining, Grant Meadows, L.L.C. will agree to pay that only if it gains control of the land and is able to move forward with the deal. Me personally, or Oxberry Group, cannot give you any assurance of that. Also, should Grant Meadows, L.L.C. gain control of the land again, and in exchange for the $50K payment, it would expect you to continue performing under the original contract and finish the permitting/drawings per the contract. Of course we understand there would be additional fees under the contract as the project moves thru design and permitting to construction administration.

Please discuss and let me know. If you approve, I can have check cut today.

EXHIBIT 25 PAGE 1 OF 2

**OXBERRY** GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

---

**From:** Michael Graham <graham@elementarchitects.com>
**Sent:** Wednesday, March 1, 2023 10:48 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Cc:** Amy Graham <a.graham@elementarchitects.com>; Patrick Helemann <p.helemann@elementarchitects.com>
**Subject:** Oxberry Payment Plan

Sean,
I spoke to my Partner and we agreed to work with you on the payment plan you suggested.  To summarize our conversation from yesterday:

- You will pay $25,000 today
- A second payment of $25,000 on 4/1/23
- A third $50,000 payment at some later date.
- You're confident the project will move forward at some point, and we're willing to work with you on these flexible payment terms.

I appreciate you recognizing this is a large amount for us and agreeing to pay out of pocket.  Please keep us apprised of the status of the project.
Best Regards,

**Michael Graham**
Partner / Principal
Architect in TX, AZ, CO, CT, FL, GA, IL, IN, KY, LA, MD, MI, ME, MN, NV, NJ, NC, OK, PA, SC, TN



1250 Wood Branch Park Dr, Suite 480, Houston, TX, 77079
832. 300. 0236 | Direct
713. 874. 0775 | Main
713. 471. 4884 | Mobile

   

EXHIBIT 25 PAGE 2 OF 2