IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, LLC, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:22-CV-3730 |
| | § | |
| GRANT MEADOWS, L.L.C. and | § | |
| SHAHIN JAMEA, | § | |
| *Defendants.* | § | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**MATTHEW BAUMGARTNER**,
Attorney in Charge
Texas State Bar No. 24062605
Southern District of Texas No. 1626953
mbaumgartner@abaustin.com
(512) 435-2308
**GUILLERMO A. ALARCON**, Of Counsel
Texas State Bar No. 24099176
Southern District of Texas No. 3122674
galarcon@abaustin.com
(512) 435-2383
**DAVID KING,** Of Counsel
Texas State Bar No. 24083310
Southern District of Texas No. 2414517
dking@abaustin.com
(512) 436-2305
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.   Introduction and Summary of Argument. ...........................................................1

II.  Statement of Facts.........................................................................................2

   A.  The Purchase and Sale Agreement ................................................... 2

   B.  The Title Commitment and Grant Meadows's initial objection....................... 2

   C.  The First Amendment to the PSA.................................................... 5

   D.  The neighbor's claims and his interactions with Jamea ................................. 6

   E.  Jamea threatens to terminate contract using neighbor's claims
      as pretext......................................................................... 7

   F.  Grant Meadows's business plan falls apart so it gins up a Title
      Objection based on the power pole .................................... 9

   G.  Sequence of Events ....................................................... 14

III. Argument.................................................................................................15

   1.  Grant Meadows lost the right to object to the power pole months before it
      terminated the PSA ................................................... 17

   2.  Grant Meadows cannot use its own breach of contract as a basis for
      terminating the contract............................................ 18

   3.  Grant Meadows agreed in the First Amendment that removing or
      relocating the power pole was not a condition to closing ............................ 19

   4.  Grant Meadows waived almost all termination rights under the Second
      Amendment ....................................................... 19

   5.  Grant Meadows was not required to deliver a Title Affidavit until closing 21

   6.  Plaintiff is entitled to an award of attorneys' fees ........................................ 22

IV.  Conclusion and Prayer.......................................................................................22

4895-4526-9923, v. 2

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Dobbins v. Redden,*
    785 S.W.2d 377 (Tex. 1990) .................................................................................. 19

*Mid-Continent Cas. Co. v. Petroleum Sols., Inc.,*
    917 F.3d 352 (5th Cir. 2019) ............................................................................... 23

*Sims v. Monumental General Ins. Co.,*
    960 F.2d 478 (5th Cir. 1992) ............................................................................... 16

*Tolar v. Allstate Tex. Lloyd's Co.,*
    772 F.Supp.2d 825 (N.D. Tex. 2011) .................................................................. 21

**Statutes**

Tex. Civ. Prac. & Rem. Code § 38.001(b)(8) ............................................................. 23

**Other Authorities**

DEFAULT, Black's Law Dictionary (11th ed. 2019) .................................................. 21

Fed. R. Civ. P. 56 ......................................................................................................... 2

4895-4526-9923, v. 2

<u>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

TO THE HONORABLE KEITH P. ELLISON:

Pursuant to Fed. R. Civ. P. 56, Plaintiff KH-REIT II Funding XXII, LLC ("Knighthead") files this motion for summary judgment on Knighthead's breach of contract claim against Defendant Grant Meadows, L.L.C. ("Grant Meadows").[1] In support, Knighthead shows the Court the following:

**I.     Introduction and Summary of Argument.**

This lawsuit is over which party gets to keep earnest money under a real estate contract. Defendant Grant Meadows, the purchaser under the contract, purported to terminate the contract only a few days before closing. Grant Meadows asserts that it is entitled to the earnest money because it terminated the contract after Knighthead, the seller, defaulted by not curing Grant Meadows's objections to a title commitment.

As explained in further detail below, Grant Meadows had waived its right to terminate the contract. Grant Meadows's waiver is based on: (1) the plain language of the contract, which has strict deadlines for title objections; (2) the plain language of a contract amendment which said: "Purchaser acknowledges and agrees that, except in the event of default by Seller under the Agreement, or following a casualty or condemnation event . . . ***<u>Purchaser shall have no further right to terminate the contract</u>***"; and (3) Defendants' undisputed conduct.

---

[1] Although Plaintiff does not move for summary judgment on its trespass claim, the granting of this summary judgment will render Plaintiff's trespass claim moot. Thus, Plaintiff requests the Court enter final judgment upon the granting of this motion.

Knighthead therefore asks the Court for summary judgment establishing that Knighthead is entitled to the earnest money and an award of attorneys' fees.

## II. Statement of Facts.

### A. The Purchase and Sale Agreement.

On March 31, 2022, Knighthead (as seller) and Grant Meadows (as purchaser) entered into a Purchase and Sale Agreement ("PSA").[2] The PSA was for two tracts of land (the "Property") in central Houston and had a purchase price of $14,375,000.[3] The PSA required Grant Meadows to make an "Initial Deposit" of $150,000 within two business days of the PSA's execution.[4] The PSA then required a "Second Deposit" of $500,000 within 90 days of the PSA's execution.[5] Closing was initially set to occur on August 29, 2022.[6]

### B. The Title Commitment and Grant Meadows's initial objection.

Before executing the PSA, Grant Meadows was provided a copy of a commitment for title insurance, dated March 21, 2022, and a copy was attached to the PSA.[7] That title commitment included various exceptions from coverage—i.e., defects in title that were expressly excluded from protection under the title insurance policy.

The PSA has a detailed provision for dealing with "Title Objections"—i.e., objections to the exceptions from coverage under the title commitment.[8] Under that

---

[2] *See* PSA (Exhibit 1).
[3] *Id.* § 2.
[4] *Id.* §§ 2–3.
[5] *Id.*
[6] *Id.* § 5(a).
[7] *Id.* at p. 25.
[8] *Id.* § 5(d).

provision, Grant Meadows had an initial 25 days to assert objections to any matter raised in the title commitment or survey of the Property.[9] The PSA provides that if Grant Meadows failed to timely deliver a Title Objection, "all exceptions and other matters appearing on any survey of the Property or existing of record shall be deemed accepted by Purchaser."[10]

The PSA further provides that if Grant Meadows received any updated title commitments or surveys, Grant Meadows could assert Title Objections to any matter "first raised" in the updated title commitment or survey.[11]

Following a Title Objection, Knighthead had two choices: Knighthead could either attempt to cure the Title Objection or it could refuse to cure the Title Objection.[12] The PSA makes clear that Knighthead had "no obligation" to cure any Title Objections, and whether it chose to do so was left to Knighthead's "sole discretion."[13]

If Knighthead refused to cure a Title Objection, Grant Meadows had as its "sole and exclusive remedy" the option to terminate the PSA and receive a refund of its earnest money.[14] But Grant Meadows had only two days to exercise that option.[15] And if Grant Meadows failed to terminate within those two days, it would

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

4895-4526-9923, v. 2

be "deemed to have waived its right to object to such Title Objection or matter and shall be obligated to close in accordance with this Agreement."[16]

On April 21, 2022, the title company issued an updated title commitment.[17] Relevant to this dispute, the updated title commitment identified, as an "exception from coverage," an "[o]verhead power line running through the center of the property with one power pole and Light [sic], and evidence of utilities servicing property."[18] The next day, Grant Meadows sent Knighthead a Title Objection letter, objecting "to the power line running through the center of Tract 2."[19] Grant Meadows demanded that "it be relocated to a location determined by Purchaser and memorialized by a written easement."[20]

After receiving Grant Meadows's Title Objection, Knighthead responded by informing Grant Meadows that "Seller will not take curative action with respect to these items."[21] Under the PSA, Grant Meadows had _two business days_ to terminate the PSA based on Knighthead's response, including those matters related to the power line. Grant Meadows chose not to. Instead, as explained below, the parties agreed by contract amendment that the issues relating to the power pole would be Grant Meadows's responsibility. Nevertheless, as explained below, this power line would serve as Grant Meadows's pretext for terminating the PSA _six months_ later.

---

[16] _Id._
[17] _See_ 2nd Title Commitment (Exhibit 2).
[18] _Id._ at p. 9.
[19] April 22, 2022 Title Objection (Exhibit 3).
[20] _Id._
[21] April 29, 2002 Response to Title Objection (Exhibit 4).

4895-4526-9923, v. 2

## C.     The First Amendment to the PSA.

Following Knighthead's refusal to "take any curative action," the parties executed an amendment to the PSA on May 3, 2022.[22]

Under the First Amendment, Knighthead gave Grant Meadows permission to enter the Property to remove or relocate the power pole.[23] But before doing so, Grant Meadows was "obligated to provide to Seller, for Seller's prior review and approval, appropriate plans for removal or relocation of the power pole."[24] Grant Meadows was also supposed to provide proof of insurance and proof of consent from CenterPoint Energy and the City of Houston.[25]

The First Amendment also states that "removal or relocation of the power pole is not a condition to closing under the terms of the Agreement."[26]

After executing the First Amendment, Grant Meadows paid CenterPoint to remove the power pole. Grant Meadows never provided plans, proof of insurance, or proof of consent to Knighthead.[27] In fact, Grant Meadows did not even tell Knighthead about the removal. At his deposition, Shahin Jamea (a member and manager of Grant Meadows) said that Grant Meadows did not provide removal plans to Knighthead because there never were any plans.[28] But, in response to a

---

[22] *See* 1st Amendment to PSA (Exhibit 5).
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Grant Meadows responses to Requests for Admission initially denied these facts. After CenterPoint produced documents showing that Grant Meadows was behind the power pole's removal, Grant Meadows amended its responses and accepted responsibility for removing the power pole.
[28] S. Jamea Deposition Tr. (Exhibit 6) at 102:18–104:14.

subpoena, CenterPoint produced plans that Jamea signed before the power pole's removal.[29] Worse still, Jamea purported to signed on Knighthead's behalf despite never providing the plans to Knighthead.[30]

### D. The neighbor's claims and his interactions with Jamea.

At around the same time Grant Meadows and Knighthead were discussing the power pole, the owner of the neighboring tract served by the power line sent Knighthead a letter concerning the power pole.[31] Specifically, the neighbor claimed that the owner of the Property is responsible for certain obligations, including "the relocation of electrical facilities benefitting and supplying power" to the neighboring tract.[32] In other words, the neighbor claimed that it was entitled to use the power line that ran across the Property to obtain electricity service for his tract.

The neighbor's claims were without merit. As Knighthead's response at the time explained, the neighbor could not show that it owned any easement rights over the Property.[33]

But, more importantly, Grant Meadows was well aware of the neighbor's claims and chose to move forward with the PSA anyway. Not only did Knighthead share its response to the neighbor with Grant Meadows, but in fact, Jamea was in direct discussions with the neighbor. The neighbor explained to Jamea (who is a licensed attorney[34]) why the neighbor believed he had an electrical utilities

---

[29] CenterPoint Documents (Exhibit 7).
[30] *Id.*
[31] April 25, 2022 Letter from Neighbor (Exhibit 8).
[32] *Id.*
[33] May 10, 2022 Response to Neighbor (Exhibit 9)
[34] Ex. 6 at 12:15–13:5.

easement over the Property.[35] Jamea and the neighbor discussed the issue by email, phone, and text message.[36] All of these facts are consistent with the parties' First Amendment giving Grant Meadows the risk of, and responsibility for, addressing the power pole issues.

###### E.    Jamea threatens to terminate contract using neighbor's claims as pretext.

As shown, in May 2022, Jamea was well aware of the neighbor's claims and was discussing those issues directly with the neighbor. Jamea was also aware of the power pole because it was disclosed in the second title commitment on April 21, 2022. Jamea was also aware—because Knighthead put it in writing in response to the updated title commitment's exception—that Knighthead would "not take curative action" regarding the power pole. After all of those events, Jamea executed an amendment to the PSA that said "removal or relocation of the power pole is not a condition to closing." By this point, Grant Meadows had already waived any right to object to the title defects caused by the power pole.

A month later, with the initial closing date quickly approaching, things were not looking good for Grant Meadows's business plan. On June 17, 2022, Jamea sent an email to Knighthead attempting to renegotiate the PSA.[37] Jamea said that Grant Meadows would "not be able to proceed with the purchase as outlined in the contract."[38] Jamea explained that he was planning a 5-story multifamily

---

[35] April 13–27, 2022 Emails Between Jamea & Neighbor (Exhibit 10).
[36] *Id.*; Neighbor's Notes Re: Phone Call (Exhibit 11).
[37] June 17, 2022 Email (Exhibit 12).
[38] *Id.*

development, and when he initially priced the project, he was anticipating "hard costs" of $16 million.[39] But a more recent projection was showing costs of $26 million.[40] Jamea added that the deal was being complicated by "recent interest hikes" and the "threat of a looming recession."[41] Finally, Jamea said that the deal needed to be renegotiated because *"it has become clear to us that the adjoining neighbor will file a lawsuit (frivolous or not) regarding his right to put a transformer on your land."*[42]

So, the parties renegotiated the contract, and on June 29, 2022, they executed a Second Amendment to the PSA.[43] Under the Second Amendment, the closing was extended from August to October 28, 2022. The Second Amendment also made clear that Grant Meadows was obligating itself to close and was giving up its rights to terminate the contract:

> **No Further Termination Rights.** Purchaser acknowledges and agrees that, except in the event of default by Seller under the Agreement, or following a casualty event or condemnation event as provided by Section 9 of the Agreement, Purchaser shall have no further right to terminate the Agreement.

Ex. 13. These facts show that Grant Meadows had used the neighbor's claims concerning the power line as a basis for demanding the Second Amendment, which the parties executed with full knowledge of the neighbor's claims.

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.* (emphasis added).
[43] 2nd Amendment to PSA (Exhibit 13).

**F.      Grant Meadows's business plan falls apart so it gins up a Title Objection based on the power pole.**

After the Second Amendment, Grant Meadows's business plans for the Property kept falling apart.

In the summer of 2022, Grant Meadows had trouble finding a lender to finance the multifamily development Grant Meadows was envisioning for the Property. For example, on June 20, 2022, Grant Meadows's debt broker, CBRE, emailed Jamea saying that a common response it was getting from potential lenders was: "[w]e have 5-10 similar MF [multifamily] requests on our desk . . . why should we do your deal?"[44] The next day, the debt broker sent an email saying: [w]e did not get good feedback from Plains Capital today" and explaining that there were "[n]ot a lot of promising options."[45]

The death knell to Grant Meadows's plans came on July 28, 2022. One of Grant Meadows's potential lenders ordered an appraisal of Grant Meadows's planned development. On July 28, 2022, the appraiser produced its report.[46] It was devastating. The appraiser concluded that "there would be no demand to prospective tenants" and therefore "there would be no market demand for the building."[47] The appraisal concluded that Grant Meadows's planned development was "not financially feasible."[48]

---

[44] June 20, 2022 CBRE email (Exhibit 14).
[45] June 21, 2022 CBRE email (Exhibit 15).
[46] July 28, 2022 Appraisal Excerpts (Exhibit 16).
[47] *Id.*
[48] *Id.*

In September 2022, one of Grant Meadows's potential equity investors informed Grant Meadows that he would not be investing in the project because he was "not too bullish on the development."[49]

Three days later, Jamea asked CBRE for an update from potential lenders.[50] CBRE responded, "[n]o other feedback, at least not positive."[51]

In discovery, Grant Meadows has not produced any documents indicating that it had secured commitments from any equity investors or debt financing for the project.

It also turned out that Grant Meadow's projected developments costs were wildly optimistic. Initially, Grant Meadows anticipated "hard costs of $16M."[52] That projection was later revised to $26 million.[53] But in October 2022, Grant Meadows received a contractor bid that estimated construction costs at $34,199,253.[54]

So, by October 2022, Grant Meadows had no lender lined up, potential investors were not showing interest, the appraisal was devastating, and costs were spiraling out of control. It was clear by October that Grant Meadows had gone under contract—and thus tied up Knighthead's ability to sell the Property to a bona fide buyer—based on unrealistic plans and expectations. And now Grant Meadows needed a way out of the PSA.

---

[49] September 16, 2022 email (Exhibit 17).
[50] September 19, 2022 CBRE Email (Exhibit 18)
[51] *Id.*
[52] Ex. 12.
[53] *Id.*
[54] October 10, 2022 Contractor Bid (Exhibit 19).

4895-4526-9923, v. 2

On October 18, 2022—10 days before closing—Grant Meadows's attorney called the title company asking it to add an exception to the title commitment based on the neighbor's months-old demands.[55] The next day, Grant Meadows's attorney sent a follow up email:

> Just checking to see if you have received any feedback from your underwriter based off our call yesterday. Specifically, what affect [sic] will the neighbor's demand letter have on title's acceptance of the previously negotiated owner's affidavit and/or will any exceptions be added to title based off the demand letters or revised owner's affidavit which discloses the demand letters?

Ex. 20.

The next day, the title company said that it had "performed an inspection of the property."[56] The title company noted that the "service line and two poles that are the subject of the ongoing conversations are gone and the splinters of the bottom of the poles remain in the holes . . .. At some point in time between April 2022 (last survey date) and today the power line and poles were removed."[57] The title company indicated it would circulate a revised title commitment "[d]ue to recent events."[58]

On October 24, 2022, the title company circulated an updated title commitment.[59] The October 2022 title commitment was nearly identical to the April 2022 title commitment. The April 2022 title commitment had identified the power pole as an exception from coverage:

---

[55] October 19, 2022 Email with Title Company (Exhibit 20).
[56] October 21, 2022 Email with Title Company (Exhibit 21).
[57] *Id.*
[58] *Id.*
[59] 3rd Title Commitment (Exhibit 22)

> f) Overhead power line running through center of the property with one power pole and Light, and evidence of utilities servicing property. all located within adjacent public rights of ways, without benefit of recorded easements.

Ex. 2. Likewise, the October 2022 title commitment identified the power pole as an exception from coverage. The only change was a notation that the power pole had been removed:

> f) Overhead power line running through the center of the property with two power poles and lights, apparently serving improvements on adjacent property, and all consequences of the existence, removal, and/or relocation thereof.

Ex. 22.

The same day the title company circulated the revised title commitment, Grant Meadows sent a Title Objection.[60] The Title Objection objected to "the new revisions of Schedule B, Item 10.m.(f)"—i.e., the new notation in the paragraph discussing the "consequences of the existence, removal and/or relocation" of the power pole. But, of course, the exception relating the pole's existence and service of the adjacent property had already been waived by Grant Meadows. That is to say: only four days before closing, Grant Meadows raised a Title Objection to a power pole that had already been the subject of a previous Title Objection and two contract amendments.

Importantly, the only "new revisions" concerned the "consequences" of the pole's existence or recent removal. This was, in reality, nothing new. All claims stemming from the pole's existence on the Property had been excepted from the title commitment months earlier, and, as shown above, Grant Meadows chose to proceed

---

[60] October 24, 2022 Title Objection (Exhibit 23).

with the contract anyway. In fact, Grant Meadows had subsequently agreed that the pole's removal was not an impediment to the closing. Thus, when Grant Meadows itself later removed the pole, that was not an action that could have validly impeded the closing under the contract.

Moreover, as explained below, although Grant Meadows had initially denied removing the pole in discovery, it later acknowledged doing so, but only after documents obtained from CenterPoint Energy showed that Jamea had directed the removal of the pole, and an initial deposition of Jamea using those documents exposed the false denial. Thus, it is now undisputed that Grant Meadows purported to terminate the PSA on an alleged defect that Grant Meadows itself caused. Worse, the manner in which it caused the alleged defect was also a breach of the PSA. In other words, Grant Meadows seeks to benefit from the consequences of its own breach of contract.

Grant Meadows also objected to "Schedule C, Item 6."[61] This, however, was a nonissue. Under Section 5(d) of the contract, Knighthead had agreed "to provide to the Title Company a Title Affidavit acceptable for purposes of causing Item 6 of Schedule C to be removed from the Title Commitment."[62] Schedule C, Item 6 simply said the title company should have Knighthead verify that "it has not been contacted by the claimants" of certain mechanic's liens.[63] And as Knighthead made clear in its response to the first title objection, Knighthead intended to deliver the

---

[61] *Id.*
[62] Ex. 1 § 5(d).
[63] Ex. 2 at p. 10.

Title Affidavit at closing.[64] And, critically, under the PSA, Knighthead was not required to deliver the Title Affidavit until closing.[65] Thus, Grant Meadows's demand that Knighthead cure Schedule C, Item 6 before closing was in direct conflict with the plain language of the PSA.[66]

On October 25, 2022, Knighthead responded to Grant Meadows's Title Objection. Knighthead informed Grant Meadows that it was "ready, willing, and able" to close on the closing date.[67]

On October 26, 20222, Grant Meadows sent a notice of termination.[68] The termination was based on the "new exception to Schedule B, Item 10.m" (i.e., the power pole's removal, which Grant Meadows itself had done) as well as "certain matters on Schedule C, which Seller is required to remove per the Contract."[69] For the reasons explained below, Grant Meadows's termination was improper and therefore Knighthead is entitled to the earnest money and an award of attorneys' fees.

### G. Sequence of Events

- March 31, 2022 – PSA signed

- April 21, 2022 – Revised title commitment (disclosing power pole) is issued.

---

[64] *See* Ex. 4 ("Seller will comply with its obligations as to Schedule C of the Title Commitment as set forth in the Contract.").

[65] Ex. 1 § 5(c).

[66] Grant Meadows also demanded "that the Survey be updated pursuant to Title Company's email from Thursday, October 20, 2022." Ex. 23. But there is nothing in the PSA requiring Knighthead to provide updated surveys. In fact, the PSA says that Grant Meadows "may, at or prior to Closing, obtain updates of the Title Commitment and Survey." Ex. 1 § 5(d). Thus, if Grant Meadows wanted an updated survey it was free to get (and pay for) one. Knighthead did nothing to prevent Grant Meadows from doing do.

[67] October 25, 2022 Letter (Exhibit 24).

[68] October 26, 2022 Letter (Exhibit 25).

[69] *Id.*

- April 21–26, 2022 – Jamea and neighbor correspond via email discussing power pole and neighbor's claim for an electrical utilities easement

- April 22, 2022 – Grant Meadows sends title objection letter to Knighthead regarding power pole.

- April 29, 2022 – Knighthead sends response to Grant Meadows saying it would "not take curative action" as to the power pole.

- May 3, 2022 – First Amendment to PSA is signed and parties agree "removal or relocation of power the power pole is not a condition to closing."

- June 17, 2022 – Jamea sends email to Knighthead trying to renegotiate PSA and uses neighbor's claims regarding the power pole as leverage.

- June 29, 2022 – Second Amendment to PSA is signed and Grant Meadows agrees to "no further termination rights."

- July 28, 2022 – Appraisal concludes Grant Meadows's project is not financially feasible.

- September 16, 2022 – Grant Meadows's investor says he is "not too bullish" on the proposed development.

- September 19, 2022 – Grant Meadows receives negative feedback from lenders.

- October 19–20, 2022 – Grant Meadows's attorney asks whether title company will add new title exception based on neighbor's claims.

- October 24, 2022 – Title company revises title commitment to reflect that Grant Meadows had removed the power pole.

- October 24, 2022 – Grant Meadows objects to revised title commitment (caused entirely by Grant Meadows's removal of the power pole).

- October 26, 2022 – Grant Meadows purports to terminate PSA.

## III.  Argument.

A breach of contract claim is "well suited for summary judgment" when a contract is unambiguous and the material facts are undisputed. *Sims v. Monumental General Ins. Co.*, 960 F.2d 478, 480 (5th Cir. 1992). Here, the material

facts are either undisputed or indisputable, and the parties' contract is unambiguous. Accordingly, summary judgment is warranted.

Grant Meadows's termination of the PSA was improper for five reasons:

*First*, Grant Meadows lost the right to raise any further objections to the power pole two business days after Knighthead told Grant Meadows it would take "not take curative action" with respect to the power pole. This deadline expired six months before Grant Meadows terminated.

*Second*, the only reason the title company revised the title commitment is because Grant Meadows removed the power pole. But Grant Meadows removed the power pole without complying with any of the contractual pre-conditions for its removal. Grant Meadows cannot rely on a title defect that it created via a breach of contract as a valid basis for terminating the PSA.

*Third*, Grant Meadows lost the right to object to the power pole when, with full knowledge of the neighbor's claims, Grant Meadows executed the First Amendment to the PSA which said that removal or relocation of the power pole was not a condition to closing.

*Fourth*, Grant Meadows lost the right to terminate the contract when, using the neighbor's claims as leverage, Grant Meadows executed the Second Amendment, which said that Grant Meadows had no further termination rights unless Knighthead defaulted.

*Fifth*, Grant Meadows's objection to "Schedule C, Item 6" was without merit because Knighthead was not required to deliver a Title Affidavit until closing.

Because Grant Meadows has no valid reason for terminating the PSA, it breached the PSA by failing to close. Knighthead is therefore entitled to the earnest money and an award of attorneys' fees.

> **1.    Grant Meadows lost the right to object to the power pole months before it terminated the PSA.**

The title company first raised the power pole in the April 2022 version of the title commitment.[70] As was its right, Grant Meadows objected to that exception from coverage.[71] But Knighthead, as was *its* right, opted to "not take curative action."[72]

Knighthead's refusal to take curative action put the ball in Grant Meadows's court. Under section 5(d) of the PSA, Grant Meadows could either terminate the PSA (within two business days) or "waive such Title Objections and accept that title to the Property is subject thereto."[73] Here, Grant Meadows chose to move forward with the PSA, and therefore accepted that title to the Property was subject to the power pole.

The October 2022 supplemental title commitment, upon which Grant Meadows based the termination, did not somehow revive Grant Meadows's right to terminate the PSA. Under section 5(d) of the PSA, Grant Meadows could object to matters that were "first raised" in supplemental title objections. The October 2022 supplemental title commitment was not the first title commitment to raise the issue

---

[70] Ex. 2 at p. 9.
[71] Ex. 3 ¶8.
[72] Ex. 4 ¶8.
[73] Ex. 1 § 5(d).

of the power pole. The power pole had already been addressed in the April 2022 title commitment and the April 2022 Title Objection letter. The October 2022 supplemental title commitment had no material changes. It merely reflected the fact that Grant Meadows had removed the power pole.

Grant Meadows could have terminated the PSA because of the power pole in April 2022. It chose not to. It therefore waived that Title Objection.

2. **Grant Meadows cannot use its own breach of contract as a basis for terminating the contract.**

As explained above, the *only* reason the title company revised the title commitment is because *Grant Meadows itself* removed the power pole. And it removed the power pole without complying with any of the contractual pre-conditions to removing the power pole—providing proof of insurance and submitting plans for Knighthead's "prior review and approval." Grant Meadows did not submit its plans to Knighthead for prior review and approval—it just removed the power pole without even alerting Knighthead. Thus, the revised title commitment is the direct result of Grant Meadows's own breach of contract that it now claims caused a defect to title.

Grant Meadows cannot be allowed to use its own breach of contract as pretext for terminating the contract. *Cf. Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990) ("It is a well established rule that 'a party to a contract who is himself in default cannot maintain a suit for its breach.'"). Having breached the contract, Grant Meadows must abide the consequences of its breach.

18

Put another way: Grant Meadows's assertion that Knighthead must provide insurance against an alleged title defect that Grant Meadows alone caused on the eve of closing, and by breaching its own contract obligations, is absurd and flies in the face of common sense.

3.  **Grant Meadows agreed in the First Amendment that removing or relocating the power pole was not a condition to closing.**

In May 2022, Grant Meadows was well aware of the power pole and of the neighbor's claims regarding the power pole. And it signed a contract amendment saying removal or relocation of the power pole was *not* a condition to closing.[74] If removal or relocation of the power pole was not a condition to closing, then, *a fortiori,* "all consequences of the of the existence, removal, or relocation thereof" also cannot be basis for avoiding closing.

With the First Amendment, Grant Meadows assumed all risks relating to the power pole and the neighbor's claims. Therefore, the power pole cannot be used as an excuse for not closing under the PSA.

This is certainly true where, as here, the only new risk to title to which Grant Meadows objected was a creature of its own creation.

4.  **Grant Meadows waived almost all termination rights under the Second Amendment.**

Under the Second Amendment to the PSA, Grant Meadows agreed it would have no further right to terminate the PSA "except in the event of default by Seller under the Agreement."[75] Thus, while the PSA may have given Grant Meadows

---

[74] Ex. 5.
[75] Ex. 13.

robust rights to terminate the PSA under various circumstances, including for uncured defects in title, the Second Amendment limited Grant Meadows's termination rights to "defaults." To claim a proper termination under the Second Amendment, Grant Meadows therefore needs to show that Knighthead defaulted under the PSA.

Here, Grant Meadows purported to terminate the contract because of an alleged refusal to cure a Title Objection. But a refusal to cure a Title Objection cannot be considered a "default" under the PSA.

The PSA does not define "default," so this Court must use the term's plain, ordinary meaning. *See Tolar v. Allstate Tex. Lloyd's Co.*, 772 F.Supp.2d 825, 830 (N.D. Tex. 2011). The term "default" means "[t]he omission or failure to perform a legal or contractual duty." DEFAULT, Black's Law Dictionary (11th ed. 2019).

Here, the PSA imposed no duty on Knighthead to cure Title Objections. In fact, the PSA states Knighthead "shall have ***no obligation***" to "remove or cure such Title Objections."[76] Thus, because the PSA imposes no duty to cure Title Objections, refusing to cure a Title Objection cannot be a "failure to perform a legal or contractual duty." There was therefore no "default" that would justify terminating the PSA under the Second Amendment's curtailed termination rights.

Moreover, allowing Grant Meadows to terminate the PSA based on the months-old power pole issues would be manifestly unjust. When negotiating the Second Amendment to the PSA, Grant Meadows forced Knighthead to delay the

---

[76] Ex. 1 § 5(d) (emphasis added).

closing date. To extract that concession, Grant Meadows used the neighbor's claims regarding the power pole as leverage.[77]

Thus, the power pole's presence on, or removal from, the Property was the precise basis for Grant Meadows's request for an extension, which the parties agreed to in an amendment that expressly stated that Grant Meadows would have no further rights to terminate the PSA.

5. **Grant Meadows was not required to deliver a Title Affidavit until closing.**

The only other basis on which Grant Meadows purported to terminate the PSA was Knighthead's alleged refusal to cure "Schedule C, Item 6" of the title commitment.[78]

As explained above, under Section 5(d) of the contract, Knighthead had agreed "to provide to the Title Company a Title Affidavit acceptable for purposes of causing Item 6 of Schedule C to be removed from the Title Commitment." To be sure, Knighthead agreed to deliver the Title Affidavit, "whether or not Purchaser provides an objection notice."[79]

Under the PSA, Knighthead was not required to deliver the Title Affidavit until closing.[80] But, it is undisputed that Grant Meadows terminated the PSA before the closing was set to occur. Thus, Knighthead's alleged failure to deliver a Title Affidavit before closing cannot be a "default" that would justify termination

---

[77] Ex. 12.
[78] Ex. 23.
[79] Ex. 1 § 5(d).
[80] Ex. 1 § 5(c).

under the Second Amendment. And, had Grant Meadows allowed the PSA to close, Knighthead would have satisfied its contractual obligation.[81]

### 6. Plaintiff is entitled to an award of attorneys' fees.

Knighthead is entitled to an award of attorney's fees for its breach of contract claim. Tex. Civ. Prac. & Rem. Code § 38.001(b)(8); *Mid-Continent Cas. Co. v. Petroleum Sols., Inc.*, 917 F.3d 352, 360 n.9 (5th Cir. 2019).

Plaintiff requests the following amount of attorney's fees incurred to date: $122,679.35.[82] In addition, Knighthead requests the following amounts in conditional appellate attorney's fees: $25,000 if an appeal is decided in Knighthead's favor without oral argument or $35,000 if an appeal is decided in Knighthead's favor with oral argument.[83]

## CONCLUSION AND PRAYER

For these reasons, Knighthead respectfully asks the Court grant summary judgment, award Knighthead the $650,000 in contractual earnest money, award Knighthead its attorney's fees, and award all other relief to which Knighthead may show itself entitled.

Respectfully submitted,

*/s/ Matthew Baumgartner*
MATTHEW BAUMGARTNER,
Attorney in Charge
Texas State Bar No. 24062605
Southern District of Texas No. 1626953
mbaumgartner@abaustin.com
(512) 435-2308

---

[81] Ex. 4.
[82] Aff. M. Baumgartner (Exhibit 26).
[83] *Id.*

4895-4526-9923, v. 2

GUILLERMO A. ALARCON, Of Counsel
Texas State Bar No. 24099176
Southern District of Texas No. 3122674
galarcon@abaustin.com
(512) 435-2383
DAVID KING, Of Counsel
Texas State Bar No. 24083310
Southern District of Texas No. 2414517
dking@abaustin.com
(512) 436-2305
ARMBRUST & BROWN, PLLC
100 Congress Avenue, Suite 1300
Austin, Texas 78701
*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, a true and correct copy of the foregoing was served on all counsel of record.

*/s/ Guillermo A. Alarcón*
Guillermo A. Alarcón