EXHIBIT INDEX

Exhibit 1        Purchase and Sale Agreement

Exhibit 2        Second Title Commitment

Exhibit 3        April 22, 2022 Title Objection

Exhibit 4        April 29, 2002 Response to Title Objection

Exhibit 5        First Amendment to Purchase and Sale Agreement

Exhibit 6        S. Jamea Deposition Transcript

Exhibit 7        CenterPoint Plans for Removal of Power Pole

Exhibit 8        April 25, 2022 Letter from Neighbor

Exhibit 9        May 10, 2022 Response to Neighbor

Exhibit 10       April 13-27, 2022 Emails between S. Jamea & Neighbor

Exhibit 11       Neighbor's Notes Regarding Phone Call with S. Jamea

Exhibit 12       June 17, 2022 Email from S. Jamea

Exhibit 13       Second Amendment to Purchase and Sale Agreement

Exhibit 14       June 20, 2022 CBRE Email

Exhibit 15       June 21, 2022 CBRE Email

Exhibit 16       July 28, 2022 Appraisal excerpts

Exhibit 17       September 16, 2022 Email from Investor

Exhibit 18       September 19, 2022 CBRE Email

Exhibit 19       October 10, 2022 Contractor Bid

Exhibit 20       October 19, 2022 Email with Title Company

Exhibit 21       October 21, 2022 Email with Title Company

Exhibit 22       Third Title Commitment

Exhibit 23      October 24, 2022 Title Objection

Exhibit 24      October 25, 2022 Response to Title Objection

Exhibit 25      October 26, 2022 Termination Letter

Exhibit 26      Affidavit of Matthew Baumgartner

# EXHIBIT 1

DocuSign Envelope ID: 92ED5E9A-FCC1-497B-854F-B08A2EC7E68F

# SALE AGREEMENT

**THIS SALE AGREEMENT** (the "**Agreement**"), dated as of March 31, 2022 (the "**Effective Date**"), is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows, L.L.C., a Texas limited liability company ("**Purchaser**").

**IN CONSIDERATION** of the respective agreements and covenants hereinafter set forth and for other good and valuable consideration, the receipt and the adequacy of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.     PURCHASE AND SALE

    (a)     <u>Property</u>. Subject to the terms and conditions set forth herein, Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase from Seller, for the Purchase Price, Seller's right, title and interest, if any, in and to the following:

    (i)     <u>Land</u>. That certain real property located in the City of Houston, Harris County, Texas, being more particularly described on **Exhibit A** attached hereto, together with all rights, easements and interests appurtenant thereto and Seller's right, title and interest, if any, in any land lying in the bed of any streets or other public ways in front of or adjacent to said real property to the center line thereof (all of such property being hereinafter referred to as the "**Land**").

    (ii)     <u>Improvements</u>. All improvements located on or under the Land, including, without limitation, any and all buildings, structures, facilities, amenities and other improvements constructed or located on or under the Land (all such improvements being hereinafter referred to collectively as the "**Improvements**").

    (iii)     <u>Intangible Property</u>. All of the right, title and interest of Seller, if any, to plans, entitlements, site plans, surveys and specifications, architectural drawings, and permits issued in connection with the construction, use or occupancy of the Improvements, and any assignable warranties ("**Intangible Property**").

    (iv)     All of Seller's right, title and interest in and to any other property interests belonging or appurtenant to the Land (all of the foregoing items, together with the Land, Improvements and Intangible Property are referred to herein collectively as the "**Property**").

2.     PURCHASE PRICE

    (a)     <u>Amount; Payment</u>. The purchase price for the Property is FOURTEEN MILLION THREE HUNDRED SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($14,375,000.00) (the "**Purchase Price**"). The Purchase Price shall be payable as follows:

    (i)     An initial deposit in an amount equal to ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($150,000.00) (the "**Initial Deposit**") shall be paid by Purchaser to Escrow Agent, as provided in <u>Section 3</u>;

    (ii)     A second deposit in an amount equal to FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) shall be paid by Purchaser to Escrow Agent, as provided in <u>Section 3</u> (the "**Second Deposit**"); and

Exhibit 1 Page 1 of 44

DocuSign Envelope ID: 92ED5E9A-FCC1-497B-954F-B08A2FC7E68F

(iii)     the balance of the Purchase Price shall be paid by Purchaser to Seller at the Closing (as defined herein) in immediately available funds.

3.     DEPOSIT; ESCROW TERMS

(a)     Deposit.  Within two (2) business days after the Effective Date, Purchaser shall wire the Initial Deposit in immediately available funds to the account of Fidelity National Title Insurance Company ("**Escrow Agent**"), whereupon Escrow Agent shall receipt the Initial Deposit and then immediately release it to Seller (it being acknowledged and agreed that, upon its release to Seller, the Initial Deposit shall be non-refundable for all purposes except as expressly provided herein).  Additionally, no later than ninety (90) days after the Effective Date, Purchaser shall wire the Second Deposit in immediately available funds to the account of Escrow Agent.  Both the Initial Deposit and the Second Deposit (collectively, the "**Deposit**") shall be earnest money hereunder, and Escrow Agent shall deposit the Second Deposit in an interest-bearing escrow account.  TIME IS OF THE ESSENCE WITH RESPECT TO THE DELIVERY OF BOTH THE INITIAL DEPOSIT AND THE SECOND DEPOSIT UNDER THIS AGREEMENT.  The Deposit, in its entirety, shall be non-refundable, except as expressly otherwise set forth in this Agreement.

(b)     Escrow Terms:

(i)     General.  Escrow Agent shall have no duties or responsibilities except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement, unless the same is in writing and signed by both Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, by Escrow Agent.  Any fees of Escrow Agent shall be borne equally by Seller and Purchaser.

(ii)     Delivery.  Escrow Agent shall disburse or apply the Deposit in accordance with this Agreement.

(iii)     Holding Deposit Pending a Dispute.   Except as expressly provided in this Agreement, if the Closing has not timely occurred, Escrow Agent shall not pay any portion of the Deposit to either party unless (1) the party claiming to be entitled thereto gives notice of such entitlement to Escrow Agent and to the other party, including an affidavit containing the facts on which such claim is based, and (2) the other party does not, within five (5) days after receipt (or deemed receipt) of such notice, give notice to Escrow Agent that it disputes the claim of the first party.  If Escrow Agent receives notice within such five-day period of a dispute regarding the claim of entitlement to the Deposit, Escrow Agent shall continue to hold the Deposit in escrow and shall not pay such amounts to either party until such dispute is finally resolved by written agreement signed by both parties or by final unappealable order of a court of competent jurisdiction.  When such dispute is so resolved, Escrow Agent shall pay the Deposit, to the party or parties entitled thereto pursuant to such final resolution.  However, Escrow Agent shall also have the right, at any time after a claim of entitlement is disputed, to deposit the Deposit, with the applicable court of competent jurisdiction, in which event Escrow Agent shall give notice of such deposit into court to Seller and Purchaser and Escrow Agent shall be relieved and discharged of all further obligations and responsibilities hereunder.

(iv)     Stakeholder.  Escrow Agent is acting solely as stakeholder at the request of Seller and Purchaser and for their convenience, and Escrow Agent shall not be deemed to be the agent of either of the parties.

(v)     Reliance upon Instruments.  Escrow Agent may rely and act upon any instrument or other writing believed by it to be genuine and purporting to be signed and presented by any person purporting to have authority to act on behalf of Seller or Purchaser, as the case may be.

Exhibit 1 Page 2 of 44

DocuSign Envelope ID: 92ED5E9A-FCC1-497B-854F-B08A2FC7E68F

(vi)  <u>Responsibility</u>.  Escrow Agent shall not be responsible in any manner for the validity or sufficiency of any securities, cash, instruments, letters of credit, documents, or any other property delivered hereunder, or for the value or collectability of any note, check, letter of credit or other instrument or security so delivered, or for any diminution in value of any investment made by Escrow Agent.  Nothing herein contained shall be deemed to obligate Escrow Agent to deliver any securities, cash instruments, letters of credit, documents or any other property referred to herein, unless the same shall have been received by Escrow Agent pursuant to this Agreement or a separate written agreement.

(c)  <u>Resignation</u>.  Escrow Agent may at any time resign upon five (5) business days' notice to Seller and Purchaser.  Seller and Purchaser shall jointly select a successor escrow agent and shall notify Escrow Agent of the name and address of such successor within five (5) business days after receipt of notice of Escrow Agent's intent to resign.  If Escrow Agent has not received notice of the name and address of its successor within such period, Escrow Agent may select on behalf of Seller and Purchaser a bank or trust company to act as its successor, for such compensation as such bank or trust company shall reasonably require of Seller and Purchaser.  At any time after such five-business day period, Escrow Agent shall deliver the Deposit to its successor as selected hereunder, and upon such delivery the successor escrow agent shall become Escrow Agent for all purposes of this Agreement and it shall have all the rights and obligations of Escrow Agent pursuant to this Agreement, and the resigning Escrow Agent shall have no further responsibilities or obligations hereunder.

(d)  <u>Acknowledgment</u>.  By execution of this Agreement, Escrow Agent only agrees to the terms of this <u>Section 3</u> and is not binding itself otherwise as a party to this Agreement.

(e)  <u>Survival</u>.  The provisions of this <u>Section 3</u> shall survive the Closing or the earlier termination of this Agreement.

4.  <u>THIRD-PARTY MATERIALS; ACCESS</u>

(a)  <u>Responsibility for Materials Prepared by Third Parties</u>.  Purchaser acknowledges Seller, its agents, and/or its attorneys have not made and will not make, nor shall Seller, its agents, its brokers, its principals and/or its attorneys be deemed to have made, any warranty or representation, express or implied, as to the accuracy or completeness of any materials provided from Seller to Purchaser which have been prepared by third parties; provided, however, that Seller represents and warrants that it is providing true and correct copies of such materials in its actual possession. Without limiting the generality of the foregoing provisions, Purchaser acknowledges and agrees that (i) any environmental or other report with respect to the Property which is delivered by Seller to Purchaser shall be for general informational purposes only, (ii) Purchaser shall not have any right to rely on any such report delivered by Seller to Purchaser, but rather will rely on its own inspections and investigations of the Property and any reports commissioned by Purchaser with respect thereto, and (iii) neither Seller, any affiliate of Seller nor the person or entity which prepared any such report delivered by Seller to Purchaser shall have any liability to Purchaser for any inaccuracy in or omission from any such report.

(b)  <u>Access</u>. Purchaser shall not be permitted to enter upon the Property unless Purchaser has first delivered written notice to Seller at least one (1) business day in advance of Purchaser's intended visit. Prior to any entry by Purchaser or its agents, representatives or contractors onto the Property, Purchaser shall provide or cause to be provided to Seller evidence reasonably satisfactory to Seller that Purchaser or its agents, representatives or contractors has in force adequate liability and worker's compensation insurance with coverage of not less than One Million Dollars ($1,000,000), to protect Seller against any and all liability, claims, demands, damages and costs (including attorneys' fees, costs and expenses) which may occur as a result of any activity of Purchaser or its agents, representatives or contractors. Purchaser shall (i) immediately pay or cause to be removed any liens filed against the Property as a result of any actions taken above by or on

Exhibit 1 Page 3 of 44

behalf of Purchaser; (ii) immediately repair and restore the Property to its condition existing immediately prior to the entry thereon by Purchaser or any of Purchaser's agents, representatives or contractors; and (iii) shall indemnify, defend and hold Seller harmless from and against all claims, damages, or losses incurred to the Property or to or by anyone on the Property ("**Claims**") as a result of the actions taken above by Purchaser, or any of Purchaser's agents, representatives or contractors, or any persons performing inspection activities or other activities on their behalf, provided, however, Purchaser shall not indemnify Seller against any (1) Claims caused by Seller or any of its agents', employees' or representative's negligence or willful misconduct, (2) Claims arising out of conditions that were present before Purchaser or Purchaser's agents, representatives or contractors entered the Property, (3) the results or finding of any inspection, unless such claim, demand, cause of action, loss, cost, liability, and/or expense is caused by Purchaser or any of Purchaser's agents, representatives or contractors activities on the Property, (4) the diminution in value in the Property arising from or relating to matters merely discovered by Purchaser or any of Purchaser's agents, representatives or contractors or to the extent that it becomes necessary for Purchaser or any of Purchaser's agents, representatives or contractors to report such discovered environmental findings to any public agency as may be required by any applicable environmental laws or regulations, or (5) damage to the Property or any portion thereof caused by anyone other than Purchaser or any of Purchaser's agents, representatives or contractors. The terms, conditions and obligations of this subsection (b) shall survive any termination of this Agreement.

5.    <u>CLOSING</u>

(a)    <u>Closing Date</u>.  The consummation of the transactions described herein (the "**Closing**") shall occur on the date that is one-hundred fifty (150) days following the Effective Date (such date on which the Closing occurs, the "**Closing Date**").  The Closing shall occur through an "escrow closing", in the offices of Escrow Agent, utilizing overnight courier delivery of originally executed documents to Escrow Agent. **TIME SHALL BE OF THE ESSENCE** with respect to Purchaser's obligation to close the transaction contemplated hereunder on or before the Closing Date.

(b)    <u>Purchaser Deliveries</u>.  At the Closing, Purchaser shall fully execute and acknowledge, if necessary, and deliver to Seller the following:

(i)    the balance of the Purchase Price, after giving effect to the cost allocations specified in this Agreement, by confirmed wire transfer of immediately available funds to Escrow Agent;

(ii)    a Bill of Sale and Assignment of Warranties substantially in the form attached hereto as **Exhibit D**;

(iii)    a settlement statement detailing the allocation of costs, expenses, and applicable credits between Seller and Purchaser as provided in this Agreement; and

(iv)    any additional documents that Escrow Agent may reasonably require for the consummation of the transaction contemplated by this Agreement.

(c)    <u>Seller Deliveries</u>.  At the Closing, Seller shall fully execute and acknowledge, if necessary, and deliver to Purchaser the following:

(i)    a deed for the Property, in the form attached hereto as **Exhibit B** (the "**Deed**"), conveying the Property to Purchaser;

(ii)    a certificate, substantially in the form attached hereto as **Exhibit C**, with respect to Section 1445(a) of the Internal Revenue Code of 1986, as amended, relating to the Foreign Investors Real Property Tax Act;

- 4 -

Exhibit 1 Page 4 of 44

(iii)      counterparts of the Bill of Sale and Assignment of Warranties;

(iv)      an owner's title affidavit in customary form reasonably acceptable to Seller and Escrow Agent (the "**Title Affidavit**");

(v)      a settlement statement detailing the allocation of costs, expenses, and applicable credits between Seller and Purchaser as provided in this Agreement; and

(vi)      any additional documents that Escrow Agent may reasonably require for the consummation of the transaction contemplated by this Agreement.

(d)      <u>Exceptions to Title</u>.  Purchaser is in receipt of a commitment for title insurance relating to the Property, dated effective March 21, 2022, a copy of which is attached hereto and incorporated herein by reference as Schedule 5(d) (the "**Title Commitment**").  Purchaser shall have the right, on or before the twenty-fifth (25th) day after the Effective Date, to provide written notification to Seller and Escrow Agent ("**Objection Notice**") of any objections it has to the Title Commitment and survey, if any, of the Property (a "**Title Objection**").  If Purchaser fails to timely deliver an Objection Notice as provided above, all exceptions and other matters appearing on any survey of the Property or existing of record shall be deemed accepted by Purchaser and included as Permitted Title Exceptions.  If Purchaser timely delivers an Objection Notice, Seller, in Seller's sole discretion, may elect (but shall have no obligation to, attempt to remove or cure such Title Objections or matters on or prior to Closing.  Seller shall be deemed to have given notice to Purchaser that Seller refuses to attempt to cure any such Title Objection or matter, which Seller may so do in its sole discretion, unless Seller, within five (5) days after Seller's receipt of an Objection Notice for the Property, notifies Purchaser in writing (each, a "**Seller's Title Notice**") that Seller will either attempt or refuse to cure such Title Objections or matters.  If any Seller's Title Notice indicates that Seller refuses to cure said Title Objections (or if Seller does not deliver a Seller's Title Notice, such failure being deemed a refusal), Purchaser may, at its option and as its sole and exclusive remedy, (i) terminate this Agreement by giving written notice thereof to Seller and Escrow Agent (provided that notice of termination is given not later than two (2) business days after the earlier of its receipt of Seller's Title Notices or the expiration of the date by which Seller's Title Notice was to otherwise be provided, time being of the essence as to such date), and in such event, the Deposit shall be returned to Purchaser and this Agreement shall be of no further force and effect (subject, however, to any obligations expressly stated to survive the termination or expiration of this Agreement); or (ii) waive such Title Objections and accept that title to the Property is subject thereto, in which event there shall be no reduction in the Purchase Price.  If Purchaser does not give such notice within such 2- business day period, time being of the essence with respect to the giving of such notice, Purchaser shall be deemed to have waived its right to object to such Title Objection or matter and shall be obligated to close in accordance with this Agreement.  Any Title Objections or matters so waived (or deemed waived) by Purchaser shall be deemed to constitute Permitted Title Exceptions.  Notwithstanding whether or not Purchaser provides any Objection Notice, Seller shall be obligated to provide to the Title Company a Title Affidavit acceptable for purposes of causing Item 6 of Schedule C to be removed from the Title Commitment.  Whether or not Purchaser furnishes any Objection Notice to Seller pursuant this Section 5(d), Purchaser may, at or prior to Closing, obtain updates of the Title Commitment and Survey and notify Seller in writing of any objections to the Title Commitment or Survey first raised by (i) the surveyor between the effective date of the Survey and Closing, or (ii) the Escrow Agent the effective date of the Title Commitment and Closing.  With respect to any Objection Notice to the Title Commitment or Survey set forth in any such notice, Seller will have the same option to cure and Purchaser will have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any Objection made by Purchaser before Closing.

Exhibit 1 Page 5 of 44

(e)      <u>Condition of Property</u>.  At the Closing and except as expressly provided in this Agreement to the contrary, the Property and possession thereof shall be delivered to Purchaser "AS IS, WHERE IS AND WITH ALL FAULTS".

6.      <u>CONDITIONS OF CLOSING</u>

(a)      <u>Seller's Obligation to Close</u>.  Seller's obligation to close hereunder is conditioned on all of the following, which may be waived by Seller by an express written waiver, at its sole option:

(i)      <u>Representations and Warranties</u>. All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects on and as of the Effective Date and on the Closing Date, as if made on and as of such date; and

(ii)      <u>Purchaser's Deliveries Complete</u>. Purchaser shall have delivered the funds required hereunder and all of the documents to be executed by Purchaser set forth in <u>Section 5(b)</u> and shall have performed all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement, to be performed or complied with by Purchaser at or prior to the Closing.

(b)      <u>Purchaser's Obligation to Close</u>.  Purchaser's obligation to close hereunder is conditioned on all of the following, which may be waived by Purchaser by an express written waiver, at its sole option:

(i)      <u>Representations and Warranties</u>. All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects on and as of the Effective Date and on the Closing Date, as if made on and as of such date;

(ii)      <u>Title Policy</u>.  Escrow Agent shall be unconditionally committed to issue a title insurance policy in the amount of the Purchase Price insuring good and indefeasible title to the Property, subject only to the Permitted Title Exceptions; and

(iii)      <u>Seller's Deliveries Complete</u>.  Seller shall have delivered all of the documents and other items required under <u>Section 5(c)</u> and shall have performed all other covenants, undertakings and obligations, and complied with all conditions required by this Agreement, to be performed or complied with by Seller at or prior to the Closing.

If any of the above-described conditions precedent to Purchaser's obligations hereunder is not satisfied, Purchaser may, at its option, (1) waive such condition and close this transaction, (2) extend Closing for a period of time not to exceed five (5) days in the aggregate in order to satisfy the conditions precedent, or (3) terminate this Agreement by notice in writing to Seller, in which event Purchaser shall be refunded the Deposit, this Agreement shall terminate, and, except as otherwise provided in this Agreement, neither Purchaser nor Seller shall have any further liability or obligation under this Agreement.

7.      <u>REMEDIES</u>

(a)      <u>Breach</u>

(i)      If there is a material breach by Seller of this Agreement which remains uncured for more than ten (10) days after receipt of written notice from Purchaser describing the default, then Purchaser's sole and exclusive remedy shall be to either, at Purchaser's election: (1) seek specific performance of any of Seller's obligations under this Agreement, or (2) terminate this Agreement by notifying Seller thereof, whereupon neither party hereto shall have any further rights or obligations hereunder.  Upon any such termination, the Deposit shall be promptly refunded to Purchaser, and except as

- 6 -

Exhibit 1 Page 6 of 44

DocuSign Envelope ID: 92FD5E9A-ECC4-4978-854E-B08A2FC7E685

otherwise expressly provided herein, no party hereto shall have any further rights or obligations under this Agreement. IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER FOR PUNITIVE, SPECULATIVE, SPECIAL, OR CONSEQUENTIAL DAMAGES.

(ii)    If there is a material breach by Purchaser of this Agreement which remains uncured for more than ten (10) days after receipt of written notice from Seller describing the default, then Seller's sole and exclusive remedy shall be to terminate this Agreement upon notice to Purchaser and Escrow Agent, whereupon the Deposit shall be paid to Seller and Seller shall have no other rights or remedies against Purchaser hereunder except as expressly set forth herein.  Purchaser agrees that the delivery of the Deposit to Seller is liquidated damages to recompense Seller for time expended, labor and services performed and the loss of its bargain, and Seller waives any and all equitable remedies, including without limitation the right to specific performance of this Agreement. Purchaser and Seller agree that it would be impractical or extremely difficult to affix damages if Purchaser so defaults and that the Deposit, together with interest thereon, represents a reasonable estimate of Seller's damages.  Seller agrees to accept the Deposit as Seller's total damages and relief if Purchaser defaults in its obligations hereunder. If Purchaser does so default, Purchaser shall have no further right, title, or interest in or to the Property.

(b)    <u>Survival</u>.  This <u>Section 7</u> shall survive the termination of this Agreement.

8.    <u>WARRANTIES, REPRESENTATIONS AND COVENANTS</u>

(a)    <u>Purchaser's Representations</u>.  Purchaser warrants, represents and covenants to Seller as of the date hereof and on and as of the Closing Date that Purchaser (i) is a duly constituted limited liability company, validly existing and in good standing in the State of its organization; (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action to authorize the execution and performance of this Agreement and the consummation of the transactions contemplated herein; (iii)  has the financial resources to consummate the transaction contemplated herein and pay the Purchase Price; and (iv) is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

(b)    <u>Seller's Representations</u>.  Seller warrants, represents and covenants to Purchaser as of the date hereof and on and as of the Closing Date that:

(i)    Seller is a duly constituted limited liability  company validly existing and in good standing in the State of its organization;

(ii)    Seller has full power and authority to execute and deliver this Agreement and to perform its obligations  hereunder and has taken all necessary action to authorize the execution and performance of this Agreement and the consummation of the transactions contemplated herein;

(iii)    the execution and performance of this Agreement does not in any manner conflict with any other agreement to which Seller is a party;

(iv)    Seller is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States;

Exhibit 1 Page 7 of 44

DocuSign Envelope ID: 92FD5E9A-ECC4-4078-854F-B08A2FC7E685

(v)     Seller has not received written notice regarding any condemnation or similar proceeding affecting the Property, and, to the best of Seller's knowledge, no such proceeding is contemplated; and

(vi)     Seller has not sold, transferred, conveyed, or entered into any agreement regarding air rights, utility rights (including capacity, credits, or reimbursements) or development rights or restrictions relating to the Property, except as may be provided in the Property Documents or as shown in the Title Report.

(vii)     To the current, actual knowledge of Seller, without duty of inquiry or investigation, there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or pursuant to any other debtor relief laws contemplated or filed by Seller, or pending against Seller; and

(viii)     The City of Houston ("**City**") has notified Seller that a portion of the construction fence surrounding the Property encroaches onto the City right-of-way and that the City has required removal of such fence. Seller shall remedy such encroachment, at its sole cost and expense, prior to the Closing Date. In the event that Seller has not received written notice from the City evidencing the City's satisfaction of the removed encroachment, Purchaser shall receive a $25,000.00 credit at Closing in order to remedy the encroachment post-Closing.

(c)     Purchaser's Acknowledgments.  As a material part of the consideration for this Agreement, Purchaser acknowledges that it is accepting the Property as of the Closing Date subject to the foregoing representations and warranties of Seller, the conveyance documents and this Agreement, but otherwise "AS IS, WHERE IS AND WITH ALL FAULTS."  Purchaser acknowledges that except as otherwise expressly provided in this Agreement or the conveyance documents, Seller, its agents, its principals, its brokers and/or its attorneys have not made and will not make, nor shall Seller, its agents, its principals, its brokers and/or its attorneys be deemed to have made, any warranty or representation, express or implied as to any matter including, without limitation, (i) the fitness, design or condition of the Property for any particular use or purpose, (ii) the quality of the material or workmanship therein, (iii) the existence of any defect, latent or patent, (iv) except as may be expressly provided herein to the contrary, Seller's title thereto which is being conveyed subject to the Permitted Title Exceptions, (v) value, (vi) compliance with specifications, (vii) location, (viii) use, (ix) condition, (x) merchantability, (xi) quality, (xii) description, (xiii) durability, (xiv) operation, or (xv) the existence of any hazardous substance.  Subject to the foregoing representations and warranties of Seller, Purchaser further acknowledges that Seller, its agents, its principals, its brokers and/or its attorneys have not made any representations or warranties with respect to environmental conditions on or affecting the Property, including (1) whether the Property has been or is contaminated by or with, or has or is contaminating or has or is contributing to the contamination of any other property with, any substance in any manner which could require remediation under any law or regulation, including local, state, federal or common law, (2) whether the Property contains or has ever contained any environmentally sensitive areas in which development could be precluded or limited under any law or regulation, including local, state, federal or common law, or wetlands or flood plains regulations or laws, (3) whether the Property contains or has ever contained any underground tanks or substances of any kind, including asbestos or polychlorinated biphenyls, whose removal or disposal is subject to or has ever been subject to special regulations under any law or regulation, including local, state, federal or common law, or (4) whether any activities on the Property have been conducted or are being conducted in violation of any laws concerning the handling of any materials by reason of the hazardous or toxic characteristics of such materials or the disposal of any wastes, the discharge of any materials into the soil, air, surface, water, or groundwater, or the conducting of activities in environmentally sensitive areas. If any defect or deficiency in any portion of the Property of any nature, whether latent or patent, Seller, its agents, its principals, its brokers and/or its attorneys shall not have any responsibility or liability  with respect thereto or for any incidental or

Exhibit 1 Page 8 of 44

consequential damages (including strict liability in tort), unless directly caused or arising from the acts or omissions of Seller, its agents, its principals, its brokers and/or its attorneys. Subject to Seller's express obligations under this Agreement, Purchaser, for itself and any entity affiliated with Purchaser, hereby waives and releases Seller, its agents, its brokers, its principals and/or its attorneys from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, existing and future, contingent or otherwise (INCLUDING ANY ACTION OR PROCEEDING, BROUGHT OR THREATENED, OR ORDERED BY ANY APPROPRIATE GOVERNMENTAL ENTITY) MADE, INCURRED, OR SUFFERED BY PURCHASER OR ANY ENTITY AFFILIATED WITH PURCHASER RELATING TO THE PRESENCE, MISUSE, USE, DISPOSAL, RELEASE OR THREATENED RELEASE OF ANY HAZARDOUS OR TOXIC MATERIALS, CHEMICALS OR WASTES AT THE PROPERTY AND ANY LIABILITY OR CLAIM RELATED TO THE PROPERTY ARISING UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, THE SUPERFUND AMENDMENTS AND REAUTHORIZATION ACT OF 1986, THE RESOURCE CONSERVATION AND RECOVERY ACT, AND THE TOXIC SUBSTANCE CONTROL ACT, ALL AS AMENDED, OR ANY OTHER CAUSE OF ACTION BASED ON ANY OTHER STATE, LOCAL, OR FEDERAL ENVIRONMENTAL LAWS, RULE OR REGULATION, EXCEPT TO THE EXTENT DIRECTLY CAUSED OR ARISING FROM THE ACTS OR OMMISSION OF SELLER, ITS AGENTS, ITS PRINCIPALS, ITS BROKERS AND/OR ITS ATTORNEYS.

Purchaser acknowledges that Seller may or may not have undertaken an independent analysis of the historical and projected financial condition and performance of the Property ("**Seller's Financial Analysis**") and that Seller's Financial Analysis, if any, constitutes proprietary and confidential information of Seller. Purchaser therefore acknowledges that Seller has not provided Seller's Financial Analysis, if any, to Purchaser. Purchaser has conducted to its satisfaction its own independent analysis of the historical and projected financial condition and performance of the Property and, in making the determination to proceed with the transactions contemplated by this Agreement, has relied solely on the results of its own independent analysis and the representations and warranties of Seller expressly set forth in this Agreement. Purchaser acknowledges and agrees that neither Seller nor any other person has made any guarantee, representation or warranty, express or implied, as to the historical or projected financial condition or performance of the Property (or any part thereof) or other matters that are not included in this Agreement. Except as otherwise provided in this Agreement or the conveyance documents, neither Seller nor any other person shall have any liability or responsibility whatsoever to Purchaser or its members, managers, directors, officers, employees, affiliates, controlling persons, agents, advisors or representatives, or any other person, on any basis (including in contract or tort, under federal or state securities laws or otherwise) based upon any information provided or made available, or statements made, to Purchaser or its directors, officers, employees, affiliates, controlling persons, advisors, agents or representatives (or any omissions therefrom).

(d)      Seller Covenants. Seller agrees that it shall continue to operate and manage the Property in substantially the same manner in which Seller has previously operated and managed the Property. Seller further agrees that, from and after the Effective Date and continuing through Closing, Seller shall reasonably cooperate with Purchaser (at Purchaser's sole liability and expense) in connection with Purchaser's applications for and pursuit of utility capacity letters, pre-plat approval requests, and building permit applications relating to the Property, and Seller shall join in such applications, as necessary, so long as the sought-after entitlements do not become effective until Closing. Seller shall respond to such request within forty-eight (48) hours prior notice from Purchaser. Prior to Closing, Seller shall not: (i) enter into any leases, licenses, or other occupancy agreements; or (ii) enter into any service contract or other contract or agreement pertaining to the Property, or any portion thereof which cannot be terminated without premium or penalty on or before the Closing Date without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

Exhibit 1 Page 9 of 44

DocuSign Envelope ID: 92FD5E9A-FCC4-4078-854F-B08A2FC7E685

(e)     <u>Limitation of Liability</u>.

(i)     Notice is hereby given that all persons dealing with Seller shall look solely to the assets of Seller for the enforcement of any claim against Seller and none of the members, directors, trustees, officers, employees, agents, shareholders or principals of Seller or its affiliates assume any personal liability for obligations entered into by or on behalf of Seller. Likewise, notice is hereby given that all persons dealing with Purchaser shall look solely to the assets of Purchaser for the enforcement of any claim against Purchaser and none of the directors, trustees, officers, employees, shareholders or principals of Purchaser assume any personal liability for obligations entered into by or on behalf of Purchaser.

(ii)     Subject to Seller's notice and cure rights as provided in Section 7(a) of this agreement, Purchaser's sole remedy with respect to a violation of a representation or warranty by Seller contained in Section 8 of this Agreement of which Purchaser has knowledge prior to the Closing shall be either (1) to terminate this Agreement by delivering written notice to Seller and Escrow Agent, whereupon the Deposit shall be returned to Purchaser, this Agreement shall terminate, and none of the parties to this Agreement shall have any further rights or obligations hereunder (other than any such rights or obligations that are expressly stated in this Agreement to survive the termination thereof), or (2) to close the transaction contemplated hereby (without any abatement of the Purchase Price or allowance of any kind), in which event Purchaser shall be deemed to have waived any violation of such representation. If Purchaser fails to deliver a termination notice to Seller and Escrow Agent on or prior to the Closing Date, then Purchaser shall proceed to Closing in accordance with the terms hereof and Seller shall not have any liability whatsoever to Purchaser with respect to any such misrepresentation of which Purchaser has knowledge, or is deemed to have knowledge, as of the Closing Date.  For purposes of this Section 8, Purchaser shall be deemed to have "knowledge" of any information relating to the Property that is delivered to Purchaser or its representatives in writing or is otherwise made available to Purchaser or its representatives in writing or electronically (including via any website or e-room on which documents and other information may be viewed), at any time prior to the Closing Date, either by or on behalf of Seller, or any partner, member, director, officer, employee, agent or counsel of Seller.

(iii)     With respect to a violation of a representation by Seller contained herein or made pursuant hereto of which Purchaser does not have knowledge until after the Closing, Purchaser may exercise any rights and remedies available at law or in equity; provided, however, that Seller's liability hereunder shall in no event exceed $50,000.00, and all claims by Purchaser against Seller hereunder shall be made no later than sixty (60) days after the Closing Date; and, provided, further, in no event shall Purchaser have the right to make a claim for or  collect any consequential, punitive or indirect damages from Seller and Purchaser waives any and all such rights.

9.     <u>CASUALTY AND CONDEMNATION</u>

If all or any portion of the Property is destroyed or materially damaged, or if condemnation proceedings are commenced against any portion of the Property, Purchaser may elect to terminate this Agreement by notifying Seller in writing of such electing within five (5) business days after receipt of notice of such event from Seller in which event the Deposit shall be returned to Purchaser. If Purchaser elects to proceed with the transaction, all proceeds of insurance or condemnation awards payable to Seller by reason of such damage or condemnation, if any, shall be paid or assigned to Purchaser at Closing. This <u>Section 9</u> shall contain Purchaser's sole remedies as against Seller in the event of any casualty or condemnation.

Exhibit 1 Page 10 of 44

10.   <u>BROKERS</u>

Purchaser and Seller each represents to the other that it has not dealt with any party acting as a broker or sales agent in connection with the transactions described in this Agreement other than Oxberry Group, as a representative of Purchaser ("**Purchaser's Broker**"), and Jones Lang Lasalle, as a representative of Seller ("**Seller's Broker**"). Purchaser's principals may have an ownership and/or managerial interest in Purchaser's Broker. Seller shall pay a commission to Seller's Broker pursuant to a separate written agreement between Seller and Seller's Broker. Additionally, Seller shall pay a commission to Purchaser's Broker in an amount equal to four percent (4%) of the Purchase Price.  No commission will be earned if the transaction fails to close and neither broker will be entitled to any portion of the Deposit that may be retained by Seller. Seller's Broker and Purchaser's Broker shall have no third-party rights and under no circumstances shall Seller have any obligations to Seller's Broker or Purchaser's Broker, except as provided herein. If any other person shall assert a claim to a finder's fee, brokerage commission or other compensation on account of alleged employment as a finder or broker or performance of services as a finder or broker in connection with the transaction, the party under whom the finder or broker is claiming shall indemnify, defend, and hold harmless the other party and such party's affiliates for, from and against any and all losses, all claims, expenses, fees or costs, including reasonable attorneys' fees and disbursements, in connection with such claim or any action or proceeding brought on such claim. The provisions of this <u>Section 10</u> shall survive the Closing or termination of this Agreement.

11.   <u>NOTICES</u>

Any notice, demand, request or other communication required to be given pursuant to the terms hereunder shall be in writing and (i) sent by certified mail, return receipt requested, (ii) hand-delivered, with receipt acknowledged, (iii) sent by overnight courier, with receipt acknowledged, or (iv) transmitted by electronic mail (e.g. email), and addressed to the party to receive the notice at the following addresses:

| | |
|---|---|
| If to Seller: | KH-REIT II FUNDING XXII, LLC<br>777 W. Putnam Ave.<br>3rd Floor, Suite B-2<br>Greenwich, CT 06830<br>Attention: Jonathan Daniel and Laura Torrado<br>Email: jdaniel@knightheadfunding.com<br>ltorrado@knighthead.com |
| with copies to: | Hajjar Peters LLP<br>3144 Bee Caves Road<br>Austin, TX 78746<br>Attention: Josh Bernstein<br>Telephone: (512) 637-4956<br>Email: jbernstein@legalstrategy.com |
| If to Purchaser: | Grant Meadows, L.L.C.<br>2429 Bissonnet Street Suite 615<br>Houston, TX 77005<br>Attention: Shahin "Sean" Jamea<br>Telephone: 713-343-6152<br>Email: sjamea@oxberrygroup.com |
| with copies to: | Wilson Cribbs + Goren<br>Attention: Travis L. Huehlefeld |

Exhibit 1 Page 11 of 44

DocuSign Envelope ID: 92FD5E9A-ECC4-4978-854F-B08A2FC7E685

2500 Fannin Street
Houston, TX 77002
Telephone: (713) 222-9000
Email: thuehlefeld@wcglaw.com

If to Escrow Agent:                Fidelity National Title Insurance Company
Attn: Lolly Avant
1900 West Loop South, Suite 200
Houston, Texas 77027
Telephone: (713) 621-9960
E-mail: lavant@fnf.com

Either party (or Escrow Agent) may change its address for notices by giving written notice to the other party and Escrow Agent, or, in the case of Escrow Agent, to both parties, as aforesaid. Any notice shall be deemed received on the day received or receipt is refused. Inability to deliver because of changed address of which no notice was given shall be deemed a receipt of such notice.

12.    <u>MISCELLANEOUS</u>

       (a)    <u>Entire Agreement; Amendments</u>.  This Agreement constitutes the complete and final expression of the agreement of the parties hereto and supersedes all previous agreements, either oral or written, with respect to the Property and the transactions described herein. This Agreement may not be modified, amended, discharged or terminated, nor may any of the obligations of the parties hereunder be waived, except by a written instrument executed by the parties hereto.

       (b)    <u>Permitted Assignment of Agreement</u>.  The terms, conditions and covenants of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective nominees, successors, beneficiaries and permitted assignees. Neither Purchaser nor Seller may transfer, assign or encumber this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; <u>provided</u>, <u>however</u>, that Purchaser may assign its rights hereunder to one or more single purpose entities wholly owned or managed by Purchaser or its principals upon written notice to Seller given at least five (5) days prior to the Closing Date. The original Purchaser shall remain primarily liable under this Agreement notwithstanding such assignment.

       (c)    <u>No Recording</u>.  Purchaser shall not (i) record, or attempt to record, this Agreement or a memorandum hereof or (ii) place, or attempt to place, a vendee's lien upon the Property. The provisions of this <u>Section 12(c)</u> shall survive the termination of this Agreement.

       (d)    <u>Parties' Expenses</u>.  Seller and Purchaser shall pay their own respective expenses, costs and fees (including attorneys' fees and disbursements) incurred in connection with the negotiation, preparation, execution and delivery of this Agreement, and any third party reports, except as otherwise expressly provided herein. Seller and Purchaser shall each pay one-half (1/2) of the fees of Escrow Agent. Seller shall pay for the cost of the standard owner's policy of title insurance to be issued pursuant to the Title Commitment, real estate transfer taxes (if any), title search costs, and the cost to record releases of any lien created by or at the direction of Seller. Purchaser shall pay the premium for extended coverage and any title insurance endorsements desired by Purchaser, all costs in connection with its mortgage loan, if applicable, and the cost of any Phase I environmental site assessment, property condition assessment, and other inspections of the Property Purchaser elects to perform. All other closing costs and expenses shall be paid in accordance with the customs of the State in which the Property is located.

Exhibit 1 Page 12 of 44

(e)     <u>Prorations</u>.  All real estate taxes, and all other public or governmental charges and public or private assessments against the Property which are or may be payable on an annual basis (including metropolitan district, sanitary commission, benefit charges, liens or encumbrances for sewer, water, drainage or other public improvements whether completed or commenced on or prior to the date hereof or subsequent thereto), shall be adjusted and prorated between the parties as of the day prior to Closing and shall thereafter be assumed and paid by Purchaser, whether or not assessments have been levied as of the date of Closing.  Any tax proration based on an estimate may be subsequently readjusted at the request of either party upon receipt of a tax bill.  The obligation to adjust shall survive Closing for one-hundred twenty (120) days.  If this sale or Purchaser's use of the Property after closing results in additional assessments for periods before Closing, including any roll back type of assessments and any penalties related thereto, the assessments will be the obligation of Purchaser.

(f)     <u>Construction; Headings</u>.  When used herein, the term "including" shall mean "including without limitation" unless otherwise specifically provided; all other language in this Agreement shall be construed simply according to its fair meaning, and not strictly for or against any of the parties hereto.  The headings in this Agreement are for convenience only, and are not to be utilized in construing the content or meanings of any of the provisions hereof and shall not be deemed to constitute a part of this Agreement.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require.

(g)     <u>Announcements; Confidentiality</u>. Neither party shall make any press release or other public announcement concerning this transaction without the prior written consent of the other party. Seller and Purchaser hereby covenant and agree to keep the nature, terms and conditions of this Agreement and the transactions contemplated hereunder confidential and Purchaser hereby covenants and agrees to keep any materials delivered to it by Seller or its affiliates confidential; <u>provided</u>, <u>however</u>, that the foregoing may be disclosed (A) as required by applicable law, regulation or legal process, and (B) to Seller's or Purchaser's representatives in connection with the consummation of the transactions contemplated herein, so long as such representatives agree to act in accordance with the terms of this <u>Section 12(g)</u>.

(h)     <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or enforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of any other provision of this Agreement.

(i)     <u>Governing Law</u>.  This Agreement shall be construed, interpreted and governed by the internal laws (and not the conflict laws) of the State in which the Property is located.

(j)     <u>Time of the Essence</u>.  Time is of the essence with respect to each of Purchaser's and Seller's obligations hereunder.

(k)     <u>WAIVER OF TRIAL BY JURY</u>. THE PARTIES HERETO SHALL AND THEY HEREBY DO INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OR INJURY OR DAMAGE RELATED THERETO.

(l)     <u>Not a Joint Venture</u>.  Seller and Purchaser each acknowledge and agree that the relationship between them is that of seller and purchaser and this Agreement does not constitute a partnership, joint venture or any other association between them.

Exhibit 1 Page 13 of 44

(m)     <u>Binding Effect of Agreement</u>.  This writing shall have no binding force or effect until executed and delivered by Purchaser and by Seller to the Escrow Agent.

(n)     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute one and the same original.  Executed copies of this Agreement may be delivered by telecopy or by email attachment and, upon receipt, shall be deemed originals and binding upon the parties hereto.  Without limiting or otherwise affecting the validity of executed copies hereof that have been delivered by telecopy, the parties will use best efforts to deliver originals as promptly as possible following execution thereof.

(o)     <u>Final Dates</u>.  If the final date of any deadline falls upon a Saturday, Sunday, or holiday recognized by the U.S. Postal Service, then in such event the time of such deadline shall be extended to the next day that is not a Saturday, Sunday, or holiday recognized by the U. S. Postal Service. Whenever the word "days" is used herein, it shall be considered to mean "calendar days" and not "business days" unless an express statement to the contrary is made

(p)     <u>Section 1031 Exchange</u>.  Seller and Purchaser may each consummate the purchase of the Property as part of a so-called like kind exchange (the "**<u>Exchange</u>**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**<u>Code</u>**"), provided that: (i) the Closing shall not be delayed or affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition precedent or condition subsequent to the exchanging party's obligations under this Agreement; (ii) the exchanging party shall effect the Exchange through an assignment of its rights under this Agreement to a qualified intermediary; and (iii) the non-exchanging party shall not be required to take an assignment of the purchase agreement for the replacement property or be required to acquire or hold title to any real property for purposes of consummating the Exchange. The non-exchanging party shall not by this agreement or acquiescence to the Exchange (1) have its rights under this Agreement affected or diminished in any manner or (2) be responsible for compliance with or be deemed to have warranted to the exchanging party that the Exchange in fact complies with Section 1031 of the Code.

The provisions of this Agreement are for the benefit of Purchaser or Seller, and no other parties shall have any right or claim against Purchaser or Seller by reason of this Agreement or be entitled to benefit therefrom or to enforce any of the provisions thereof.

(q)     <u>Separate Counsel</u>.  Each party hereby represents that it has had the adequate opportunity to consult with and has consulted with legal counsel in connection with this Agreement and hereby waives any defense or claim that such party was not effectively represented in connection with this Agreement.  None of the provisions of this Agreement shall be interpreted against the interest of the party who caused the Agreement to be drafted.

[Signature page to follow]

Exhibit 1 Page 14 of 44

IN WITNESS WHEREOF, Seller and Purchaser have executed this Agreement as of the date first above written.

Dated:  March ___, 2022
            4/1/2022

SELLER:

KH-REIT II FUNDING XXII, LLC,
a Delaware limited liability  company

By: _____
Name:  Laura L. Torrado
Title:    Authorized Signatory


Dated:  March ___, 2022
            3/31/2022

PURCHASER:

GRANT MEADOWS, L.L.C.,
a Texas limited liability  company

By: _____
Name: Shahin Jamea
Title: Authorized  Agent


Dated:  March ___, 2022

ESCROW AGENT:

With respect to Section 3 only:

FIDELITY NATIONAL TITLE INSURANCE COMPANY


By: _____
Name: _____
Title: _____

- 15 -

Exhibit 1 Page 15 of 44

## EXHIBIT A

### Legal Description of Land

TRACT 1:

Being all of Unrestricted Reserve "A", Block 1, of CAYDON 2701 MAIN STREET, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Film Code No. 693477, of the Map Records of Harris County, Texas.

TRACT 2:

Being all of Unrestricted Reserve "A", Block 1, of CAYDON 2627 MAIN STREET, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Film Code No. 693664, of the Map Records of Harris County, Texas.

Exhibit 1 Page 16 of 44

DocuSign Envelope ID: 92FD5E9A-ECC4-4978-854E-B08A2EC7E685

**EXHIBIT B**

**Form of Deed**

**SPECIAL WARRANTY DEED**

STATE OF TEXAS         §

                         KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF HARRIS     §

      That KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company ("**Grantor**"), having an address of 777 West Putnam Ave., 3rd Floor, Suite B-2, Greenwich, CT 06830, for and in consideration of $10.00 and other good and valuable consideration paid, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, AND CONVEYED and by these presents does GRANT, BARGAIN, SELL, AND CONVEY to _____ ("**Grantee**"), that certain parcel or parcels of land in the county and state referenced above, more particularly described on Exhibit A attached hereto and incorporated herein for all purposes, together with all and singular the rights, privileges, hereditaments, and appurtenances pertaining to such real property (collectively, the "**Property**").

      This conveyance is made and accepted subject to current real property taxes and all unpaid non-delinquent general and special taxes, bonds and assessments; all liens, covenants, conditions, reservations, rights, easements, interests, rights of way, and restrictions of public record; all matters of public record; all leases and other occupancy agreements in effect; all zoning ordinances and regulations and any other laws, ordinances or governmental regulations restricting or regulating the use, occupancy or enjoyment of the Property; all matters visible upon or about the Property or that would be disclosed by an accurate survey of the Property ("**Permitted Encumbrances**").

      TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto the said Grantee, its successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor but not otherwise, subject to the Permitted Encumbrances.

Grantee's address is: _____

[SIGNATURE PAGE FOLLOWS]

Exhibit 1 Page 17 of 44

EXECUTED as of _____, 2022.

KH-REIT II FUNDING XXII, LLC,
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title: Authorized Signatory

STATE OF _____     §
    §
COUNTY OF _____     §

    The foregoing instrument was acknowledged before me this _____ day of _____, 2022, by Laura Torrado, Authorized Signatory of KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____
Notary Public, State of _____

EXHIBIT A

LEGAL DESCRIPTION

Exhibit 1 Page 19 of 44

## EXHIBIT C

**Form of FIRPTA Certificate**

CERTIFICATE OF NONFOREIGN STATUS

PURCHASER:

SELLER:

U.S. REAL PROPERTY INTEREST:

Section 1445 of the Internal Revenue Code (the "Code") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445 of the Code), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law), and not the disregarded entity, will be the transferor of such property.

To inform Purchaser that withholding of tax is not required upon the disposition by Seller of the U.S. real property interest, the undersigned, on behalf of [_____] ("Owner") in its capacity as owner of Seller, certifies to Purchaser, the following:

      1.      Owner is the owner of Seller;

      2.      Seller is a disregarded entity;

      3.      Owner is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

      4.      Owner is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Income Tax Regulations promulgated thereunder);

      5.      Owner's U.S. employer identification number is _____, and its office address is: _____.

Owner understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Owner.

[Signature Page Follows]

Exhibit 1 Page 20 of 44

DocuSign Envelope ID: 92FD5E9A-ECC4-407B-854F-B08A2EC7E685

Dated: _____

[_____]

By:      _____
Name:
Title:

Sworn to me this _____ day of _____, 2022

_____
Notary Public

Exhibit 1 Page 21 of 44

## EXHIBIT D

**Form of Bill of Sale and Assignment of Warranties**

## BILL OF SALE AND GENERAL  ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS, that KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company ("**Seller**"), for and in consideration of the sum of Ten Dollars and No/100 Dollars ($10.00) in hand paid by _____ ("**Purchaser**"), to or on behalf of Seller, the receipt of which is hereby acknowledged, Assignor has simultaneously herewith conveyed to the Assignee all of Assignor's right, title and interest in and to certain real property located at 2701 Main Street and 0 Main Street and 2606 Fannin Street, Houston, Texas 77002 (the "**Premises**"), and in connection therewith, Assignor does hereby sell, transfer and assign to Purchaser, its successors and assigns, all of Seller's right, title and interest, if any, in and to the following (collectively, "**Assigned Property**"): (i) all machinery, appliances, furniture, equipment, trade fixtures and other tangible personal property (collectively, the "**Equipment**"); (ii) any warranties and/or guaranties relating to the Premises to the extent assignable (collectively, "**Warranties**"), and (iii) to the extent assignable, any transferable consents, authorizations, variances or waivers, licenses, permits, development rights, air rights, entitlements, guarantees, certificates, permits, warranties and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality relating to the Premises (collectively "**Approvals**"), (iv) all guarantees, licenses, approvals, certificates, permits, warranties, transferable telephone exchange numbers, plans and specifications, engineering plans and studies, floor plans, landscape plans, logos, designs, trade names, trademarks, servicemarks, copyrights and other intellectual property, to the extent assignable (collectively, "**Intangible Property**").  Seller makes no warranty or representation with respect to the Assigned Property, which is conveyed on an "AS-IS, WHERE-IS, WITH ALL FAULTS" basis, without recourse to Assignor.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

Exhibit 1 Page 22 of 44

**IN WITNESS  WHEREOF**,  Seller and Purchaser have executed this Bill  of Sale and General Assignment as of the date first above written.

Dated:  _____ ___, 2022         SELLER:

KH-REIT II FUNDING XXII, LLC,
a Delaware limited  liability  company


By:      _____
Name:  Laura L. Torrado
Title:    Authorized Signatory


Dated:  _____ ___, 2022         PURCHASER:


GRANT MEADOWS, L.L.C., a Texas limited liability  company


By: _____
Name: _____
Title: _____

- 2 -

Exhibit 1 Page 23 of 44

## SCHEDULE 5(D)

### [TITLE COMMITMENT]

Exhibit 1 Page 24 of 44

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Fidelity National Title Insurance Company**

Commitment Number:

**FAH22004012**

---

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

---

We (Fidelity National Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Fidelity National Title Insurance Company**
By:

_____
Michael J. Nolan, President

Attest:

_____
Marjorie Nemzura, Secretary

Issued By:

**Fidelity National Title**
1900 West Loop South, Suite 200
Houston, TX 77027
lavant@fnf.com; RMB-teamavant@fnf.com

_____
Authorized Signatory

**CONDITIONS AND STIPULATIONS**

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

DocuSign Envelope ID: 92FD5E9A-FCC4-4078-854F-B08A2FC7E685

---

THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

---

### Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data").  Title Data owns and maintains land title plants for various Texas counties.  Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information.  The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**



Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
|:---:|:---:|
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

Exhibit 1 Page 27 of 44

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE A

Effective Date:  March 14, 2022 at 8:00 AM                    GF No.:  FTH-18-FAH22004012
Commitment No.:  FAH22004012                                 Issued:  March 21, 2022 at 8:00 AM

1.  The policy or policies to be issued are:

    a.  OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
       (Not applicable for improved one-to-four family residential real estate)

       Policy Amount:          TBD
       PROPOSED INSURED:  Grant Meadows, LLC

    b.  TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
       ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

       Policy Amount:
       PROPOSED INSURED:

    c.  LOAN POLICY OF TITLE INSURANCE (Form T-2)

       Policy Amount:          TBD
       PROPOSED INSURED:  TBD
       Proposed Borrower:      Grant Meadows, LLC

    d.  TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    e.  LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    f.  OTHER

       Policy Amount:
       PROPOSED INSURED:

2.  The interest in the land covered by this Commitment is:

    Fee Simple

3.  Record title to the land on the Effective Date appears to be vested in:

    KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

**FIDELITY NATIONAL TITLE INSURANCE**                                    **Commitment No.: FAH22004012**
**COMPANY**

---

## SCHEDULE A
(continued)

4.  Legal description of land:

TRACT 1

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2701 MAIN STREET, a subdivision of 1.1478 acres, according to the map or plat thereof recorded under Film Code Number 693477 of the Map Records of Harris County, Texas.

TRACT 2

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2627 MAIN STREET, a subdivision of 0.9410 acres, according to the map or plat thereof recorded under Film Code Number 693664 of the Map Records of Harris County, Texas.


**END OF SCHEDULE A**

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                **COMMITMENT NO.: FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.: FAH22004012                                   GF No.: FTH-18-FAH22004012

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1.   The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

     Film Code No. 693477, of the Map Records of Harris County, Texas. (Tract 1)
     Film Code No. 693664, of the Map Records of Harris County, Texas. (Tract 2)


     Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2.   Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.   Homestead or community property or survivorship rights, if any of any spouse of any insured.

     (Applies to the Owner Policy only.)

4.   Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

     a.   to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

     b.   to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

     c.   to filled-in lands, or artificial islands, or

     d.   to statutory water rights, including riparian rights, or

     e.   to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

          (Applies to the Owner Policy only.)

5.   Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6.   The terms and conditions of the documents creating your interest in the land.

7.   Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the

Exhibit 1 Page 30 of 44

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8.  Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

    (Applies to Mortgagee Policy (T-2) only.)

9.  The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10. The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

    a.  Rights of parties in possession.

    b.  The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

        Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

        Note:   Upon receipt of a survey acceptable to the Title Company, this exception will be deleted. The Company reserves the right to except additional items and/or make additional requirements after reviewing said survey.

    c.  Easement(s) for the purpose(s), visibility triangle, and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at all four corners, recorded as Document No. Film Code Number 693477 Map Records Harris County, Texas. (Tract 1)

        Purpose, pedestrian realm, affects 1.0 feet wide along Main Street and 2.2 feet wide along Dennis Street.

        Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

    d.  Building set-back line, as disclosed by said plat recorded in Film Code No. 693477, of the Map Records of Harris County, Texas. (As to Tract 1)

        Affects:   2.0 feet wide along Fannin Street
        Affects: Variable width from 7.9 feet wide to 4.5 feet wide along Drew Street

    e.  Agreement ENCROACHMENT, MAINTENANCE AND ACCESS EASEMENT AGREEMENT, executed by CAYDON HOUSTON PROPERTY 2 LP, a Delaware limited partnership, Grantor and MAIN 2601 PARTNERS, LLC, a Texas limited liability company, Grantee, recorded on August 3, 2017, as Document No. Harris County Clerk's File No. RP-2017-350471, Affects as shown on Exhibit "C-2" for maintenance and on Exhibit "D-2" for access, attached thereto.  (Tract 2)

    f.  Easement(s) for the purpose(s), visibility triangle , and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at the west and south corners, recorded as Film Code Number 693664 Map Records Harris County, Texas.  (Tract 2)

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

g.     A building set-back line, as disclosed by said map/plat in Film Code No. 693664, of the Map Records of County, Texas.  (Tract 2)

Affects:   10 feet in width along the Dennis Street property line
Affects:   25 feet in width along the Main Street and Fannin Street property lines

h.     All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

i.     Rights of tenants in possession, as tenants only, under unrecorded lease agreements. ( both Tracts)

j.     If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

Owner and Loan Policy(ies):   Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of  County, Texas, prior to the date hereof.

Owner Policy(ies) Only:   Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

Loan Policy(ies) Only:   Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

k.     NOTICE OF STORM WATER QUALITY REQUIREMENTS, executed by Caydon Houston Property 2 LP ("Owner"), recorded on September 21, 2020, under Harris County Clerk's File No. RP-2020-442240. (Tract 1)

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**           **COMMITMENT NO:  FAH22004012**

## SCHEDULE C

Commitment No.:  FAH22004012                          GF No.:  FTH-18-FAH22004012

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1.      Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2.      Satisfactory evidence must be provided that:

   a.      no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b.      all standby fees, taxes, assessments and charges against the property have been paid,

   c.      all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d.      there is legal right of access to and from the land,

   e.      (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3.      You must pay the seller or borrower the agreed amount for your property or interest.

4.      Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5.      Please be advised that our search did not disclose any open mortgages of record.  If you should have knowledge of any outstanding obligation, please contact the Title Department immediately for further review prior to closing.

6.      We must have lender verify that it has not been contacted by the claimants of Mecanic's Liens filed under Harris County Clerk's File No(s) RP-2021-137391 and RP-2021-413788, seeking to be paid by the lender on some quantum meruit theory.

7.      Title to subject property is vested in KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company by virtue of (Substitute) Trustee's Deed

   Dated:                  April 6, 2021
   Recording No.:          Harris County Clerk's File No. RP-2021-191476

   The Company must be furnished with the following information reduced to recordable affidavit, pertaining to the Trustee's sale:

   Whether the defaulting mortgagor(s) was living and competent on the date of posting of notice(s) for the sale and on the date of the sale.

   Who is in possession of subject property at the present time.

   Satisfactory evidence that the seller/lender is in peaceable possession of the property.

8.      The Land lies within the boundaries of Midtown Management District and may be subject to taxes or special assessments by reason thereof.  Notice of inclusion of said Land in said district must be given and executed by

DocuSign Envelope ID: 92FD5E9A-ECC4-4078-854E-B08A2EC7E685

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**      **COMMITMENT NO.: FAH22004012**

## SCHEDULE C
(continued)

purchaser and seller and filed of record.

9.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   KH-REIT II FUNDING XXII, LLC

a.    A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.    If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d.    A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

10.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   Grant Meadows, LLC

a.    A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.    If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.    If the Limited Liability Company is member-managed a full and complete current list of members certified by the appropriate manager or member.

d.    A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.    If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

11.    The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

Grantor:         Sandy Dasigenis, Substitute Trustee
Grantee:         KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

---

Exhibit 1 Page 34 of 44

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE C
(continued)

Recording Date:     April 9, 2021
Recording No:       Harris County Clerk's File No. RP-2021-191476

12.     Note –Important Notice

You have the right to have your funds deposited in an interest-bearing account.

If you choose to establish an interest-bearing account for your deposit, notify your escrow officer immediately. Thereafter you will be provided with a Notice of Election form which you should complete in writing by completing and returning the form, along with your taxpayer identification information, not later than five (5) days before the scheduled closing.  If you choose to establish an interest-bearing account for your deposit, an additional charge of $50.00 will be required.  This charge may exceed the amount of interest to be earned on the deposit, depending on the amount, applicable interest rate, and the duration of the deposit.

As an example, the amount of interest you can earn on a deposit of $1000.00 for a thirty-day period at an interest rate of 4% is $3.33.  Interest earned is dependent on the amount of deposit, time of deposit and the applicable interest rate.

If you do not choose to establish an interest-bearing account for your deposit, your funds will be deposited with other escrow funds in your escrow agent's general escrow account with an authorized financial institution and may be transferred to another general escrow account or accounts.  By reason of the banking relationship between our Company and the financial institution, the Company may receive an array of bank services, accommodations or other benefits.  The escrow funds will not be affected by such services, accommodations or other benefits.

Failure to notify your escrow officer and complete the additional required investment authorization form shall constitute waiver of any intention of establishing an interest-bearing account for your deposit(s).

13.     As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

• Confirmation prior to closing that the County Clerk of Harris County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

• Electronic recordation of the instruments to be insured in the Official Public Records of Harris County, Texas.

• Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

• Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

14.     Due to office closures related to COVID-19, we may be temporarily unable to record/access documents in the normal course of business. As such, we will require our AFFIDAVIT OF UNDERSTANDING AND INDEMNITY AND HOLD HARMLESS AGREEMENT DUE TO CORONAVIRUS PANDEMIC to be signed by all parties.

DocuSign Envelope ID: 92FD5E9A-ECC4-4078-854F-B08A2FC7E685

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

# SCHEDULE D

Commitment No.:  FAH22004012                                            GF No.:  FTH-18-FAH22004012

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1.  The issuing Title Insurance Company, **Fidelity National Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

    **Shareholders:**  Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

    **Directors:**  Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Steven G. Day

    **Officers:**  Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2.  The following disclosures are made by the Title Insurance Agent issuing this Commitment:

    **Fidelity National Title**

    (a)  A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

    **Owners:**  FNTS Holdings, LLC owns 100% of **Fidelity National Title**

    (b)  A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

    **Owners:**  FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

    (c)  If the Agent is a corporation:  (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

    **Directors:**  Raymond Randall Quirk, Anthony John Park

    **Officers:**  Laurie H. Ford (President), Paula D. Hester (President), Todd B. Rasco (President), Anthony John Park (Chief Financial Officer and Executive Vice President), Marjorie Nemzura (Secretary), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President)

    (d)  The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive.  NONE.

    (e)  For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3.  You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates.  Upon your request, such disclosure will be made to you.  Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

    You are further advised that the estimated title premium* is:

    |          | Total | $ | 0.00 |
    |----------|-------|---|------|

    Of this total amount:  15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

    | Percent/Amount | To Whom | For Services |
    |----------------|---------|--------------|

    *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance.  Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

Exhibit 1 Page 36 of 44

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|

To obtain information or make a complaint:

Para obtener información o para presentar una queja:

You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al:

**1-877-862-9111**

**1-877-862-9111**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al:

**1-800-252-3439**

**1-800-252-3439**

You may write the Texas Department of Insurance:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Sitio web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|
| To obtain information or make a complaint: | Para obtener información o para presentar una queja: |
| You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al: |
| **1-877-862-9111** | **1-877-862-9111** |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at: | Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al: |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance: | Usted puede escribir al Departamento de Seguros de Texas a: |
| P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov | P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Sitio web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov |
| **PREMIUM OR CLAIM DISPUTES:**<br>Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**<br>Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas. |
| **ATTACH THIS NOTICE TO YOUR POLICY:**<br>This notice is for information only and does not become a part or condition of the attached document. | **ADJUNTE ESTE AVISO A SU PÓLIZA:**<br>Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto. |

DocuSign Envelope ID: 92FD5E9A-ECC4-4978-854F-B08A2FC7E685

# DELETION OF ARBITRATION PROVISION
### (Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution.  It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company.  However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process.  In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below).  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity).  All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured.  Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

_____          _____
Signature                                                                                   Date

# TEXAS TITLE INSURANCE INFORMATION

| |
|---|
| Title insurance insures you against loss resulting from certain risks to your title. |
| The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date. |
| El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propiedad. |
| El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción. |

Your Commitment for Title insurance is a legal contract between you and us.  The Commitment is not an opinion or report of your title.  It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable.  This determination has already been made.  Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

        **--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy.  Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them.  You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

        **---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

        **---EXCLUSIONS** are title risks that a Policy generally does not cover.  Exclusions are contained in the Policy but not shown or discussed in the Commitment.

        **---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company.  They are contained in the Policy but not shown or discussed in the Commitment.  The Policy Conditions are not the same as the Commitment Conditions.

DocuSign Envelope ID: 92FD5E9A-ECCA-497B-854F-B08A2FC7E685

Commitment Number: FAH22004012 GF#: FTH-18-FAH22004012

## TEXAS TITLE INSURANCE INFORMATION
### (Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment. The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy. Some of the changes to consider are:

    ---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy. Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

    ---Allow the Company to add an exception to "rights of parties in possession." If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection. If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued. You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

DocuSign Envelope ID: 92FD5E9A-ECC4-497B-854F-B08A2EC7E685

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Exhibit 1 Page 42 of 44

Effective Date: 5/1/2018

<u>Links to Other Sites</u>.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.  We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you.  Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice.  We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

<u>For California Residents</u>:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

Exhibit 1 Page 43 of 44

Effective Date: 5/1/2018

For Nevada Residents:  You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice.  Nevada law requires that we also provide you with the following contact information:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  BCPINFO@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users

FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

## Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

## Accessing and Correcting Information; Contact Us

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer

Exhibit 1 Page 44 of 44

# EXHIBIT 2

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Fidelity National Title Insurance Company**

Commitment Number:

**FAH22004012**

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

We (Fidelity National Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Fidelity National Title Insurance Company**
By:

**Issued By:**

**Fidelity National Title**
National Commercial Services
1900 West Loop South, Suite 200
Houston, TX 77027
lavant@fnf.com; RMB-teamavant@fnf.com

_____
Michael J. Nolan, President

Attest:

_____
Authorized Signatory

_____
Marjorie Nemzura, Secretary

## CONDITIONS AND STIPULATIONS

1.  If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2.  Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

Exhibit 2 Page 1 of 24

> THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

### Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data").  Title Data owns and maintains land title plants for various Texas counties.  Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information.  The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**

 Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

| | |
|---|---|
| *Federal Bureau of Investigation:* | *Internet Crime Complaint Center:* |
| *http://www.fbi.gov* | *http://www.ic3.gov* |

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

FNTIC-119

Exhibit 2 Page 3 of 24

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO.:  FAH22004012**

## SCHEDULE A

Effective Date:  March 14, 2022 at 8:00 AM                         GF No.:  FTH-18-FAH22004012
Commitment No.:  FAH22004012                                     Issued:  April 21, 2022 at 8:00 AM

1.  The policy or policies to be issued are:

   a.  OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
       (Not applicable for improved one-to-four family residential real estate)

       Policy Amount:  ██████████
       PROPOSED INSURED:  Grant Meadows, L.L.C., a Texas limited liability company

   b.  TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
       ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

       Policy Amount:
       PROPOSED INSURED:

   c.  LOAN POLICY OF TITLE INSURANCE (Form T-2)

       Policy Amount:           TBD
       PROPOSED INSURED:
       Proposed Borrower:       Grant Meadows, L.L.C., a Texas limited liability company

   d.  TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

   e.  LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

   f.  OTHER

       Policy Amount:
       PROPOSED INSURED:

2.  The interest in the land covered by this Commitment is:

       Fee Simple

3.  Record title to the land on the Effective Date appears to be vested in:

       KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

---

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**

**Commitment No.: FAH22004012**

## SCHEDULE A
(continued)

4. Legal description of land:

TRACT 1

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2701 MAIN STREET, a subdivision of 1.1478 acres, according to the map or plat thereof recorded under Film Code Number 693477 of the Map Records of Harris County, Texas.

TRACT 2

All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2627 MAIN STREET, a subdivision of 0.9410 acres, according to the map or plat thereof recorded under Film Code Number 693664 of the Map Records of Harris County, Texas.

**END OF SCHEDULE A**

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.:  FAH22004012                         GF No.:  FTH-18-FAH22004012

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1.    The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

      <u>Film Code No. 693477</u>, of the Map Records of Harris County, Texas. (Tract 1)
      <u>Film Code No. 693664</u>, of the Map Records of Harris County, Texas. (Tract 2)


      Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2.    Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.    Homestead or community property or survivorship rights, if any of any spouse of any insured.

      (Applies to the Owner Policy only.)

4.    Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

      a.    to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

      b.    to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

      c.    to filled-in lands, or artificial islands, or

      d.    to statutory water rights, including riparian rights, or

      e.    to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

      (Applies to the Owner Policy only.)

5.    Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6.    The terms and conditions of the documents creating your interest in the land.

7.    Materials furnished or labor performed in connection with planned construction before signing and delivering the

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8.    Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

    (Applies to Mortgagee Policy (T-2) only.)

9.    The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10.    The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

    a.    Rights of parties in possession.

    b.    The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

        Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

        Note:   Upon receipt of a survey acceptable to the Title Company, this exception will be deleted. The Company reserves the right to except additional items and/or make additional requirements after reviewing said survey.

    c.    Easement(s) for the purpose(s), visibility triangle, and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at all four corners, recorded as Document No. Film Code Number <u>693477</u> Map Records Harris County, Texas. (Tract 1)

        Purpose, pedestrian realm, affects 1.0 feet wide along Main Street and 2.2 feet wide along Dennis Street.

        Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

    d.    Building set-back line, as disclosed by said plat recorded in <u>Film Code No. 693477</u>, of the Map Records of  Harris County, Texas. (As to Tract 1)

        Affects:   2.0 feet wide along Fannin Street
        Affects: Variable width from 7.9 feet wide to 4.5 feet wide along Drew Street

    e.    Agreement ENCROACHMENT, MAINTENANCE AND ACCESS EASEMENT AGREEMENT, executed by CAYDON HOUSTON PROPERTY 2 LP, a Delaware limited partnership, Grantor and MAIN 2601 PARTNERS, LLC, a Texas limited liability company, Grantee, recorded on August 3, 2017, as Document No. Harris County Clerk's File No. <u>RP-2017-350471</u>, Affects as shown on Exhibit "C-2" for maintenance and on Exhibit "D-2" for access, attached thereto.  (Tract 2)

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

f.   Easement(s) for the purpose(s), visibility triangle , and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at the west and south corners, recorded as Film Code Number 693664 Map Records Harris County, Texas.  (Tract 2)

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

g.   A building set-back line, as disclosed by said map/plat in Film Code No. 693664, of the Map Records of County, Texas.  (Tract 2)

Affects:   10 feet in width along the Dennis Street property line
Affects:   25 feet in width along the Main Street and Fannin Street property lines

h.   All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

i.   Rights of tenants in possession, as tenants only, under unrecorded lease agreements. ( both Tracts)

j.   If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

Owner and Loan Policy(ies):   Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of  County, Texas, prior to the date hereof.

Owner Policy(ies) Only:   Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

Loan Policy(ies) Only:   Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

k.   NOTICE OF STORM WATER QUALITY REQUIREMENTS, executed by Caydon Houston Property 2 LP ("Owner"), recorded on September 21, 2020, under Harris County Clerk's File No. RP-2020-442240". (Tract 1)

l.   Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57646, as to Tract 1:

---

Exhibit 2 Page 8 of 24

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

a) Sidewalk encumbrance by construction fence along Main, Fannin, Dennis and Drew streets;
b) Gate Posts located inside property line on Dennis Street;
c) Evidence of utilities servicing property all located within adjacent public right of ways, without benefit of recorded easements.

m.      Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57547, as to Tract 2:

a) Encroachment of approximately 1.0 feet by the adjacent building located on Lot 6;
b) Parking spaces encroach over boundary line along Main Street;
c) Parking spaces encroach over the access easement running from Main to Fannin streets;
d) Sidewalk encumbrance by construction fence along Main, Fannin and Dennis streets;
e) Bollards throughout the property and Gate Post & Gate Motor located inside property line on Fannin Street and outside property line on Main Street;
f) Overhead power line running through center of the property with one power pole and Light, and evidence of utilities servicing property. all located within adjacent public rights of ways, without benefit  of recorded easements.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE C

Commitment No.:  FAH22004012                                   GF No.:  FTH-18-FAH22004012

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1.      Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2.      Satisfactory evidence must be provided that:

      a.      no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

      b.      all standby fees, taxes, assessments and charges against the property have been paid,

      c.      all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

      d.      there is legal right of access to and from the land,

      e.      (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3.      You must pay the seller or borrower the agreed amount for your property or interest.

4.      Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5.      Please be advised that our search did not disclose any open mortgages of record.  If you should have knowledge of any outstanding obligation, please contact the Title Department immediately for further review prior to closing.

6.      We should have lender verify that it has not been contacted by the claimants of Mecanic's Liens filed under Harris County Clerk's File No(s) RP-2021-137391 and RP-2021-413788, seeking to be paid by the lender on some quantum meruit theory.

7.      Title to subject property is vested in KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company by virtue of (Substitute) Trustee's Deed

      Dated:                      April 6, 2021
      Recording No.:         Harris County Clerk's File No. RP-2021-191476

      The Company must be furnished with the following information reduced to recordable affidavit, pertaining to the Trustee's sale:

      Whether the defaulting mortgagor(s) was living and competent on the date of posting of notice(s) for the sale and on the date of the sale.

      Who is in possession of subject property at the present time.

      Satisfactory evidence that the seller/lender is in peaceable possession of the property.

8.      The Land lies within the boundaries of Midtown Management District and may be subject to taxes or special

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**              **COMMITMENT NO:  FAH22004012**

## SCHEDULE C
(continued)

assessments by reason thereof.  Notice of inclusion of said Land in said district must be given and executed by purchaser and seller and filed of record.

9.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   KH-REIT II FUNDING XXII, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

10.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   Grant Meadows, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

11.   The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

Exhibit 2 Page 11 of 24

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE C
(continued)

| | |
|---|---|
| Grantor: | Sandy Dasigenis, Substitute Trustee |
| Grantee: | KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company |
| Recording Date: | April 9, 2021 |
| Recording No: | Harris County Clerk's File No. RP-2021-191476 |

12.    Note –Important Notice

You have the right to have your funds deposited in an interest-bearing account.

If you choose to establish an interest-bearing account for your deposit, notify your escrow officer immediately. Thereafter you will be provided with a Notice of Election form which you should complete in writing by completing and returning the form, along with your taxpayer identification information, not later than five (5) days before the scheduled closing.  If you choose to establish an interest-bearing account for your deposit, an additional charge of $50.00 will be required.  This charge may exceed the amount of interest to be earned on the deposit, depending on the amount, applicable interest rate, and the duration of the deposit.

As an example, the amount of interest you can earn on a deposit of $1000.00 for a thirty-day period at an interest rate of 4% is $3.33.  Interest earned is dependent on the amount of deposit, time of deposit and the applicable interest rate.

If you do not choose to establish an interest-bearing account for your deposit, your funds will be deposited with other escrow funds in your escrow agent's general escrow account with an authorized financial institution and may be transferred to another general escrow account or accounts.  By reason of the banking relationship between our Company and the financial institution, the Company may receive an array of bank services, accommodations or other benefits.  The escrow funds will not be affected by such services, accommodations or other benefits.

Failure to notify your escrow officer and complete the additional required investment authorization form shall constitute waiver of any intention of establishing an interest-bearing account for your deposit(s).

13.    As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

• Confirmation prior to closing that the County Clerk of Harris County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

• Electronic recordation of the instruments to be insured in the Official Public Records of Harris County, Texas.

• Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

• Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

14.    Due to office closures related to COVID-19, we may be temporarily unable to record/access documents in the normal course of business. As such, we will require our AFFIDAVIT OF UNDERSTANDING AND INDEMNITY AND HOLD HARMLESS AGREEMENT DUE TO CORONAVIRUS PANDEMIC to be signed by all parties.

Exhibit 2 Page 12 of 24

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO.:  FAH22004012**

# SCHEDULE D

Commitment No.:  FAH22004012                                          GF No.:  FTH-18-FAH22004012

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1.  The issuing Title Insurance Company, **Fidelity National Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

    **Shareholders**:  Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

    **Directors**:  Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Steven G. Day

    **Officers**:  Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2.  The following disclosures are made by the Title Insurance Agent issuing this Commitment:

    **Fidelity National Title Agency, Inc.**

    (a)  A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

    **Owners**:    FNTS Holdings, LLC owns 100% of **Fidelity National Title Agency, Inc.**

    (b)  A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

    **Owners**:    FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

    (c)  If the Agent is a corporation:  (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

    **Directors**:  Raymond Randall Quirk, Anthony John Park

    **Officers**:    Laurie H. Ford (President), Paula D. Hester (President), Todd B. Rasco (President), Anthony John Park (Chief Financial Officer and Executive Vice President), Marjorie Nemzura (Secretary), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President)

    (d)  The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive.  NONE.

    (e)  For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3.  You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates.  Upon your request, such disclosure will be made to you.  Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

    You are further advised that the estimated title premium* is:

    | | | | |
    |---|---|---|---|
    | **Owner's Policy** | | $ | 57,147.00 |
    | | **Total** | $ | 57,147.00 |

    Of this total amount:  15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

    | Percent/Amount | To Whom | For Services |
    |---|---|---|
    | | | |

    *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance.  Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

---

Form T-7:  Commitment for Title Insurance (01/03/14)                           TX-FT-FHST--SPS-1-22-FAH22004012

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|
| To obtain information or make a complaint: | Para obtener información o para presentar una queja: |
| You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at: | Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al: |
| **1-877-862-9111** | **1-877-862-9111** |
| You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at: | Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al: |
| **1-800-252-3439** | **1-800-252-3439** |
| You may write the Texas Department of Insurance: | Usted puede escribir al Departamento de Seguros de Texas a: |
| P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov | P.O. Box 149104<br>Austin, TX  78714-9104<br>Fax:  (512) 490-1007<br>Sitio web:  www.tdi.texas.gov<br>E-mail:  ConsumerProtection@tdi.texas.gov |
| **PREMIUM OR CLAIM DISPUTES:**<br>Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**<br>Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas. |
| **ATTACH THIS NOTICE TO YOUR POLICY:**<br>This notice is for information only and does not become a part or condition of the attached document. | **ADJUNTE ESTE AVISO A SU PÓLIZA:**<br>Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto. |

Exhibit 2 Page 14 of 24

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

To obtain information or make a complaint:

Para obtener información o para presentar una queja:

You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al:

**1-877-862-9111**          **1-877-862-9111**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al:

**1-800-252-3439**          **1-800-252-3439**

You may write the Texas Department of Insurance:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Sitio web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

## DELETION OF ARBITRATION PROVISION
(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution.  It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company.  However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process.  In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below).  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity).  All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured.  Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

_____          _____
Signature                                                                   Date

## TEXAS TITLE INSURANCE INFORMATION

Title insurance insures you against loss resulting from certain risks to your title.

The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date.

El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.

El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción.

Your Commitment for Title insurance is a legal contract between you and us. The Commitment is not an opinion or report of your title. It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable. This determination has already been made. Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

--**MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy. Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them. You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

---**EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

---**EXCLUSIONS** are title risks that a Policy generally does not cover. Exclusions are contained in the Policy but not shown or discussed in the Commitment.

---**CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company. They are contained in the Policy but not shown or discussed in the Commitment. The Policy Conditions are not the same as the Commitment Conditions.

Commitment Number: FAH22004012

GF#: FTH-18-FAH22004012

## TEXAS TITLE INSURANCE INFORMATION
(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment.  The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy.  Some of the changes to consider are:

    ---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy.  Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

    ---Allow the Company to add an exception to "rights of parties in possession."  If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection.  If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued.  You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

Exhibit 2 Page 18 of 24

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective January 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

## Collection of Personal Information

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

## Collection of Browsing Information

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

## Other Online Specifics

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Effective Date: 5/1/2018

<u>Web Beacons</u>.  We use web beacons to determine when and how many times a page has been viewed.  This information is used to improve our websites.

<u>Do Not Track</u>.  Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

<u>Links to Other Sites</u>.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.

- To improve our products and services.

- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;

- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;

- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or

- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.  We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you.  Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice.  We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.



Effective Date: 5/1/2018

For California Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents:  You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice.  Nevada law requires that we also provide you with the following contact information:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  BCPINFO@ag.state.nv.us.

For Oregon Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**Information From Children**

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**

FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.   By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.   FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes; Use of Comments or Feedback**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

Effective Date: 5/1/2018

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 934-3354 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer

> THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

### Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data").  Title Data owns and maintains land title plants for various Texas counties.  Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information.  The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**

 Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

FNTIC-140
Exhibit 2 Page 24 of 24

# EXHIBIT 3

# WILSON CRIBBS + GOREN

**TRAVIS HUEHLEFELD**
Attorney at Law

2500 Fannin Street
Houston, Texas 77002

713.222.9000 *main*
713.229.8824 *fax*

thuehlefeld@wcglaw.com
713.547.8516 *direct*

April 22, 2022

***Sent Via Email: jdaniel@knightheadfunding.com and ltorrado@knighthead.com***
KH-REIT II FUNDING XXII, LLC
777 W. Putnam Ave.
3rd Floor, Suite B-2
Greenwich, CT 06830
Attention: Jonathan Daniel and Laura Torrado

Re:    SALE AGREEMENT, dated March 31, 2022 (the "**Contract**"), between KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company ("**Seller**"), and GRANT MEADOWS, L.L.C., a Texas limited liability company ("**Purchaser**"), for that certain real property located in the City of Houston, Texas, as further defined in the Agreement (the "**Property**") (Our File No. 10123-060)

All:

This firm represents the Purchaser in the above referenced transaction. All capitalized terms used herein but not defined shall have the same meaning as set forth in the Contract.  The following are Purchaser's initial title objections which are based upon our review of the Commitment for Title Insurance issued by Fidelity National Title Insurance Company (the "**Title Company**"); GF. FTH-18-FAH22004012, issued April 21, 2022 (effective date March 14, 2022) (the "**Commitment**"), and the preliminary surveys dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599, of Windrose, Job Nos. 57646 (Tract 1) and 57547 (Tract 2) (together, the "**Survey**").

1.   Schedule A, General.  The effective date of the Commitment must be updated to within seven (7) days of the date of Closing.

2.   Schedule B, Item 2. Purchaser objects to this exception and requires that it state only "shortages in area" based off Title Company's review and approval of the Survey.

3.   Schedule B, Items 6, 7, 8 and 9.  Purchaser objects to these general exceptions and requires they be removed so they do not appear as exceptions on Purchaser's Title Policy.

4.   Schedule B, Item 10.a. Purchaser objects to this general exception for parties in possession and requires that it be removed so that it does not appear as an exception to Purchaser's Title Policy. Purchaser requests that Seller provide a commercially reasonable owner's affidavit as required by the Title Company in order to remove this exception.

5.   Schedule B, Item 10.b. Purchaser objects to general exceptions that can be removed with an updated survey. Purchaser requires that this exception be removed upon Title Company's review and approval of the Survey.

6.   Schedule B, Item 10.e. Purchaser objects to this item, with respect to Harris County Clerk's File No. RP-2017-350471 (the "**Easement**"), and Purchaser requires that Seller provide Purchaser (for reliance by Purchaser and Purchaser's lender) a written estoppel certificate from the Grantee (as defined therein) certifying (a) that the Easement has not been amended or modified except as indicated in the Commitment,  (b) that no condition exists on the Property that constitutes, or with the

Exhibit 3 Page 1 of 2

KH-REIT II FUNDING XXII, LLC
April 22, 2022
Page 2

giving of notice would constitute, a violation or default of any kind under the Easement, and (c) the name and contact information of the current Grantee under the Easement.

7. <u>Schedule B, Item 10.i</u>. Purchaser objects to this general exception for tenants in possession and requires that it be removed so that it does not appear as an exception to Purchaser's Title Policy. Purchaser requests that Seller provide a commercially reasonable owner's affidavit as required by the Title Company in order to remove this exception.

8. <u>Schedule B, Items 10.l and m</u>. With respect to these two items, Purchaser makes the following objections:
   ▪ Purchaser objects to the exception as to the building encroachment because such encroachment is permitted under the Easement.
   ▪ Purchaser objects to the exception regarding the fence encroachments. Per Section 8(b)(viii), Seller shall remedy such encroachment, at its sole cost and expense, prior to the Closing Date or provide Purchaser with a $25,000.00 credit at Closing. In the event Seller remedies such encroachment prior to Closing, Purchaser requires this exception be deleted.
   ▪ Purchaser objects to the power line running through the center of Tract 2 and requires that it be relocated to a location determined by Purchaser and memorialized by a written easement, in a form approved by Purchaser.
   ▪ Purchaser objects to the utilities located at the property without and easement and requires that each utility be memorialized by a written easement, in a form approved by Purchaser.

9. <u>Schedule C, General</u>.  All items in Schedule C are to be satisfied as part of Seller's obligations under the Contract, and Schedule C must be deleted in its entirety. Specifically, pursuant to Section 5(d) of the Agreement, Seller is obligated to remove Schedule C, Item 6.

10. <u>Deletions</u>.  Purchaser requests Title Company keep the same numerical order on the Commitment and replace deleted items with "Intentionally Deleted."

11. <u>Endorsements</u>.  Purchaser requests that the Title Company confirm the *availability* and *cost* of the following:

   ▪ T-19.1;
   ▪ T-23 for Tract 1 (Drew Street, Fannin Street, Dennis Street, and Main Street); and
   ▪ T-23 for Tract 2 (Dennis Street, Fannin Street, and Main Street).

The foregoing constitutes Purchaser's initial Commitment and Survey objections as of the date of this letter. Purchaser reserves the right to make further objections based on additional information received, including any revised Commitment and updated survey.

I look forward to receiving your response to these matters.

Very truly yours,

/s/ Travis Huehlefeld

cc:   Lolly Avant                                 ***Via Email: lavant@fnf.com***
      Fidelity National Title Insurance Company

      Josh Bernstein                       ***Via Email: jbernstein@legalstrategy.com***
      Hajjar Peters LLP

      Sean Jamea                        ***Via Email: sjamea@oxberrygroup.com***
      Grant Meadows, L.L.C.

Exhibit 3 Page 2 of 2

# EXHIBIT 4



# HAJJAR / PETERS
## L L P

jbernstein@legalstrategy.com

April 29, 2022

Travis Huehlefeld
Wilson Cribbs + Goren
2500 Fannin Street
Houston, Texas 77002
*Via email: thuelefeld@wcglaw.com*

Re:    GF No. FAH22004012; Sale Agreement, dated March 31, 2022 (the "Contract"), by and between KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company, as Seller, and GRANT MEADOWS, L.L.C., a Texas limited liability company, as Purchaser

Dear Travis:

As you are aware, we represent the Seller in the above referenced transaction. Capitalized terms not otherwise defined herein shall have their same meaning as in the Contract.

We have received and reviewed the Title Commitment for GF No. FAH22004012 (the "Title Commitment"), issued by Fidelity National Title Company (the "Title Company"), together with your title objection letter relating to the Title Commitment and the Contract, dated April 22, 2022 (the "Title Objection Letter").

Set forth below are Seller's responses to Purchaser's objections in the Title Objection Letter. Item numbers correspond to the items listed in the Title Objection Letter.

1.  <u>Schedule A</u>. Seller defers to the Title Company for its response to this item.

2.  <u>Schedule B, Item 2</u>. Seller defers to the Title Company for its response to this item.

3.  <u>Schedule B, Items 6, 7, 8 and 9</u>. Seller defers to the Title Company for its response to this item.

4.  <u>Schedule B, Item 10.a.</u>  Seller has provided an owner's affidavit to the Title Company, and the Title Company has accepted such affidavit. Enclosed herewith is a copy of the owner's affidavit for your reference.

5.  <u>Schedule B, Item 10.b.</u>  Seller defers to the Title Company for its response to this item.

CONFIDENTIAL

Exhibit 4 Page 1 of 2

KH00085



6. <u>Schedule B, Item 10.e.</u>  Seller will not take curative action with respect to this item, and will not seek or provide the requested estoppel.

7. <u>Schedule B, Item 10.i.</u>  Seller has provided an owner's affidavit to the Title Company, and the Title Company has accepted such affidavit.  Subject to Seller providing such affidavit to the Title Company at Closing, Seller defers to the Title Company for its response to this item.

8. <u>Schedule B, Items 10.l and 10.m.</u>  Seller will not take curative action with respect to these items.

9. <u>Schedule C.</u>  Seller will comply with its obligations as to Schedule C of the Title Commitment as set forth in the Contract.

10. <u>Deletions.</u>  Seller defers to the Title Company for its response to this item.

11. <u>Endorsements.</u>  Seller defers to the Title Company for its response to this item.

Thank you for your cooperation with these matters.  If you have any questions or concerns, please do not hesitate to contact me.

Very Truly Yours,

Joshua D. Bernstein

cc:     KH-REIT II FUNDING XXII, LLC
        777 W. Putnam Ave.
        3rd Floor, Suite B-2
        Greenwich, CT 06830
        Attn: Jonathan Daniel and Laura Torrado
        **VIA EMAIL:** *jdaniel@knightheadfunding.com*;
        *ltorrado@knightheadfunding.com*

        Fidelity National Title Insurance Company
        Attn: Lolly Avant
        National Commercial Services
        1900 West Loop South, Suite 200
        Houston, Texas 77027
        **VIA EMAIL** *lavant@fnf.com*

        Sean Jamea
        Grant Meadows, L.L.C.
        **VIA EMAIL** *sjames@oxberrygroup.com*

CONFIDENTIAL

Exhibit 4 Page 2 of 2

KH00086

# EXHIBIT 5

{W0802327.1}

## FIRST AMENDMENT TO SALE AGREEMENT

This First Amendment to Sale Agreement (this "**First Amendment**") dated effective as of May 3rd, 2022, is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows, L.L.C., a Texas limited liability company ("**Purchaser**").  Seller and Purchaser are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

A.      Seller and Purchaser entered into that certain Sale Agreement dated effective March 31, 2022 (the "**Agreement**"), for that certain real property located in the City of Houston, Harris County, Texas, as further described in the Agreement.  All initially capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement unless the context clearly indicates otherwise.

B.      The Parties desire to amend the Agreement as provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## AGREEMENT

1.      **Recitals**.  The recitals above are incorporated herein by reference.

2.      **Power Pole**. Pursuant to that certain Title and Survey Objection Letter, dated April 22, 2022 from Purchaser to Seller, together with attached (i) Commitment for Title Insurance issued by Fidelity National Title Insurance Company, Commitment Number FAH22004012, and  (ii) survey, dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose Land Surveying/Platting, identified as Job No. 57547, as to Tract 2, an overhead power line runs through the center of Tract 2 of the Land with one power pole and light. Purchaser has requested, and Seller has agreed, that Purchaser, at its sole cost and expense, is permitted to remove or relocate (or cause to be removed or relocated) the power pole to a location acceptable to both Seller and Purchaser, and in accordance with applicable law. Seller consents to Purchaser coordinating with CenterPoint Energy and the City of Houston in connection with such removal or relocation. Seller shall reasonably cooperate with Purchaser in connection with the removal or relocation of the power pole and Seller shall join in such applications or agreements, as necessary, all at no liability or expense to Seller; provided, however, that Purchaser shall be obligated to provide to Seller, for Seller's prior review and approval, appropriate plans for removal or relocation of the power pole, together with (i) consent from CenterPoint and/or the City of Houston, as applicable, and (ii) certificates or other evidence of liability insurance, reasonably acceptable to Seller, for acts or omissions arising out of the removal or relocation of the power pole  (which insurance shall name Seller). Seller shall respond to such request within three (3) Business Days' prior written notice from Purchaser.

3.      **Acknowledgement**.  The Parties acknowledge and agree that removal or relocation of the power pole is not a condition to closing under the terms of the Agreement. Any permits that are obtained in Seller's name for such relocation or removal shall be assigned to Purchaser at closing without representation or warranty.

4.      **No Other Amendments**.  Except as expressly modified hereby, the Agreement shall remain unmodified and in full force and effect.

Exhibit 5 Page 1 of 4

5.     **Counterparts**.  This First Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Each counterpart may be delivered by electronic transmission.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto.

[*Signature Page Follows*]

Exhibit 5 Page 2 of 4

IN WITNESS WHEREOF, the Parties have executed this First Amendment to be effective as of the date first written above.

**PURCHASER:**

**GRANT MEADOWS, L.L.C.,**
a Texas limited liability company

By: _Shahin Jamea_ _____
DocuSigned by:
CA22DB0A5B7F488...
Name: Shahin Jamea
Its: Authorized Signatory

**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title: Authorized Signatory

3

Exhibit 5 Page 3 of 4

IN WITNESS WHEREOF, the Parties have executed this First Amendment to be effective as of the date first written above.

**PURCHASER:**

**GRANT MEADOWS, L.L.C.,**
a Texas limited liability company

By: _____
Name: Shahin Jamea
Its: Authorized Signatory

**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title: Authorized Signatory

Exhibit 5 Page 4 of 4

# EXHIBIT 6

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                       HOUSTON DIVISION

3  KH-REIT II FUNDING XXII,      )
   LLC                           )
4       Plaintiff,               )
                                 )
5  v.                            ) CAUSE NO.: 4:22-CV-03730
                                 )
6  GRANT MEADOWS, L.L.C          )
        Defendant                )
7

8            ------------------------------------

9             ORAL AND VIDEOTAPED DEPOSITION OF

10                SHAHIN "SEAN" JAMEA

11                  JULY 26, 2023

12           ------------------------------------

13      ORAL AND VIDEOTAPED DEPOSITION OF SHAHIN "SEAN"

14  JAMEA, produced as a witness at the instance of the

15  PLAINTIFF, and duly sworn, was taken in the above-styled

16  and numbered cause on the 26th of July, 2023, from 10:03

17  a.m. to 1:39 p.m., before Velma C. LaChausse, Shorthand

18  Reporter and Notary Public in and for the State of

19  Texas, reported by machine shorthand, at the law offices

20  of The Porter Law Firm, 2221 South Voss Road, Suite 200,

21  Houston, Texas 77057, pursuant to the Federal Rules of

22  Civil Procedure and the provisions stated on the record

23  or attached hereto.

24

25
```

Shahin Jamea
July 26, 2023                                                    2

```
 1                A P P E A R A N C E S

 2

 3
     FOR THE PLAINTIFF:
 4        Mr. Guillermo Alarcon
          ARMBRUST & BROWN, PLLC
 5        100 Congress Avenue, Suite 1300
          Austin, Texas 78701
 6        Phone: (512)435-2300
          E-mail:  galarcon@abaustin.com
 7

 8   FOR THE DEFENDANT:
          Mr. J. Robert MacNaughton
 9        PORTER LAW FIRM
          2221 South Voss Road, Suite 200
10        Houston, Texas 77057
          Phone: 713)600-4314
11        E-mail: robert@porterfirm.com

12
     ALSO PRESENT:
13        Mr. Corey LaBorde, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 6 Page 2 of 13

```
 1                        INDEX

 2                                             PAGE

 3   Stipulations....................................... 1

 4   Appearances........................................ 2

 5   WITNESS:  SHAHIN "SEAN" JAMEA

 6         Examination by Mr. Alarcon.................... 5

 7   Signature Waived

 8   Reporter's Certificate............................ 160

 9

10                      EXHIBITS

11   NO.  DESCRIPTION                               PAGE

12   1    Sale Agreement                            18

13   2    E-mail                                    18

14   3    E-mail                                    23

15   4    IBC Term Sheet                            33

16   5    PlainsCapital Bank Confidential Proposed Term

17        Sheet for Oxberry Group dated 9-26-22     35

18   6    E-mail                                    43

19   7    E-mail                                    55

20   8    2627 Main Street Debt Financing Request   60

21   9    E-mail                                    40

22   10   Oxberry Preliminary Pricing dated 8-19-21 63

23   11   Cadence McShane Construction Request for

24        Proposal                                  66

25   12   Newmark Valuation & Advisory Appraisal Report 66
```

Exhibit 6 Page 3 of 13

Shahin Jamea
July 26, 2023                                                    4

1   13    E-mail                                                   79

2   14    E-mail                                                   88

3   15    E-mail                                                   91

4   16    First Amendment to Sale Agreement                       97

5   17    Defendant's Objections & Responses to

6         Plaintiff's Request for Admission to Defendant 100

7   18    CenterPoint Energy Invoice                             113

8   19    CenterPoint Energy Invoice                             113

9   20    Second Amendment to Sale Agreement                     119

10  21    Texts between Brent Friedman and Sean Jamea            126

11  22    Notes: Call with Sean Jamea, re: Post-closing

12        Obligations                                            127

13  23    E-mail                                                 134

14  24    E-mail                                                 153

15

16

17

18

19

20

21

22

23

24

25

```
 1                        PROCEEDINGS
 2               THE VIDEOGRAPHER:  Today is the 26th of
 3    July, 2023.  The time is approximately 10:03 a.m.
 4    Central time, and we are now on the record.
 5                    SHAHIN SEAN JAMEA,
 6    having been first duly sworn, testified as follows:
 7                      EXAMINATION
 8    BY MR. ALARCON:
 9       Q.  Good morning, Mr. Jamea.  My name is Guillermo
10    Alarcon, and I represent the plaintiff, KH-REIT II
11    Funding XXII, LLC.  Is that okay with you if I just call
12    them Knighthead?
13       A.  Sure.
14               MR. MACNAUGHTON:  Okay.  Before we get
15    started, that's good.  I wanted to make sure on the
16    record the notice of deposition is for Sean as an
17    individual.  So he's a fact witness on behalf of the
18    defendant.
19               MR. ALARCON:  Well, he's a fact witness.
20               MR. MACNAUGHTON:  Fact witness.
21               MR. ALARCON:  Right.
22               MR. MACNAUGHTON:  Okay.  And the defendant
23    is Grant Meadows.
24               MR. ALARCON:  Yes.
25               MR. MACNAUGHTON:  Okay.
```

Exhibit 6 Page 5 of 13

1      Q.  (BY MR. ALARCON)  Mr. Jamea, have you ever been

2  deposed before?

3      A.  Yes.

4      Q.  How many times?

5      A.  A dozen or two.

6      Q.  A dozen or two dozen?

7      A.  Yes.

8      Q.  Okay.  Well, I'm going to go over a couple of

9  ground rules.  I'm sure you've heard them a couple of

10 dozen times already.  Most important, we don't talk over

11 each other.  It makes the court reporter's job

12 impossible.  So I'd like to -- if you would agree to let

13 me finish answering my questions before you start

14 speaking, and I will agree to try my hardest to let you

15 finish answering before I start talking again.  Can we

16 agree to that?

17     A.  Sure.

18     Q.  The second is, "uh-huhs" and "huh-uhs" look the

19 same on the transcript.  So if I ask a question that

20 requires a "yes" or "no," I'd ask that you say "yes" or

21 "no," not "uh-huh" or "huh-uh" or nod your head or shake

22 your head.  Is that okay?

23     A.  Yes.

24     Q.  And the third is, if you don't understand the

25 question, please let me know that you don't understand

 1      Q.   Have you been sued more times than you have

 2   sued?

 3      A.   I don't know.

 4      Q.   Okay.  What law firms have represented you in

 5   those 20 to 40 lawsuits?

 6      A.   Porter Hedges, Wilson Cribbs, AZA, Porter Law

 7   Firm, Fetner Thompson; some of that I can think of.

 8      Q.   Okay.  So how long have you been in business?

 9      A.   My brother and I started Oxberry Group 2004 or

10   2005.

11      Q.   And those 20 to 40 lawsuits have all been after

12   you started Oxberry Group?

13      A.   No.  Before -- before and after.

14      Q.   What were you doing before Oxberry Group?

15      A.   I was a practicing attorney for a few years,

16   and before that my brother and I had a number of

17   restaurants.

18      Q.   Okay.  When you were -- what years were you a

19   practicing attorney?

20      A.   I got my license in 2001.  I would say between

21   2001 and 2006 or '07.

22      Q.   Was that with a law firm?

23      A.   No.  By myself.

24      Q.   What kind of law did you practice?

25      A.   Business, both transactional and litigation.

Shahin Jamea
July 26, 2023                                                13

1        Q.   Okay.   And you said you started Oxberry in

2   2004?

3        A.   2004-2005.

4        Q.   Are you still a practicing attorney?

5        A.   I have a license, but I don't take clients.

6        Q.   So there was about a one- to two-year window

7   where you were doing both Oxberry and the law firm?

8        A.   Give or take, I don't know.

9        Q.   Okay.

10        A.   Yeah.

11        Q.   What does Oxberry do?

12        A.   Commercial real estate development.

13        Q.   Anything in particular?

14              MR. MACNAUGHTON:   Objection; 401,

15   relevance.

16        A.   We're mostly developers inside the Loop or we

17   have been since 2010.   Before that we were more --

18   geographically, we were more diversified.   Now we're

19   more mainly inside the Loop developers.

20        Q.   (BY MR. ALARCON)   Multifamily?

21        A.   We've done multifamily, we've done retail, a

22   little bit of industrial, yes.

23        Q.   All right.   Okay.   And for different

24   transactions you create different entities, like Grant

25   Meadows, LLC?

1    Q.  (BY MR. ALARCON)  Mr. Jamea, when you talked to

2  CenterPoint, were you doing that on behalf of Grant

3  Meadows, LLC?

4    A.  Yes.

5    Q.  Okay.  So you, on behalf of Grant Meadows, LLC,

6  asked CenterPoint to remove the power pole.  Right?

7    A.  Yes.

8    Q.  So this denial is incorrect.  Right?

9    A.  We did ask CenterPoint to remove the pole.

10 Grant Meadows asked CenterPoint to remove the pole.

11   Q.  And then on your request, CenterPoint removed

12 the power pole.  Correct?

13   A.  Yes.

14   Q.  So you caused its removal.  Would you agree?

15   A.  Yes.

16   Q.  Okay.  So this denial is incorrect.  Right?

17   A.  Okay.

18   Q.  No. 2 asks you to admit that the first

19 amendment required you to provide appropriate plans for

20 removal and relocation of the power pole to my client

21 for review and approval before removal or relocation of

22 the power pole at least three business days before

23 removal or relocation of the power pole?

24   A.  Yes.

25   Q.  And you deny that?

1      A.  Yes.

2      Q.  Even though the agreement says "provided,

3  however, the purchaser shall be obligated to provide to

4  seller for seller's prior review and approval

5  appropriate plans for removal or relocation"?

6      A.  There were no --

7              MR. MACNAUGHTON:  Objection; asked and

8  answered.  Objection; the document speaks for itself.

9      A.  There were no plans for removal.  There were no

10  plans for the removal.  The removal is just something

11  CenterPoint does.  There is no plans.

12      Q.  (BY MR. ALARCON)  Okay.  So No. 3 asks you to

13  admit that you did not provide plans for removal or

14  relocation of the power pole to my client before the

15  power pole's removal, and you denied that.  Can you

16  explain that denial, please?

17      A.  There was one pole in the center of the

18  property that had a transformer on it that was not

19  connected to anything.  There was no -- it wasn't

20  providing power to anything.  It was just a line from

21  CenterPoint going to the pole and ending there.

22              There was another power pole on the street,

23  and for the street we didn't -- that was just -- we just

24  asked CenterPoint for removal.  There was a plan for

25  that, which has nothing to do with your property.  There

1    was no plan for that.  There was no plans for removal of

2    the pole in the middle of your client's property.

3         Q.  Right.  So this question was much more simple

4    than that.  It asked you to admit that you did not

5    provide plans for removal or relocation.

6         A.  I guess I'm not understanding this question.

7    It's a negative.  You want me to admit a negative?  I

8    don't understand this question.

9         Q.  So I'm asking -- you've already admitted here

10   that you did not provide plans for removal or

11   relocation?

12        A.  Yes.

13        Q.  Because they didn't exist, according to you?

14        A.  That's right.

15        Q.  So then why are you denying that in this

16   response?  Is that denial also incorrect?

17        A.  Like I said, I just didn't understand your

18   question.

19        Q.  Now that you understand it -- you understand it

20   now?

21        A.  There were no plans submitted for the removal

22   of the pole.

23        Q.  Okay.  So this denial is not correct.  Right?

24        A.  I don't understand this question still.

25        Q.  Okay.  I'll move on to the next one.  No. 4,

Shahin Jamea
July 26, 2023                                          160

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3   KH-REIT II FUNDING XXII,      )
     LLC                           )
 4        Plaintiff,               )
                                   )
 5   v.                            ) CAUSE NO.: 4:22-CV-03730
                                   )
 6   GRANT MEADOWS, L.L.C          )
          Defendant                )

 7

 8        ------------------------------------

 9              REPORTER'S CERTIFICATION

10         ORAL AND VIDEOTAPED DEPOSITION OF

11              SHAHIN "SEAN" JAMEA

12                  JULY 26, 2023

13        ------------------------------------

14              I, Velma C. LaChausse, a Shorthand Reporter

15   and Notary Public in and for the State of Texas, do

16   hereby certify that the facts as stated by me in the

17   caption hereto are true; that the above and foregoing

18   answers of the witness, SHAHIN "SEAN" JAMEA, to the

19   interrogatories as indicated were made before me by the

20   said witness after being first duly sworn to testify the

21   truth, and same were reduced to typewriting under my

22   direction; that the above and foregoing deposition as

23   set forth in typewriting is a full, true, and correct

24   transcript of the proceedings had at the time of taking

25   of said deposition.
```

Exhibit 6 Page 12 of 13

1           I further certify that I am not, in any

2    capacity, a regular employee of the party in whose

3    behalf this deposition is taken, nor in the regular

4    employ of his attorney; and I certify that I am not

5    interested in the cause, nor of kin or counsel to either

6    of the parties;

7           GIVEN UNDER MY HAND AND SEAL OF OFFICE, on

8    this, the 8th day of August, 2023.

9

10                    _____
                      Velma C. LaChausse
11                    Notary Public in and for
                      The State of Texas
12                    My Commission Expires: 03-22-2026
                      U.S. Legal Support, Inc.
13                    Firm Registration No. 122
                      16825 Northchase Drive
14                    Suite 800
                      Houston, Texas 77060
15                    Phone: (713)653-7100

16

17

18

19

20

21

22

23

24

25

Exhibit 6 Page 13 of 13

# EXHIBIT 7



## INVOICE

CNP Houston Electric, LLC

P.O. Box 61482

Houston, Texas  77208-1482

In Account With:
SJPHC LLC
2429 BISSONNET ST UNT 615
HOUSTON TX  77005-1451

Date:  07/20/2022

Page:   1

| Invoice No. 3001112730 | Customer No. 9338163 | Contract Acct. No. 11779850-4 | Due Date: 08/19/2022 |
|---|---|---|---|

| Item | Description | Qty | Price | Amount |
|---|---|---|---|---|
| 0010 | CP: CUST PAY OTHER | 1 | 7,500.00 /  1 EA | 7,500.00 |
| | SAP WO # 103371997 | | | |
| | BARRY ESPINOSA<br>2627 MAIN ST | | | |
| | CHECK #: 1211 CK AMT: $7,500.00 | | | |
| | JENNIFER WALTER/SERVICE CONSULTANT<br>713-945-4298 | | | |
| | AL/BEL SC | | | |

| | Total Amount Due | $ | 7,500.00 |
|---|---|---|---|

0040035840020        00030000117798504200007500000000075000020

Keep Upper Portion For Your Records

Please Mail Lower Portion With Your Payment

## REMITTANCE

Please make check payable to:
CNP Houston Electric, LLC

Invoice Date:  07/20/2022
Customer No.:  9338163
Contract Acct No.:  11779850-4
Invoice No.:  3001112730
Contact Number:  (713) 207-2222

Due Date: 08/19/2022

Amount: $   7,500.00

CNP Houston Electric, LLC
PO Box 61482
Houston, TX  77208-1482

SJPHC LLC
2429 BISSONNET ST UNT 615
HOUSTON TX  77005-1451

0040035840020        00030000117798504200007500000000075000020

CEHE0000004
Exhibit 7 Page 1 of 6

BP # 9338163
CA # 11779850
ARO # 4880571
DOC # 3061112730



SJPHC LLC
2429 Bissonnet St., No. 615
Houston, TX 77005

Bank of America
ACH R/T 111000025
35-2/1130 TX 334

1211

PAY
TO THE
ORDER OF    CenterPoint Energy                    7/13/2022

Seven Thousand Five Hundred and 00/100********************************    $   **7,500.00

                                                              DOLLARS

CenterPoint Energy
PDS Admin Coordinator
4300 Bissonnet St.
Houston, Texas 77401

MEMO   2627 Main Pole Removal W/O# 103371997        AUTHORIZED SIGNATURE

CEHE0000005
Exhibit 7 Page 2 of 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4



**CenterPoint**
**Energy**

Please make check payable to:

CenterPoint Energy

**Attn:**    *PDS Admin Coordinator*

*4300 Bissonnet St*
*Houston, TX 77401*

## *INVOICE*

*Customer Info:*                                                     **7/13/22**

| Name: | | Barry Espinosa | | | |
|---|---|---|---|---|---|
| Address: | | 2627 Main St | | | |
| City: | Houston | State: | TX | Zip: | 77002 |
| Phone: | (832) 803-6377 | | | | |
| Email: | *barryesp@sbcglobal.com* | | | | |
| CNP Representative: | Jennifer Walter | Phone: | (713)945-4298 | | |

| | Description | W/O # | Total | |
|---|---|---|---|---|
| 1 | Cost to remove facilities | 103371997 | $ | 7,500.00 |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| | | | **$7,500.00** | |

### PLEASE MAIL PAYMENT TO THE ABOVE ADDRESS.
### Processing of check may be delayed without the return of this invoice.

Make all checks payable to: *CenterPoint Energy*

Please send a copy of this invoice along with the check. Charges good for 1 year from date of invoice.

*Payment is required prior to release of construction work order.*

If you have any questions concerning this invoice, please contact your CNP Representative at number above.

## Thank you for using CenterPoint Energy

CEHE0000006
Exhibit 7 Page 3 of 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4

Chapter 6: Company Specific Items

Sheet No. 6.24
Page 1 of 2

CenterPoint Energy Houston Electric, LLC
Applicable: Entire Service Area                    CNP 8038

## 6.3    AGREEMENTS AND FORMS

### 6.3.1    FACILITIES EXTENSION AGREEMENTS

#### 6.3.1.1 FACILITIES EXTENSION AGREEMENT FOR DISTRIBUTION VOLTAGE FACILITIES

This Facilities Extension Agreement for Distribution Voltage Facilities is entered into by and between   KH-REIT II Funding XXII, LLC                                                                ,
herein called "Retail Customer" and CenterPoint Energy Houston Electric, LLC, herein called "Company" (hereinafter referred to as Agreement) for the extension of Company's Delivery System distribution voltage facilities, including temporary facilities (hereinafter referred to as facilities extension or extension), as described herein.

This Agreement covers the facilities extension to Retail Customer location at   2627 Main St

The Company agrees to accept payment of _____7500.00_____ Dollars to be paid by the Retail Customer, as a Non-Refundable Construction Payment in connection with the Retail Customer request to extend Company facilities to the above described location as follows: cost to remove facilities inside property

sap wo: 103371997

- Unless otherwise stated by Company in writing, the Non-Refundable Construction Payment amount above is valid for twelve months.

In consideration of said Non-Refundable Payment, to be paid to Company by Retail Customer prior to commencement of construction, Company agrees to install and operate lines and equipment necessary to distribute electric service to the identified location under the following General Conditions:

- Company shall at all times have title to and complete ownership and control over facilities installed by Company.

- Retail Customer must make satisfactory payment arrangements (if payment is required to extend Company facilities) and sign and return this Agreement before Company can proceed with the requested extension.

Revision Number: 6th                                        Effective: 04/23/20

CEHE0000007
Exhibit 7 Page 4 of 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4

Chapter 6: Company Specific Items

Sheet No. 6.24
Page 2 of 2

CenterPoint Energy Houston Electric, LLC
Applicable: Entire Service Area

CNP 8038

- Extension of service facilities is contingent on acquisition of all necessary easements and rights of way.

If the facilities extension requested by Retail Customer calls for construction of underground Delivery System facilities at distribution voltages, Retail Customer must also agree to Company's additional specifications and terms and conditions determined by Company for the construction of underground electric service facilities.

The Company's Tariff for Retail Delivery Service, on file with the Public Utility Commission of Texas, is incorporated into this Agreement, including without limitation Sections 5.2.1 (limitation of liability), 5.2.4 (force majeure), and 5.2.6 (disclaimer of warranties) thereof.

Nothing herein contained within this Agreement shall be construed as a waiver or relinquishment by Company of any right that it has or may hereafter have to discontinue service for or on account of default in the payment of any bill owing or to become owing thereafter for any other reason or cause stated in Company's Tariff.

This Agreement shall not be binding upon Company unless and until it is signed by an authorized representative of the Company.

CenterPoint Energy Houston Electric, LLC

By _____
Jennifer Walter
(name printed or typed)

Title _____ Service Consultant _____

Date _____ July 13, 2022 _____

KH-REIT II Funding XXII, LLC
Retail Customer

By _____
Shahin Jamea ~~Barry Espinosa~~
(name printed or typed)

Title Authorized Agent

Date 7/13/2022

Revision Number: 6th

304

Effective: 04/23/20

CEHE0000008
Exhibit 7 Page 5 of 6

DocuSign Envelope ID: ACDDC0AF-AED1-4125-8339-B854E0B41CC4



**CENTERPOINT ENERGY**

**Safety Forward**

NOTES: CNP to remove 2 poles and wye bank

PL 1
EXISTING:
P19-3
45 - 2
37'L
Hx GYC0,GYC0,GYC0,GYC6PN

PL 2
EXISTING:
P03-3
45 - 4
REMOVE:
P43-3

PL 3
REMOVE:
P03
40 - 4
TR FUSE
41073

PL 4
REMOVE:
P25-3
40 - 4
(3)250kVA-ABC
277/480V 12KV

DocuSigned by:
Jennifer Walter
C595E1A8F471491...

DocuSigned by:
Shalin Jamea
CA22DB0A5B7F4B8...

| WORK ORDER # | MAIN WORK CENTER | ORDER TYPE | MAINT ACCT TYPE |
|---|---|---|---|
| 103371997 | Bellaire | HDC3 | 51 |

| ADDRESS: 2627 Main St | | | |
|---|---|---|---|
| CONSULTANT | | GLN | FUNCTIONAL LOCATION |
| Jennifer Walter | | 5356859074 | DIS-040679-OVH |
| PHONE NUMBER | MOBILE NUMBER | KEY MAP | CIRCUIT ID NUMBER |
| 7139454298 | | 493T | MID02 |
| DATE REQUESTED | FIELD TECH | FIELD COMPLETION DATE | SCALE: 1" = 1:46 |
| | | | DDS DESIGN |

# EXHIBIT 8

*Nathan Sommers Jacobs*



April 25, 2022

***Via Federal Express and***
    ***Via E-Mail (ltorrado@knighthead.com)***

KH-REIT II FUNDING XXII, LLC
777 West Putnam Avenue
3rd Floor, Suite B-2
Greenwich, CT 06830
Attention: Laura Torrado, Esq.

      Re:    Sale (the "Sale") by Main 2601 Partners, LLC, a Texas limited liability company ("Seller"), to Caydon Houston Property 2 LP, a Delaware limited partnership ("Caydon"), of certain property located in Harris County, Texas (the "Property")

Dear Ms. Torrado:

      This firm represents Seller in connection with the above referenced matter.

      It has come to the undersigned's attention that KH-REIT II FUNDING XXII, LLC ("Owner") acquired, and is marketing and intending to sell, the Property which is designated as "Tract 3" on Exhibit A to that certain Substitute Trustee's Deed with Bill of Sale, dated April 6, 2021, and filed of record under Harris County Clerk's File No. RP-2021-191476 (the "Property"). The Property adjoins the real property owned by Seller that is commonly known as 1000 McGowen St., Houston, Texas (the "Seller's Property").

      The Owner is responsible for certain post-closing obligations, including, without limitation, the relocation of electrical facilities benefiting and supplying power to the Seller's Property which obligations remain uncompleted. Further, pursuant to that certain Encroachment, Maintenance and Access Easement Agreement executed by Caydon and Seller, dated August 3, 2017, and recorded under Harris County Clerk's File No. RP-2017-350471, Owner is responsible for constructing the "Additional Curb Cut" as defined therein which construction remains uncompleted.

      Please be advised that this correspondence is not intended to, and does not, constitute a waiver or release by Seller of any rights or remedies that Seller may have under any contracts and agreements, at law, in equity or otherwise.  Seller expressly reserves and retains (and does not waive or otherwise release) any claims, demands, actions, causes of action, and counterclaims that Seller now or hereafter has or may claim to have against Caydon and/or Owner.

*direct tel*  (713) 892-4821
*e-mail*  mrizzo@nathansommers.com

**Attorneys and Counselors**
2800 Post Oak Boulevard    *tel*  713.960.0303
61st Floor    *fax*  713.892.4800
Houston, Texas 77056    www.nathansommers.com

<span style="color:red">Exhibit 8 Page 1 of 2</span>



KH-REIT II FUNDING, LLC
April 25, 2022
Page 2

If you wish to more fully discuss the above, please do not hesitate to contact: (a) the undersigned at: 713-892-4821 or mrizzo@nathansommers.com; or (b) Seller at: 713-530-6564 or brent@parklanecompanies.com.

Sincerely,

C. Maxwell Rizzo

cc:     *__Via E-Mail: brent@parklanecompanies.com__*

Main 2601 Partners, LLC
c/o Brent Friedman
2322 Bissonnet St., Suite 2
Houston, Texas 77005

*__Via Federal Express__*

KH-REIT II FUNDING XXII, LLC
c/o Knighthead Funding, LLC
33 Benedict Place
Greenwich, CT 06830

*__Via Federal Express__*

KH-REIT II FUNDING XXII, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Exhibit 8 Page 2 of 2

# EXHIBIT 9

{W0802327.1}



**HAJJAR/PETERS**
LLP

Brian H. Buster
bbuster@legalstrategy.com

May 10, 2022

C. Maxwell Rizzo
NATHAN SOMMERS JACOBS, LLP
2800 Post Oak Blvd., 61ˢᵗ Floor
Houston, Texas 77056
*Via First Class Mail,*
*Certified Mail Number*
*7021 2720 0002 9717 8195*
*Return Receipt Requested, and*
*E-Mail: mrizzo@nathansommers.com*

Re:   Correspondence dated April 25, 2022; Notice of Post-Closing
Obligations; Purchase and Sale Agreement ("PSA"); Encroachment,
Maintenance and Access Easement Agreement dated August 3, 2017
(the "Agreement") by and between Caydon Houston Property 2, LP
("Caydon") and 2601 Partners, LLC ("Seller"), 2701 Main Street,
Houston, Texas 77002 (the "Property").

Dear Mr. Rizzo,

This law firm has been retained by KH-REIT II Funding XXII, LLC ("Knighthead")
with regard to correspondence dated April 25, 2022 in which Seller purports to notify
Knighthead of post-closing obligations to relocate electrical facilities and to construct an
"Additional Curb Cut" as defined in your letter.

As we suspect you are aware, Knighthead lawfully foreclosed on the Property on
April, 6 2021 and as such, Caydon no longer owns the Property. With regard to the
electrical facilities, any obligations under the PSA (to the extent they survived closing by the
terms of the PSA) were and remain the contractual responsibility of Caydon. They did not
run with the land, and they cannot bind my client merely because it foreclosed on Caydon.

It appears that the obligations that touch and concern the land, namely those
involving the Additional Curb Cut, were to be performed within 365 days of the execution
of the Agreement on August 3, 2017 and that if the Additional Curb Cut was not

Exhibit 9 Page 1 of 2



constructed within that timeframe, Seller could then obtain a permit to construct the Additional Curb Cut. Neither Caydon nor Seller pursued either of these courses of action.

The easements and the obligations that touch and concern the land are all contained in Sec. 1 of the Agreement, which is capped off by the language requiring Sec. 1 and its obligations to run with the land. Seller's remedies are contained in Sec. 3 which contains no such language. As a result, the remedies afforded to Caydon and Seller arise in contract and do not run with the land. Seller is not in privity of contract with Knighthead and the four year statute of limitations to bring an action for a breach of contract claim expired on or about August 3, 2021. Accordingly, Seller has no remedy that it can contractually assert against anyone, let alone Knighthead for Caydon's failure to construct the Additional Curb Cut.

Knighthead considers this matter closed. Please do not hesitate to contact this office should you have any questions or concerns and to confirm that that Seller does not intend to seek any further action against Knighthead. We appreciate your prompt attention to this serious matter.

Sincerely,

Brian H. Buster

pc:      Client, file

May 10, 2022 | Page 2

Exhibit 9 Page 2 of 2

# EXHIBIT 10

| | |
|---|---|
| **From:** | Brent Friedman <brent@parklanecompanies.com> |
| **Sent:** | Tuesday, April 26, 2022 10:47 PM |
| **To:** | Shahin Jamea |
| **Cc:** | becky@currentstanding.com |
| **Subject:** | RE: Surveys.     [GSB] |
| **Attachments:** | Post-Closing Obligations.pdf |

Hey,

Sorry. Yes. The recorded deed references the PSA for all purposes. Attached is from the PSA, related to post-closing obligation for electrical service.

Brent Friedman
Current Standing Developments
2322 Bissonnet Street • Suite_02
Houston, Texas 77005
• (713) 332-0060 **| Office**
• (713) 530-6564 **| Cell**

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Thursday, April 21, 2022 4:38 PM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Cc:** becky@currentstanding.com
**Subject:** Re: Surveys. [GSB]

Thanks Brent. Same here.

Please send me the agreement regarding electricity and transformer. We don't find anything on the title commitment as a recorded instrument.

Sean Jamea

> On Apr 21, 2022, at 4:26 PM, Brent Friedman <brent@parklanecompanies.com> wrote:
>
> Sean,
>
> Thanks again for the time yesterday, and updates. Enjoyed it. And the project looks great.
>
> In way of follow-ups promised:

Exhibit 10 Page 1 of 3

- Lock code for auto gate on Fannin is: **1970**. Just to make sure you have latest. (Or… will be. Apparently the lock was cut and will be replaced in coming days w new lock w this code).

- Re: transformer/elec. service, note that I'd misremembered this when I pointed to the location in the easement – that location was, instead, the planned location for trash dumpsters. You were right – if a pad-mounted transformer is needed, it would not be located in the Easement area. Instead, the owner of the Caydon ppty will provide such location on their ppty, with an easement for service and access.

- And, re: kVa service requirement for the bdg, I looked back at my notes from mtgs and emails w Caydon, and believe the civil and MEP determined that: Depending on the user(s)/use type(s), the requirement could be +750 kVa, on the "low-side", or perhaps 2,000 kVa on realistic "high-side" scenario. And we'd asked Caydon: "In the event we have to lock-in today, inasmuch as we don't yet know for sure what the exact capacity need is, do you guys know whether – if we were to go with 750 kVa, and later need to expand up to, say, 2,000 kVa – if this would just be a matter of adding 2 or 3 poles, assuming it could be pole-mounted?" And didn't hear back on this.

Hope this helps. Let me know if I missed anything, or you need any other info from us, on this or otherwise.

Thanks,

Brent Friedman
Current Standing Developments
2322 Bissonnet Street ▪ Suite_02
Houston, Texas 77005
▪ (713) 332-0060 **| Office**
▪ (713) 530-6564 **| Cell**

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, April 13, 2022 7:50 AM
**To:** Brent Friedman <brent@parklanecompanies.com>
**Subject:** Re: Surveys. [GSB]

Next Wednesday April 20th at 3:30? Same coffee shop in the village?

Sean Jamea

On Apr 13, 2022, at 7:46 AM, Brent Friedman <brent@parklanecompanies.com> wrote:

 Morning Sean,

Just happened across this email and reminded me. Wanted to make sure you saw below. And, if you do still want to grab coffee maybe one day next week, shoot me a text (c: 713-530-6564).

Exhibit 10 Page 2 of 3

Thanks,


Brent Friedman

On Apr 6, 2022, at 10:35 AM, Brent Friedman <brent@parklanecompanies.com> wrote:

C: 713-530-6564).

Exhibit 10 Page 3 of 3

# EXHIBIT 11

# NOTES :: Call w Sean Jamea re: Post-Closing Obligations
## [26-Sep-22]

**NOTE:** Text below in <span style="color:red">red font</span> are notes from the meeting/call.  Text which is also <mark>highlighted</mark> are "follow-up/action items".

- Sean called and explained that he was interested in an update from us on the "post-closing-obligations" matter with the current owner.  He said he was hoping it had been resolved because 'the last thing (he) wants' is to get into a situation where he's adverse to us.

- I explained that I hadn't heard anything about it in a couple of months, but I think last I heard our attorney sent their attorney a letter.  And my guess is there has not been a resolution between them, as I imagine I would have heard about that.   But, I'm happy to call and get an update and let him know.

- He said that would be great, but asked what I knew about the "obligations", in general – bc, as he understands it, the seller has recently removed the T- poles in the parking lot.

- I said I'd tell him everything I know on it, which is :

  - When Caydon approached us to purchase the property, we didn't want to sell.  After months of trying, the president of Caydon ultimately convinced me to meet to discuss our reservations to see if they might be able to resolve them.

    

    We met and I talked him through our 3 main reservations preventing us from selling – namely: Parking, electrical service and access to the rear of our building.   They then – over the following weeks/months – set about to resolve those concerns.   And were ultimately able to address these to our satisfaction and convince us to agree to sell.

    On the electrical service, they committed to be solely responsible to provide consistent electrical service to our building, both:  (i) Initially – on an "interim" basis and during their construction, until such time as they could place new transformers to service our property;  and, (ii) Then service via the permanent transformers, thereafter.   And that was where this obligation – and the others – as well as the easement-area designation, in our agreements came from.

  - Our attorneys explained to us that they were quite sure that these obligations are the obligations of any Caydon successor/assigns, regardless of the circumstances.   And I think last I heard on it, our attorney sent their attorney a letter explaining this.

- Sean reiterated about the seller having recently removed the T-poles, in a way seeming to suggest that this removal would mark the end of any post-closing obligation(s).   So I asked him what the connection was between this removal and these obligations.

- He said that his understanding was that our attorneys' letter said that they could not remove the T-poles, and that the Seller doing so indicated that they (Seller) believed that they were not concerned about these obligations, and also that they could now not provide this "interim" service.

- I said that I wouldn't think removing the pole would remove this obligation, and they would still be obligated to provide temporary service when our building needs it.   But, again, I'm happy to reach out to our attorneys for an update.   He said "Great.  Please.  And let me know."

- So, wanted to touch base w you on it.   And, sending recap by email so you have it and can review – but, feel free to call to discuss if you'd like to.

<span style="color:red">Exhibit 11 Page 1 of 1</span>

# EXHIBIT 12

{W0802327.1}

Message

---

| | |
|---|---|
| **From**: | Shahin Jamea [sjamea@oxberrygroup.com] |
| **Sent**: | 6/17/2022 8:51:59 AM |
| **To**: | Travis Huehlefeld [tHuehlefeld@wcglaw.com]; Rebecca Brown [Rbrown@knightheadfunding.com]; Joshua Bernstein [jbernstein@legalstrategy.com] |
| **CC**: | Adams, Davis [Davis.Adams@am.jll.com]; Jonathan Daniel [jdaniel@knightheadfunding.com]; Henry Boeckmann [hboeckmann@knightheadfunding.com]; Barry Espinosa [bespinosa@oxberrygroup.com] |
| **Subject**: | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC |

Dear Knighthead Team,

Davis and I have been playing phone tag, which is mainly on me as I'm vacationing in Europe. I was hoping to talk to him before sending this email.

We will not be able to proceed with the purchase as outlined in our contract. I will give you a brief synopsis below and would be happy to get on a call to discuss further, if there is interest.

We have a building plan for a 5 story stick multifamily development for the partial block to the north. When we priced the project initially, the hard cost came in at $16M in December. A slightly modified version of the plans were priced at $26M in May. Then came the recent interest hikes. Despite all this and the threat of a looming recession, we are still interested in purchasing the partial block and moving forward with the development when the markets settle in the future.

We always thought of the partial block as the inferior site. Not only is a large portion of the land under an easement, but it has become clear to us that the adjoining neighbor will file a lawsuit (frivolous or not) regarding his right to put a transformer on your land. As I told Davis from the beginning, we thought the value of partial block to be around $120 and justified the $150 aggregate purchase price by allocating a higher cost and resale/development value to the full city block.

We are willing to proceed with the contract as modified below:

1) Drop the full city block and only purchase the partial block to the north;
2) Sales price of $120 PSF;
3) $500K additional hard earnest money upon execution of the amendment;
4) Closing date of October 1st

Please let me know if you want me to send in termination notice or the amendment.

Sincerely,

**OXBERRY**GROUP

**Shahin "Sean" Jamea, J.D.**
Principal
sjamea@oxberrygroup.com

**D** 713.343.6152
2429 Bissonnet St. | No. 615 | Houston, TX 77005

Exhibit 12 Page 1 of 1

KH01266

# EXHIBIT 13

{W0802327.1}

## SECOND AMENDMENT TO SALE AGREEMENT

THIS SECOND AMENDMENT TO SALE AGREEMENT (this "**Second Amendment**") dated effective as of June 29, 2022 (the "**Effective Date**"), is entered into by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("**Seller**"), and Grant Meadows L.L.C., a Texas limited liability company ("**Purchaser**"). Seller and the Buyer are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Sale Agreement dated effective March 31, 2022, as amended by that certain First Amendment to Sale Agreement, dated May 3, 2022 (as amended, the "**Agreement**"), for that certain real property located in the City of Houston, Harris County, Texas, being more particularly described in the Agreement. All capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement.

WHEREAS, the Parties desire to amend the Agreement as provided herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## AGREEMENT

1.  **Recitals**. The recitals above are incorporated herein by reference.

2.  **Closing Date**. Section 5(a) of the Agreement is hereby amended to provide that the Closing Date shall occur on October 28, 2022, or such earlier date agreed upon by the Parties.

3.  **Payment of Second Deposit**. Concurrent herewith, Purchaser shall deliver the Second Deposit to the Title Company. Accordingly, the continued effectiveness of this Second Amendment, and all of Seller's obligations hereunder and pursuant to the Agreement, shall be expressly conditioned on the timely payment by Purchaser of the Second Deposit. **In the event that the Second Deposit is not timely made for any reason, this Second Amendment shall be null and void and of no further force or effect.**

4.  **Fence Encroachment**. Seller and Purchaser acknowledge and agree that Seller has remedied the fence encroachment into City of Houston right-of-way; as such, the $25,000.00 contingent payment at Closing referenced in Section 8(b)(viii) of the Agreement shall **not** be due and payable.

5.  **No Further Termination Rights**. Purchaser acknowledges and agrees that, except in the event of default by Seller under the Agreement, or following a casualty or condemnation event as provided in Section 9 of the Agreement, Purchaser shall have no further right to terminate the Agreement.

6.  **Entire Agreement**. The Agreement and this Second Amendment contain the entire integrated agreement between Seller and Buyer with respect to the subject matter of the Agreement and this Second Amendment. There are no other representations, agreements, arrangements or understandings, oral or in writing, between or among Seller and Buyer relating to this subject matter which are not fully expressed in the Agreement and this Second Amendment. The Agreement, hereby reaffirmed by the parties hereto, is and remains in full force and effect on the terms and conditions set forth therein, as amended by this Second Amendment. In the event of any conflict between the terms of this Second Amendment and the terms of the Agreement, the terms of this Second Amendment will control.

Exhibit 13 Page 1 of 3

DocuSign Envelope ID: 0E5F9945-75C7-405D-9ACE-8AF4A6EA76AA

7.     **Counterparts**.  This Second Amendment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Each counterpart may be delivered by electronic transmission.  The signature page of any counterpart may be detached therefrom without impairing the legal effect of the signature(s) thereon provided such signature page is attached to any other counterpart identical thereto.

*[Signature Page Follows]*

2

Exhibit 13 Page 2 of 3

IN WITNESS WHEREOF, the Parties have executed this Second Amendment to be effective as of the Effective Date.

**SELLER:**

**KH-REIT II FUNDING XXII, LLC,**
a Delaware limited liability company

By: _____
Name: Laura L. Torrado
Title:  Authorized Signatory


**BUYER:**

**GRANT MEADOWS L.L.C.,**
a Texas limited liability company

By: _____
Name: Shahin "Sean" Jamea
Title:    President

3

Exhibit 13 Page 3 of 3

# EXHIBIT 14

{W0802327.1}

**From:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Sent:** Monday, June 20, 2022 9:19 AM
**To:** Shahin Jamea
**Cc:** Hudson, Brock @ Houston; Thompson, Michael @ Houston
**Subject:** Re: Midtown MF Loan

Later this week is goal.

Feedback has been slow.

Common response is: "We have 5-10 similar MF requests on our desk at 65-70% LTC with parking; why should we do your deal?"

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets



On Jun 20, 2022, at 8:41 AM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:

**External**

When will you have a matrix for me to review?

Sean Jamea

On Jun 20, 2022, at 4:23 PM, Stein, Jeff @ Houston <Jeff.Stein@cbre.com> wrote:

Sean,
Mario was maxed out at 70% and will not allow PACE based on my prior conversation with him last week. Plains Capital is competitive at 75% and going to committee to firm up terms. Don't think they will allow PACE either.

Challenge has been finding PACE friendly lender with reasonable rates and comfort with no parking.

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056

1

<span style="color:red">Exhibit 14 Page 1 of 3</span>

T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets

On Jun 19, 2022, at 11:55 PM, Shahin Jamea
<sjamea@oxberrygroup.com> wrote:

**External**

Morning Mario,

Is there a good time this week to discuss this deal? My preference
would be mornings.

Sean Jamea

On May 17, 2022, at 11:20 PM, FAZIO, MARIO
<MarioFazio@ibc.com> wrote:

Thanks Sean,
Jeff, Please send me the OM and I will review it this
week and get back to you with comments next week.
Thanks

**Mario Fazio**
First Vice President | Commercial
IBC Bank - Houston
(713) 285-2160 / Ext. 22160

<image002.png>

<image003.png>

<image004.png>

<image005.png>

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Tuesday, May 17, 2022 3:18 PM
**To:** FAZIO, MARIO <MarioFazio@ibc.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>;
Hudson, Brock @ Houston <brock.hudson@cbre.com>
**Subject:** [EXTERNAL SENDER] Midtown MF Loan
Mario,
Per our call, I'd like to present to you my ground-up
multifamily project in midtown. Jeff and Brock with

2

Exhibit 14 Page 2 of 3

CBRE are our agents on the debt side, so I'll let them make the presentation to you.

Thanks,

<image006.png>

**Shahin "Sean" Jamea, J.D.**
Principal

sjamea@oxberrygroup.com

**D** 713.343.6152
2429 Bissonnet St. | No. 615 | Houston, TX 77005

This email and any attachments are confidential and are intended solely for the use of the named addressee. If you have received this email in error please contact the International Bank of Commerce.

3

Exhibit 14 Page 3 of 3

# EXHIBIT 15

| | |
|---|---|
| **From:** | Stein, Jeff @ Houston <Jeff.Stein@cbre.com> |
| **Sent:** | Tuesday, June 21, 2022 5:00 PM |
| **To:** | Shahin Jamea |
| **Cc:** | Hudson, Brock @ Houston; Thompson, Michael @ Houston |
| **Subject:** | RE: Midtown MF Loan |

Sean,

We did not get good feedback from Plains Capital today after they took deal to committee. They are taking a very conservative approach on debt and interest rates over the next 24 months resulting in max 65% LTC and these terms would need to go to next committee level for final approval.

> 65% LTC. Breakeven is 90% occupancy
> Stressing to 7% rate in 2-yrs.
> Micro unit concerns – first deal in Dallas deal took some time to lease up
> Lack of dedicated parking is a concern too
> Prime + 25-50 with 6% floor was initial quote.

Mezz/Pref Lender: We thought we had a small balance pref lender, but they are passing. They could not get one of their partners comfortable with the lack of parking on site. The challenge is the size of the mezz/pref loan is small for a construction loan. Its too small for the usual players.

Not a lot of promising options at the moment north of 70% LTC and no lender has been open to doing PACE that expressed interest in the deal 1st lien.

Have you heard back from seller (Knighthead)?


Jeff Stein | Executive Vice President
CBRE | Capital Markets | Debt & Structured Finance
T +1 713 787 1906 | C +1 713 409 8436

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Monday, June 20, 2022 1:31 PM
**To:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Cc:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>; Thompson, Michael @ Houston <Michael.Thompson3@cbre.com>
**Subject:** RE: Midtown MF Loan


**External**


OK. As an update, we're working on turning drawings into the City first week of July. I also contacted the seller and asked them to split up the two parcels and let me just buy 2627 Main parcel @ $120 on October 1st. Haven't received a response yet.

Need to talk to IBC to see about a land loan for now. I'll report back.

Exhibit 15 Page 1 of 4

**OX**BERRY GROUP

**Shahin "Sean" Jamea, J.D.**
Principal

---

**From:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Sent:** Monday, June 20, 2022 9:19 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Cc:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>; Thompson, Michael @ Houston <Michael.Thompson3@cbre.com>
**Subject:** Re: Midtown MF Loan

Later this week is goal.

Feedback has been slow.

Common response is: "We have 5-10 similar MF requests on our desk at 65-70% LTC with parking; why should we do your deal?"

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets



> On Jun 20, 2022, at 8:41 AM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:
>
>
> External
>
>
> When will you have a matrix for me to review?
>
> Sean Jamea
>
> > On Jun 20, 2022, at 4:23 PM, Stein, Jeff @ Houston <Jeff.Stein@cbre.com> wrote:
> >
> > Sean,
> > Mario was maxed out at 70% and will not allow PACE based on my prior conversation with him last week. Plains Capital is competitive at 75% and going to committee to firm up terms. Don't think they will allow PACE either.

2

<span style="color:red">Exhibit 15 Page 2 of 4</span>

Challenge has been finding PACE friendly lender with reasonable rates and comfort with no parking.

Jeff Stein | Executive Vice President & Co-Head Houston DSF
Debt & Structured Finance
CBRE | Capital Markets
2800 Post Oak Blvd., Suite 500 | Houston, TX 77056
T 713 787 1906 | F 713 881 0999 | C 713 409 8436
jeff.stein@cbre.com | www.cbre.com/capitalmarkets

> On Jun 19, 2022, at 11:55 PM, Shahin Jamea <sjamea@oxberrygroup.com> wrote:
>
> External
>
> Morning Mario,
>
> Is there a good time this week to discuss this deal? My preference would be mornings.
>
> Sean Jamea
>
>> On May 17, 2022, at 11:20 PM, FAZIO, MARIO <MarioFazio@ibc.com> wrote:
>>
>> Thanks Sean,
>>
>> Jeff, Please send me the OM and I will review it this week and get back to you with comments next week.
>>
>> Thanks
>>
>> **Mario Fazio**
>> First Vice President | Commercial
>> IBC Bank - Houston
>> (713) 285-2160 / Ext. 22160
>>
>> <image002.png>
>>
>> <image003.png>
>>
>> <image004.png>
>>
>> <image005.png>

3

Exhibit 15 Page 3 of 4

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Tuesday, May 17, 2022 3:18 PM
**To:** FAZIO, MARIO <MarioFazio@ibc.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>;
Hudson, Brock @ Houston <brock.hudson@cbre.com>
**Subject:** [EXTERNAL SENDER] Midtown MF Loan

Mario,

Per our call, I'd like to present to you my ground-up
multifamily project in midtown. Jeff and Brock with
CBRE are our agents on the debt side, so I'll let them
make the presentation to you.

Thanks,

<image006.png>

**Shahin "Sean" Jamea, J.D.**
Principal

sjamea@oxberrygroup.com

**D** 713.343.6152
2429 Bissonnet St. | No. 615 | Houston, TX 77005

This email and any attachments are confidential and are
intended solely for the use of the named addressee. If
you have received this email in error please contact the
International Bank of Commerce.

Exhibit 15 Page 4 of 4

# EXHIBIT 16

**NEWMARK VALUATION & ADVISORY**

# Oxberry Midtown



2627 Main Street
Houston, Harris County, TX 77002

Newmark Job No.: 22-0171219-1

**Appraisal Report Prepared For:**

Marvin Gonzalez
Credit Analyst
International Bank of Commerce
5615 Kirby Drive
Houston, TX  77005

**Prepared By:**

**Newmark Valuation & Advisory**
1700 Post Oak Boulevard, 2 BLVD Place, Ste. 350
Houston, TX, 77056



Exhibit 16 Page 1 of 5

**NEWMARK VALUATION & ADVISORY**

July 28, 2022

Marvin Gonzalez
Credit Analyst
International Bank of Commerce
5615 Kirby Drive
Houston, TX  77005

RE:     Appraisal Of A Multifamily Property Known As Oxberry Midtown Located At 2627 Main
        Street, Houston, Harris County, TX 77002, Prepared By Newmark Valuation & Advisory,
        LLC (herein "Firm" or "Newmark")

Newmark Job No.:  22-0171219-1

Dear Mr. Gonzalez :

The subject is a proposed mid-rise style apartment complex that will contain 182-apartment units between 1-multifamily building. The improvements will consist of 5-stories. Property amenities are expected to include a courtyard with rooftop pool and outdoor lounge, business center, fitness center and resident lounge. Unit amenities will include stainless steel appliances, built-in microwave, slab granite countertops, steam showers, oversize walk-in closets, ceiling fans and vinyl plank (faux wood) flooring. The subject's site area is 2.0888 acres, or 90,990 square feet, and consists of 2-parcels.

The sponsor is planning to master lease the entire property to Sonder, a third party that will operate the units similar to an Air B&B or extended stay hotel. Based on the letter of intent (LOI) provided, the initial lease term is for 10-years with two 5-year options to renew. Rents will be set at $1,200 per efficiency unit and $1,325 per one-bedroom unit, respectively, with annual rent escalations of 2.00% through the course of the initial lease term and any applicable renewal term. This lease will offer potential buyers predictable cash flows with stable growth going forward. The lease to Sonder also minimizes operating costs as Sonder is responsible for the day to day operations of the property (i.e minimal payroll/management fee, no make ready of units or advertising required by the landlord). Also Sonder will be responsible for utility costs to the individual units and all common areas. If Sonder wants to terminate their lease of the subject, they must give a 180-day notice and may only occur in YR 5 of the lease.

Newmark Valuation & Advisory
1700 Post Oak Blvd, 2 BLVD Pl.,
Ste. 350

www.nmrk.com/valuation

**NEWMARK**

Exhibit 16 Page 2 of 5

July 28, 2022
**MARVIN GONZALEZ**

As requested by the client, Newmark has provided prospective market values on a fee simple basis as if the Sonder lease is not in place and the subject is leased on a conventional basis. However, the subject will not include any parking to prospective tenants. The Houston metro area is a widespread market where the primary mode of transportation is the automobile. It is our opinion that there would be no demand to prospective tenants, on a conventional basis, to live in an apartment development that does not provide any parking as a car is virtually essential in this market. As such, there is no value to the subject as a conventional multifamily property without any parking. If the Sonder lease were to terminate in Year 5, there would be no market demand for the building.

## Key Value Considerations

**Strengths**

– Good location near the CBD of Houston

– In close proximity to major thoroughfares, primarily Main Street

– Light rail access with nearest station in walking distance of the subject (McGowen Station)

– Positive household population projections are forecasted according to the demographic data for the neighborhood

**Risk Factors**

– No structured parking available to tenants eliminating any demand for conventional leasing

Based on the analysis contained in the following report, the opinions of value for the subject are:

| Value Conclusions | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value "As Is" (Land Only) | Fee Simple | 7/15/2022 | $14,380,000 |
| Prospective Market Value "Upon Completion and Stabilization" | Fee Simple | 9/15/2023 | N/A |
| Prospective Market Value "Upon Stabilization" | Fee Simple | 9/15/2023 | N/A |
| Prospective Market Value "Upon Completion/Stabilization" (Sonder) | Leased Fee | 9/15/2023 | $26,560,000 |

*Compiled by Newmark*

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.



# Highest and Best Use

## PROCESS

Before a property can be valued, an opinion of highest and best use must be developed for the subject site, both as if vacant, and as improved or proposed. By definition, the highest and best use must be:

– Physically possible

– Legally permissible under the zoning regulations and other restrictions that apply to the site

– Financially feasible

– Maximally productive, i.e., capable of producing the highest value from among the permissible, possible and financially feasible uses

## AS VACANT

### Legally Permissible

The site is not subject to zoning.  Further information and analysis about the legal restrictions to the subject property is included in the Site Analysis and Zoning and Legal Restrictions sections of this report.

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for a multifamily development. It appears that a newly developed multifamily development on the site would have a value commensurate with its cost. Therefore, multifamily use is considered financially feasible.

### Maximally Productive

The test of maximum productivity is to determine the actual use of the property that results in the highest land value and/or the highest return to the land.  It is important to consider the risk of potential uses as a use that may generate the highest returns in cash could also be the riskiest and thus not as likely for a developer to consider. In this case, the maximally productive use is a multifamily development.  The associated risk is typical and market conditions appear to be supportive.



### Highest and Best Use Conclusion – As Vacant

The highest and best use of the subject as though vacant is the development of a multifamily use.

### AS PROPOSED

The subject site is proposed to be developed with a multifamily development consisting of 182-Class A apartment units, which is consistent with the highest and best use of the site as if it were vacant.

### Physically Possible

The proposed improvements conform to the physical characteristics of the site. Therefore, multifamily use of the property is reasonably probable and appropriate.

### Legally Permissible

The proposed multifamily improvements are not subject to zoning.

### Financially Feasible

The proposed improvements are projected to be leased and produce a significant positive cash flow that we expect will continue. However, since there is no available parking for tenants, the proposed use is concluded to not be financially feasible. This is also apparent in the cost approach to value, as there is significant external obsolescence noted. Due to the risk of the Sonder lease not renewing in 5 years and the load to the capitalization rate to reflect a potentially vacant building, external depreciation exists which indicates a value below cost and is therefore not financially feasible.

### Maximally Productive

Based on our analysis, the value of the proposed improved property does not exceed the value of the site, as if vacant, and the cost to construct (including entrepreneurial profit) due to the external obsolescence noted in the cost approach. The cost feasible NOI exceeds the subject's pro form NOI and thus is not feasible to build at this time.

### Highest and Best Use – As Proposed

Therefore, the highest and best use of the subject as proposed is a multifamily use at a future data with available parking to tenants.

**Most Probable Buyer**

After consultations with investment sale brokers active in the Houston market, it has been indicated that there are no potential buyers of this property due to inadequate parking.  Therefore, the most probable buyer is a developer for the future development of a residential property with adequate parking.



# EXHIBIT 17

{W0802327.1}

**From:** Brian Lai <brian@rockylai.com>
**Sent:** Friday, September 16, 2022 3:10 PM
**To:** Shahin Jamea
**Subject:** Re: Sonder

Hi Shahin,

Rocky is not too bullish on the proposed development. He's concerned about Sonder's credibility. How is
Sonder doing in San Antonio and Dallas? Is there also zero parking for those sites?
Is George/Sunny investing in this deal?


Brian Lai
Vice President
**Rocky Lai & Associates, Inc.**

3217 Montrose Blvd. Suite 222
Houston, TX 77006
O: 281-888-1919
C: 832-755-6599
brian@rockylai.com


On Tue, Sep 13, 2022 at 10:31 AM Shahin Jamea <sjamea@oxberrygroup.com> wrote:

Thanks Brian. Be glad to jump on a call or meet to answer any questions.

**OXBERRY**GROUP

**Shahin "Sean" Jamea, J.D.**

Principal

**From:** Brian Lai <brian@rockylai.com>
**Sent:** Tuesday, September 13, 2022 10:30 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** Sonder

Just a FYI - Rocky has been out of the country and will be back this Wednesday. We'll discuss how much we
can commit once he is back, but I am thinking it will be somewhere between **$1.0m - $1.5m**


Brian Lai

Vice President

1

Exhibit 17 Page 1 of 2

**Rocky Lai & Associates, Inc.**

3217 Montrose Blvd. Suite 222

Houston, TX 77006

O: 281-888-1919

C: 832-755-6599

brian@rockylai.com

Exhibit 17 Page 2 of 2

# EXHIBIT 18

| | |
|---|---|
| **From:** | Stein, Jeff @ Houston <Jeff.Stein@cbre.com> |
| **Sent:** | Monday, September 19, 2022 10:15 AM |
| **To:** | Shahin Jamea; Hudson, Brock @ Houston |
| **Subject:** | RE: Sonder Midtown - Guarantor Info |

No term sheet yet.

No other feedback, at least not positive. Hope to be in position to select lender by Wed. We are pushing. Thx

Jeff Stein | Executive Vice President
CBRE | Capital Markets | Debt & Structured Finance
T +1 713 787 1906 | C +1 713 409 8436

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Monday, September 19, 2022 10:14 AM
**To:** Hudson, Brock @ Houston <Brock.Hudson@cbre.com>
**Cc:** Stein, Jeff @ Houston <Jeff.Stein@cbre.com>
**Subject:** Re: Sonder Midtown - Guarantor Info

**External**

Please update. Was term sheet not sent? Other lenders?

Sean Jamea

> On Sep 15, 2022, at 10:16 AM, Hudson, Brock @ Houston <Brock.Hudson@cbre.com> wrote:
>
> Good morning Sean,
>
> Per lender request, do you have an updated PFS for you and PJ that you could provide? If not, and updated ball park NW/liquidity figure will work.
>
> Thanks,
>
> **Brock Hudson**
> CBRE | Capital Markets | Debt & Structured Finance
> 2800 Post Oak Blvd, Suite 500 | Houston, TX 77056
> T +1 713 787 1942 | C +1 713 430 6431
> brock.hudson@cbre.com

Exhibit 18 Page 1 of 1

# EXHIBIT 19



**REQUEST FOR PROPOSAL**

## Oxberry Group
Oxberry Midtown

**October 10, 2022**

**ELECTRONIC COPY**

*This Proposal includes data that shall not be disclosed outside the owner and the A/E design team and shall not be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the Proposal. All material disclosed is marked as "proprietary and confidential".*

Exhibit 19 Page 1 of 45



10370 Richmond Avenue
Suite 1200
Houston, TX 77042
www.cadencemcshane.com

October 10, 2022

**Barry Espinosa**
Oxberry Group
3040 Post Oak
Ste 1800-145
Houston, TX 77056

**RE:** Oxberry Midtown

## INDUSTRY RANKINGS

**#5**
**Top Multifamily Contractor**
Multifamily Executive / NMHC

**#8**
**Top Multifamily Construction Firms**
Building Design + Construction

**#5**
**Top Multi-Unit Residential Contractors**
ENR

Dear Mr. Espinosa,

Our team has spent considerable time reviewing the project documents and assembled a project approach that will provide an exceptional experience and value to **Oxberry Group** for the **Oxberry Midtown** project. We bring experience from multiple multifamily projects in Texas, and we have the capability to deliver valuable construction services, maintain our budgets, and execute the work on or ahead of schedule. Since 1985, our dedication and commitment has built a solid foundation of excellence for everything we do. As you select your construction partner, we encourage you to consider the following characteristics that set Cadence McShane apart from others:

### Experienced Builder
Cadence McShane is the builder of choice in Texas for various multifamily projects. In the past five years, we have contracted 33 housing projects (7,835 units), with a total value of $1.2 billion. Cadence McShane has completed, or is currently constructing, over 10,000 housing units in Texas. This year, Cadence McShane will celebrate 30 years since the opening of our Houston office in 1992. Over the past 3 decades, we have established ourselves as a leading provider of resident-focused housing developments.

### Experienced Team
Due to Cadence McShane's long, successful history of constructing multifamily projects, our team has developed effective communication methods, efficient design review practices, and accurate budget and cost control strategies. Accuracy and consistency of our deliverables will provide **Oxberry Group** with confidence in the process without surprises at the end.

### Strong Local Presence
Cadence McShane has well-established relationships with local trade partners who are familiar with the Houston housing market and the effort required to deliver a quality project. Due to our local presence, **Oxberry Group** will benefit from our understanding of the local processes for permitting and inspections as well as our trade partner connections. We have several multifamily projects in progress in the Houston area, providing **Oxberry Group** with competitive pricing through our large and qualified trade pool.

On behalf of our project team and everyone at Cadence McShane, we look forward to building our partnership with **Oxberry Group**. Should you have any questions, or if I can help in any way, please feel free to call me on my cell at 713.329.5011 or email at crose@cadencemcshane.com

Best Regards,

Colby Rose, Vice President and Business Unit Leader
Cadence McShane Construction Company LLC

REQUEST FOR PROPOSAL



# Table of Contents



Broadway Chapter Apartments

2022 Distinguished Building Award

**A.**   Issue for Permit Pricing
Assumptions & Clarifications



Hermosa Village Apartments

2021 Best in American Living Award

**B.**   Schedule



The '68 Apartments at Hemisfair

2020 Best Mixed Use Project

**C.**   Multifamily Project Experience





# Tab A

## ISSUE FOR PERMIT PRICING

## ASSUMPTIONS & CLARIFICATIONS

EAST BANK AT RICHWOOD VILLAGE | RICHWOOD, TX

Exhibit 19 Page 4 of 45

OXBERRY - Permit Pricing with 2 Addendums
Architect: EA Architects
DATE: 10/10/2022

| CODE | DESCRIPTION | Cadence McShane Construction | Notes / Comments |
|---|---|---|---|
| **DIVISION 01** | **MISC GENERAL REQUIREMENTS** | **$167,000.00** | |
| 600 | Misc. General Requirements | $ 167,000.00 | |
| 1000 | Winter and Weather Conditions | Excluded | |
| 1100 | Material Testing and Inspections | Excluded | |
| 1200 | Land Surveying and Layout | Included | |
| 1300 | General Dewatering | Excluded | |
| 1400 | Final Cleaning | Included | |
| 1700 | Security | Included | |
| 1750 | Temporary Utilities | Included | |
| 1800 | Owner Leasing Trailer | Excluded | |
| | Net | $ 167,000.00 | |
| **DIVISION 02** | **SITE** | **$1,981,497.00** | |
| 2025 | Over-Excavation / Under-Cutting / Fill | Included | |
| 2026 | Excavation | Included | |
| 2050 | Site Demolition and Clearing | $ 97,200.00 | |
| 2100 | Earthwork and Erosion Control | $ 246,247.00 | |
| 2175 | Building Excavation | Included | |
| 2225 | Deep Foundations | Excluded | |
| 2300 | Sanitary Sewer System | $ 114,830.00 | |
| 2301 | Water System | $ 61,910.00 | |
| 2302 | Fire System | $ 159,620.00 | |
| 2303 | Storm Sewer System | $ 1,003,020.00 | |
| 2304 | Roof Drain Tie-Ins | Excluded | |
| 2305 | Courtyard Storm Drainage | Excluded | |
| 2275 | Electrical Utilities | In Electrical | |
| 2325 | Asphalt Pavement and Accessories | Excluded | |
| 2375 | Sidewalk Concrete | $ 48,888.00 | |
| 2450 | Concrete Paving | $ 26,900.00 | |
| 2475 | Irrigation | $ 25,879.00 | |
| 2525 | Fences and Gates | $ 82,137.00 | |
| 2552 | Site Amenities - Sun Shade | None | |
| 2553 | Site Amenities - Misc Hardscape | $ 16,080.00 | |
| 2575 | Trash Enclosure System | None | |
| 2600 | Monument Signage | Included in sidewalks | |
| 2700 | Exterior Site Lighting | In Electrical | |
| 2500 | Landscaping | $ 98,786.00 | |
| | Net | $ 1,981,497.00 | |
| **DIVISION 03** | **CONCRETE** | **$695,458.00** | |
| 3000 | Cast In Place Concrete | Included | |
| 3200 | Elevator Pits | Included | |
| 3300 | Gypcrete | $ 349,500.00 | |
| 3340 | Slab on Grade | $ 345,958.00 | |
| 3400 | Exterior Concrete | Included | |
| | Net | $ 695,458.00 | |
| **DIVISION 04** | **MASONRY** | **$454,446.00** | |
| 4000 | CMU | $ 454,446.00 | |
| 4100 | Fascade Burnish Block | Included | |
| 4300 | Elevator Shaft | Included | |
| | Net | $ 454,446.00 | |
| **DIVISION 05** | **METALS** | **$266,312.00** | |
| 5000 | Structural Steel | $ 136,067.00 | |
| 5200 | Misc. Steel | $ 130,245.00 | |
| 5300 | Handrails, Guardrails | Included | |
| | Net | $ 266,312.00 | |
| **DIVISION** | **WOOD AND PLASTIC** | **$5,321,935.06** | |
| 6100 | Rough Carpentry | $ 4,991,288.00 | |
| 6100 | Wood Trusses | Included | |
| 6400 | Custom Millwork, Cabinets & Tops | $ 16,800.00 | |
| 6500 | Standing and Running Trim | $ 313,847.06 | |
| | Net | $ 5,321,935.06 | |



TAB A

Exhibit 19 Page 5 of 45

| DIVISION | | THERMAL AND MOISTURE PROTECTION | $1,690,151.00 | |
|---|---|---|---|---|
| | 7000 | Dampproofing and Waterproofing | $ | 12,360.00 |
| | 7100 | Thermal Insulation | $ | 547,450.00 |
| | 7251 | Stucco | Excluded | |
| | 7300 | Metal Wall and Ceiling Panels | $ | 370,434.00 |
| | 7400 | Membrane Roofing | Excluded | |
| | 7542 | TPO Roofing | $ | 528,023.00 |
| | 7600 | Applied Fireproofing | $ | 170,200.00 |
| | 7650 | Expansion Joints | Excluded | |
| | 7700 | Joint Sealants | $ | 61,684.00 |
| | | Net | $ | 1,690,151.00 |
| DIVISION | | DOORS AND WINDOWS | $1,341,367.56 | |
| | | Frames, Doors, and Hardware -Units, Common, & | | |
| | 8000 | Amenities | $ | 419,051.32 |
| | | Door/trim installation | $ | 273,247.24 |
| | 8200 | Windows | $ | 239,837.00 |
| | 8300 | Access Doors and Panels | Included | |
| | 8400 | Overhead Doors and Operators | Excluded | |
| | 8450 | Aluminum Entrances, Storefronts, and Glazing | $ | 252,510.00 |
| | | Glass Railing at 3-5 | $ | 128,860.00 |
| | 8500 | Automatic Doors and Operators | Excluded | |
| | 8700 | Electronic Door Access Hardware | Included | |
| | 8750 | Plate Glass Mirrors | $ | 27,862.00 |
| | | Net | $ | 1,341,367.56 |
| DIVISION | | FINISHES | $3,269,803.00 | |
| | 9000 | Drywall | $ | 1,381,892.00 |
| | 9050 | Tile | $ | 450,086.00 |
| | 9100 | Vinyl Flooring | $ | 504,880.00 |
| | 9150 | Carpet Flooring | $ | 67,967.60 |
| | 9250 | Rubber Flooring | $ | 18,997.40 |
| | 9300 | Slat Screen System | $ | 217,800.00 |
| | 9350 | Painting | $ | 628,180.00 |
| | 9400 | Wallcovering | Excluded | |
| | 9772 | Gypsum Board Assemblies | In Drywall | |
| | 9800 | Hardboard Siding | In Framing | |
| | | Net | $ | 3,269,803.00 |
| DIVISION | | SPECIALTIES | $190,632.19 | |
| | 10000 | Toilet Partitions | $ | 22,147.87 |
| | 10150 | Louvers and Vents | Excluded | |
| | 10200 | Wall and Corner Guards | Excluded | |
| | 10250 | Soil Pest Treatment | $ | 3,900.00 |
| | 10300 | Fireplaces | $ | 2,800.00 |
| | 10450 | Building Signage | $ | 29,636.00 |
| | 10550 | Mail Boxes & Lockers | $ | 34,517.32 |
| | 10600 | Awnings and Canopies | $ | 45,299.00 |
| | 10650 | Toilet Accessories | $ | 52,332.00 |
| | 10750 | Closet Wire Shelving | Excluded | |
| | | Net | $ | 190,632.19 |
| DIVISION | | EQUIPMENT | $1,022,514.00 | |
| | 11060 | Audio and Visual Equipment | Excluded | |
| | 11100 | Commercial Laundry Equipment | Excluded | |
| | 11405 | Food Service Equipment | Excluded | |
| | 11450 | Appliances and Laundry Equip. | $ | 1,022,514.00 |
| | | Net | $ | 1,022,514.00 |
| DIVISION | | FURNISHINGS | $3,973,977.00 | |
| | 12000 | Manufactured Casework | $ | 3,603,600.00 |
| | 12100 | Solid Surfaces Countertops | $ | 204,515.00 |
| | 12500 | Window Coverings | $ | 165,862.00 |
| | | Net | $ | 3,973,977.00 |
| DIVISION | | SPECIAL CONSTRUCTION | $86,492.31 | |
| | 13200 | Lightning Protection System | Excluded | |
| | 13700 | Swimming Pool | $ | 64,240.00 |
| | 13750 | Fire Extinguishers and Cabinets | $ | 22,252.31 |
| | | Net | $ | 86,492.31 |
| DIVISION | | CONVEYING SYSTEMS | $262,845.00 | |
| | 14200 | Trash Chute | $ | 22,845.00 |
| | | Elevators | $ | 240,000.00 |
| | | Net | $ | 262,845.00 |



Exhibit 19 Page 6 of 45

| DIVISION 15 | UTILITIES | | |
|---|---|---|---|
| 15000 | Sanitary Sewerage Piping | In Plumbing | |
| 15100 | Storm Utility Drainage Piping | In Plumbing | |
| | Net | $ | - |

| DIVISION 16 | MECHANICAL SYSTEMS | $4,579,914.00 | |
|---|---|---|---|
| 16000 | Natural Gas Piping System | Excluded | |
| 16100 | Fire Suppression | $ | 603,525.00 |
| 16200 | Plumbing System | $ | 2,190,889.00 |
| 16250 | Plumbing (Drains in Floors and Outside) | Included | |
| 16300 | HVAC System | $ | 1,785,500.00 |
| 16400 | HVAC Instrumentation and Controls | Included | |
| | Net | $ | 4,579,914.00 |

| DIVISION 17 | ELECTRICAL SYSTEMS | $3,396,995.00 | |
|---|---|---|---|
| 17000 | Electrical & Fire Alarm System | $ | 2,657,774.00 |
| 17100 | Standby Generator | Excluded | |
| 17200 | Lighting Fixtures | $ | 274,039.00 |
| 17300 | Tele/Data/CATV/Security | $ | 270,282.00 |
| 17500 | Radio Booster System - Conduit Rough In | $ | 63,557.00 |
| 17501 | Radio Booster System - Wire & Equipment | $ | 45,959.00 |
| 17550 | Access Control System | $ | 85,384.00 |
| | Net | $ | 3,396,995.00 |
| | Sub-Total (all net) | $ | 28,701,339.12 |

| CONTINGENCIES | | | |
|---|---|---|---|
| Overhead and Profit | $ | 1,550,801.00 | |
| Insurance Liability | $ | 256,495.00 | General Liability |
| Builder Risk Insurance | $ | 512,989.00 | |
| Preconstruction Fee | $ | - | |
| General conditions | $ | 2,080,000.00 | |
| Insurance | $ | 457,463.00 | Subcontractor Default Insurance |
| Bond(s) | $ | - | Not required |
| Project Contingency | $ | 640,166.00 | |
| Design Contingency | $ | - | |
| Escalation Contingency | $ | - | BY Owner |
| Tax | $ | - | |

| **Total price** | **$34,199,253** |
|---|---|

**Owner Alternates 1 - 5**

| Alt 1 - Landscape Planting as Sod | $ | (12,342.00) | |
|---|---|---|---|
| Alt 2 - LVT-05 Shaw Limitless ILO Specified | $ | (246,147.00) | |
| Alt 3 - Salto Breakout Cost | $ | 161,055.00 | |
| Alt 4 - Standard T-Stat ILO Smart T-Stat | $ | - | Will update and send in separate email |
| Alt 5 - Wood Slat Wall ILO Aluminum | $ | - | Will update and send in separate email |
| | $ | - | |



Exhibit 19 Page 7 of 45



Oxberry Midtown
Houston, Texas

## Clarifications and Assumptions

### General Notes

1. This proposal is based on the list of Documents per Element Architects dated 8-19-2022 with addendums 01 and 02.
2. This proposal excludes Payment and Performance Bonds.
3. This proposal includes Subcontractor Default Insurance at 1.60% of the total subcontractor amount.
4. This proposal includes General Liability Insurance at 0.75% of the total proposal amount.
5. This proposal includes Builder's Risk Insurance at 1.50% of the total proposal amount.
6. This proposal includes a Construction Contingency of $637,429.
7. This proposal is based on the parties reaching a mutually agreeable contract terms.
8. This proposal is based on Cadence McShane being able to utilize the adjacent site as laydown and storage area.
9. Notwithstanding the foregoing, Owner understands that we are in an unprecedented time and that price and availability of materials are fluctuating at an unpredictable rate that is out of the control of Contractor or its Subcontractors. In addition, increased labor prices is impacting the projects that have longer durations. Upon execution of the Prime Contract, Contractor shall use its best efforts to execute the Subcontracts and purchase orders that will be necessary to complete the Work at the Guaranteed Maximum Price and within the Contract Time. However, should the delivery time for certain materials be delayed so as to delay Substantial Completion or the cost of materials or labor increase due to industry-wide delays and price escalations that are impossible to accurately predict at the time this Agreement is signed, Owner agrees to increase the Contract Time and/or the Contract Sum, as appropriate, by Change Order upon presentation by Contractor of documentation of such industry-wide delays and price escalations. Contractor agrees to use its best efforts to mitigate such delays and escalations, including where appropriate and possible, providing alternate material or delivery options. Such alternates may be provided solely to assist in mitigation of industry-wide delays or price increases and should not be considered providing architectural or engineering services. Further, if any new tariffs are enacted or increased after the execution of this Agreement, the Guaranteed Maximum Price shall be increased by the cost of the new tariff or amount of the increase in an existing tariff by Change Order.

### *Division 01*
### *General Requirements*

Includes:

1. 1 (one) mobilization.
2. 20-month schedule based on time of mobilization to substantial completion.
3. Temporary power and water to all Units, Buildings and Site by the contractor until TCO. The services will be set up in the Owner's name from initiation.

Excludes:

4. All building permit fees, Site Development Fees, impact fees, inspection fees, and franchise utility fees. We include cost for trade permit fees.
5. The use of generators for temporary power. It is the responsibility of the Owner to provide temporary power to the site for use by Contractor.
6. Relocation or demolition of existing utilities at site not shown or clearly defined on civil documents. Architectural site demolition plan D.001 doesn't define our outline this scope.
7. Any removal or relocation of existing power as no demo or primary power plan was provided by CenterPoint Energy at time of bid.
8. Registered surveys or ALTA surveys.
9. Setting property corners and onsite benchmarks. These are assumed to be set up onsite through a registered surveyor / Civil Engineer of Record and paid for by the Owner. All layout beyond these control points will be included in our costs.
10. LEED or Build Green or Energy Star requirements or inspections.
11. 3rd party testing.
12. Rock Excavation.
13. Topo for site as we assume existing grading plan has current Topo's.



Exhibit 19 Page 8 of 45



**Oxberry Midtown**
**Houston, Texas**

*Division 02*

*Division 03*
*Concrete*

Includes:

1.  Vapor barrier at building slab to be Xtreme Poly 10-mil.
2.  SOG and flatwork to be 3,000 PSI and paving to be 3,500 PSI.
3.  Paving to have #3 bars at 18" on center each way.
4.  One monument sign base only, no detail provided.
5.  4" concrete at sidewalks and courtyard.

Excludes:

6.  Stegowrap or other MFG than listed above.
7.  Paving outside of street modifications on Dennis.

*Division 04*
*Masonry*

Includes:

1.  Burnished block by Best Block or Revels.
2.  Elevator shafts to be medium weight natural gray block.

Excludes:

3.  Waterproof admixture in mortar.
4.  Colored mortar.
5.  Waterproofing of block.
6.  Galvanized lintels, primed only.
7.  CMU at stair shafts.
8.  Metal or stainless steel flashings, rubberized only.
9.  UL rated block.
10. Rebar shop drawings.
11. Brick, stone, or any other masonry material.

*Division 05*
*Metals*

Includes:

1.  18 tons of structural steel columns and beams at entry lobby and covered patio locations only.
2.  Stairs to have precast concrete treads and not be pan filled.
3.  Hoist beam, pit ladder, and sump pit grate.

Excludes:

4.  Metal decking.  Assumed all infill of floor framing to be wood trusses and decking.
5.  AISC certifications for fabrication and erection.

*Division 06*



Exhibit 19 Page 9 of 45



**Oxberry Midtown**
**Houston, Texas**

*Wood/Plastics/Composites*

Includes:

1.  1 layer PyroGuard as exterior sheathing, type III-B.
2.  Fiber cement panel system EZ trim reveal system.
3.  Allowance of $230,000 for WP-01 and amenity trim.
4.  CL01 and WS01 a ceilings and walls by Gordon.
5.  P-Lam cabinets and tops in breakroom, public restrooms, and gathering space.

Excludes:

6.  WA-01 at gathering space 23.
7.  Unit entries, none shown on plans.
8.  Unit bedframes and headboards with open casework shelving.

*Division 07*
*Thermal and Moisture Protection*

Includes:

1.  Sheet waterproofing at elevator pits only.  No other below grade condition exists.
2.  Urethane building joint sealants at windows, exterior doors, masonry to dissimilar, exterior MEP penetrations, walks, and paving control joints only.
3.  R-5.6 ISO for non-vented roof with (2) layers ISO for fully tapered roof system to promote drainage to roof drains.
4.  60 mil mechanically fastened TPO roof system by Carlisle or equal.
5.  45 mil TPO at walls and parapets.
6.  24 gauge pre-finished, in standard colors, for coping cap and metal drip edges.
7.  45 mil TPO walkway pads.
8.  Metal wall panels and soffits by Alcotex.
9.  5.5" Mineral wool at exterior walls, R-19 unfaced at corridors and tenant separation walls, full fill interstitial for NFPA 13, and R-38 blown in attics.
10. Stage II polyseal after sheetrock.

Excludes:

11. Fluid applied air barrier.
12. Building envelope testing.
13. Expansion joints, non shown.
14. Centria ACM panels.
15. 2 year contractor warranty on fiber cement panels, 1 year warranty standard.
16. Fully adhered TPO roofing.
17. ½" coverboard at TPO..
18. Firestone, assumed equal to in our bid.
19. Diamond tread walkway pads.
20. Sound insulation at interior walls.
21. Insulation at interior unit or amenity space walls, not shown on wall types.
22. Third party inspections for insulation.

*Division 08*
*Openings*

Includes:

1.  8'-0" flush metal 20-minute unit entry door with spring hinge.
2.  7'0" interior hollow core and louver doors as shown.



Exhibit 19 Page 10 of 45



## Oxberry Midtown
## Houston, Texas

3.  PMDF base and casing at units and common areas.
4.  Primed finger joint pine window stools in units.
5.  BHP soma unit door hardware.
6.  Cal Royal common and amenity area door hardware.
7.  1100 single hung bronze exterior/white interior vinyl windows by Plygem or equal.
8.  DP +35//50
9.  U-factor of .35
10. SHGC of .23
11. VLT of .43
12. STC rating of 26
13. 2" x 4-1/2" storefront with dark bronze finish.
14. Medium style doors with hardware.
15. GRS glass railing system with Kynar finish to match storefront inclusive of ½" clear laminated glass.
16. 1" Solarban 90 on clear tempered glass at exterior storefront, interior systems to be glazed with ¼" clear tempered glass.
17. Break metal sill flashing at exterior storefront.

Excludes:

18. Specified door hardware per 08 71 00.
19. Solid core unit entry doors.
20. Finger joint pine trim at units or common areas.
21. Aluminum windows per 08 52 00.
22. 05 73 00, glass railings shown.

*Division 09*
*Finishes*

Includes:

1.  Level 4 textured finish at walls and ceilings for units, corridors, and amenity areas.
2.  FRP at trash and fire riser rooms only.
3.  2-hour ceiling assembly at trash and fire riser rooms only.  All other floor/ceiling assemblies to be 1 hour per plans.
4.  5/8" Dens Shield tile backer at tub/shower surrounds only.
5.  Tub and shower surrounds to be 7'-0" AFF per elevations inclusive of wall waterproofing.
6.  FT-03 to be applied over tile-redi shower pans in all units.
7.  Attic stock at 2%.
8.  Schluter at exposed vertical edges of tile only.
9.  Waterproofing and crack suppression at floor tile on levels 2-5 only.
10. Tile backsplash to include pattern as indicated in addendum 2.
11. Eggshell finish at units.
12. Walls and ceilings in units to be different colors.
13. Paint in units and common areas to include 1 coat primer and 1 coat finish with backroll
14. Apartment grade paint only.

Excludes:

15. Draftstopping at attics, not shown on attic plans.
16. Dens Shield at all wet walls, assumed at tubs/shower walls only.
17. Area separation walls, none shown.
18. Field built showers with floor waterproofing.
19. Protection of hinges at units.
20. 2 finish coats of paint on walls, ceilings, and metals, assumed 1 finish coat with backroll.
21. 2 year contractor warranty on paint, 1 year standard.
22. Wallcoverings, none shown.


Exhibit 19 Page 11 of 45



**Oxberry Midtown**
**Houston, Texas**

23. Painting of CMU.

*Division 10*
*Specialties*

Includes:

1. Allowance for unit, common area, amenity, and building signage.
2. Unit and common area toilet and bath accessories by Gatco.  Shower rod and grab bars by Bobrick.
3. Includes common area fire extinguishers and cabinets.
4. Includes front loading and parcel mailboxes as required for 182 units.
5. Electric fireplace as shown on 5/A.210.

Excludes:

6. 10 43 00 and 10 44 00.
7. Unit fire extinguisher cabinets, not required by code.
8. Package lockers or other type systems, assumed to be by Owner.
9. 10 88 50 shower door and enclosures.  Plans show shower rods.
10. Gas fireplace, electric shown.

*Division 11*
*Equipment*

Includes:

1. Appliances in stainless steel by GE as follows:
   a. GWE19JY - Refrigerator
   b. JS760S - 5.3 CF Range
   c. UVC9300S – 30" SS Hood
   d. JES1657S – Microwave
   e. GDT665SS - Dishwasher
   f. GFC325 - Disposal
   g. GFW510SC – Washer, Front Load
   h. GFD55ESS – Dryer Front Load
   i. GYE18JY – ADA Refrigerator
   j. GDT225SS – ADA Dishwasher

2. Allowance of $6,687 for amenity appliances.

Excludes:

3. Appliances by other MFG than those listed above.

*Division 12*
*Furnishings*

Includes:

1. Manual roller shades at unit windows by SWF or equal with 5% openness.
2. Manual roller shades at amenity areas listed in drawings by SWF or equal.
3. Motorized window shades at 1st floor lobby and flex space.
4. 2 CM eased edge import quartz, similar to Calacatta, at unit kitchens and vanity tops.
5. Includes current shipping rates on quartz.  Any future shipping surcharges will be priced at time of shipping and processed via change order to the Owner.
6. PLAM-1 cabinets at units in kitchens, vanities, floating shelves, open casework, and shelving at desk areas.



Exhibit 19 Page 12 of 45



**Oxberry Midtown**
**Houston, Texas**

Excludes:

7. Motorized shades at any other location than that listed above.
8. Blackout shades in units or amenity areas.
9. Domestic quartz by Daltile at units or common areas.
10. Master Woodcraft Sienna cabinets at units or equal.
11. Bedframe and headboard with open shelving.

*Division 13*
*Special Construction*

Includes:

1. Code compliant splash pool and concrete deck complete with code required lift sleeve and signage.

Excludes:

2. Pool allowance of $125,000.

*Division 14*
*Conveying Equipment*

Includes:

1. (2) EA 3300 MRL 150 FPM traction elevators by Schindler with standard cab finishes.
2. (1) EA Midland chute 24" diameter 16-gauge aluminized steel trash chute.

Excludes:

3. Custom cab finishes at elevators.
4. Trash compactors, assumed to be by Owner.
5. Waste caddy and tow hitches, assumed to be by Owner.
6. 2 CY containers, assumed to be by Owner.
7. Odor containment at trash compactor, assumed to be by Owner.

*Division 21*
*Fire Suppression*

Includes:

1. Code compliant NFPA 13 fire sprinkler system for a 5-story wood framed building type III-B per local codes and AHJ.
2. Includes attic dry system as required.
3. Includes fire pump and break tank as required.
4. Standpipes as required.
5. Flex heads, VS-1, as required at balconies.

Excludes:

6. Interstitial sprinkler system.
7. FARS system.
8. Knox caps
9. Heat trace
10. Transfer switch
11. Fire hose cabinets

*Division 22*
*Plumbing*



Exhibit 19 Page 13 of 45



**Oxberry Midtown**
**Houston, Texas**

Includes:

1. PVC and CPVC water, sewer, and storm piping as allowed by code.
2. Trap guards at floor and hub drains.
3. Loop vents at island kitchen sinks.
4. Water heaters by Rheem or equal.
5. Plumbing fixtures to be Kohler/AMSTD chrome with undermount white lavatory sinks and Elkay for kitchen sinks.
6. Toilets to be Gerber G0028990 white.
7. Floor drains to be Sioux Chief 833-24-DNR-V.
8. Fire rated boxes to be Sioux Chief.
9. Tile-redi shower pans ILO field-built showers.
10. Insulation on hot water piping per code.
11. Water meters for each unit by Minol or equal.

Excludes:

12. Copper water piping.
13. Cast iron piping.
14. Rock excavation for plumbing.
15. Gas main or any site gas to amenities or building.
16. Any subsurface and perimeter foundation drainage
17. Domestic booster pump.
18. Aquatic showers.
19. Water hammer arrestors.

*Division 23*
*HVAC*

Includes:

1. Goodman SEER2 straight cool split system HVAC equipment for units and common areas.
2. Outside air with motorized damper in units to be Aprilaire model #8126.
3. Grilles to be stamped steel in whit finish with thru-face operator.
4. UL approved protection of HVAC penetrations of rated structure as required by local code enforcement agency.
5. Sheetmetal ductwork as shown in units and common areas.
6. Dryer booster fans to be Tjerlund model LB2.

Excludes:

7. Testing and Air Balance or commissioning of any systems.
8. Trane HVAC equipment.
9. Aluminum HVAC registers and diffusers.

*Division 26*
*Electrical*

Includes:

1. Allowance for primary conduits, with concrete encasement from enclosures on Dennis street to XFMR.
2. Aluminum secondaries.
3. Romex wiring as allowed by code.
4. Allowance for 2" conduit above ceiling from MDF to IDF.
5. Allowance for (1) 2" conduit from street to MDF.
6. Allowance for wiring to landscape lighting not shown on drawings.

Excludes:



Exhibit 19 Page 14 of 45



## Oxberry Midtown
## Houston, Texas

23.  Copper conductors or feeders.
24.  Primary Conduits wire and gear.
25.  Any underground fire loops.

### Division 27
### Communication

Includes:

1.  Salto unit entry locks.
2.  Allowance for voice, data, and tv at units.
3.  Allowance for voice, data, and tv at amenity areas.
4.  Allowance for Wi-Fi at amenity areas.

Excludes:

5.  Homeruns from IDF to Units, assumed to be done by provider.
6.  Backbone fiber from POE to MDF and from MDF to IDF with associated patch panels and equipment racks.

### Division 28
### Electronic Safety and Security

Includes:

1.  Code minimum fire alarm system.
2.  Allowance for access control with 9 locations.
3.  Allowance for CCTV with 23 locations.
4.  Allowance for intrusion detection at amenity areas.
5.  Allowance for ERRC system.

Excludes:

6.  2 way communication or area of refuge.
7.  Access control at site, no site gates in proposal.
8.  Access control at units.

### Division 31
### Earthwork

Includes:

1.  Demo of asphalt paving and saw cut and remove future entrances into property per D.001.
2.  Building pad prep to be 2.5' of select fill.
3.  Lime stabilization at new access drive only.
4.  Haul off as needed of excess.
5.  Tree protection with orange snow fence and metal T-posts only at (11) existing trees.

Excludes:

6.  Additional demo not shown or specifically called out on D.001.
7.  Removal of unforeseen obstructions or objects.
8.  Dewatering/well pointing.
9.  Protection of existing buildings or underpinning adjacent buildings foundations.

### Division 32



Exhibit 19 Page 15 of 45



**Oxberry Midtown**
**Houston, Texas**

### Exterior Improvements

Includes:

1.  8' steel perimeter fence to be 16 gauge, ¾" square pickets at 4" on center, with 3" 14-gauge posts at 8' on center.
2.  1 EA 42" x 8' steel pedestrian gate with Simplex Unican lock.
3.  1 EA 13' x 8' steel double gate with slide bolt and (2) drop rods.
4.  5' steel pool fence with same picket and post design as perimeter fence.
5.  42" x 5' steel pool fence gate with lock box, TB200 closer, and 10" kickplate.
6.  12' wood perimeter fence with 2"x6" cedar pickets, horizontal, 4" square 14-gauge steel posts at 7' on center

Excludes:

7.  Dog park fencing, gates, pet waste stations, and drinking stations as none are identified on drawings.
8.  Ameristar brand prefinished aluminum fencing per 32 31 20 and 32 31 21.
9.  Doorking gate operator per 32 31 20 and 32 31 21, assumed gates are manual.

### Division 33
### Utilities

Includes:

1.  (2) road bores for water lines.
2.  Contech solid CMP detention system.
3.  Pavement and sidewalk demo and replacement for utility work.
4.  Stabilized sand to 1' below subgrade where under paving or stabilized base.

Excludes:

5.  Demo of existing utilities as none are shown on D.001.
6.  Offsite Utilities.
7.  Light pole conflicts.
8.  Tapping fees, meter fees, or deposits.
9.  Meters.
10. CPA of existing meters.
11. Connection of downspouts to storm lines, none shown.
12. Landscape or pool deck drainage, none shown.
13. New fire hydrants or work on existing, none shown.

### Owner Allowances

Includes:

1.  An allowance of $230,000 for WP-01 and amenity trim and casing.
2.  An allowance of $6,687 for amenity area appliances.
3.  An allowance of $85,328 for unit and amenity area voice, data, TV, and Wi-Fi.
4.  An allowance of $23,899 for amenity area speakers.
5.  An allowance of $85,384 for amenity area access control, intrusion detection, and CCTV.

### Alternates

See owner bid form for Alternates 1 – 5.



Exhibit 19 Page 16 of 45





# Tab B

## SCHEDULE



THE '68 APARTMENTS AT HEMISFAIR | SAN ANTONIO, TX

Exhibit 19 Page 17 of 45



# Schedule

Cadence McShane's project team will work with **Oxberry Group** and the design team to refine and optimize a mutually agreeable project schedule that will account for the current state of the industry related to commodity availability and the current manpower status in the subcontractor market.

Our approach to timely completion of the projects starts with securing commitments from every team member involved in planning and establishing the schedule. We generate detailed reports demonstrating our plans to manage activities on the critical path.

## Developing the Project Schedule

During the initial phase of design, contacts within the subcontracting community will be used as a resource to generate budget pricing, material availability, and market condition and scheduling information in order to properly plan the implementation of the project. In the bidding phase, we request duration assumptions by the subcontractors with their quotation. As we go to contract, we typically provide milestone targets for each trade contractor and may provide incentive for early delivery, if necessary. **We customize the scheduling tools identified in the graphic below to accommodate needs of Oxberry Group and/or the design team.**

## Methods of Corrective Action to Overcome Schedule Deficiencies

In the event of schedule impacts such as weather delays, unforeseen conditions, delivery delays, design changes or sequence alteration, Cadence McShane will meet with the project team and key subcontractors to discuss man power, extended work hours, and sequencing methods to bring the schedule back on track.

A detailed recovery schedule will be reviewed and published to the project team, so it can be monitored closely and updated accordingly. We will generate detailed reports demonstrating our plans to manage activities on the critical path, as well as our strategy to keep follow-on items off the critical path.

We believe clear communication with all team members, including the owner and design team, is crucial in relating key schedule updates. Recovery schedules will not be implemented until Cadence McShane and **Oxberry Group** approve the change.

| PRE-CONSTRUCTION | MASTER | MILESTONES | CONSTRUCTION | LOOK AHEAD | CUSTOM REPORTS |
|---|---|---|---|---|---|
| Captures design document release, design interval estimates, early package releases, advertisements, subcontractor bid dates, and GMP submission date. | A comprehensive, big picture view of the project. Developed in Primavera P6 software. | Identifies critical elements to meet major deadlines provided in the master schedule including critical submittal approval and procurement durations. | Incorporates all trade partner activities, supply deliveries, safety training and inspections, and quality reviews. | A three- to four- week look-ahead and shows the construction site team a list of activities requiring coordination between trades. | Generation of custom reports to analyze critical path, sorted trade resources, longest path, cost reports and monthly updates as needed. |

Exhibit 19 Page 18 of 45



Oxberry Midtown

| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| **OMP Oxberry Midtown** | 550 | 36 | 514 | 19-Aug-22A | 26-Sep-24 |
| **OMP.1 Milestones / Pre-Con** | 550 | 36 | 514 | 19-Aug-22A | 26-Sep-24 |
| **OMP.1.5 Milestones** | 462 | 0 | 462 | 21-Dec-22 | 26-Sep-24 |
| NTP | 1 | 0 | 1 | 21-Dec-22 | 21-Dec-22 |
| Mobilization | 1 | 0 | 1 | 04-Jan-23 | 04-Jan-23 |
| Level 1 Turnover | 1 | 0 | 1 | 20-Jun-24 | 20-Jun-24 |
| Level 2 Turnover | 1 | 0 | 1 | 08-Jul-24 | 08-Jul-24 |
| Level 3 Turnover | 1 | 0 | 1 | 25-Jul-24 | 25-Jul-24 |
| Level 4 Turnover | 1 | 0 | 1 | 13-Aug-24 | 13-Aug-24 |
| Level 5 Turnover | 1 | 0 | 1 | 27-Aug-24 | 27-Aug-24 |
| Substantial Completion | 1 | 0 | 1 | 28-Aug-24 | 28-Aug-24 |
| Final Completion | 1 | 0 | 1 | 26-Sep-24 | 26-Sep-24 |
| **OMP.1.4 Design & Permitting** | 62 | 23 | 1 | 19-Aug-22A | 14-Nov-22 |
| Addendum No. 1 (Issue for Permit/Bid Set) | 1 | 1 | 0 | 19-Aug-22A | 19-Aug-22A |
| Addendum No. 2 (Permit Responses) | 0 | 0 | 0 | 21-Sep-22A | 21-Sep-22A |
| Addendum No. 3 (Issue for Construction Set) | 1 | 0 | 1 | 14-Nov-22 | 14-Nov-22 |
| **OMP.1.2 Contract** | 79 | 26 | 53 | 02-Sep-22A | 21-Dec-22 |
| GC Pricing | 27 | 26 | 1 | 02-Sep-22A | 10-Oct-22 |
| Incorporate Permit Comments into IFCs | 25 | 0 | 25 | 10-Oct-22 | 11-Nov-22 |
| GC Selection | 15 | 0 | 15 | 11-Oct-22 | 31-Oct-22 |
| GC Award | 1 | 0 | 1 | 01-Nov-22 | 01-Nov-22 |
| Prepare CD/Permit Estimate | 25 | 0 | 25 | 15-Nov-22 | 19-Dec-22 |
| Execute GMP | 1 | 0 | 1 | 20-Dec-22 | 20-Dec-22 |
| NTP | 1 | 0 | 1 | 21-Dec-22 | 21-Dec-22 |
| **OMP.1.1 Procurement** | 245 | 0 | 245 | 21-Dec-22 | 28-Nov-23 |
| **OMP.1.1.1 Trade Partner / Supplier Buyout** | 30 | 0 | 30 | 21-Dec-22 | 31-Jan-23 |
| Priority Trade Partner / Supplier Buyout | 30 | 0 | 30 | 21-Dec-22 | 31-Jan-23 |
| **OMP.1.1.2 Submittals** | 60 | 0 | 60 | 11-Jan-23 | 04-Apr-23 |
| Priority Submittals | 60 | 0 | 60 | 11-Jan-23 | 04-Apr-23 |
| **OMP.1.1.3 Fabrication** | 230 | 0 | 230 | 11-Jan-23 | 28-Nov-23 |
| Trusses | 120 | 0 | 120 | 11-Jan-23 | 27-Jun-23 |
| Switchgear | 200 | 0 | 200 | 22-Feb-23 | 28-Nov-23 |
| **OMP.2 Site Work** | 381 | 0 | 381 | 04-Jan-23 | 19-Jun-24 |
| **OMP.2.3 Initial Site Work** | 60 | 0 | 60 | 04-Jan-23 | 28-Mar-23 |
| Mobilize on Site | 10 | 0 | 10 | 04-Jan-23 | 17-Jan-23 |
| Demo Existing Asphalt and Concrete Paving | 10 | 0 | 10 | 18-Jan-23 | 31-Jan-23 |
| Demo and Relocate Existing Site Utilities | 15 | 0 | 15 | 01-Feb-23 | 21-Feb-23 |
| Rough Grade Site | 5 | 0 | 5 | 22-Feb-23 | 28-Feb-23 |
| Layout and Staking | 5 | 0 | 5 | 01-Mar-23 | 07-Mar-23 |
| Cut and Fill Building Pad | 15 | 0 | 15 | 08-Mar-23 | 28-Mar-23 |
| **OMP.2.2 Site Utilities** | 30 | 0 | 30 | 29-Mar-23 | 09-May-23 |
| Sanitary Sewer to Building | 5 | 0 | 5 | 29-Mar-23 | 04-Apr-23 |
| Storm Drainage / Detention System (96" CMP) | 30 | 0 | 30 | 29-Mar-23 | 09-May-23 |
| Domestic Water / Fire to Building | 5 | 0 | 5 | 12-Apr-23 | 18-Apr-23 |
| **OMP.2.1 Site Finishes** | 65 | 0 | 65 | 21-Mar-24 | 19-Jun-24 |
| Site Lighting Underground | 5 | 0 | 5 | 21-Mar-24 | 27-Mar-24 |

Legend:
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- Milestone
- summary

TASK filter: All Activities

CADENCE McSHANE CONSTRUCTION

Cadence McShane Construction

10-Oct-22 15:07

Exhibit 19 Page 19 of 45



| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| Site Amenities and Splash Pool | 45 | 0 | 45 | 21-Mar-24 | 22-May-24 |
| Paving Lime Stabilize | 5 | 0 | 5 | 23-May-24 | 29-May-24 |
| Paving FRP | 15 | 0 | 15 | 30-May-24 | 19-Jun-24 |
| **OMP.3  Building Substructure** | **45** | **0** | **45** | **29-Mar-23** | **30-May-23** |
| Form and Pour Elevator Pits and Walls | 10 | 0 | 10 | 29-Mar-23 | 11-Apr-23 |
| Underground Plumbing | 10 | 0 | 10 | 29-Mar-23 | 11-Apr-23 |
| Underground Electrical | 10 | 0 | 10 | 29-Mar-23 | 11-Apr-23 |
| Form and Pour Spread Footings | 15 | 0 | 15 | 29-Mar-23 | 18-Apr-23 |
| Form and Pour Beams and PT Cables | 15 | 0 | 15 | 12-Apr-23 | 02-May-23 |
| Form and Pour Slab On Grade | 15 | 0 | 15 | 03-May-23 | 23-May-23 |
| Form and Pour Leave Out PT Strips | 5 | 0 | 5 | 24-May-23 | 30-May-23 |
| **OMP.4  Building Superstructure** | **106** | **0** | **106** | **31-May-23** | **25-Oct-23** |
| Structural Steel Framing at Clubhouse | 10 | 0 | 10 | 31-May-23 | 13-Jun-23 |
| CMU Elevator Shaft | 15 | 0 | 15 | 31-May-23 | 20-Jun-23 |
| CMU Trash Chute | 15 | 0 | 15 | 31-May-23 | 20-Jun-23 |
| Level 1 Framing | 15 | 0 | 15 | 07-Jun-23 | 27-Jun-23 |
| Level 2 Floor Trusses and Deck | 10 | 0 | 10 | 28-Jun-23 | 11-Jul-23 |
| Level 2 Framing | 15 | 0 | 15 | 12-Jul-23 | 01-Aug-23 |
| Level 3 Floor Trusses and Deck | 10 | 0 | 10 | 02-Aug-23 | 15-Aug-23 |
| Level 3 Framing | 15 | 0 | 15 | 16-Aug-23 | 05-Sep-23 |
| Install Metal Stairs | 30 | 0 | 30 | 30-Aug-23 | 10-Oct-23 |
| Level 4 Floor Trusses and Deck | 10 | 0 | 10 | 06-Sep-23 | 19-Sep-23 |
| Level 5 Framing | 15 | 0 | 15 | 20-Sep-23 | 10-Oct-23 |
| Roof Trusses and Deck | 10 | 0 | 10 | 11-Oct-23 | 24-Oct-23 |
| Structural Inspection | 1 | 0 | 1 | 25-Oct-23 | 25-Oct-23 |
| **OMP.5  Building Shell and Envelope** | **105** | **0** | **105** | **26-Oct-23** | **20-Mar-24** |
| Roofing | 15 | 0 | 15 | 26-Oct-23 | 15-Nov-23 |
| Waterproofing | 20 | 0 | 20 | 26-Oct-23 | 22-Nov-23 |
| Set Windows and Exterior Doors | 20 | 0 | 20 | 23-Nov-23 | 20-Dec-23 |
| Burnished Block (Best Block) | 20 | 0 | 20 | 21-Dec-23 | 17-Jan-24 |
| Cornice Trim (Hardie) | 20 | 0 | 20 | 04-Jan-24 | 31-Jan-24 |
| Exterior Paint | 20 | 0 | 20 | 25-Jan-24 | 21-Feb-24 |
| Metal Panels (Centria) | 20 | 0 | 20 | 22-Feb-24 | 20-Mar-24 |
| **OMP.7  Interior Finishes and Trim** | **224** | **0** | **224** | **26-Oct-23** | **03-Sep-24** |
| **OMP.7.8  Building MEP Infrastructure** | **196** | **0** | **196** | **26-Oct-23** | **25-Jul-24** |
| Fire Riser | 2 | 0 | 2 | 26-Oct-23 | 27-Oct-23 |
| Set Fire Pump | 5 | 0 | 5 | 30-Oct-23 | 03-Nov-23 |
| Electrical Rough-In | 15 | 0 | 15 | 29-Nov-23 | 19-Dec-23 |
| Electrical Distribution to Each Floor | 10 | 0 | 10 | 06-Dec-23 | 19-Dec-23 |
| Permanent Power | 1 | 0 | 1 | 01-Apr-24 | 01-Apr-24 |
| Trash Chutes Installation to Each Floor | 10 | 0 | 10 | 01-Apr-24 | 12-Apr-24 |
| Elevator Set Cabs and Test | 10 | 0 | 10 | 02-Apr-24 | 15-Apr-24 |

Oxberry Midtown

10-Oct-22 15:07

Actual Level of Effort — Remaining Work — ◆ ◆ Milestone
Actual Work — Critical Remaining Work — summary

TASK filter: All Activities

CADENCE McSHANE CONSTRUCTION

Cadence McShane Construction

Exhibit 19 Page 20 of 45

Oxberry Midtown

10-Oct-22 15:07

| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| Start Up Fire Pump and Test | 2 | 0 | 2 | 24-Jul-24 | 25-Jul-24 |
| **OMP7.6  Level 1 Lobby, Flex Space, Kitchenette, a** | **70** | **0** | **70** | **14-Mar-24** | **19-Jun-24** |
| Lobby, Flex Space, Kitchenette, and Offices | 70 | 0 | 70 | 14-Mar-24 | 19-Jun-24 |
| **OMP7.5  Level 1 Units (28 Units)** | **110** | **0** | **110** | **21-Dec-23** | **22-May-24** |
| Pre-Rock Ceilings | 5 | 0 | 5 | 21-Dec-23 | 27-Dec-23 |
| Rough-In Sprinkler / Ductwork Ceilings | 5 | 0 | 5 | 28-Dec-23 | 03-Jan-24 |
| Rough-In Electrical / Plumbing Walls | 8 | 0 | 8 | 28-Dec-23 | 08-Jan-24 |
| MEP Close-In Inspection | 2 | 0 | 2 | 09-Jan-24 | 10-Jan-24 |
| Insulation | 3 | 0 | 3 | 11-Jan-24 | 15-Jan-24 |
| Close-In Inspection - Insulation | 1 | 0 | 1 | 16-Jan-24 | 16-Jan-24 |
| Hang Drywall | 11 | 0 | 11 | 17-Jan-24 | 31-Jan-24 |
| Tape, Bed, and Texture Drywall | 10 | 0 | 10 | 01-Feb-24 | 14-Feb-24 |
| Gypcrete Units | 2 | 0 | 2 | 15-Feb-24 | 16-Feb-24 |
| Hot Punch Units | 4 | 0 | 4 | 15-Feb-24 | 20-Feb-24 |
| Set HVAC Unit and Water Heater | 5 | 0 | 5 | 15-Feb-24 | 21-Feb-24 |
| Light Weight Concrete Balconies | 2 | 0 | 2 | 19-Feb-24 | 20-Feb-24 |
| First Trim and PH Doors | 8 | 0 | 8 | 19-Feb-24 | 28-Feb-24 |
| Cabinets | 10 | 0 | 10 | 19-Feb-24 | 01-Mar-24 |
| Start Up Units | 2 | 0 | 2 | 21-Feb-24 | 22-Feb-24 |
| Paint | 5 | 0 | 5 | 29-Feb-24 | 06-Mar-24 |
| Countertops | 8 | 0 | 8 | 12-Mar-24 | 21-Mar-24 |
| Set Minor Appliances | 5 | 0 | 5 | 22-Mar-24 | 28-Mar-24 |
| Ceramic Tile | 5 | 0 | 5 | 22-Mar-24 | 28-Mar-24 |
| Rough Clean Final | 2 | 0 | 2 | 29-Mar-24 | 01-Apr-24 |
| LVT Flooring | 5 | 0 | 5 | 02-Apr-24 | 08-Apr-24 |
| Set Major Appliances | 3 | 0 | 3 | 09-Apr-24 | 11-Apr-24 |
| Final MEP Trim | 5 | 0 | 5 | 09-Apr-24 | 15-Apr-24 |
| Carpet (Corridors) | 2 | 0 | 2 | 16-Apr-24 | 17-Apr-24 |
| Touch-Up Paint | 4 | 0 | 4 | 18-Apr-24 | 23-Apr-24 |
| CMC Punch | 8 | 0 | 8 | 24-Apr-24 | 03-May-24 |
| Final Clean | 3 | 0 | 3 | 06-May-24 | 08-May-24 |
| Owner Acceptance | 4 | 0 | 4 | 09-May-24 | 14-May-24 |
| TCO Inspections | 5 | 0 | 5 | 09-May-24 | 15-May-24 |
| Owner Punch | 10 | 0 | 10 | 09-May-24 | 22-May-24 |
| **OMP7.4  Level 2 Units (40 Units)** | **138** | **0** | **138** | **04-Jan-24** | **15-Jul-24** |
| Pre-Rock Ceilings | 8 | 0 | 8 | 04-Jan-24 | 15-Jan-24 |
| Rough-In Sprinkler / Ductwork Ceilings | 9 | 0 | 9 | 16-Jan-24 | 26-Jan-24 |
| Rough-In Electrical / Plumbing Walls | 13 | 0 | 13 | 16-Jan-24 | 01-Feb-24 |
| MEP Close-In Inspection | 2 | 0 | 2 | 02-Feb-24 | 05-Feb-24 |
| Insulation | 4 | 0 | 4 | 06-Feb-24 | 09-Feb-24 |
| Close-In Inspection - Insulation | 1 | 0 | 1 | 12-Feb-24 | 12-Feb-24 |
| Hang Drywall | 15 | 0 | 15 | 13-Feb-24 | 04-Mar-24 |
| Tape, Bed, and Texture Drywall | 11 | 0 | 11 | 05-Mar-24 | 19-Mar-24 |
| Gypcrete Units | 2 | 0 | 2 | 20-Mar-24 | 21-Mar-24 |
| Hot Punch Units | 5 | 0 | 5 | 20-Mar-24 | 26-Mar-24 |
| Set HVAC Unit and Water Heater | 7 | 0 | 7 | 20-Mar-24 | 28-Mar-24 |
| Light Weight Concrete Balconies | 2 | 0 | 2 | 22-Mar-24 | 25-Mar-24 |

| | | |
|---|---|---|
| ▬ Actual Level of Effort | ▭ Remaining Work | ◆——◆ Milestone |
| ▬ Actual Work | ▬ Critical Remaining Work | ▬▬ summary |

TASK filter: All Activities

CADENCE
McSHANE
CONSTRUCTION

Cadence McShane Construction

Exhibit 19 Page 21 of 45

Oxberry Midtown

10-Oct-22 15:07

| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| First Trim and PH Doors | 10 | 0 | 10 | 22-Mar-24 | 04-Apr-24 |
| Cabinets | 11 | 0 | 11 | 22-Mar-24 | 05-Apr-24 |
| Start Up Units | 2 | 0 | 2 | 27-Mar-24 | 28-Mar-24 |
| Paint | 8 | 0 | 8 | 05-Apr-24 | 16-Apr-24 |
| Countertops | 10 | 0 | 10 | 16-Apr-24 | 29-Apr-24 |
| Set Minor Appliances | 7 | 0 | 7 | 30-Apr-24 | 08-May-24 |
| Ceramic Tile | 7 | 0 | 7 | 30-Apr-24 | 08-May-24 |
| Rough Clean Final | 2 | 0 | 2 | 09-May-24 | 10-May-24 |
| LVT Flooring | 9 | 0 | 9 | 13-May-24 | 23-May-24 |
| Set Major Appliances | 4 | 0 | 4 | 24-May-24 | 29-May-24 |
| Final MEP Trim | 7 | 0 | 7 | 24-May-24 | 03-Jun-24 |
| Carpet (Corridors) | 2 | 0 | 2 | 04-Jun-24 | 05-Jun-24 |
| Touch-Up Paint | 5 | 0 | 5 | 06-Jun-24 | 12-Jun-24 |
| CMC Punch | 10 | 0 | 10 | 13-Jun-24 | 26-Jun-24 |
| Final Clean | 3 | 0 | 3 | 27-Jun-24 | 01-Jul-24 |
| Owner Acceptance | 4 | 0 | 4 | 02-Jul-24 | 05-Jul-24 |
| TCO Inspections | 5 | 0 | 5 | 02-Jul-24 | 08-Jul-24 |
| Owner Punch | 10 | 0 | 10 | 02-Jul-24 | 15-Jul-24 |
| **OMP7.3  Level 3 Units (40 Units)** | **138** | **0** | **138** | **23-Jan-24** | **01-Aug-24** |
| Pre-Rock Ceilings | 8 | 0 | 8 | 23-Jan-24 | 01-Feb-24 |
| Rough-In Sprinkler / Ductwork Ceilings | 9 | 0 | 9 | 02-Feb-24 | 14-Feb-24 |
| Rough-In Electrical / Plumbing Walls | 13 | 0 | 13 | 02-Feb-24 | 20-Feb-24 |
| MEP Close-In Inspection | 2 | 0 | 2 | 21-Feb-24 | 22-Feb-24 |
| Insulation | 4 | 0 | 4 | 23-Feb-24 | 28-Feb-24 |
| Close-In Inspection - Insulation | 1 | 0 | 1 | 29-Feb-24 | 29-Feb-24 |
| Hang Drywall | 15 | 0 | 15 | 01-Mar-24 | 21-Mar-24 |
| Tape, Bed, and Texture Drywall | 11 | 0 | 11 | 22-Mar-24 | 05-Apr-24 |
| Gypcrete Units | 2 | 0 | 2 | 08-Apr-24 | 09-Apr-24 |
| Hot Punch Units | 5 | 0 | 5 | 08-Apr-24 | 12-Apr-24 |
| Set HVAC Unit and Water Heater | 7 | 0 | 7 | 08-Apr-24 | 16-Apr-24 |
| Light Weight Concrete Balconies | 2 | 0 | 2 | 10-Apr-24 | 11-Apr-24 |
| First Trim and PH Doors | 10 | 0 | 10 | 10-Apr-24 | 24-Apr-24 |
| Cabinets | 11 | 0 | 11 | 10-Apr-24 | 24-Apr-24 |
| Start Up Units | 2 | 0 | 2 | 15-Apr-24 | 16-Apr-24 |
| Paint | 8 | 0 | 8 | 24-Apr-24 | 03-May-24 |
| Countertops | 10 | 0 | 10 | 03-May-24 | 16-May-24 |
| Set Minor Appliances | 7 | 0 | 7 | 17-May-24 | 27-May-24 |
| Ceramic Tile | 7 | 0 | 7 | 17-May-24 | 27-May-24 |
| Rough Clean Final | 2 | 0 | 2 | 28-May-24 | 29-May-24 |
| LVT Flooring | 9 | 0 | 9 | 30-May-24 | 11-Jun-24 |
| Set Major Appliances | 4 | 0 | 4 | 12-Jun-24 | 17-Jun-24 |
| Final MEP Trim | 7 | 0 | 7 | 12-Jun-24 | 20-Jun-24 |
| Carpet (Corridors) | 2 | 0 | 2 | 21-Jun-24 | 24-Jun-24 |
| Touch-Up Paint | 5 | 0 | 5 | 25-Jun-24 | 01-Jul-24 |
| CMC Punch | 10 | 0 | 10 | 02-Jul-24 | 15-Jul-24 |
| Final Clean | 3 | 0 | 3 | 16-Jul-24 | 18-Jul-24 |
| Owner Acceptance | 4 | 0 | 4 | 19-Jul-24 | 24-Jul-24 |

| Legend | |
|---|---|
| Actual Level of Effort | Remaining Work |
| Actual Work | Critical Remaining Work |
| | ◆ Milestone |
| | summary |

TASK filter: All Activities

CADENCE
McSHANE
CONSTRUCTION

Cadence McShane Construction

Exhibit 19 Page 22 of 45

Oxberry Midtown

10-Oct-22 15:07

| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| TCO Inspections | 5 | 0 | 5 | 19-Jul-24 | 25-Jul-24 |
| Owner Punch | 10 | 0 | 10 | 19-Jul-24 | 01-Aug-24 |
| **OMP.7.2  Level 4 Units (40 Units)** | **138** | **0** | **138** | **09-Feb-24** | **20-Aug-24** |
| Pre-Rock Ceilings | 8 | 0 | 8 | 09-Feb-24 | 20-Feb-24 |
| Rough-In Sprinkler / Ductwork Ceilings | 9 | 0 | 9 | 21-Feb-24 | 04-Mar-24 |
| Rough-In Electrical / Plumbing Walls | 13 | 0 | 13 | 21-Feb-24 | 08-Mar-24 |
| MEP Close-In Inspection | 2 | 0 | 2 | 11-Mar-24 | 12-Mar-24 |
| Insulation | 4 | 0 | 4 | 13-Mar-24 | 18-Mar-24 |
| Close-In Inspection - Insulation | 1 | 0 | 1 | 19-Mar-24 | 19-Mar-24 |
| Hang Drywall | 15 | 0 | 15 | 20-Mar-24 | 09-Apr-24 |
| Tape, Bed, and Texture Drywall | 11 | 0 | 11 | 10-Apr-24 | 24-Apr-24 |
| Gypcrete Units | 2 | 0 | 2 | 25-Apr-24 | 26-Apr-24 |
| Hot Punch Units | 5 | 0 | 5 | 25-Apr-24 | 01-May-24 |
| Set HVAC Unit and Water Heater | 7 | 0 | 7 | 25-Apr-24 | 03-May-24 |
| Light Weight Concrete Balconies | 2 | 0 | 2 | 29-Apr-24 | 30-Apr-24 |
| First Trim and PH Doors | 10 | 0 | 10 | 29-Apr-24 | 10-May-24 |
| Cabinets | 11 | 0 | 11 | 29-Apr-24 | 13-May-24 |
| Start Up Units | 2 | 0 | 2 | 02-May-24 | 03-May-24 |
| Paint | 8 | 0 | 8 | 13-May-24 | 22-May-24 |
| Countertops | 10 | 0 | 10 | 22-May-24 | 04-Jun-24 |
| Set Minor Appliances | 7 | 0 | 7 | 05-Jun-24 | 13-Jun-24 |
| Ceramic Tile | 7 | 0 | 7 | 05-Jun-24 | 13-Jun-24 |
| Rough Clean Final | 2 | 0 | 2 | 14-Jun-24 | 17-Jun-24 |
| LVT Flooring | 9 | 0 | 9 | 18-Jun-24 | 28-Jun-24 |
| Set Major Appliances | 4 | 0 | 4 | 01-Jul-24 | 04-Jul-24 |
| Final MEP Trim | 7 | 0 | 7 | 01-Jul-24 | 09-Jul-24 |
| Carpet (Corridors) | 2 | 0 | 2 | 10-Jul-24 | 11-Jul-24 |
| Touch-Up Paint | 5 | 0 | 5 | 12-Jul-24 | 18-Jul-24 |
| CMC Punch | 10 | 0 | 10 | 19-Jul-24 | 01-Aug-24 |
| Final Clean | 3 | 0 | 3 | 02-Aug-24 | 06-Aug-24 |
| Owner Acceptance | 4 | 0 | 4 | 07-Aug-24 | 12-Aug-24 |
| TCO Inspections | 5 | 0 | 5 | 07-Aug-24 | 13-Aug-24 |
| Owner Punch | 10 | 0 | 10 | 07-Aug-24 | 20-Aug-24 |
| **OMP.7.1  Level 5 Units (34 Units)** | **135** | **0** | **135** | **28-Feb-24** | **03-Sep-24** |
| Pre-Rock Ceilings | 8 | 0 | 8 | 28-Feb-24 | 08-Mar-24 |
| Rough-In Sprinkler / Ductwork Ceilings | 9 | 0 | 9 | 11-Mar-24 | 21-Mar-24 |
| Rough-In Electrical / Plumbing Walls | 13 | 0 | 13 | 11-Mar-24 | 27-Mar-24 |
| MEP Close-In Inspection | 2 | 0 | 2 | 28-Mar-24 | 29-Mar-24 |
| Insulation | 4 | 0 | 4 | 01-Apr-24 | 04-Apr-24 |
| Close-In Inspection - Insulation | 1 | 0 | 1 | 05-Apr-24 | 05-Apr-24 |
| Hang Drywall | 14 | 0 | 14 | 08-Apr-24 | 25-Apr-24 |
| Tape, Bed, and Texture Drywall | 10 | 0 | 10 | 26-Apr-24 | 09-May-24 |
| Gypcrete Units | 2 | 0 | 2 | 10-May-24 | 13-May-24 |
| Hot Punch Units | 5 | 0 | 5 | 10-May-24 | 16-May-24 |
| Set HVAC Unit and Water Heater | 7 | 0 | 7 | 10-May-24 | 20-May-24 |
| Light Weight Concrete Balconies | 2 | 0 | 2 | 14-May-24 | 15-May-24 |

Legend:
- Actual Level of Effort
- Actual Work
- Remaining Work
- Critical Remaining Work
- ◆ Milestone
- summary

CADENCE McSHANE
CONSTRUCTION

TASK filter: All Activities

Cadence McShane Construction

Exhibit 19 Page 23 of 45

Oxberry Midtown

10-Oct-22 15:07

| Activity Name | Original Duration | Actual Duration | Remaining Duration | Start | Finish |
|---|---|---|---|---|---|
| First Trim and PH Doors | 9 | 0 | 9 | 14-May-24 | 24-May-24 |
| Cabinets | 10 | 0 | 10 | 14-May-24 | 27-May-24 |
| Start Up Units | 2 | 0 | 2 | 17-May-24 | 20-May-24 |
| Paint | 9 | 0 | 9 | 27-May-24 | 06-Jun-24 |
| Countertops | 10 | 0 | 10 | 05-Jun-24 | 18-Jun-24 |
| Set Minor Appliances | 6 | 0 | 6 | 19-Jun-24 | 26-Jun-24 |
| Ceramic Tile | 6 | 0 | 6 | 19-Jun-24 | 26-Jun-24 |
| Rough Clean Final | 2 | 0 | 2 | 27-Jun-24 | 28-Jun-24 |
| LVT Flooring | 10 | 0 | 10 | 01-Jul-24 | 12-Jul-24 |
| Set Major Appliances | 4 | 0 | 4 | 15-Jul-24 | 18-Jul-24 |
| Final MEP Trim | 7 | 0 | 7 | 15-Jul-24 | 23-Jul-24 |
| Carpet (Corridors) | 2 | 0 | 2 | 24-Jul-24 | 25-Jul-24 |
| Touch-Up Paint | 5 | 0 | 5 | 26-Jul-24 | 01-Aug-24 |
| CMC Punch | 10 | 0 | 10 | 02-Aug-24 | 15-Aug-24 |
| Final Clean | 3 | 0 | 3 | 16-Aug-24 | 20-Aug-24 |
| Owner Acceptance | 4 | 0 | 4 | 21-Aug-24 | 26-Aug-24 |
| TCO Inspections | 5 | 0 | 5 | 21-Aug-24 | 27-Aug-24 |
| Owner Punch | 10 | 0 | 10 | 21-Aug-24 | 04-Sep-24 |
| **OMP7.7  Level 5 Rooftop Patio and Gathering Spa** | **40** | **0** | **40** | **03-Jun-24** | **26-Jul-24** |
| Level 5 Rooftop Patio and Gathering Space | 40 | 0 | 40 | 03-Jun-24 | 26-Jul-24 |
| **OMP.8  Building Turnover** | **63** | **0** | **63** | **20-Jun-24** | **16-Sep-24** |
| **OMP8.1  Level 1 Turnover** | **15** | **0** | **15** | **20-Jun-24** | **10-Jul-24** |
| Level 1 Turnover | 15 | 0 | 15 | 20-Jun-24 | 10-Jul-24 |
| **OMP8.2  Level 2 Turnover** | **15** | **0** | **15** | **08-Jul-24** | **26-Jul-24** |
| Level 2 Turnover | 15 | 0 | 15 | 08-Jul-24 | 26-Jul-24 |
| **OMP8.3  Level 3 Turnover** | **15** | **0** | **15** | **25-Jul-24** | **14-Aug-24** |
| Level 3 Turnover | 15 | 0 | 15 | 25-Jul-24 | 14-Aug-24 |
| **OMP8.4  Level 4 Turnover** | **15** | **0** | **15** | **13-Aug-24** | **02-Sep-24** |
| Level 4 Turnover | 15 | 0 | 15 | 13-Aug-24 | 02-Sep-24 |
| **OMP8.5  Level 5 Turnover** | **15** | **0** | **15** | **27-Aug-24** | **16-Sep-24** |
| Level 5 Turnover | 15 | 0 | 15 | 27-Aug-24 | 16-Sep-24 |

| Actual Level of Effort | Remaining Work | ◆ ◆ Milestone |
|---|---|---|
| Actual Work | Critical Remaining Work | ▬▬ summary |

CADENCE McSHANE CONSTRUCTION

TASK filter: All Activities

Cadence McShane Construction

Exhibit 19 Page 24 of 45



# Tab C

## MULTIFAMILY PROJECT EXPERIENCE



TRINITY GROVE BEAUMONT | BEAUMONT, TX

Exhibit 19 Page 25 of 45



# Multifamily Project Experience

Founded in 1985, Cadence McShane has grown to become one of the most trusted and well-established contractors in the State of Texas and beyond.  Specializing in the Multifamily, Senior Living, Commercial, Industrial, and Education market sectors, we offer construction management and design-build services from our offices in Austin, Dallas, Houston, and San Antonio.

CMC is part of The McShane Companies and, along-side our sister company McShane Construction, is recognized as one of the largest general contractors in the United States, with top-10 rankings across the Multifamily and Senior Living sectors.



**#5**
**2022 TOP MULTIFAMILY CONTRACTOR**



**#5**
**2022 TOP MULTI-UNIT RESIDENTIAL CONTRACTOR**

BUILDING DESIGN +CONSTRUCTION

**#8**
**2022 TOP MULTI-FAMILY CONTRACTOR**

## HOUSING PROJECTS IN THE PAST 5 YEARS
Constructed and in progress

| | Housing Projects | Housing Units | Housing Project Value |
|---|---|---|---|
| **The McShane Companies** | 108 | 25,107 | $3.8B |
| **Cadence McShane – Texas** | 33 | 7,835 | $1.2B |
| **Cadence McShane – Houston** | 7 | 1,218 | $176.1M |

OXBERRY GROUP | OXBERRY MIDTOWN                                                PROPRIETARY AND CONFIDENTIAL

Exhibit 19 Page 26 of 45

# Multifamily Project Experience



Cadence McShane is an industry expert in the State of Texas and has a depth of project experience across the state. As a demonstration of our strength, we are consistently ranked by ENR and Business Journals as one of the top contractors in the region.

Housing projects contracted by Cadence McShane and McShane range in complexity from garden-style walk-up apartments to high-density wraps and high-rise concrete structures with amenity-filled common areas and quality interior finishes, as shown on the table below.

## Notable Housing Projects - Current and Past 5 Years

| Project Name | Location | Units | Project Type |
|---|---|---|---|
| Residences at Kingwood | Atascocita, TX | 289 | Multifamily |
| Century Heights Senior Living | Beaumont, TX | 200 | Senior Living |
| Bluestem Apartments | Houston, TX | 180 | Multifamily |
| Aviva Terranova | Spring, TX | 163 | Multifamily |
| Trinity Grove Beaumont | Beaumont, TX | 192 | Multifamily |
| Anthology of Tanglewood | Houston, TX | 162 | Senior Living |
| Village at Sugar Land | Sugar Land, TX | 97 | Senior Living |
| East Bank at Richwood Village | Richwood, TX | 200 | Multifamily |
| Blockhouse Farm Creek | Leander, TX | 347 | Multifamily |
| Edenbrook Ridge Apartments | Pflugerville, TX | 338 | Multifamily |
| Lakeline Station | Austin, TX | 378 | Multifamily |



Exhibit 19 Page 27 of 45

## Multifamily Project Experience

| Project Name | Location | Units | Project Type |
|---|---|---|---|
| Goodwin Apartments | Austin, TX | 364 | Multifamily |
| EastVillage Apartments | Austin, TX | 422 | Multifamily |
| Hillside on Parmer | Austin, TX | 300 | Multifamily |
| Anthology of Austin | Austin, TX | 130 | Senior Living |
| 1812 E. 6th Street | Austin, TX | 60 | Multifamily |
| Granada Ridge Apartments | Austin, TX | 372 | Multifamily |
| Hermosa Village Apartments | Leander, TX | 238 | Multifamily |
| Edison Apartments | Austin, TX | 354 | Multifamily |
| Hermosa Village Apartments | Leander, TX | 238 | Multifamily |
| Woodcreek Apartments | Woodcreek, TX | 72 | Multifamily |
| Atlantica at Alamo Ranch | San Antonio, TX | 375 | Multifamily |
| Wheatley Park Senior Living | San Antonio, TX | 80 | Senior Living/IL |
| St. John's Square | San Antonio, TX | 253 | Multifamily |
| Granada Homes Senior Living Renovations | San Antonio, TX | 265 | Senior Living |
| Brookwood Senior Apartments | San Antonio, TX | 197 | Senior Living |
| Ensemble Senior Apartments | San Antonio, TX | 300 | Senior Living |
| East Meadows Apartments Phase II | San Antonio, TX | 119 | Multifamily |
| The '68 Apartments at Hemisfair | San Antonio, TX | 151 | Multifamily |
| Horizon Pointe Apartments | San Antonio, TX | 330 | Multifamily |
| 120 Ninth Street | San Antonio, TX | 220 | Multifamily |
| Villas at the Rim | San Antonio, TX | 427 | Multifamily |
| Anthology of Highland Park | Dallas, TX | 120 | Senior Living |
| Broadway Chapter | Fort Worth, TX | 242 | Multifamily |





## 6th & Chicon Micro-Apartments
### Austin, Texas

**Description**

6th & Chicon is a 34,364 SF podium-style multifamily project in the Upper East Side of Austin, TX. The complex will feature 60 "micro-apartments", where the average size for each apartment is 355 SF with units ranging from 252 SF to 465 SF. The complex includes 8,701 square feet of core area and 2,868 square feet of amenity space. Construction is Type IB with podium over retail and ground-level parking. This is an infill project in the Austin Urban Core.

At full buildout, the property will span six floors featuring modern amenities including multiple co-working spaces, individualized workout rooms on each level, multiple community kitchens, and outdoor spaces including a rooftop patio, all with clear views of Downtown Austin.



**Client:**
Watershed Development Group

**Architect:**
m(ødm)

**Size:**
34,364SF | 60 units

**Contract Value:**
$11,407,472

**Completion Year:**
2023





## Residences at Kingwood
### Atascocita, Texas

**Description**

The Residences at Kingwood is a new 25-building apartment complex, constructed on behalf of Trammell Crow (High Street Residential) in Houston, Texas. The 289-unit complex includes (10) 3-story garden-style walk-ups, (14) 2-story Townhomes, (1) Clubhouse, and surface parking and detached garages with 526 spaces combined.  The 423,000 SF complex offers units in one-, two-, and three-unit configurations. Site amenities include a swimming pool, dog wash station, putting green, and pickleball court. Site work includes landscaping and amenity areas.

The Residences at Kingwood is located in the prestigious Kingwood master-planned community next to Lake Houston and is approximately 20 miles from Downtown Houston. Kingwood is a suburban community consisting of mostly single-family residences, with a variety of retail options, and family-oriented amenities. The 19.7-acre greenfield site is one of the last remaining developable parcels within the Kingwood community.



**Client:**
High Street Residential

**Architect:**
W Partnership

**Size:**
423,000 SF | 289 units

**Contract Value:**
$46,091,842

**Completion Year:**
2024

**CADENCE McSHANE** CONSTRUCTION

Exhibit 19 Page 30 of 45





## CASE STUDY

**Cadence McShane Construction was approached by High Street Residential, a Trammell Crow Company, in August 2020, requesting a high-level Schedule of Values budget for a 423,000 SF garden-style, Class A multifamily project in Atascocita, Texas. This 289-unit complex includes (10) 3-story garden-style walk-ups, (14) 2-story Townhomes, (1) Clubhouse, swimming pool, dog wash station, putting green, Pickleball court and surface parking and detached garages with 526 spaces combined.**

**Residences at Kingwood**
PROJECT TITLE

**Atascocita, TX**
LOCATION

**289 Units**
SIZE

Over the next several months, the Cadence McShane preconstruction team worked with High Street Residential to determine the viability of the project. After engaging W Architects at the end of 2020, High Street entered in a preconstruction agreement with Cadence McShane at the beginning of 2021 and issued 50% SDs to begin the budgeting/ preconstruction process.

Throughout 2021, Cadence McShane worked hand in hand with W Architects and High Street Residential, battling escalating material pricing by providing many cost-management measures. These scope alternatives included eleven cost-saving ideas such as reducing the amount of pedestrian pavers; price range guidelines for interior finishes for unit vinyl plank flooring, granite countertops, backsplash, tub surround tile, etc.; reducing the use of Nichiha panels on

the clubhouse; reducing the use of metal roofing materials; and price range guidelines for interior finishes for the clubhouse including faux beams.

One of the unique services that Cadence McShane provided during the design stage was site/civil redesign. Under the guidance of the civil engineer, Kimley Horn, we assisted in the redesign of the water and storm plans to help better granulate the site (per owner request). This resulted in cost reduction by reducing the amount of piping needed for the site. Also, after reviewing the Geotech report, we suggested reconditioning the soil vs. removal and backfilling with select fill, reducing the overall cost of the site work.

At the end of December 2021, Cadence McShane fully executed an iGMP with High Street at 85% issue for permit drawings, with delivery of the final GMP in May 2022.



## Trinity Grove Beaumont
### Beaumont, Texas

**Description**

Trinity Groves Apartments is a new 230,000-square-foot apartment community, located in Beaumont on Highway 105.

The new affordable housing development is comprised of 192 units across eight garden-style buildings. The leasing building features a fitness center, a computer learning center, and a community room. The 9.6-acre grounds offer children's playscapes, multiple courtyards with grill stations, and gazebo areas perfect for outdoor gatherings.

There are three different unit configurations to accommodate the needs of future tenants that vary from one to three bedrooms. Each unit is equipped with Energy Star appliances and features nine-foot ceilings.



**Client:**
Brinshore Development

**Architect:**
JHP Architecture

**Size:**
229,847 SF | 192 units

**Contract Value:**
$28,996,621

**Completion Year:**
2023





## Century Heights Senior Living Apartments
### Beaumont, Texas

**Description**

Century Heights Senior Living Apartments is a 201,400 SF active senior living apartment complex located in Beaumont, Texas.

The apartment complex features 182 one-bedroom units and 20 two-bedroom units for a total of 202 units. Amenities include a fitness center, courtyard in the center of the complex with a covered gazebo, a dog park with accessible walking paths along the complex, a fully-furnished community room and learning center, and health screening center with social and supportive services.

This project was funded through the Community Block Development Grant - Disaster Recovery (CDBG-DR) financed through the Texas Government Land Office (GLO) and coordinated with Beaumont Housing Authority (BHA) to be able to provide affordable housing to seniors in the area.



**Client:**
Brinshore Development

**Architect:**
Steinberg Dickey Collaborative

**Size:**
201,400 SF | 202 units

**Contract Value:**
$29,024,361

**Completion Year:**
2023



Exhibit 19 Page 33 of 45



## Anthology of Tanglewood
### Houston, Texas

**Description**

Anthology of Tanglewood is a two-phase Renovations and Additions project to an existing Senior Living facility located in Houston, Texas.

The existing building was a seven-story, senior-living building consisting of two subsurface parking levels, a mix of common amenity and support spaces at the main level (Level 2), and 192 residential units spread across Levels 2-6.

Phase 1 involved interior renovations to select common spaces within an existing building totaling 5,800-square-feet. Renovations included a new commercial kitchen, a formal dining room, various multipurpose spaces, and a concierge center.

Phase 2 involved the addition of an Assisted Living/Memory Care Wing in a separate building totaling 55,000 square feet and 58 additional residential units connected to the existing building by a second-floor skybridge.



**Client:**
CA Anthology

**Architect:**
OZ Architecture

**Size:**
61,050 SF | 60 units

**Contract Value:**
$14,349,855

**Completion Year:**
2022

**CADENCE McSHANE** CONSTRUCTION

TAB C



## Lakeline Station Multifamily
### Austin, Texas

**Description**

Lakeline Station is a new 408,000-square-foot multifamily community located adjacent to the Lakeline Station light rail and bus hub in North Austin, Texas. The project will consist of 310,00-square-feet of residential space, divided into two (2) four-story, wrap multifamily buildings: the North Building and the South Building.

Built on a 3-acre site, the North building has a total of 165 units with one- and two-bedroom configurations, and over 2,000-square-feet of retail space on the first floor.  The South Building is built on a 4-acre site and has a total of 213 units with one-, two-, and three-bedroom configurations. The South Building has over 5,000-square-feet of retail space on the first floor.

Both buildings will have a state-of-the-art fitness center and a pool, as well as a 4-level precast parking garage. The two parking garages will provide 578 spaces combined.



**Client:**
Sabot Development

**Architect:**
STG Design

**Size:**
408,000 SF | 378 units

**Contract Value:**
$76,551,699

**Completion Year:**
2024

**CADENCE McSHANE** CONSTRUCTION

Exhibit 19 Page 35 of 45



## Goodwin Apartments
### Austin, Texas

Description

The Goodwin Apartment project is a five-story wrap, wood-framed, east Austin multi-family infill redevelopment located at 3706 Goodwin Avenue, near Airport Boulevard. The site, consisting of approximately 3.74 acres, is an urban infill project currently zoned for general commercial services, mixed-use, and vertical mixed-use building.

The mixed-use development will incorporate 364 residential units (10% of those will be affordable housing) and 5,000 square feet of commercial space. The project includes a wrap precast garage as well. The project will be completed with multiple occupancy and turnover milestones.



**Client:**
Sabot Development

**Architect:**
Davies Collaborative

**Size:**
352,000 SF | 364 units

**Contract Value:**
$58,594,051

**Completion Year:**
2023

**CADENCE McSHANE** CONSTRUCTION



## EastVillage Apartments
### Austin, TX

**Description**

EastVillage is a dynamic, mixed-use development that will include commercial, residential and retail spaces in the northeast side of Austin, Texas, just outside the Samsung Campus. Phase 1 is part of an overall development plan that comprises of two, five-story mixed-use structures totaling 422 residential units with retail and restaurant spaces on the ground level, as well as six, two-story mixed use structures for retail, restaurant, and office spaces.

The project scope also includes sitework for a large green space, "Town Center Village Green", which will provide a space for community events and weekend entertainment.



**Client:**
Reger Holding LLC

**Architect:**
Hatch + Ulland Owen Architects

**Size:**
1,817,403 SF | 422 units

**Contract Value:**
$106,098,305

**Completion Year:**
2024





## Edison Apartments
### Austin, Texas

**Description**

Edison Apartments is a wood-framed, wrap, 354-unit multifamily design-build development located in Austin, Texas. The community consists of two apartment buildings which include 183 one-bedroom and 171 two-bedroom units. In addition, there are 2 four-story, wrap pre-cast parking garages totaling 153,376 square feet with capacity for 468 spaces. Cadence McShane constructed the wrap property on a 9.5-acre site using stucco, Hardie board siding, brick, stone, and metal siding for the exterior structure.

Construction was completed in three phases to accommodate the extensive site work and confined parameters. Phasing was also an essential method of programming the timely turnover of a multifamily project to an owner. The architect Page, through feedback from Cadence McShane designed the building to be turned over to the owner for occupancy in phases by designing the building into four quadrants, (A,B,C,D) separated by the double egress fire rated doors. This designed division of the building enabled Cadence to allow safe accessibility to the owner and ultimately release the building over to the owner for tenant occupancy.

> " Presidium recently completed a project along the Riverside corridor named "The Edison". From the first time we sat down with the team at Cadence McShane all the way through TCO and C/O, **The team handled themselves with the utmost professionalism, the highest possible level of integrity, ethics, and fair and honest dealing.** "
>
> NATHAN VARGO
> SENIOR VICE PRESIDENT OF DEVELOPMENT - PRESIDIUM GROUP

**Client:**
Presidium

**Architect:**
Page Southerland Page Inc.

**Size:**
499,000 SF | 354 units

**Contract Value:**
$49,049,560

**Completion Year:**
2019



TAB C



## 120 Ninth Street
### San Antonio, Texas

**Description**

120 Ninth Street is a 236,611-square-foot, five-story, wood-framed podium multifamily community located on the Riverwalk in San Antonio, Texas. The 220 luxury units consist of six studio apartments, 176 one-bedroom and 38 two-bedroom units. Additionally, the project includes a fitness center, a luxurious zero-edge pool, leasing office, and a central courtyard with a bocce ball court, fire pit, and grilling stations. The project includes a five-and-a-half level, 110,410-square-foot, pre-cast parking garage accommodates 300 cars.

Our preconstruction team participated in discussions with the architect soon after award to better understand the intent of design. We were able to buy out the project scope within the parameters of the intent of the architect. We compared the bids received to scope to confirm there were no gaps and, through cost savings ideas presented by our team, we reduced the estimate by $5 million to reach the final budget.

The project is located on a compact zero lot line site with no more than 10 feet on any side of the project. Cadence McShane worked with the San Antonio River Authority to design a plan to safely reroute pedestrian paths along the Riverwalk and maintain a temporary pedestrian path in compliance with ADA code requirements.



**Client:**
SC Bodner Company, Inc.

**Architect:**
Studio M

**Size:**
347,000 SF | 220 units

**Contract Value:**
$28,991,898

**Completion Year:**
2019

**CADENCE McSHANE** CONSTRUCTION

Exhibit 19 Page 39 of 45



# CADENCE McSHANE
C O N S T R U C T I O N



## 120 Ninth Street
PROJECT TITLE

## San Antonio, TX
LOCATION

## 220 Units
SIZE

## 12%
COST SAVINGS

*Our team was able to identify unnecessary costs and bring this project within budget by recommending cost-effective alternative solutions.*

## CASE STUDY

In early 2016, Cadence McShane was contacted by SC Bodner Company about their project on the San Antonio River Walk. The five-story, 220-unit, wood-framed project was set to be built on a compact, zero lot line site with setbacks less than ten feet at the property lines.

The project was already fully-designed and several million dollars over the construction budget based on pricing they had received. At the direction of others, the building was designed with four floors of wood framing atop a single-story podium. Cadence McShane was asked to evaluate the construction documents and offer **Cost Savings Ideas** to bring the project into budget and then to provide pricing based on those recommendations.

The first major VE solution that we brought to the table was to redesign the project to a more conventional five-story wood frame structure and eliminate the podium. There was no programmed area that required a podium for code compliance as the parking structure was independent of the building structure.

The next major VE item was to revise the product specification for lap siding and cementitious paneling to a James Hardie product, made in Texas and used extensively in multifamily projects, in lieu of a single-family residential product manufactured in the Pacific Northwest.

These items alone reduced the project cost by 60% of the overall targeted reduction. Over the next few months, we were able to incorporate numerous other suggestions, reducing overall project costs by nearly 12%, thereby meeting the required project budget.



Winner of the 2020 San Antonio Business Journal Best Mixed-Use Project Award

## The '68 Apartments at Hemisfair
### San Antonio, Texas

**Description**

The '68 Apartments at Hemisfair is a cold-form, metal-framed, podium-style multifamily and mixed use development located in San Antonio, Texas. The residential community includes 151 units, leasing office, fitness center, rooftop basketball court. The ground floor includes 8,364 square feet of retail and restaurants. A 156,298-square-foot, seven level, pre-cast garage has capacity for 394 parking spaces, which connects to the building on two sides, and was erected after the building was complete.

The project is on a zero lot line in the middle of an active city park with only one site entrance. Through thorough planning and logistics coordination, we did not impact operations of the park during construction.



**Client:**
AREA Real Estate

**Architect:**
Lake Flato Architects

**Size:**
283,217 SF | 151 units

**Contract Value:**
$23,942,995

**Completion Year:**
2019



Exhibit 19 Page 41 of 45



TAB C



# CADENCE McSHANE
CONSTRUCTION

'68 Apartments

**PROJECT TITLE**

San Antonio, TX

**LOCATION**

151 Units

**SIZE**

## CASE STUDY

In 2014, AREA Real Estate selected the design team of Lake Flato Architects and W Architects, along with the construction team of Cadence McShane Construction.  From the onset, the team diligently provided cost savings suggestions through the progression of design and budgeting (SDs, DDs, CDs, and GMP).  To provide cost reduction ideas, Cadence McShane brought in our Structural and MEP systems subcontractors to the meetings, as these trades represented 70% of the overall construction costs.

From the very beginning, Cadence McShane and the design team were challenged with keeping this 8-story, cold-form metal framed project under 75 feet total height so that the project would not be considered a high-rise structure.  To address this, the team decided to design the project using a long span structural metal deck system between the demising wall.  This allowed a lower profile flooring system between the floors of the building, while still allowing the ceiling heights in the units to be nine feet clear high.

Since the project was located in the historic Hemisfair park, there were many City of San Antonio development and construction restrictions.  The site was less than an acre and posed unique complications in terms of a very tight laydown area, adjacencies to existing historic buildings and unfavorable soil conditions, to name a few.

After commencement of construction, this project had its fair share of unforeseen site conditions that impacted the project schedule, such as some underground historic discoveries, as well as foundations of the old Monorail from the 1968 World's Fair, which was discovered during the excavation process.

Cadence McShane came up with several non-traditional construction methods to accelerate the construction schedule.  First, we needed to construct the main building first and then build the parking structure.  Second we utilized a pre-cast parking structure design in place of a cast-in-place structure. In the end, the Cadence McShane team was able to overcome a multitude of site challenges - that had the potential to impact schedule and budget – and deliver the project on time and on budget.

**www.cadencemcshane.com**

Exhibit 19 Page 42 of 45



## Villas at The Rim
### San Antonio, Texas

#### Description

Villas at the Rim is a podium style, wood-frame, 900,000-square-foot multifamily complex located in San Antonio, Texas. The project includes a 22,000-square-foot clubhouse and leasing center with high end, resort-style amenities including a full spa, basketball, tennis, volleyball, racquetball, bocce ball, and pickle-ball courts.

Cadence McShane constructed the 427-unit luxury property on a 15-acre site that includes two full building wrap parking garages with capacity for 911 vehicles.

Cadence McShane participated in BIM modeling and provided value analysis for the project including structural, architectural, MEP, civil, interior design, and landscaping.



**Client:**
Management Support

**Architect:**
Clifford Wong Architects Inc

**Size:**
900,000 SF | 427 units

**Contract Value:**
$67,069,856

**Completion Year:**
2018

Exhibit 19 Page 43 of 45



*Winner of the 2022 TEXO Distinguished Building Awards*

## Broadway Chapter
### Fort Worth, Texas

**Description**

Broadway Chapter is a 218,807-square-foot multifamily community in the hospital district of Downtown Fort Worth, Texas. The 242-unit building consists of 202 one-bedroom and 40 two-bedroom units, a fitness center, pool, and leasing office. The five-story, wood-framed, partial wrap structure includes a 98,175-square-foot pre-cast parking garage with 295 parking spaces. The footprint of the structure takes up the complete two-acre project site, which is surrounded by city streets.

With record amounts of rainfall, and material shortages and delays caused by COVID-19, the schedule faced a six-month delay in the delivery of the parking garage. The Cadence McShane team re-sequenced the work to start with the north section of the building, and then erected the parking garage once materials became available, eventually piecing the two together. Despite these challenges, construction was impressively completed ahead of the original schedule.



**Client:**
CRG Real Estate Solutions

**Architect:**
Lamar Johnson Collaborative

**Size:**
320,429 SF | 242 units

**Contract Value:**
$30,293,212

**Completion Year:**
2021



## CADENCE McSHANE
### CONSTRUCTION

5057 Keller Springs Road
Suite 500
Addison, TX 75001
972.239.2336

10370 Richmond Avenue
Suite 1200
Houston, TX 77042
713.681.8500

1221 S. Mopac Expressway
Suite 250
Austin, TX 78746
512.328.1411

2915 W. Bitters Road
Suite 316
San Antonio, TX 78248
210.233.1146



**Colby Rose**
*Vice President & Business Unit Leader*
crose@cadencemcshane.com
713.329.5011



**Rebecca Mansfield**
*Director of Client Relations*
rmansfield@cadencemcshane.com
512.296.6360

**www.cadencemcshane.com**

Exhibit 19 Page 45 of 45

# EXHIBIT 20

| | |
|---|---|
| **From:** | Avant, Lolly <LAvant@fnf.com> |
| **Sent:** | Wednesday, October 19, 2022 1:43 PM |
| **To:** | Travis Huehlefeld; Montgomery, Deborah |
| **Cc:** | Shahin Jamea; Avant, Alli; Ebbs, Mary; Sara Prasatik; Galperin, Robert |
| **Subject:** | RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - |

<div style="background:#1F5FA6;color:white;text-align:center">This message was sent securely using Zix®</div>

My underwriter and I are reviewing the recent correspondence received from Josh Bernstein.
I have a conference call with Josh and his team tomorrow morning at 10am.
Travis, may we schedule a call at 11am or 2pm tomorrow?
Lolly Avant, SVP
National Business Development|Senior Closer
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: lavant@fnf.com
Direct: 713-621-9170
Mobile: 281-217-9517

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Wednesday, October 19, 2022 1:32 PM
**To:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>; Sara Prasatik <sprasatik@wcglaw.com>
**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

<mark>IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.</mark>

Lolly – Just checking to see if you have received any feedback from your underwriter based off our call yesterday. Specifically, what affect will the neighbor's demand letter have on title's acceptance of the previously negotiated owner's affidavit and/or will any exceptions be added to title based off the demand letters or revised owner's affidavit which discloses the demand letters?
Additionally, please let me know if they are available for a call today/tomorrow morning to discuss.
Thank you,
Travis
**OUT OF OFFICE THURSDAY, OCTOBER 20 AND FRIDAY, OCTOBER 21**
**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Travis Huehlefeld
**Sent:** Tuesday, October 18, 2022 10:06 AM
**To:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>; Sara Prasatik <sprasatik@wcglaw.com>

Exhibit 20 Page 1 of 8

**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

Lolly - Thank you for the call. Please keep us posted after you speak with your underwriter.

Best,

Travis

**OUT OF OFFICE THURSDAY, OCTOBER 20 AND FRIDAY, OCTOBER 21**

**TRAVIS L. HUEHLEFELD** | Attorney

Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002

713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)

thuehlefeld@wcglaw.com | www.wcglaw.com | vcard

**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Avant, Lolly <LAvant@fnf.com>
**Sent:** Tuesday, October 18, 2022 9:55 AM
**To:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>
**Subject:** RE: FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

| This message was sent securely using Zix® |
|---|

Travis,

I left you a voice message this morning.

Based on the Notice to Seller circulated on 10/11/22, is the purchaser set to close on 10/28/22?

Thank you Travis.

Lolly Avant, SVP

National Business Development|Senior Closer

Fidelity National Title

National Commercial Services

1900 West Loop South, Suite 200

Houston, Texas 77027

Email: lavant@fnf.com

Direct: 713-621-9170

Mobile: 281-217-9517

**From:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Sent:** Friday, September 30, 2022 2:24 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>; Avant, Lolly <LAvant@fnf.com>; Avant, Alli <Alli.Avant@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>
**Subject:** FAH22004012 | Updated Hyperlinked Title Commitment | Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC -

Attached find the updated Hyperlinked Title Commitment for your review. No new matters were found in the update. Same has been distributed to the Seller team. We will begin preparation of the closing documents, including the Buyer's Closing Statement, for your review. Please forward any invoices that will need to be added to the closing statement. Attached is the negotiated Owner's Affidavit for your records. Please send us the Buyer's entity documents as outlined in Schedule C, Item No. 10 of the Commitment. Confirm that this is a cash transaction or if not, please provide the lender information and contact. Please let us know if there are questions. Thank you.

Deborah Montgomery

National Commercial Closer, AVP

Fidelity National Title Insurance Company

1900 West Loop South, Suite 200

Houston, TX 77027

800-879-1677;Direct Line (713) 621-9280

Fax # 713-623-4406; Mobile (832) 768-7137

Deborah.montgomery@fnf.com

Exhibit 20 Page 2 of 8

Chicago Title | Commonwealth | Fidelity National Title
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Thursday, September 29, 2022 3:12 PM
**To:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>; Avant, Lolly <LAvant@fnf.com>
**Cc:** Shahin Jamea <sjamea@oxberrygroup.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

IMPORTANT NOTICE – This message sourced from an external mail server outside of the Company.

Deborah/Lolly – As a reminder this transaction is scheduled to close on 10/28/2022. Would you mind sending me an updated title commitment and any draft title company closing documents to review, including your standard form of owner's affidavit?

Thank you!

Travis

**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard

**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Sent:** Wednesday, June 29, 2022 1:17 PM
**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

This message was sent securely using Zix®

We are in receipt of the second deposit in the amount of $500,000.00. Thank you.

Deborah Montgomery
National Commercial Closer, AVP
Fidelity National Title Insurance Company
1900 West Loop South, Suite 200
Houston, TX 77027
800-879-1677;Direct Line (713) 621-9280
Fax # 713-623-4406; Mobile (832) 768-7137
Deborah.montgomery@fnf.com

Chicago Title | Commonwealth | Fidelity National Title
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Montgomery, Deborah
**Sent:** Wednesday, June 29, 2022 11:41 AM
**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Exhibit 20 Page 3 of 8

We are in receipt of the fully executed Second Amendment and will advise once the Second Deposit has been received. Thank you.

Deborah Montgomery
National Commercial Closer, AVP
Fidelity National Title Insurance Company
1900 West Loop South, Suite 200
Houston, TX 77027
800-879-1677;Direct Line (713) 621-9280
Fax # 713-623-4406; Mobile (832) 768-7137
Deborah.montgomery@fnf.com
**Chicago Title | Commonwealth | Fidelity National Title**
Did you know our Houston office is a National Commercial Center? We can help you coordinate your out of state commercial or multi-site transactions.

**From:** Rebecca Brown <Rbrown@knightheadfunding.com>
**Sent:** Wednesday, June 29, 2022 11:26 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Please see attached fully-executed Second Amendment.
Please let us know when the wire has been initiated and provide a Fed Reference number when available.
Title, please confirm receipt of the wire as soon as possible.



Rebecca B. Brown
Deputy General Counsel
Knighthead Funding, LLC
777 West Putnam Avenue
3rd Floor, Suite B-2
Greenwich, CT 06830

Tel: (203) 327-3327
Direct: (203) 489-1423
rbrown@knightheadfunding.com
www.knightheadfunding.com

The information contained in this e-mail, and any attachment, is confidential and is intended solely for the use of the intended recipient. Any review, use, disclosure, distribution or copying of this e-mail and/or the attachments hereto is prohibited except by or on behalf of -the intended recipient. If you have received this e-mail in error, please notify the sender immediately by reply email and destroy all copies of the e-mail and the attachments. Content is provided by the individual sender and does not necessarily reflect the views of Knighthead Realty Capital Management, L.L.C. or its affiliates, and does not constitute investment advice. This e-mail does not constitute an offer to sell or the solicitation of an offer to buy any interest in any investment product or fund. Such offer or solicitation may only be made by means of delivery of a confidential private offering memorandum or other appropriate document which contains a description of the material terms (including, without limitation, risk factors, conflicts of interest, fees and charges) relating to such investment product or fund. No assurances are given that this e-mail message and its attachments (if any) are free of viruses, and Knighthead Realty Capital Management, L.L.C. accepts no liability for any damage sustained as a result of any viruses. If you reply to this email, please note that we are a public investor and do not want any material non-public information. We do not agree to keep confidential any information you provide and do not agree to any restrictions on our trading activity, except pursuant to a written confidentiality agreement executed by Knighthead Realty Capital Management, L.L.C.

Exhibit 20 Page 4 of 8

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, June 29, 2022 11:31 AM
**To:** Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
See attached.

**OXBERRY**GROUP
**Shahin "Sean" Jamea, J.D.**
Principal

---

**From:** Joshua Bernstein <jbernstein@legalstrategy.com>
**Sent:** Wednesday, June 29, 2022 10:28 AM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
Please see attached seller's revised draft of the 2nd amendment to PSA (clean and PDF redline).
-Josh

---

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Wednesday, June 29, 2022 7:57 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All,
Revised amendment with October 28th closing date. Please countersign and return.

**OXBERRY**GROUP
**Shahin "Sean" Jamea, J.D.**
Principal

---

**From:** Shahin Jamea
**Sent:** Wednesday, June 29, 2022 12:55 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
Buyer executed amendment attached.

**OXBERRY**GROUP
**Shahin "Sean" Jamea, J.D.**
Principal

Exhibit 20 Page 5 of 8

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Tuesday, June 28, 2022 5:49 PM
**To:** Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

All – Please find attached the draft Second Amendment extending closing to 12/16/2022. This draft is being sent simultaneously to my client and remains subject to their review and comment.

Please let me know if you have any comments.

Thank you,
Travis

**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
**Confidentiality Notice** | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Shahin Jamea <sjamea@oxberrygroup.com>
**Sent:** Tuesday, June 28, 2022 2:36 PM
**To:** Joshua Bernstein <jbernstein@legalstrategy.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

Travis,
Buyer has asked the Seller for an extension of the closing date to December 16th before moving forward with the deposit of the additional $500K earnest money due tomorrow. Seller is considering the request but hasn't responded yet. In the interest of time, please draft and circulate an amendment extending the closing date for seller and their counsel to review.

**OXBERRY**GROUP
**Shahin "Sean" Jamea, J.D.**
Principal

**From:** Joshua Bernstein <jbernstein@legalstrategy.com>
**Sent:** Friday, April 29, 2022 2:29 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Alli <Alli.Avant@fnf.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Laura Torrado <ltorrado@knighthead.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

All:
Attached is seller's response to buyer's title and survey objection letter.
-Josh

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Friday, April 22, 2022 4:52 PM
**To:** Avant, Alli <Alli.Avant@fnf.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel

Exhibit 20 Page 6 of 8

<jdaniel@knightheadfunding.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>; ltorrado@knighthead.com
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

All – Please find attached buyer's title and survey objection letter with respect to the above referenced matter. After you have a chance to review, please let me know if you have any comments or would like to discuss.
Thank you,
Travis
**OUT OF OFFICE MONDAY, APRIL 25**
**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

**From:** Avant, Alli <Alli.Avant@fnf.com>
**Sent:** Monday, April 4, 2022 9:23 AM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>; Adams, Davis <Davis.Adams@am.jll.com>; Rebecca Brown <Rbrown@knightheadfunding.com>
**Cc:** Avant, Lolly <LAvant@fnf.com>; Montgomery, Deborah <Deborah.Montgomery@fnf.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

> This message was sent securely using Zix®

Good morning,
Our office is in receipt of the $150,000.00 initial deposit.
Pursuant to Section 3(a) of the PSA, the title company is to immediately release the deposit to Seller. Please forward the Seller's wiring instructions and a method to confirm the instructions.
Please contact me with any questions.
Thank you,
Allison Avant
Commercial Escrow Assistant
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: alli.avant@fnf.com
Office Ph.: 713-968-7165

**From:** Avant, Alli
**Sent:** Friday, April 1, 2022 4:40 PM
**To:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Avant, Lolly <LAvant@fnf.com>
**Cc:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Adams, Davis <Davis.Adams@am.jll.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>
**Subject:** RE: Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA
Good afternoon,
Attached, please find the receipted contract. The order number assigned to this transaction is FAH22004012.
We will send our wiring instructions to the buyer under separate cover.
Thank you,
Allison Avant
Commercial Escrow Assistant
Fidelity National Title

Exhibit 20 Page 7 of 8

National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: alli.avant@fnf.com
Office Ph.: 713-968-7165

**From:** Travis Huehlefeld <tHuehlefeld@wcglaw.com>
**Sent:** Friday, April 1, 2022 4:25 PM
**To:** Avant, Lolly <LAvant@fnf.com>; Avant, Alli <Alli.Avant@fnf.com>
**Cc:** Rebecca Brown <Rbrown@knightheadfunding.com>; Shahin Jamea <sjamea@oxberrygroup.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; Adams, Davis <Davis.Adams@am.jll.com>; Henry Boeckmann <hboeckmann@knightheadfunding.com>; Jonathan Daniel <jdaniel@knightheadfunding.com>
**Subject:** Grant Meadows, L.L.C./KH-REIT II Funding XXII, LLC - Executed PSA

IMPORTANT NOTICE - This message sourced from an external mail server outside of the Company.

Lolly – I believe that you may have received the attached PSA, but sending just in case. Can you please sign and return a copy to this group and circulate wiring instructions of the Initial Deposit?

We look forward to working with you.

Thank you and have a good weekend,

Travis

**TRAVIS L. HUEHLEFELD** | Attorney
Wilson Cribbs **+** Goren | 2500 Fannin St | Houston, TX 77002
713.222.9000 (O) | 713.547.8516 (D) | 713.229.8824 (F)
thuehlefeld@wcglaw.com | www.wcglaw.com | vcard
Confidentiality Notice | Wilson, Cribbs & Goren, P.C. | The information in this email may be confidential and/or privileged. This email is intended to be reviewed by only the individual or organization named above. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, dissemination or copying of this email and its attachments, if any, or the information contained herein is prohibited. If you have received this email in error, please immediately notify the sender by return email and delete this email from your system.

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

-----------------------------------------------------------------------
This message was secured by **Zix**®.

-----------------------------------------------------------------------
This message was secured by **Zix**®.

-----------------------------------------------------------------------
This message was secured by **Zix**®.

----------------------------------------------------------------------
This message was secured by **Zix**®.

Exhibit 20 Page 8 of 8

# EXHIBIT 21

{W0802327.1}

## Guillermo Alarcon

| | |
|---|---|
| **From:** | Avant, Lolly <LAvant@fnf.com> |
| **Sent:** | Friday, October 21, 2022 3:36 PM |
| **To:** | Rebecca Brown; Brian H. Buster; Joshua Bernstein; Shahin Jamea; Travis Huehlefeld; Sara Prasatik |
| **Cc:** | Galperin, Robert; Ebbs, Mary |
| **Subject:** | RE: Property Inspection |

> This message was sent securely using Zix®

Good Afternoon,

Due to recent developments, I will be circulating a revised commitment/proforma revising Schedule B, Exception (f) on Monday.

Thank you,

Lolly Avant, SVP
National Business Development|Senior Closer
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: lavant@fnf.com
Direct: 713-621-9170
Mobile: 281-217-9517

**From:** Avant, Lolly
**Sent:** Thursday, October 20, 2022 2:26 PM
**To:** Rebecca Brown <Rbrown@knightheadfunding.com>; Brian H. Buster <bbuster@legalstrategy.com>; Joshua Bernstein <jbernstein@legalstrategy.com>; 'Shahin Jamea' <sjamea@oxberrygroup.com>; Travis Huehlefeld <tHuehlefeld@wcglaw.com>; Sara Prasatik <sprasatik@wcglaw.com>
**Cc:** Galperin, Robert <Robert.Galperin@fnf.com>; Ebbs, Mary <Mary.Ebbs@fnf.com>
**Subject:** Property Inspection

Good afternoon,

This morning my office performed an inspection of the property.

The service lines and two poles that are the subject of ongoing conversations are gone and the splinters of the bottom of the poles remain in the holes. There is not power to the Main 2601 owner's building.

My title specialist walked around to McGowen Street and front of the building and sidewalk are boarded up and the power to the adjacent businesses adjacent to the building comes from the power poles in the McGowen Street ROW.

At some point in time between April 2022 (last survey date) and today the power line and poles were removed. Seller are you aware that the poles and line were removed?

I would think CenterPoint would have removed the utility lines. I think an electrician would not remove the service line without CenterPoint's involvement unless the service line had already been disconnected at the pole on Dennis Street.

The survey would need to updated to reflect there are no power lines or poles located on the property.

Lolly Avant, SVP
National Business Development|Senior Closer
Fidelity National Title
National Commercial Services
1900 West Loop South, Suite 200
Houston, Texas 77027
Email: lavant@fnf.com
Direct: 713-621-9170

Exhibit 21 Page 1 of 2

Mobile: 281-217-9517

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

--------------------------------------------------------------------
This message was secured by **Zix**®.

Exhibit 21 Page 2 of 2

# EXHIBIT 22

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Fidelity National Title Insurance Company**

Commitment Number:

**FAH22004012**

---

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

---

We (Fidelity National Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Issued By:**

**Fidelity National Title**

**National Commercial Services**

**1900 West Loop South, Suite 200**

**Houston, TX  77027**

**(713) 621-9170; (800) 879-1677**

**RMB-teamavant@fnf.com;lavant@fnf.com**

_____
Authorized Signatory

**Fidelity National Title Insurance Company**
By:

_____
Michael J. Nolan, President

Attest:

_____
Marjorie Nemzura, Secretary

**SEAL**

## CONDITIONS AND STIPULATIONS

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.

2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

THE LANGUAGE SET FORTH BELOW *MUST* BE INCORPORATED INTO A COVER LETTER ATTACHED TO ALL TITLE INSURANCE COMMITMENTS.

### Required Language for a Title Insurance Commitment Cover Letter

The attached title insurance commitment contains information which has been obtained or derived from records and information owned by Title Data, Inc. or one (1) of its subsidiaries (collectively "Title Data").  Title Data owns and maintains land title plants for various Texas counties.  Our company's right to access and use Title Data's title plants is governed by the Subscription Agreement(s) we have with Title Data, which restricts who can receive and/or use a title insurance commitment, which is based in whole or in part, upon Title Data's records and information.  The information contained in the title plants is protected by federal copyright law and Texas common law on trade secrets and contract.

**This Title Insurance Commitment should not be re-distributed without first confirming with the issuing agent what is permissible under the terms of their Subscription Agreement with Title Data.**



Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification.  **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions.  Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you.  DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify.  **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.**  DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols.  Make your passwords greater than eight (8) characters.  Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts.  Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

Exhibit 22 Page 3 of 20

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

To obtain information or make a complaint:

Para obtener información o para presentar una queja:

You may call Fidelity National Title Insurance Company's toll-free telephone number for information or to make a complaint at:

Usted puede llamar al número de teléfono gratuito de Fidelity National Title Insurance Company's para obtener información o para presentar una queja al:

**1-877-862-9111**

**1-877-862-9111**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights, or complaints at:

Usted puede comunicarse con el Departamento de Seguros de Texas para obtener información sobre compañías, coberturas, derechos, o quejas al:

**1-800-252-3439**

**1-800-252-3439**

You may write the Texas Department of Insurance:

Usted puede escribir al Departamento de Seguros de Texas a:

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

P.O. Box 149104
Austin, TX  78714-9104
Fax:  (512) 490-1007
Sitio web:  www.tdi.texas.gov
E-mail:  ConsumerProtection@tdi.texas.gov

**PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

**DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**
Si tiene una disputa relacionada con su prima de seguro o con una reclamación, usted debe comunicarse con la compañía primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas.

**ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

**ADJUNTE ESTE AVISO A SU PÓLIZA:**
Este aviso es solamente para propósitos informativos y no se convierte en parte o en condición del documento adjunto.

Texas Form B-0023-07 Important Notice (06/01/15)

Exhibit 22 Page 4 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**    **COMMITMENT NO.:  FAH22004012**

# SCHEDULE A

Effective Date:  October 16, 2022 at 8:00 AM    GF No.:  FTH-18-FAH22004012
Commitment No.:  FAH22004012    Issued:  October 24, 2022 at 8:00 AM

1.  The policy or policies to be issued are:

    a.  OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
       (Not applicable for improved one-to-four family residential real estate)

       Policy Amount:    $14,375,000.00
       PROPOSED INSURED:  Grant Meadows, L.L.C., a Texas limited liability company

    b.  TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
       ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

       Policy Amount:
       PROPOSED INSURED:

    c.  LOAN POLICY OF TITLE INSURANCE (Form T-2)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    d.  TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    e.  LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

       Policy Amount:
       PROPOSED INSURED:
       Proposed Borrower:

    f.  OTHER

       Policy Amount:
       PROPOSED INSURED:

2.  The interest in the land covered by this Commitment is:

    Fee Simple

3.  Record title to the land on the Effective Date appears to be vested in:

    KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

Exhibit 22 Page 5 of 20

**FIDELITY NATIONAL TITLE INSURANCE**　　　　　　　　　　　　　**Commitment No.: FAH22004012**
**COMPANY**

## SCHEDULE A
(continued)

4.  Legal description of land:

    TRACT 1

    All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2701 MAIN STREET, a subdivision of 1.1478 acres, according to the map or plat thereof recorded under Film Code Number 693477 of the Map Records of Harris County, Texas.

    TRACT 2

    All of UNRESTRICTED RESERVE "A", BLOCK 1, CAYDON 2627 MAIN STREET, a subdivision of 0.9410 acres, according to the map or plat thereof recorded under Film Code Number 693664 of the Map Records of Harris County, Texas.

**END OF SCHEDULE A**

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.:  FAH22004012                                   GF No.:  FTH-18-FAH22004012

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1.      The following restrictive covenants of record itemized below (We must either insert specific recording data or delete this exception):

Film Code No. 693477, of the Map Records of Harris County, Texas. (Tract 1)
Film Code No. 693664, of the Map Records of Harris County, Texas. (Tract 2)


Omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

2.      Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3.      Homestead or community property or survivorship rights, if any of any spouse of any insured.

(Applies to the Owner Policy only.)

4.      Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

a.      to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

b.      to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

c.      to filled-in lands, or artificial islands, or

d.      to statutory water rights, including riparian rights, or

e.      to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

(Applies to the Owner Policy only.)

5.      Standby fees, taxes and assessments by any taxing authority for the year 2022 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years. (If Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) is issued, that policy will substitute "which become due and payable subsequent to Date of Policy" in lieu of "for the year 2022 and subsequent years.")

6.      The terms and conditions of the documents creating your interest in the land.

7.      Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the

Form T-7:  Commitment for Title Insurance (01/03/14)                              TX-FT-FHST--SPS-1-22-FAH22004012

Exhibit 22 Page 7 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Mortgagee Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8.     Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage.

        (Applies to Mortgagee Policy (T-2) only.)

9.     The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Mortgagee Policy of Title Insurance (T-2R).

10.    The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

        a.    Rights of parties in possession.

        b.    The following exception will appear in any policy issued (other than the T-1R Residential Owner Policy of Title Insurance and the T-2R Short-Form Residential Mortgagee Policy) if the Company is not provided a survey of the Land, acceptable to the Company, for review at or prior to closing:

              Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title that would be disclosed by an accurate and complete land survey of the Land.

              Note:   Upon receipt of a survey acceptable to the Title Company, this exception will be deleted. The Company reserves the right to except additional items and/or make additional requirements after reviewing said survey.

        c.    Easement(s) for the purpose(s), visibility triangle, and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at all four corners, recorded as Document No. Film Code Number 693477 Map Records Harris County, Texas. (Tract 1)

              Purpose, pedestrian realm, affects 1.0 feet wide along Main Street and 2.2 feet wide along Dennis Street.

              Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

        d.    Building set-back line, as disclosed by said plat recorded in Film Code No. 693477, of the Map Records of Harris County, Texas. (As to Tract 1)

              Affects:   2.0 feet wide along Fannin Street
              Affects: Variable width from 7.9 feet wide to 4.5 feet wide along Drew Street

        e.    Agreement ENCROACHMENT, MAINTENANCE AND ACCESS EASEMENT AGREEMENT, executed by CAYDON HOUSTON PROPERTY 2 LP, a Delaware limited partnership, Grantor and MAIN 2601 PARTNERS, LLC, a Texas limited liability company, Grantee, recorded on August 3, 2017, as Document No. Harris County Clerk's File No. RP-2017-350471, Affects as shown on Exhibit "C-2" for maintenance and on Exhibit "D-2" for access, attached thereto.  (Tract 2)

        f.    Easement(s) for the purpose(s), visibility triangle , and rights incidental thereto as delineated or as offered for dedication, on the map of said tract/plat; affects 15 feet by 15 feet at the west and south corners, recorded as Film Code Number 693664 Map Records Harris County, Texas.  (Tract 2)

Exhibit 22 Page 8 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

Purpose, drainage, affects 15  feet wide along either side of the centerline of all natural drainage courses in the addition .

g.    A building set-back line, as disclosed by said map/plat in <u>Film Code No. 693664</u>, of the Map Records of County, Texas.  (Tract 2)

Affects:   10 feet in width along the Dennis Street property line
Affects:   25 feet in width along the Main Street and Fannin Street property lines

h.    All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not.  There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

i.    Rights of tenants in possession, as tenants only, under unrecorded lease agreements. ( both Tracts)

j.    If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

Owner and Loan Policy(ies):   Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of  County, Texas, prior to the date hereof.

Owner Policy(ies) Only:   Liability hereunder at the date hereof is limited to $ 0.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

Loan Policy(ies) Only:   Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

k.    NOTICE OF STORM WATER QUALITY REQUIREMENTS, executed by Caydon Houston Property 2 LP ("Owner"), recorded on September 21, 2020, under Harris County Clerk's <u>File No. RP-2020-442240</u>. (Tract 1)

l.    Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 25, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57646, as to Tract 1:

a) Sidewalk encumbrance by construction fence along Main, Fannin, Dennis and Drew streets;
b) Gate Posts located inside property line on Dennis Street;
c) Evidence of utilities servicing property all located within adjacent public right of ways, without benefit  of

Exhibit 22 Page 9 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

recorded easements.

m.     Any rights, interest or claims which may arise by reason of the following matters disclosed by the survey dated April 25, 2022, prepared by Lucas G. Davis, RPLS No. 6599 of Windrose land Surveying/Platting, identified as Job No. 57547, as to Tract 2:

a) Intentionally deleted;
b) Parking spaces encroach over boundary line along Main Street;
c) Parking spaces encroach over the access easement running from Main to Fannin streets;
d) Sidewalk encumbrance by construction fence along Main, Fannin and Dennis streets;
e) Bollards throughout the property and Gate Post & Gate Motor located inside property line on Fannin Street and outside property line on Main Street;
f) Overhead power line running through the center of the property with two power poles and lights, apparently serving improvements on adjacent property, and all consequences of the existence, removal, and/or relocation thereof.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE C

Commitment No.:  FAH22004012                                      GF No.:  FTH-18-FAH22004012

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1.      Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2.      Satisfactory evidence must be provided that:

   a.      no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b.      all standby fees, taxes, assessments and charges against the property have been paid,

   c.      all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d.      there is legal right of access to and from the land,

   e.      (on a Mortgagee Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3.      You must pay the seller or borrower the agreed amount for your property or interest.

4.      Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5.      Please be advised that our search did not disclose any open mortgages of record.  If you should have knowledge of any outstanding obligation, please contact the Title Department immediately for further review prior to closing.

6.      We should have lender verify that it has not been contacted by the claimants of Mecanic's Liens filed under Harris County Clerk's File No(s) RP-2021-137391 and RP-2021-413788, seeking to be paid by the lender on some quantum meruit theory.

7.      Title to subject property is vested in KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company by virtue of (Substitute) Trustee's Deed

   Dated:              April 6, 2021
   Recording No.:     Harris County Clerk's File No. RP-2021-191476

   The Company must be furnished with the following information reduced to recordable affidavit, pertaining to the Trustee's sale:

   Whether the defaulting mortgagor(s) was living and competent on the date of posting of notice(s) for the sale and on the date of the sale.

   Who is in possession of subject property at the present time.

   Satisfactory evidence that the seller/lender is in peaceable possession of the property.

8.      The Land lies within the boundaries of Midtown Management District and may be subject to taxes or special assessments by reason thereof.  Notice of inclusion of said Land in said district must be given and executed by

Exhibit 22 Page 11 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO.:  FAH22004012**

## SCHEDULE C
(continued)

purchaser and seller and filed of record.

9.     The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   KH-REIT II FUNDING XXII, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

10.    The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:   Grant Meadows, LLC

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or  member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

11.    The following note is for informational purposes only:

The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

Grantor:          Sandy Dasigenis, Substitute Trustee
Grantee:          KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company

Exhibit 22 Page 12 of 20

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**                    **COMMITMENT NO.: FAH22004012**

## SCHEDULE C
(continued)

Recording Date:     April 9, 2021
Recording No:       Harris County Clerk's File No. RP-2021-191476

12.     Note –Important Notice

You have the right to have your funds deposited in an interest-bearing account.

If you choose to establish an interest-bearing account for your deposit, notify your escrow officer immediately. Thereafter you will be provided with a Notice of Election form which you should complete in writing by completing and returning the form, along with your taxpayer identification information, not later than five (5) days before the scheduled closing.  If you choose to establish an interest-bearing account for your deposit, an additional charge of $50.00 will be required.  This charge may exceed the amount of interest to be earned on the deposit, depending on the amount, applicable interest rate, and the duration of the deposit.

As an example, the amount of interest you can earn on a deposit of $1000.00 for a thirty-day period at an interest rate of 4% is $3.33.  Interest earned is dependent on the amount of deposit, time of deposit and the applicable interest rate.

If you do not choose to establish an interest-bearing account for your deposit, your funds will be deposited with other escrow funds in your escrow agent's general escrow account with an authorized financial institution and may be transferred to another general escrow account or accounts.  By reason of the banking relationship between our Company and the financial institution, the Company may receive an array of bank services, accommodations or other benefits.  The escrow funds will not be affected by such services, accommodations or other benefits.

Failure to notify your escrow officer and complete the additional required investment authorization form shall constitute waiver of any intention of establishing an interest-bearing account for your deposit(s).

13.     As to any document creating your title or interest that will be executed or recorded electronically, or notarized pursuant to an online notarization, the following requirements apply:

• Confirmation prior to closing that the County Clerk of Harris County, Texas has approved and authorized electronic recording of electronically signed and notarized instruments in the form and format that is being used.

• Electronic recordation of the instruments to be insured in the Official Public Records of Harris County, Texas.

• Execution of the instruments to be insured pursuant to the requirements of the Texas Uniform Electronic Transactions Act, Chapter 322 of the Business and Commerce Code.

• Acknowledgement of the instruments to be insured by a notary properly commissioned as an online notary public by the Texas Secretary of State with the ability to perform electronic and online notarial acts under 1 TAC Chapter 87.

14.     Due to office closures related to COVID-19, we may be temporarily unable to record/access documents in the normal course of business. As such, we will require our AFFIDAVIT OF UNDERSTANDING AND INDEMNITY AND HOLD HARMLESS AGREEMENT DUE TO CORONAVIRUS PANDEMIC to be signed by all parties.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY**          **COMMITMENT NO:  FAH22004012**

## SCHEDULE D

Commitment No.:  FAH22004012                                     GF No.:  FTH-18-FAH22004012

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1.  The issuing Title Insurance Company, **Fidelity National Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

     <u>Shareholders</u>:  Fidelity National Title Group, Inc. which is owned 100% by FNTG Holdings, LLC which is owned 100% by Fidelity National Financial, Inc.

     <u>Directors</u>:  Raymond Randall Quirk, Anthony John Park, Marjorie Nemzura, Michael J. Nolan, Steven G. Day

     <u>Officers</u>:  Raymond Randall Quirk (President), Anthony John Park (Executive Vice President), Marjorie Nemzura (Secretary), Daniel Kennedy Murphy (Treasurer)

2.  The following disclosures are made by the Title Insurance Agent issuing this Commitment:

     **Fidelity National Title**

     (a)  A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

          <u>Owners</u>:  FNTS Holdings, LLC owns 100% of **Fidelity National Title**

     (b)  A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

          <u>Owners</u>:  FNTG Holdings, LLC owns 100% of FNTS Holdings, LLC

     (c)  If the Agent is a corporation:  (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

          <u>Directors</u>:  Raymond Randall Quirk, Anthony John Park

          <u>Officers</u>:  Laurie H. Ford (President), Paula D. Hester (President), Todd B. Rasco (President), Anthony John Park (Chief Financial Officer and Executive Vice President), Marjorie Nemzura (Secretary), Joseph William Grealish (Executive Vice President), John Ernst (Executive Vice President)

     (d)  The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive.  NONE.

     (e)  For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3.  You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates.  Upon your request, such disclosure will be made to you.  Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

     You are further advised that the estimated title premium* is:

| | | |
|---|---|---|
| **Owner's Policy** | $ | 56,364.00 |
| **Endorsement Charges** | $ | 14,091.00 |
| Total | $ | 70,455.00 |

     Of this total amount:  15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Percent/Amount | To Whom | For Services |
|---|---|---|
| | | |

     *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance.  Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

Exhibit 22 Page 14 of 20

## DELETION OF ARBITRATION PROVISION

(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution.  It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company.  However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process.  In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below).  It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less.  If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued.  You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

"Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules").  Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons.  Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy.  All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity).  All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured.  Arbitration pursuant to this policy and under the Rules shall be binding upon the parties.  Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

_____        _____
Signature                                       Date

## TEXAS TITLE INSURANCE INFORMATION

---

Title insurance insures you against loss resulting from certain risks to your title.

The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date.

---

El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.

El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción.

---

Your Commitment for Title insurance is a legal contract between you and us.  The Commitment is not an opinion or report of your title.  It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable.  This determination has already been made.  Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

 **--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy.  Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them.  You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

 **---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

 **---EXCLUSIONS** are title risks that a Policy generally does not cover.  Exclusions are contained in the Policy but not shown or discussed in the Commitment.

 **---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company.  They are contained in the Policy but not shown or discussed in the Commitment.  The Policy Conditions are not the same as the Commitment Conditions.

Commitment Number: FAH22004012                                                    GF#: FTH-18-FAH22004012

# TEXAS TITLE INSURANCE INFORMATION
(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment.  The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy.  Some of the changes to consider are:

 ---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy.  Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

 ---Allow the Company to add an exception to "rights of parties in possession."  If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection.  If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued.  You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

**FIDELITY NATIONAL FINANCIAL**
**PRIVACY NOTICE**

Effective August 1, 2021

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy.  This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices.  If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

## Collection of Personal Information

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

## Collection of Browsing Information

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above.  We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites.  Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

## Other Online Specifics

Cookies.  When you visit an FNF Website, a "cookie" may be sent to your computer.  A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive.  Information gathered using cookies helps us improve your user experience.  For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences.  You can choose whether or not to accept cookies by changing your Internet browser settings.  Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons.  We use web beacons to determine when and how many times a page has been viewed.  This information is used to improve our websites.

Do Not Track.  Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Exhibit 22 Page 18 of 20

Effective Date: 5/1/2018

Links to Other Sites.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**

FNF uses Personal Information for three main purposes:

- To provide products and services to you or in connection with a transaction involving you.

- To improve our products and services.

- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;

- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;

- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or

- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.  We may share your Personal Information with affiliates (other companies owned by FNF) to directly market to you.  Please see "Choices with Your Information" to learn how to restrict that sharing.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**

If you do not want FNF to share your information among our affiliates to directly market to you, you may send an "opt out" request as directed at the end of this Privacy Notice.  We do not share your Personal Information with nonaffiliates for their use to direct market to you without your consent.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

Exhibit 22 Page 19 of 20

Effective Date: 5/1/2018

<u>For Nevada Residents</u>:  You may be placed on our internal Do Not Call List by calling (888)714-2710 or by contacting us via the information set forth at the end of this Privacy Notice.  Nevada law requires that we also provide you with the following contact information:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  BCPINFO@ag.state.nv.us.

<u>For Oregon Residents</u>:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

<u>For Vermont Residents</u>:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do <u>not</u> collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users

FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.  FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary:  to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

## Your Consent To This Privacy Notice; Notice Changes

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice.  We may change this Privacy Notice at any time.  The Privacy Notice's effective date will show the last date changes were made.  If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

## Accessing and Correcting Information; Contact Us

If you have questions, would like to correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, visit FNF's Opt Out Page or contact us by phone at (888) 714-2710 or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn:  Chief Privacy Officer

Exhibit 22 Page 20 of 20

# EXHIBIT 23

# WILSON CRIBBS **+** GOREN

**TRAVIS HUEHLEFELD**
Attorney at Law

2500 Fannin Street
Houston, Texas 77002

713.222.9000 *main*
713.229.8824 *fax*

thuehlefeld@wcglaw.com
713.547.8516 *direct*

October 24, 2022

***Sent Via Email: jdaniel@knightheadfunding.com and ltorrado@knighthead.com***
KH-REIT II FUNDING XXII, LLC
777 W. Putnam Ave.
3rd Floor, Suite B-2
Greenwich, CT 06830
Attention: Jonathan Daniel and Laura Torrado

Re:    SALE AGREEMENT, dated March 31, 2022 (as amended, the "**Contract**"), between KH-REIT II FUNDING XXII, LLC, a Delaware limited liability company ("**Seller**"), and GRANT MEADOWS, L.L.C., a Texas limited liability company ("**Purchaser**"), for that certain real property located in the City of Houston, Texas, as further defined in the Agreement (the "**Property**") (Our File No. 10123-060)

All:

This firm represents the Purchaser in the above referenced transaction. All capitalized terms used herein but not defined shall have the same meaning as set forth in the Contract.  The following are Purchaser's supplemental title objections which are based upon our review of the Commitment for Title Insurance issued by Fidelity National Title Insurance Company (the "**Title Company**"); GF. FTH-18-FAH22004012, issued October 24, 2022 (effective date October 16, 2022) (the "**Revised Commitment**"); and the preliminary surveys dated April 20, 2022, prepared by Lucas G. Davis, RPLS No. 6599, of Windrose, Job Nos. 57646 (Tract 1) and 57547 (Tract 2) (together, the "**Survey**").

1.  Schedule B, Item 10.m. Purchaser objects to the new revisions of Schedule B, Item 10.m.(f) of the Revised Commitment and requires that Seller cause such exception to be removed from the Revised Commitment and that the final owner's policy to be delivered at Closing not contain such exception.

2.  Schedule B, Item 10.m. Purchaser also objects to Schedule B, Item 10.m.(f) with respect to the reference that the power poles apparently serve adjacent property. Purchaser requests that Seller provide a copy of any unrecorded agreement in which the power poles on the Property serve improvements on the adjacent property as noted in such exception.

3.  Schedule C, General.  All items in Schedule C are to be satisfied as part of Seller's obligations under the Contract, and Schedule C must be deleted in its entirety. Specifically, pursuant to Section 5(d) of the Agreement, Seller is obligated to remove Schedule C, Item 6.

4.  Survey. Purchaser requires that the Survey be updated pursuant to Title Company's email from Thursday, October 20, 2022. Upon a physical inspection of the Property, the Title Company has required the Survey be updated to reflect there are no power lines or poles located on the Property.

The foregoing constitutes Purchaser's objections to the Revised Commitment and Survey as of the date of this letter. Purchaser reserves the right to make further objections based on additional information received, including any updates to the Revised Commitment or Survey.

Exhibit 23 Page 1 of 2

KH-REIT II FUNDING XXII, LLC
October 24, 2022
Page 2

Very truly yours,

/s/ Travis Huehlefeld

cc:    Lolly Avant                                      *Via Email: lavant@fnf.com*
        Fidelity National Title Insurance Company

        Josh Bernstein                      *Via Email: jbernstein@legalstrategy.com*
        Hajjar Peters LLP

        Sean Jamea                        *Via Email: sjamea@oxberrygroup.com*
        Grant Meadows, L.L.C.

        Sara Prasatik                      *Via email: sprasatik@wcglaw.com*
        Wilson Cribbs & Goren, P.C.

Exhibit 23 Page 2 of 2

# EXHIBIT 24

{W0802327.1}



Josh Bernstein
jbernstein@legalstrategy.com

October 25, 2022

Travis Huehlefeld
Sara Prasatik
WILSON, CRIBBS & GOREN, PC
2500 Fannin Street
Houston, Texas 77002
*Via E-Mail:* thuehlefeld@wcglaw.com and *sprasatik@wcglaw.com*

> Re:   Sale Agreement, dated March 31, 2022, by and between KH-REIT
> II Funding XXII, LLC, a Delaware limited liability company
> ("Seller" or "Knighthead"), and Grant Meadows, LLC, a Texas
> limited liability company ("Purchaser"), related to approximately
> 2.089 acres in Houston, Texas (the "Property"), as amended (the
> "Contract"), and GF No. FAH22004012.

Dear Mr. Huehlefeld and Ms. Prasatik,

We write to you, again, on behalf of Knighthead, who we represent in connection with the above-captioned matter. This letter shall serve as Knighthead's response to your purported supplemental title objection letter, dated October 24, 2022 (the "Second Objection Letter").

As we previously advised you, we are aware that Purchaser, acting on its own or through its agents, has entered upon the Property, without permission from Seller and without any legal authority to do so, and removed the power poles and transmission lines from the Property that were referenced in your prior correspondence to Seller, dated October 11, 2022 ("Purchaser's Trespass and Default").

It is Purchaser's Trespass and Default that have caused Fidelity National Title Insurance Company (the "Title Company") to issue the revised title commitment referenced in the Second Objection Letter. As such, we reject not only the content of the Second Objection Letter, and the requests therein, but also Purchaser's claim of authority to send the Second Objection Letter in the first place, and any future claims by Purchaser to exercise remedies under the Contract arising from Purchaser's Trespass and Default and the Second Objection Letter.

The Second Objection Letter is a transparent attempt to manipulate the supplemental title objection process in the Contract.



The Title Company has made it clear that they are prepared to close on October 28, 2022, and Knighthead remains ready, willing and able to close on such date.  It is only Purchaser, now, that stands in the way of a timely closing under the Contract.

Knighthead expressly reserves any and all rights, at law or in equity, none of which are waived.

Sincerely,

/s/ Josh Bernstein

pc:      Client, file

cc:      Lolly Avant, SVP
         National Business Development|Senior Closer
         Fidelity National Title
         National Commercial Services
         1900 West Loop South, Suite 200
         Houston, Texas 77027
         Via Email: lavant@fnf.com

Exhibit 24 Page 2 of 2

# EXHIBIT 25

# WILSON CRIBBS + GOREN

**SARA PRASATIK**
Attorney at Law

2500 Fannin Street
Houston, Texas 77002

713.222.9000 *main*
713.229.8824 *fax*

sprasatik@wcglaw.com
713.547.8520 *direct*

October 26, 2022

**Via Email:** jdaniel@knightheadfunding.com and ltorrado@knighthead.com
KH-REIT II FUNDING XXII, LLC
777 W. Putnam Ave.
3rd Floor, Suite B-2
Greenwich, CT 06830
Attn: Jonathan Daniel and Laura Torrado

**Via Email:** jbernstein@legalstrategy.com
KH-REIT II FUNDING XXII, LLC
c/o Hajjar Peters LLP
3144 Bee Caves Road
Austin, TX 78746
Attn: Josh Bernstein

**Via Email:** lavant@fnf.com and deborah.montgomery@fnf.com
FIDELITY NATIONAL TITLE INSURANCE COMPANY
1900 West Loop South, Suite 200
Houston, TX 77027
Attn: Lolly Avant, Deborah Montgomery

RE:   **NOTICE OF TERMINATION** of the Sale Agreement dated March 31, 2022 by and between KH-REIT II Funding XXII, LLC, a Delaware limited liability company ("Seller"), and Grant Meadows, LLC, a Texas limited liability company ("Purchaser"), related to approximately 2.089 acres in Houston, Texas, and as amended ("Contract") and GF No. FAH22004012.

Ladies and Gentlemen:

This firm continues to represent Purchaser in connection with the referenced Contract. All capitalized terms not herein defined shall have the same meaning as in the Contract.

On October 24 ,2022, Fidelity National Title Company ("Title Company") issued a Revised Commitment which added a new exception to Schedule B, Item 10.m. On the same day, Purchaser timely served written notice of Purchaser's objections to the newly added exception, as well as certain matters on Schedule C, which Seller is required to remove per the Contract, and requiring an updated Survey.

Exhibit 25 Page 1 of 2

October 26, 2022
Page | 2

In response to Purchaser's October 24, 2022, objections, Seller responded, in writing, rejecting the "content of the Second Objection Letter" and refusing to cure the objections.

Accordingly, per Section 5(d) of the Contract, Purchaser hereby exercises its right to terminate the Contract. Demand is hereby made that the Deposit—being the total of $650,000.00—be returned to Purchaser.

By copy of this letter to the Title Company, Purchaser instructs Title Company to release to Purchaser the $500,000.00 of the Deposit being held in escrow by the Title Company.

By this letter, Purchaser does not waive and expressly reserves any and all rights it not exercised herein, under the Contract and under Texas law.

I appreciate and expect your prompt attention to this matter.

Sincerely,

Wilson, Cribbs & Goren, PC

By: _____
     Sara Prasatik

Enclosures

cc:    Client
       Travis Huehlefeld (firm)

Exhibit 25 Page 2 of 2

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, L.L.C., | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:22-CV-3730 |
| | § | |
| GRANT MEADOWS, LLC and SHAHIN | § | |
| JAMEA, | § | |
| *Defendants.* | § | |

## AFFIDAVIT OF MATTHEW BAUMGARTNER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared the undersigned affiant, who, being by me duly sworn, upon his oath, stated:

1.      "My name is Matthew Baumgartner.  I am over eighteen (18) years of age, and I have never been convicted of a felony.  I am of sound mind, capable of making this affidavit, and am fully competent to testify to the matters stated herein.  I have personal knowledge of the matters stated herein, and the matters stated herein are true and correct.

2.      "This Affidavit is being submitted in support of KH-REIT II Funding XXII, L.L.C.'s request for attorneys' fees in connection with its motion for summary judgment.

3.      "I am a licensed attorney in good standing in the State of Texas.  I have been licensed to practice law since 2005, and I am a member of the law firm of Armbrust & Brown, PLLC ('A&B').  For all of that time my practice has been focused on civil litigation, including real estate litigation. I am the attorney at A&B primarily responsible for representing the Plaintiff in the above-styled Lawsuit, and I have personal knowledge of the services provided by A&B to Plaintiff in the above-styled Lawsuit.  In this litigation, I have been assisted by my colleague, Guillermo A. Alarcon,

Exhibit 26 Page 1 of 13

who has been licensed to practice law since 2016. Earlier in the case, I was assisted by another colleague, David King. Mr. King has been licensed to practice since 2012.

4.      "I am familiar with the fees customarily charged by lawyers in Harris County, Texas for services similar to the above-styled Lawsuit.

5.      "Through February 5, 2024, I have spent 84.5 hours on this case. My current (2024) hourly rate is $585.  For 2023, my hourly rate was $535 per hour. Mr. Alarcon's 2023 rate was $390 and his 2024 rate is $425.  Mr. Alarcon has spent 208.2 hours on this case.  Mr. King spent 4.2 hours on this case, and his hourly rate at that time was  $415. It is my opinion that the time spent by Mr. Alarcon, Mr. King, and myself on this case has been reasonable and necessary.  It is also my opinion that the hourly rates charged by Mr. Alarcon, Mr. King, and myself are reasonable and in line with attorneys that have our experience and qualifications.  In total, Plaintiff has incurred $128,676.85 in attorneys' fees prosecuting this case.  It is my opinion that the time expended for these services, the hourly rates charged, and the total fees charged were and are reasonable and necessary.

6.      "In this case, Plaintiff has asserted two claims: (1) breach of contract and (2) trespass. Attorneys' fees are recoverable for the breach of contract claim but not the trespass claim. However, Mr. Alarcon and I have spent little time on the trespass claim.  In total, I have spent 1.9 hours on tasks relating to the trespass claim, and Mr. Alarcon has spent 4.9 hours on tasks relating to the trespass claim.  In total, Plaintiff has incurred $2,927.50 in fees associated with its trespass claim.  In addition, Mr. Alarcon and I have spent time on tasks associated with Fidelity National Title Insurance Company's interpleader action. I have spent 1.6 hours on tasks associated with the interpleader action. And Mr. Alarcon has spent approximately 5.6 hours on tasks associated with

Exhibit 26 Page 2 of 13

the interpleader action. In total, Plaintiff has incurred $3,070 in fees associated with the interpleader action. Plaintiff does not seek a recovery of these fees.

7.      "Thus, after segregating fees relating to claims that do not allow for recovery of attorney's fees, Plaintiff has incurred $122,679.35 in fees relating to its breach of contract claim. It is my opinion that the time expended for these services, the hourly rates charged, and the total fees charged were and are reasonable and necessary.

8.      "I have attached to Plaintiff's motion for summary judgment a redacted copy of A&B's time entries and the associated fees charged for this case.  The attached time entries have been produced from A&B's electronic files which are made and kept in the regular course of A&B's business; they reflect time entries record at the time of the events by myself and Mr. Alarcon; and, they are true and correct copies of those contemporaneously recorded events.

9.      "In addition, it is my opinion that if Defendants appeal the judgment in this case to the Fifth Circuit, Mr. Alarcon and myself will spend approximately 50 hours preparing an appellate brief.  And, if the Court of Appeals orders oral argument, we will spend an additional 20 hours preparing for and attending oral argument. Therefore, it is my opinion that if this case is appealed, Plaintiff will incur $25,000 in attorney's fees if the appeal is decided without oral argument, and it will incur an additional $10,000 if the appeal is decided with oral argument.  It is my opinion that such appellate fees would be both reasonable and necessary.

10.     "In determining the reasonableness and necessity of the attorneys' fees of Plaintiff in connection with this matter, I have considered the following factors as set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–18 (5th Cir. 1974), *abrogated on other grounds as stated in Blanchard v. Bergeron*, 489 U.S. 87, 91 (1989):

    a.      The time and labor required;

    b.      The novelty and difficulty of the questions;

<div align="center">3</div>

Exhibit 26 Page 3 of 13

c.      The skill requisite to perform the legal services properly;

d.      The preclusion of other employment by the attorney due to acceptance of the case;

e.      The customary fee;

f.      Whether the fee is fixed, contingent, or hourly;

g.      Time limitations imposed by the client or circumstances;

h.      The amount involved; and

i.      The experience, reputation, and ability of the attorneys."

FURTHER AFFIANT SAYETH NAUGHT.

Matthew Baumgartner

SUBSCRIBED TO AND SWORN TO before me on this 6th day of February, 2024.

Notary Public, State of Texas

KIMBERLY BELLAMY
Notary Public, State of Texas
Notary ID# 1126736-3
My Commission Expires
JUNE 25, 2026

4

# Statement of Account

| 049115 | KH-REIT II FUNDING XXII, LLC | 01/01/2022 - 02/05/2024 |
|--------|------------------------------|-------------------------|
| 000101 | 2701 MAIN STREET (HOUSTON)   | Time & Rate: Original Value |

███████████████████████
■

**Fees**

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|-----|-------------|------|-----------|-------------|-------------|
| 10/26/2022 | DAK | Conference call with co-counsel to discuss case details, review all relevant documents, and draft original complaint; Email correspondence with co-counsel. | 3.50 | $415 | $1,452.50 | $1,452.50 |
| 10/27/2022 | DAK | Email correspondence with co-counsel regarding lawsuit against buyer. | 0.50 | $415 | $207.50 | $207.50 |
| 10/27/2022 | MBB | Work on complaint; Edit same per Hajjar Peters' comments; Attend Zoom meeting with client to discuss complaint and further revise same. | 2.50 | $535 | $1,337.50 | $1,337.50 |
| | | **Total Fees:  10/2022** | **6.50** | | **$2,997.50** | **$2,997.50** |
| 11/30/2022 | MBB | Review counterclaim and settlement correspondence in advance of team meeting; Team meeting to discuss counterclaim; Call with Rebecca Brown regarding litigation strategy and issues. | 1.20 | $535 | $642.00 | $642.00 |
| | | **Total Fees:  11/2022** | **1.20** | | **$642.00** | **$642.00** |
| 12/2/2022 | DAK | Attention to email correspondence from client; Intraoffice conference with M. Baumgartner. | 0.20 | $415 | $83.00 | $74.70 |
| 12/2/2022 | MBB | Draft conflict letter and discuss same with Rebecca Brown and Josh Bernstein; Edits to same; Research into title issues and unclear hands argument for summary judgment purposes. | 2.90 | $535 | $1,551.50 | $1,396.35 |
| 12/5/2022 | MBB | Further revisions to Wilson Cribbs conflict letter and send same to opposing counsel. | 0.30 | $535 | $160.50 | $144.45 |
| 12/8/2022 | MBB | Call from Wilson Cribbs counsel regarding conflict letter/withdrawal; Email to Knighthead personnel regarding same. | 0.30 | $535 | $160.50 | $144.45 |
| 12/11/2022 | MBB | Review and edit Motion to Dismiss mirror-image dec action counter-claim. | 0.30 | $535 | $160.50 | $144.45 |
| 12/11/2022 | GAA | Draft partial motion to dismiss; legal research regarding whether a partial motion to dismiss suspends answer deadline; e-mail to M. Baumgartner regarding same. | 4.40 | $375 | $1,650.00 | $1,485.00 |
| 12/12/2022 | MBB | Review and edit Motion to Dismiss mirror-image dec action counter-claim; Calls with Rebecca Brown; Emails with Hajjar Peters. | 1.80 | $535 | $963.00 | $866.70 |
| 12/12/2022 | GAA | Draft answer to complaint. | 4.20 | $375 | $1,575.00 | $1,417.50 |
| 12/13/2022 | MBB | Review and revise Answer; Review J. Eames emails regarding statutory fraud and discuss with Rebecca Brown. | 0.60 | $535 | $321.00 | $288.90 |
| 12/13/2022 | GAA | Meeting with M. Baumgartner regarding revisions to motion to dismiss; incorporate all revisions to motion to dismiss and answer. | 2.40 | $375 | $900.00 | $810.00 |
| 12/14/2022 | MBB | Make final round of edits to Answer to Counterclaim and Partial Motion to Dismiss; Draft proposed order for MTD; Email to R. Brown providing brief description of SD Tex procedure and next steps in case. | 1.60 | $535 | $856.00 | $770.40 |
| 12/19/2022 | GAA | Prepare budget. | 0.70 | $375 | $262.50 | $236.25 |
| 12/20/2022 | MBB | Draft proposed budget and outline of case and send to R. Brown; Review court's order regarding initial scheduling conference and status hearing; Call from Porter law firm regarding substitution of counsel and scheduling Rule 26(f) conference. | 0.50 | $535 | $267.50 | $240.75 |
| 12/21/2022 | MBB | Confer with new opposing counsel regarding motion to substitute and response to motion to dismiss. | 0.10 | $535 | $53.50 | $48.15 |
| 12/22/2022 | MBB | Email update to R. Brown regarding opposing counsel substitution and response to motion to dismiss, and describing Grant Meadows' deadline to amend as a matter of course. | 0.20 | $535 | $107.00 | $96.30 |

# Statement of Account

049115                                                                                          01/01/2022 - 02/05/2024
000101    2701 MAIN STREET (HOUSTON)                                                Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|-----|-------------|------|-----------|-------------|-------------|
| | | **Total Fees:  12/2022** | **20.50** | | **$9,071.50** | **$8,164.35** |
| 1/9/2023 | MBB | Prepare for and participate in conference call with Knighthead personnel regarding case strategy. | 1.30 | $535 | $695.50 | $695.50 |
| 1/9/2023 | GAA | Meeting with client to discuss next steps; review contract language; phone call to opposing counsel regarding motion to substitute counsel. | 1.60 | $390 | $624.00 | $624.00 |
| 1/17/2023 | MBB | Review court correspondence regarding motion to dismiss, and review email from opposing counsel; Email with R. Brown regarding search parameters for initial disclosures and request for settlement meeting from opposing counsel. | 0.30 | $535 | $160.50 | $160.50 |
| 1/17/2023 | GAA | Meeting with M. Baumgartner regarding e-mail from court coordinator. | 0.30 | $390 | $117.00 | $117.00 |
| 1/24/2023 | MBB | Review R. Brown email and manage download/collection of documents for initial disclosures; Email to opposing counsel regarding Rule 26(f) conference. | 0.30 | $535 | $160.50 | $160.50 |
| 1/31/2023 | MBB | Prepare for Rule 26(f) conference and discuss initial disclosures with G. Alarcon; Respond to email from opposing counsel rescheduling conference; Review file on property and discuss review of emails with G. Alarcon. | 0.80 | $535 | $428.00 | $428.00 |
| 1/31/2023 | GAA | Prepare for Rule 26(f) conference; meeting with M. Baumgartner regarding same; prepare draft Rule 26(f) report. | 2.60 | $390 | $1,014.00 | $1,014.00 |
| | | **Total Fees:  01/2023** | **7.20** | | **$3,199.50** | **$3,199.50** |
| 2/1/2023 | GAA | Prepare draft of Rule 26(f) conference report; e-mail ti M. Baumgartner regarding same; meeting with M. Baumgartner regarding e-mails from court coordinator and status of interpleader. | 3.90 | $390 | $1,521.00 | $1,521.00 |
| 2/2/2023 | MBB | Participate in Rule 26(f) conference and revise draft report based on same. | 1.60 | $535 | $856.00 | $856.00 |
| 2/3/2023 | MBB | Email to R. Brown providing update on Rule 26(f) conference and settlement issues. | 0.20 | $535 | $107.00 | $107.00 |
| 2/3/2023 | GAA | Prepare motion to withdraw J. Eames as counsel. | 0.50 | $390 | $195.00 | $195.00 |
| 2/6/2023 | MBB | Attention to interpleader motion and order; Call with Fidelity counsel regarding overbreadth of release and discuss redline of same with G. Alarcon; Emails with opposing counsel regarding Rule 26(f) report and scheduling order. | 1.00 | $535 | $535.00 | $535.00 |
| 2/6/2023 | GAA | Prepare draft of agreed scheduling order; phone call with M. Torres regarding interpleader; revise M. Torre's draft order on interpleader; meeting with M. Baumgartner regarding same; legal research regarding permissible scope of interpleader action; e-mails to M. Torres regarding same. | 4.80 | $390 | $1,872.00 | $1,872.00 |
| 2/7/2023 | MBB | Final review and revisions to Rule 26(f) report, notice of filing, and joint proposed scheduling order. | 0.10 | $535 | $53.50 | $53.50 |
| 2/7/2023 | GAA | Finalize and file Rule 26(f) report and agreed scheduling order; meeting with M. Baumgartner regarding interpleader. | 1.90 | $390 | $741.00 | $741.00 |
| 2/13/2023 | GAA | Draft first request for production to Grant Meadows. | 2.30 | $390 | $897.00 | $897.00 |
| 2/14/2023 | MBB | Review and revise draft requests for documents to Grant Meadows; Draft requests to send to title company and send to G. Alarcon. | 1.00 | $535 | $535.00 | $535.00 |
| 2/14/2023 | GAA | Revise draft requests for production Grant Meadows; draft request for production for title company; draft requests for admission for Grant Meadows; send discovery requests to client. | 2.70 | $390 | $1,053.00 | $1,053.00 |
| 2/15/2023 | GAA | Review and respond to client's revisions to discovery requests. | 0.80 | $390 | $312.00 | $312.00 |
| | | **Total Fees:  02/2023** | **20.80** | | **$8,677.50** | **$8,677.50** |
| 3/2/2023 | GAA | Attention to setting up review database. | 1.40 | $390 | $546.00 | $546.00 |
| 3/3/2023 | GAA | Meeting with M. Baumgartner regarding title company's request for discovery extension. | 0.30 | $390 | $117.00 | $117.00 |
| 3/6/2023 | MBB | Call with Rebecca Brown regarding additional emails from Grant Meadows securing bids for property maintenance. | 0.10 | $535 | $53.50 | $53.50 |

ARMBRUST & BROWN, PLLC                     Exhibit 26 Page 6 of 13     02/06/2024  07:35am

# Statement of Account

049115
000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024
Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|-----|-------------|------|-----------|-------------|-------------|
| 3/8/2023 | GAA | Draft initial disclosures. | 0.90 | $390 | $351.00 | $351.00 |
| 3/9/2023 | MBB | Work on Initial Disclosures; discuss with R. Brown. | 1.10 | $535 | $588.50 | $588.50 |
| 3/10/2023 | GAA | Attention to review database; finalize plaintiff's Rule 26f disclosures; review defendant's disclosures. | 0.90 | $390 | $351.00 | $351.00 |
| 3/13/2023 | GAA | E-mail to R. Brown regarding defendant's Rule 26 disclosures. | 0.10 | $390 | $39.00 | $39.00 |
| 3/14/2023 | GAA | Draft cease and desist letter and email same to client; legal research regarding ability to assert specific performance and whether defendant has waived any limitations on remedies; respond to R. Brown's e-mail regarding same. | 3.50 | $390 | $1,365.00 | $1,365.00 |
| 3/20/2023 | GAA | Review defendant's discovery responses. | 0.30 | $390 | $117.00 | $117.00 |
| 3/23/2023 | MBB | Review email correspondence, discovery responses, and scheduling order, in advance of settlement call with opposing counsel and Sean Jamea; Participate in call; Discuss with Knighthead counsel, R. Brown, afterward; Begin drafting letter regarding inadequate discovery responses. | 2.40 | $535 | $1,284.00 | $1,284.00 |
| 3/27/2023 | MBB | Draft discovery letter to opposing counsel; Discuss settlement with R. Brown and J. Daniel. | 1.20 | $535 | $642.00 | $642.00 |
| | | **Total Fees:  03/2023** | **12.20** | | **$5,454.00** | **$5,454.00** |
| 4/4/2023 | MBB | Further revisions to discovery letter; Email to R. Brown; Call with R. Brown; Draft settlement response letter. | 2.40 | $535 | $1,284.00 | $1,284.00 |
| 4/4/2023 | GAA | Review and revise discovery letter to opposing counsel. | 0.10 | $390 | $39.00 | $39.00 |
| 4/5/2023 | MBB | Review pending discovery requests to Fidelity Title and Grant Meadows for need to send additional requests; Emails with opposing counsel. | 0.30 | $535 | $160.50 | $160.50 |
| 4/17/2023 | MBB | Call with Robert MacNaughton regarding amending scheduling order and creating a date certain for mutual document exchange; Draft same; Emails with R. Brown regarding same. | 2.20 | $535 | $1,177.00 | $1,177.00 |
| 4/17/2023 | GAA | Meeting with M. Baumgartner to discuss to-do list; review e-mails with title company's lawyer regarding discovery. | 0.60 | $390 | $234.00 | $234.00 |
| 4/18/2023 | MBB | Call from opposing counsel regarding DCO dates; Emails with R. Brown; Create document review parameters and email R. Brown regarding attorney names for privilege sorting; Revise motion and amended DCO based on feedback from Knighthead about additional in-house review, and send to opposing counsel. | 2.40 | $535 | $1,284.00 | $1,284.00 |
| 4/19/2023 | MBB | Attention to document review set-up; and run privilege searches. | 0.20 | $535 | $107.00 | $107.00 |
| 4/19/2023 | GAA | Phone call with J. Lyons regarding relativity database; review documents on relativity. | 6.90 | $390 | $2,691.00 | $2,691.00 |
| 4/20/2023 | MBB | Follow up email to opposing counsel regarding agreed motion to extend deadlines; Review returned motion and approve for filing; Discuss privilege issues in KH-REIT documents with G. Alarcon. | 0.80 | $535 | $428.00 | $428.00 |
| 4/20/2023 | GAA | Review documents in relativity; meeting with M. Baumgartner regarding same. | 3.30 | $390 | $1,287.00 | $1,287.00 |
| 4/21/2023 | MBB | Review documents for production. | 2.20 | $535 | $1,177.00 | $1,177.00 |
| 4/24/2023 | MBB | Review Knighthead documents for privilege and relevance. | 2.20 | $535 | $1,177.00 | $1,177.00 |
| 4/24/2023 | GAA | Review documents in relativity. | 3.20 | $390 | $1,248.00 | $1,248.00 |
| 4/25/2023 | MBB | Review documents for privilege and relevance. | 4.60 | $535 | $2,461.00 | $2,461.00 |
| 4/25/2023 | GAA | Review documents in relativity. | 4.00 | $390 | $1,560.00 | $1,560.00 |
| 4/26/2023 | MBB | Review documents for relevance and privilege; Email to J. Bernstein to collect Hajjar Peters communications with Third Parties. | 0.70 | $535 | $374.50 | $374.50 |
| 4/26/2023 | GAA | Review documents in relativity. | 5.30 | $390 | $2,067.00 | $2,067.00 |
| 4/27/2023 | MBB | Document review for privilege and relevance; Research and notes for | 2.20 | $535 | $1,177.00 | $1,177.00 |

ARMBRUST & BROWN, PLLC
Exhibit 26 Page 7 of 13

# Statement of Account

049115
000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024
Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|----|----|------|------|------|------|
| | | summary judgment motion, including estoppel/unclean hands, prior material breach and waiver; Discuss contract waiver argument with G. Alarcon. | | | | |
| 4/27/2023 | GAA | Review documents in relativity; conduct searches for documents relating to the first amendment to contract. | 3.10 | $390 | $1,209.00 | $1,209.00 |
| | | **Total Fees:  04/2023** | **46.70** | | **$21,142.00** | **$21,142.00** |
| 5/3/2023 | MBB | Privilege and relevance review (second pass). | 3.00 | $535 | $1,605.00 | $1,605.00 |
| 5/3/2023 | GAA | Review documents produced by title company. | 1.00 | $390 | $390.00 | $390.00 |
| 5/4/2023 | MBB | Document review report email to R. Brown; Second pass review. | 0.80 | $535 | $428.00 | $428.00 |
| 5/5/2023 | GAA | Phone call with J. Lyons regarding KH internal document review; Zoom meeting with R. Brown and J. Lyons regarding same. | 0.90 | $390 | $351.00 | $351.00 |
| 5/9/2023 | MBB | Complete second pass review and send R. Brown email re document review. | 0.80 | $535 | $428.00 | $428.00 |
| 5/11/2023 | MBB | Discuss document production with R. Brown; Further review and code documents per discussion with R. Brown. | 1.80 | $535 | $963.00 | $963.00 |
| 5/12/2023 | MBB | Review of R. Brown tagging on documents and work through same to prepare document production. | 3.10 | $535 | $1,658.50 | $1,658.50 |
| 5/12/2023 | GAA | Prepare third-party subpoenas for CenterPoint and 2601 Main. | 1.70 | $390 | $663.00 | $663.00 |
| 5/13/2023 | GAA | Draft subpoenas to CenterPoint and 2601 Main Partners and send subpoenas to process server; draft and serve notices of subpoenas to opposing counsel. | 2.50 | $390 | $975.00 | $975.00 |
| 5/14/2023 | MBB | Further review of narrowed-down production set. | 0.20 | $535 | $107.00 | $107.00 |
| 5/15/2023 | MBB | Review R. Brown edits to document production; Finalize same; Emails with opposing counsel re whether Defendant will meet production deadline; Produce documents after confirming receipt of Defendant's production. | 0.90 | $535 | $481.50 | $481.50 |
| 5/16/2023 | MBB | Email to R. Brown re status of document productions; Call from J. Lyons re same; Email to opposing counsel re deficiencies in document production. | 0.50 | $535 | $267.50 | $267.50 |
| 5/22/2023 | GAA | Attention to subpoena to CenterPoint Energy; legal research regarding production format under Rule 34; emails to M. Baumgartner regarding same. | 0.90 | $390 | $351.00 | $351.00 |
| | | **Total Fees:  05/2023** | **18.10** | | **$8,668.50** | **$8,668.50** |
| 6/13/2023 | MBB | Conference call regarding next steps with Knighthead personnel; Calls for Brent Friedman (neighbor) regarding Third Party subpoena. | 0.40 | $535 | $214.00 | $214.00 |
| 6/19/2023 | MBB | Review GM's documents. | 1.30 | $535 | $695.50 | $695.50 |
| 6/20/2023 | MBB | Review Grant Meadows documents and send summary to R. Brown; Discuss subpoena with 2701 Main (Brent Friedman). | 2.80 | $535 | $1,498.00 | $1,498.00 |
| 6/26/2023 | MBB | Draft discovery letter to opposing counsel. Email to Knighthead personnel regarding same, and regarding depositions. | 2.40 | $535 | $1,284.00 | $1,284.00 |
| 6/30/2023 | GAA | Phone call with M. Baumgartner regarding document production and scheduling deposition; review documents from Main 2601 Partners; email to M. Baumgartner and R. Brown regarding same. | 0.60 | $390 | $234.00 | $234.00 |
| | | **Total Fees:  06/2023** | **7.50** | | **$3,925.50** | **$3,925.50** |
| 7/5/2023 | MBB | Conference call with Knighthead personnel; Research for trespass counterclaim against Jamea personally. | 1.20 | $535 | $642.00 | $642.00 |
| 7/6/2023 | GAA | Review amended notice of deposition for S. Jamea. | 0.20 | $390 | $78.00 | $78.00 |
| 7/8/2023 | GAA | Draft supplemental complaint against S. Jamea. | 3.50 | $390 | $1,365.00 | $1,365.00 |
| 7/9/2023 | MBB | Work on trespass claim against Jamea. | 0.70 | $535 | $374.50 | $374.50 |
| 7/9/2023 | GAA | Finalize and file supplemental complaint against S. Jamea. | 1.40 | $390 | $546.00 | $546.00 |
| 7/20/2023 | GAA | Meeting with M. Baumgartner regarding deposition of S. Jamea; emails with R. MacNaughton regarding deposition of B. Espinosa; prepare for deposition of | 2.20 | $390 | $858.00 | $858.00 |

ARMBRUST & BROWN, PLLC    Exhibit 26 Page 8 of 13

# Statement of Account

049115
000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024
Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|----|-----|------|-----------|-------------|-------------|
| | | S. Jamea. | | | | |
| 7/25/2023 | GAA | Review documents in preparation for deposition; prepare deposition outline; compile and prepare exhibits for deposition of S. Jamea. | 13.40 | $390 | $5,226.00 | $5,226.00 |
| 7/26/2023 | GAA | Travel to and from Houston for deposition of S. Jamea. | 10.80 | $390 | $4,212.00 | $4,212.00 |
| 7/27/2023 | MBB | Discuss deposition and post-deposition motions and third-part subpoenas with G. Alarcon. | 0.50 | $535 | $267.50 | $267.50 |
| | | **Total Fees:  07/2023** | **33.90** | | **$13,569.00** | **$13,569.00** |
| 8/3/2023 | MBB | Attention to emails from R. Brown; Review MSJ research and email G. Alarcon regarding same. | 0.20 | $535 | $107.00 | $107.00 |
| 8/3/2023 | GAA | Prepare email summarizing deposition of S. Jamea for R. Brown. | 1.20 | $390 | $468.00 | $468.00 |
| 8/9/2023 | MBB | Email to R. Brown regarding summary judgment, discovery and settlement issues. | 0.20 | $535 | $107.00 | $107.00 |
| 8/14/2023 | MBB | Call with Robert MacNaughton regarding settlement and discovery issues; Begin draft of motion to compel; Call with Robert MacNaughton regarding settlement and discovery issues; Draft follow-up letter regarding same. | 1.20 | $535 | $642.00 | $642.00 |
| 8/15/2023 | MBB | Draft and send settlement letter to R. MacNaughton. | 0.50 | $535 | $267.50 | $267.50 |
| 8/15/2023 | GAA | Edit letter to opposing counsel regarding discovery. | 0.10 | $390 | $39.00 | $39.00 |
| 8/17/2023 | GAA | Review S. Jamea deposition transcript. | 0.70 | $390 | $273.00 | $273.00 |
| 8/24/2023 | GAA | Draft motion to compel and for discovery sanctions. | 4.90 | $390 | $1,911.00 | $1,911.00 |
| 8/25/2023 | GAA | Draft motion to compel and for sanctions. | 6.80 | $390 | $2,652.00 | $2,652.00 |
| 8/27/2023 | MBB | Review and revise motion to compel and for sanctions; send same to R. Brown for client edits and comments. | 2.20 | $535 | $1,177.00 | $1,177.00 |
| 8/29/2023 | GAA | Draft motion to compel and for sanctions; compile exhibits for same. | 5.20 | $390 | $2,028.00 | $2,028.00 |
| 8/30/2023 | GAA | Compile exhibits for motion to compel. | 3.70 | $390 | $1,443.00 | $1,443.00 |
| 8/31/2023 | MBB | Final revisions to motion to compel and for sanctions; Revise fee affidavit. | 0.50 | $535 | $267.50 | $267.50 |
| 8/31/2023 | GAA | Finalize motion to compel and exhibits. | 6.90 | $390 | $2,691.00 | $2,691.00 |
| | | **Total Fees:  08/2023** | **34.30** | | **$14,073.00** | **$14,073.00** |
| 9/1/2023 | MBB | Call from opposing counsel--proposing e-discovery search terms. | 0.30 | $535 | $160.50 | $160.50 |
| 9/12/2023 | GAA | Meeting with M. Baumgartner regarding response to opposing counsel's request to conduct word searches in lieu of manual document review; draft and send response. | 1.00 | $390 | $390.00 | $390.00 |
| 9/22/2023 | GAA | Review local rules to confirm due date for reply in support of motion to compel; begin drafting same. | 0.80 | $390 | $312.00 | $312.00 |
| 9/25/2023 | MBB | Attention to and respond to R. Brown emails regarding next steps following Grant Meadows' response to discovery motion. | 0.10 | $535 | $53.50 | $53.50 |
| 9/25/2023 | GAA | Draft reply in support of motion to compel and for discovery sanctions. | 4.30 | $390 | $1,677.00 | $1,677.00 |
| 9/26/2023 | MBB | Review and revise reply in support of discovery motion, and send to R. Brown for review. | 0.80 | $535 | $428.00 | $428.00 |
| 9/26/2023 | GAA | Draft reply in support of motion to compel and for discovery sanctions. | 4.90 | $390 | $1,911.00 | $1,911.00 |
| 9/28/2023 | MBB | Revise and finalize for filing reply in support of motion to compel and for sanctions. | 2.00 | $535 | $1,070.00 | $1,070.00 |
| | | **Total Fees:  09/2023** | **14.20** | | **$6,002.00** | **$6,002.00** |
| 10/2/2023 | GAA | Review Defendants' supplemental production. | 0.50 | $390 | $195.00 | $195.00 |
| 10/5/2023 | GAA | Prepare list of third parties that need to be subpoenaed; circulate list to team. | 0.60 | $390 | $234.00 | $234.00 |
| 10/6/2023 | MBB | Attention to third-party subpoenas. | 0.20 | $535 | $107.00 | $107.00 |
| 10/17/2023 | GAA | Review Defendants' surresponse to motion to compel; meeting with M. | 0.50 | $390 | $195.00 | $195.00 |

ARMBRUST & BROWN, PLLC    Exhibit 26 Page 9 of 13    02/06/2024  07:35am

# Statement of Account

049115
000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024
Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|---|---|---|---|---|---|---|
| | | Baumgartner regarding same. | | | | |
| 10/18/2023 | GAA | Research regarding whether Judge Ellison's requires motion for leave to file surreply. | 0.30 | $390 | $117.00 | $117.00 |
| 10/19/2023 | MBB | Revisions to surreply in support of motion for sanctions; Send same to R. Brown for comment. | 1.00 | $535 | $535.00 | $535.00 |
| 10/19/2023 | GAA | Draft surreply in support of motion to compel. | 2.30 | $390 | $897.00 | $897.00 |
| 10/20/2023 | MBB | Review R. Brown edits to surreply and approve same for filing. | 0.20 | $535 | $107.00 | $107.00 |
| 10/20/2023 | GAA | Finalize and file surreply in support of motion to compel. | 1.70 | $390 | $663.00 | $663.00 |
| 10/31/2023 | MBB | Attend telephonic discovery hearing with Judge Ellison; Update to R. Brown regarding same. | 1.10 | $535 | $588.50 | $588.50 |
| 10/31/2023 | GAA | Review Defendant's supplemental document production; prepare for and argue telephonic hearing on motion to compel; phone call with R. Brown regarding same. | 2.50 | $390 | $975.00 | $975.00 |
| | | **Total Fees: 10/2023** | **10.90** | | **$4,613.50** | **$4,613.50** |
| 11/15/2023 | GAA | Email to opposing counsel regarding deposition dates; email to M. Baumgartner regarding interpleader. | 0.20 | $390 | $78.00 | $78.00 |
| 11/17/2023 | MBB | Attention to deposition and settlement strategy; email to Knight head personnel re same; Review Jame's document production. | 0.50 | $535 | $267.50 | $267.50 |
| | | **Total Fees: 11/2023** | **0.70** | | **$345.50** | **$345.50** |
| 12/6/2023 | GAA | Attention to scheduling deposition of S. Jamea. | 0.20 | $390 | $78.00 | $78.00 |
| 12/13/2023 | GAA | Phone call with clients regarding upcoming deposition and status of motion for sanctions. | 0.20 | $390 | $78.00 | $78.00 |
| 12/14/2023 | GAA | Review Defendants' supplemental production to prepare for deposition of S. Jamea. | 4.20 | $390 | $1,638.00 | $1,638.00 |
| 12/18/2023 | GAA | Prepare for deposition of S. Jamea; compile exhibits for same. | 9.20 | $390 | $3,588.00 | $3,588.00 |
| 12/19/2023 | GAA | Prepare for deposition of S. Jamea; attend and take deposition of S. Jamea. | 5.30 | $390 | $2,067.00 | $2,067.00 |
| 12/20/2023 | MBB | Call with R. Brown and J. Daniel; Attention to revised schedule and discuss same with G. Alarcon. | 0.50 | $535 | $267.50 | $267.50 |
| 12/20/2023 | GAA | Phone call with clients regarding S. Jamea deposition and next steps. | 0.30 | $390 | $117.00 | $117.00 |
| | | **Total Fees: 12/2023** | **19.90** | | **$7,833.50** | **$7,833.50** |
| 1/18/2024 | GAA | Draft motion for summary judgment. | 3.20 | $425 | $1,360.00 | $1,360.00 |
| 1/19/2024 | GAA | Draft motion for summary judgment. | 5.80 | $425 | $2,465.00 | $2,465.00 |
| 1/20/2024 | GAA | Draft motion for summary judgment. | 3.60 | $425 | $1,530.00 | $1,530.00 |
| 1/21/2024 | MBB | Revise and research for motion for summary judgment. | 3.20 | $585 | $1,872.00 | $1,872.00 |
| 1/21/2024 | GAA | Draft Plaintiff's motion for summary judgment. | 1.50 | $425 | $637.50 | $637.50 |
| 1/22/2024 | MBB | Further revisions to Motion for Summary Judgment. | 1.40 | $585 | $819.00 | $819.00 |
| 1/22/2024 | GAA | Draft motion for summary judgment; draft motion for discovery sanctions; attention to amended scheduling order. | 3.90 | $425 | $1,657.50 | $1,657.50 |
| 1/23/2024 | MBB | Attention to sanctions letter to opposing counsel, and fees and costs for deposition to be paid by Grant Meadows. | 0.20 | $585 | $117.00 | $117.00 |
| 1/23/2024 | GAA | Draft motion for discovery sanctions; email to opposing counsel regarding scheduling order; draft letter to opposing counsel regarding payment of sanctions. | 3.20 | $425 | $1,360.00 | $1,360.00 |
| 1/24/2024 | MBB | Work on second motion for sanctions and discuss same with G. Alarcon. | 0.90 | $585 | $526.50 | $526.50 |
| 1/24/2024 | GAA | Draft motion to compel and for discovery sanctions. | 3.50 | $425 | $1,487.50 | $1,487.50 |
| 1/31/2024 | MBB | Attention to email from Fidelity attorney re interpleader; Call re same; Emails | 0.60 | $585 | $351.00 | $351.00 |

ARMBRUST & BROWN, PLLC  Exhibit 26 Page 10 of 13  02/06/2024  07:35am

# Statement of Account

049115

000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024

Time & Rate: Original Value

## Fees

| Date | ID | Description | Time | Hrly Rate | Orig Amount | Bill Amount |
|------|-----|-------------|------|-----------|-------------|-------------|
| | | with R. Brown re same (and interest bearing account requirement); Follow-up email with opposing counsel re scheduling order. | | | | |
| | | **Total Fees: 01/2024** | **31.00** | | **$14,183.00** | **$14,183.00** |
| 2/2/2024 | MBB | Attention to opposing counsel supplemental production email and revise motion for sanctions to account for same. | 1.10 | $585 | $643.50 | $643.50 |
| 2/4/2024 | GAA | Finalize motion to compel; compile exhibits for same; draft motion for summary judgment. | 3.30 | $425 | $1,402.50 | $1,402.50 |
| 2/5/2024 | MBB | Revisions to motion for sanctions and fee affidavit, and motion for summary judgment and fee affidavit. | 1.30 | $585 | $760.50 | $760.50 |
| 2/5/2024 | GAA | Draft motion for summary judgment; prepare exhibits for same. | 5.60 | $425 | $2,380.00 | $2,380.00 |
| | | **Total Fees: 02/2024** | **11.30** | | **$5,186.50** | **$5,186.50** |
| | | **Total Fees:** | **296.90** | | **$129,584.00** | **$128,676.85** |

## Summary of Billed Time

| ID | Timekeeper Name | Time | Standard Dollars | Actual Dollars | Write Up/Down | Standard Rate | Actual Rate |
|-----|-----------------|------|-----------------|----------------|----------------|----------------|--------------|
| DAK | DAVID KING | 0.20 | $83.00 | $74.70 | ($8.30) | $415.00 | $373.50 |
| DAK | DAVID KING | 4.00 | $1,660.00 | $1,660.00 | $0.00 | $415.00 | $415.00 |
| GAA | GUILLERMO A ALARCON | 162.90 | $63,531.00 | $63,531.00 | $0.00 | $390.00 | $390.00 |
| GAA | GUILLERMO A ALARCON | 11.70 | $4,387.50 | $3,948.75 | ($438.75) | $375.00 | $337.50 |
| MBB | MATTHEW BAUMGARTNER | 8.60 | $4,601.00 | $4,140.90 | ($460.10) | $535.00 | $481.50 |
| MBB | MATTHEW BAUMGARTNER | 67.20 | $35,952.00 | $35,952.00 | $0.00 | $535.00 | $535.00 |
| | | **254.60** | **$110,214.50** | **$109,307.35** | **($907.15)** | **$0.00** | **$0.00** |

## Summary of Unbilled Time

| ID | Timekeeper Name | Time | Standard Dollars | Actual Dollars | Write Up/Down | Standard Rate | Actual Rate |
|-----|-----------------|------|-----------------|----------------|----------------|----------------|--------------|
| GAA | GUILLERMO A ALARCON | 33.60 | $14,280.00 | $14,280.00 | $0.00 | $425.00 | $425.00 |
| MBB | MATTHEW BAUMGARTNER | 8.70 | $5,089.50 | $5,089.50 | $0.00 | $585.00 | $585.00 |
| | | **42.30** | **$19,369.50** | **$19,369.50** | **$0.00** | **$0.00** | **$0.00** |

## Summary of Total Time

| ID | Timekeeper Name | Time | Standard Dollars | Actual Dollars | Write Up/Down | Standard Rate | Actual Rate |
|-----|-----------------|------|-----------------|----------------|----------------|----------------|--------------|
| DAK | DAVID KING | 0.20 | $83.00 | $74.70 | ($8.30) | $415.00 | $373.50 |
| DAK | DAVID KING | 4.00 | $1,660.00 | $1,660.00 | $0.00 | $415.00 | $415.00 |
| GAA | GUILLERMO A ALARCON | 162.90 | $63,531.00 | $63,531.00 | $0.00 | $390.00 | $390.00 |
| GAA | GUILLERMO A ALARCON | 11.70 | $4,387.50 | $3,948.75 | ($438.75) | $375.00 | $337.50 |
| GAA | GUILLERMO A ALARCON | 33.60 | $14,280.00 | $14,280.00 | $0.00 | $425.00 | $425.00 |
| MBB | MATTHEW BAUMGARTNER | 8.70 | $5,089.50 | $5,089.50 | $0.00 | $585.00 | $585.00 |
| MBB | MATTHEW BAUMGARTNER | 8.60 | $4,601.00 | $4,140.90 | ($460.10) | $535.00 | $481.50 |

# Statement of Account

049115

000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024

Time & Rate: Original Value

## Summary of Total Time

| ID | Timekeeper Name | Time | Standard Dollars | Actual Dollars | Write Up/Down | Standard Rate | Actual Rate |
|----|-----------------|------|------------------|----------------|---------------|---------------|-------------|
| MBB | MATTHEW BAUMGARTNER | 67.20 | $35,952.00 | $35,952.00 | $0.00 | $535.00 | $535.00 |
| | | **296.90** | **$129,584.00** | **$128,676.85** | **($907.15)** | **$436.46** | **$433.40** |

## Costs and Expenses

| Date | Description | Orig Expense | Orig Cost | Bill Amount |
|------|-------------|--------------|-----------|-------------|
| 12/15/2022 | TRANSUNION RISK AND ALTERNATIVE DATA SOLUTIONS, INC.- INVESTIGATIVE FEES & EXPENSES- | | | $45.00 |
| | **Total Costs/Expenses:    12/2022** | **$0.00** | **$0.00** | **$45.00** |
| 05/13/2023 | SECRETARY OF STATE OF TEXAS- INVESTIGATIVE FEES & EXPENSES- SOS FIND- MAIN 2601 PARTNERS | | | $1.00 |
| 05/13/2023 | SECRETARY OF STATE OF TEXAS- INVESTIGATIVE FEES & EXPENSES- SOS FIND- MAIN 2601 PARTNERS | | | $1.00 |
| 05/13/2023 | SECRETARY OF STATE OF TEXAS- INVESTIGATIVE FEES & EXPENSES- SOS FIND- CENTER POINT ENERGY | | | $1.00 |
| 05/17/2023 | ATX PROCESS, LLC- COURT COSTS- FEDERAL WITNESS TENDER | | | $471.00 |
| 05/23/2023 | SECRETARY OF STATE OF TEXAS- INVESTIGATIVE FEES & EXPENSES- SOS FIND- PLC CAPITAL CORPORATION | | | $1.00 |
| | **Total Costs/Expenses:    05/2023** | **$0.00** | **$0.00** | **$475.00** |
| 06/01/2023 | ATX PROCESS, LLC- COURT COSTS- FEDERAL WITNESS TENDER | | | $233.90 |
| 06/21/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB | | | $783.73 |
| 06/21/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSITNG/GB | | | $1,151.78 |
| 06/22/2023 | SECRETARY OF STATE OF TEXAS- INVESTIGATIVE FEES & EXPENSES- SOS FIND - CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC | | | $1.00 |
| 06/30/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB - KH REIT | | | $534.76 |
| | **Total Costs/Expenses:    06/2023** | **$0.00** | **$0.00** | **$2,705.17** |
| 07/03/2023 | ATX PROCESS, LLC- COURT COSTS- KH-REIT II FUNDING XXII, LLC | | | $512.70 |
| 07/31/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB | | | $534.76 |
| | **Total Costs/Expenses:    07/2023** | **$0.00** | **$0.00** | **$1,047.46** |
| 09/06/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING | | | $631.10 |
| 09/07/2023 | U.S. LEGAL SUPPORT- COPIES OF COURT/GOVT DOCUMENTS- FEES FOR COPY OF COURT DOCS | | | $2,331.70 |
| 09/07/2023 | U.S. LEGAL SUPPORT- MISCELLANEOUS- FEES FOR VIDEO RECORDING | | | $1,347.50 |
| 09/19/2023 | ATX PROCESS, LLC- COURT COSTS- CASE NUMBER: SOUTHERN 4:22-CV-3730 | | | $105.00 |
| | **Total Costs/Expenses:    09/2023** | **$0.00** | **$0.00** | **$4,415.30** |
| 10/11/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING | | | $631.10 |
| | **Total Costs/Expenses:    10/2023** | **$0.00** | **$0.00** | **$631.10** |
| 11/03/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB | | | $793.47 |
| 11/17/2023 | SPECIAL MAIL EXPENSE - J. MANUEL TORRES-RODRIGUEZ | | | $8.53 |
| | **Total Costs/Expenses:    11/2023** | **$0.00** | **$0.00** | **$802.00** |
| 12/06/2023 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB | | | $631.10 |
| | **Total Costs/Expenses:    12/2023** | **$0.00** | **$0.00** | **$631.10** |

# Statement of Account

049115

000101    2701 MAIN STREET (HOUSTON)

01/01/2022 - 02/05/2024

Time & Rate: Original Value

## Costs and Expenses

| Date | Description | Orig Expense | Orig Cost | Bill Amount |
|---|---|---|---|---|
| 01/04/2024 | UBEO LLC- MISCELLANEOUS- MONTHLY RELATIVITY HOSTING/GB | | | $634.35 |
| | **Total Costs/Expenses:   01/2024** | **$0.00** | **$0.00** | **$634.35** |
| | | | | |
| 02/02/2024 | U.S. LEGAL SUPPORT- COPIES OF COURT/GOVT DOCUMENTS- COURT REPORTING | | | $2,442.50 |
| | **Total Costs/Expenses:   02/2024** | **$0.00** | **$0.00** | **$2,442.50** |
| | | | | |
| | **Total Costs/Expenses:** | **$0.00** | **$0.00** | **$13,828.98** |

## Other Accounting

| Date | Description | Amount |
|---|---|---|
| ██████████ | | ████████ |
| ██████████ | | ████████ |
| ██████████ | | ████████ |
| ██████████ | | ████████ |