IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KH-REIT II FUNDING XXII, LLC, | § | |
|    *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 4:22-CV-3730 |
| | § | |
| GRANT MEADOWS, L.L.C. and | § | |
| SHAHIN JAMEA, | § | |
|    *Defendants.* | § | |

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Plaintiff KH-REIT II Funding XXII, LLC ("Knighthead") files this reply in support of its motion for summary judgment.

I.  **Introduction.**

Defendant's ("Grant Meadows") response confirms that this case involves no factual disputes.

Grant Meadows does not dispute that, months before the first scheduled closing, it had knowledge of, and submitted a title objection based on, the power pole.[1] But instead of terminating the PSA, Grant Meadows—after lodging that objection—chose to sign a PSA amendment that said "removal or relocation of the power pole is not a condition to closing."[2] It is thus undisputed that Grant Meadows, after knowing of the title exception for the power pole, chose to go forward with the PSA.

---

[1] Pl.'s Ex. 3 (Doc. 37-1 at 244).
[2] Pl.'s Ex. 5 (Doc. 37-1 at 80).

Grant Meadows's later termination notice, on the eve of the rescheduled closing, was based on an alleged "new exception" in the title commitment to the same power pole.[3] But it is also undisputed that the new exception merely reflected that Grant Meadows—without permission and in violation of the PSA amendment—had, itself, removed the power pole. Obviously, if removal of the power pole "is not a condition to closing," then a title exception based on the (unauthorized) removal cannot be a condition to closing either.

Nor does Grant Meadows deny that it had actual knowledge of the neighbor's (frivolous) claims months before closing. Grant Meadows threatened to use the neighbor's claims as a pretext for terminating the PSA when its construction costs spiraled out of control and interest rate hikes were foreshadowing a "looming recession."[4] But, then, Grant Meadows did not terminate the PSA based on the neighbors claims; it instead chose to sign another amendment to the PSA that said "Purchaser shall have no further right to terminate the Agreement."[5] That amendment also included a major contractual concession that favored Grant Meadows (a later closing date).

This clear language, and the undisputed facts that Grant Meadows chose a contract amendment with that language in response to the title exception for the pole, and with full knowledge of the neighbor's claims, establish that Grant

---

[3] Pl.'s Ex. 25 (Doc. 37-1 at 229).
[4] Pl.'s Ex. 12 (Doc. 37-1 at 118).
[5] Pl.'s Ex. 13 (Doc. 37-1 at 120).

Meadows's failure to close was not justified under the PSA and constitutes a default entitling Knighthead to summary judgment.

## II. Argument.

### A. Grant Meadows's reliance on the Title Affidavit is misplaced.

Grant Meadows's statement of facts emphasizes the Title Affidavit Knighthead *would have* delivered at closing. In its argument section, the Title Affidavit receives only two sentences of briefing. *See* Resp. at 16. It argues (*id.*) that Knighthead was "not capable of performance" because Knighthead "could not truthfully execute the agreed Title Affidavit"—due to the power pole and the neighbor's claims. This argument is contrary to the PSA and the facts.

With one specific exception not relevant here, the PSA does not describe what the Title Affidavit must say.[6] The PSA requires only that the Title Affidavit be "in customary form reasonably acceptable to Seller and Escrow Agent."[7] Thus, the exact wording and acceptability of the Title Affidavit was a matter between Knighthead and the title company. Grant Meadows had no say.

Second, contrary to Grant Meadows' argument that Knighthead would not have been able to deliver the Title Affidavit, Knighthead *did* execute and deliver a negotiated Title Affidavit, along with all other required Seller closing documents. It

---

[6] The PSA's one substantive requirement for the Title Affidavit is that the Title Affidavit be sufficient "for purposes of causing Item 6 of Schedule C to be removed from the Title Commitment." Pl.'s Ex. 1 § 5(d) (Doc. 37-1 at 8). "Item 6 Schedule C" related to certain Mechanic's Liens that had been recorded in the deed records. *See* Pl.'s Ex. 2 (Doc. 37-1 at 58). The agreed-upon Title Affidavit satisfied this requirement because it established that the mechanic's liens were extinguished by Knighthead's foreclosure on the property. *See* Def.'s Ex. 2 ¶2 (Doc. 47 at 7).

[7] Pl.'s Ex. 1 § 5(c)(iv) (Doc. 37-1 at 8).

did so long after the parties had discussed the pole issue and agreed to handle it via amendment to the PSA. The *executed* Title Affidavit was in escrow when Grant Meadows failed to close.[8] It contains the same statements as the unexecuted, negotiated Title Affidavit Grant Meadows attaches to its response, including:

> 3. To my actual knowledge, with no duty of investigation or inquiry Seller is not a party to any pending lawsuits in any State or Federal Court, and except for an alleged, untimely claim of mechanics' lien by Glumac that would have been extinguished by the foreclosure of Seller's deed of trust, as previously disclosed to the Title Company, I am not aware of any lawsuit which may be filed against Seller; nor has Seller been declared bankrupt or insolvent, voluntarily or involuntarily, in any court.

Grant Meadows (at 7) falsely argues this statement could not be truthfully made.[9] But it is truthful. The neighbor's letter does not actually threaten any litigation; nor does it demand any action from Knighthead.[10] And when Knighthead responded to the neighbor, it informed the neighbor that any claims the neighbor may have had lacked merit and were by then time-barred.[11] Knighthead "consider[ed] this matter closed."[12] If the neighbor's claims were time-barred in 2022, that is even more true today (in 2024). Yet, the neighbor has still not filed suit. In 2022, Knighthead was not aware of any lawsuits which may have been filed against it, and it is still not aware of any such lawsuits.

---

[8] Seller's executed closing documents, including the negotiated Affidavit, are attached as Ex. 1, along with proof of delivery to the title company, to rebut Grant Meadows's false allegation that Knighthead could not have delivered the Affidavit.

[9] This is the precise language that was negotiated. *See* Defs.' Ex. 2 ¶3 (Doc. 47 at 7).

[10] Pl.'s Ex. 8 (Doc. 37-1 at 106).

[11] Pl.'s Ex. 9 (Doc. 37-1 at 109).

[12] *Id.*

Grant Meadows also argues that the Title Affidavit statement that "there are no unrecorded and/or outstanding leases, contracts, options or agreements affecting the Property"[13] is false, based on the neighbor's letter. Again, Grant Meadows is wrong. As Knighthead explained to the neighbor, any agreements the neighbor may have had with a previous owner did not run with the land and, in any event, the neighbor's potential claims based on such agreements were time-barred.[14]

Put simply, Knighthead considered the neighbor's claims to be frivolous and did not consider them an impediment to signing the Title Affidavit—so it signed and delivered the Title Affidavit along with other required closing documents. There was, after all, no lis pendens, no lawsuit, and no easement in the public records. Yet, despite these uncontroverted facts, Grant Meadows asserts (at 8) that any potential claim concerning the Property, no matter how frivolous or time-barred, necessarily prevented Knighthead from delivering a truthful Title Affidavit—even if Grant Meadows had actually known about the issues for months and contractually waived title objections and termination rights.[15] Grant Meadows's reading of the contract is contrary to Texas law because Texas courts "will not construe a contract

---

[13] Defs.' Ex. 2 ¶5 (Doc. 47 at 5).

[14] Pl.'s Ex. 9 (Doc. 37-1 at 109).

[15] There is troubling evidence that Grant Meadows attempted to coax the neighbor into pursuing claims against Knighthead by blatantly misrepresenting to the neighbor what was actually happening. *See* Pl.'s Ex. 11 (Doc. 37-1 at 116). On September 26, 2022 (a month before closing), Jamea called the neighbor and falsely told the neighbor that *Knighthead* had removed the power pole. *Id.* It is now undisputed Grant Meadows and Jamea removed it without Knighthead's knowledge or required approval. Jamea "reiterated" that Knighthead had "removed the T-poles." *Id.* Jamea told the neighbor that Knighthead's removal of the power pole "indicated that they (Seller) believed that they were not concerned about these obligations." *Id.* Jamea was obviously trying to instigate a fight between the neighbor and Knighthead so that Grant Meadows would have an excuse for terminating the PSA.

to achieve an absurd result." *Illinois Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 533 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Moreover, and contrary to Grant Meadows's argument (at 8), Knighthead did not "unilaterally" deem the Title Affidavit acceptable. The PSA makes the form of the Title Affidavit a matter between Knighthead and the title company.[16]

Grant Meadows has not shown that the title company was unwilling to accept the previously-negotiated Title Affidavit. The opposite is true. On the eve of closing, Grant Meadows asked the title company to reject the Title Affidavit.[17] Grant Meadows was obviously looking for an excuse to justify termination of the PSA—even if it had to create one itself—because it could not close. But, notably, while the title company did make a minor revision to the title commitment, <u>it did not require any changes to the Title Affidavit</u>. The title company was no more concerned about the neighbor's claims than Knighthead was. Thus, at no point was Knighthead in breach of its obligation to provide a Title Affidavit "reasonably acceptable to Seller and Escrow Agent."[18]

### B. The April and October title commitments were substantively identical.

The April 2022 title commitment disclosed the existence of the power pole.[19] As explained in the motion for summary judgment (at 2–4), Grant Meadows initially objected to the power pole, but then chose to waive that objection. Grant

---

[16] Pl.'s Ex. 1 § 5(c)(iv) (Doc. 37-1 at 8).

[17] Pl.'s Ex. 20 (Doc. 37-1 at 190) ("Just checking to see if you have received any feedback from your underwriter . . . Specifically, what affect will the neighbor's demand letter have on title's acceptance of the previously negotiated owner's affidavit . . . .").

[18] Pl.'s Ex. 1 § 5(c)(iv) (Doc. 37-1 at 8).

[19] Pl.'s Ex. 2 (Doc. 37-1 at 57).

Meadows then agreed that removing or relocating the power pole were not conditions to closing.[20]

Six months later, after Grant Meadows removed the power pole (without complying with the PSA's requirements for removal), the title company revised the title commitment. But as explained in the motion for summary judgment (at 12) the revised title commitment merely disclosed that the power pole was no longer there (because Grant Meadows had removed it).

Grant Meadows now argues (at 14) that the revised title commitment revived its right to object to the power pole. Under Grant Meadows's view, the October title commitment is sufficiently different from the April title commitment because the October title commitment related to "all consequences of the existence, removal, and/or relocation" of the power pole.[21] But, again, Grant Meadows agreed that removing or relocating the power pole was **_not_** a condition to closing. Obviously, then, the "consequences" of removing the power pole are not a condition to closing.

At the end of the day, Grant Meadows's termination of the PSA was based on the power pole's removal; however, Grant Meadows waived any right to terminate the PSA because of the power pole. And furthermore, Grant Meadows is the party that removed the power pole without complying with the PSA requirements for its removal (as explained immediately below).

---

[20] Pl.'s Ex. 5 (Doc. 37-1 at 80).
[21] Pl.'s Ex. 22 (Doc. 37-1 at 211).

## C. Grant Meadows breached the first amendment to the PSA by removing the power pole without providing plans to Knighthead for prior review and approval.

As explained in the motion (at 18), allowing Grant Meadows to assert title objections based on the power pole's removal would be manifestly unjust because *Grant Meadows removed the power pole—and then lied about it.*[22] And Grant Meadows did so in a way that breached the first amendment to the PSA.

The first amendment to the PSA gave Grant Meadows permission to remove the power pole, but before doing so, Grant Meadows was "obligated to provide to Seller, for Seller's prior review and approval, appropriate plans for removal or relocation."[23] It is undisputed that Grant Meadows did not comply with this provision. In fact, Grand Meadows removed the power pole without even telling Knighthead.

All Grant Meadows says in response (at 14) is that it did not have to provide Knighthead with any plans because "CenterPoint drafted its own plans for removal." But it is undisputed that CenterPoint sent those plans to Jamea.[24] Jamea should have sent those plans to Knighthead for "prior review and approval." Instead, Jamea lied to CenterPoint and said he was Knighthead's "authorized agent" and purported to approve the plans on Knightheads behalf.[25] This breach by Grant Meadows cannot possibly allow it to avoid its own contract obligations.

---

[22] Grant Meadows initially denied having any involvement in the power pole's removal. *See* Defs.' Resp. to Req. for Amis. (Doc. 24-1 at 141). After third-party discovery revealed the truth, Grant Meadows accepted responsibility. *See* Pl.'s Ex. 6 (Doc. 37-1 at 93).

[23] Pl.'s Ex. 5 (Doc. 37-1 at 80).

[24] Pl.'s Ex. 7 (Doc. 37-1 at 102–04)

[25] *Id.*

8

### D. Grant Meadows waived almost all termination rights under the Second Amendment.

Grant Meadows does not dispute that it waived almost all termination rights under the second amendment to the PSA. Nor does Grant Meadows dispute that it executed that waiver with knowledge of the neighbor's claims. Grant Meadows nonetheless argues, citing no authority, that enforcing the waiver would be "a gross miscarriage of justice."

There is nothing unjust about enforcing a written contract that was entered into in an arm's length transaction between sophisticated parties with full knowledge of the facts. *See Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005) ("The court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written."). Here, Jamea is himself a licensed attorney with over two decades of experience in real estate development.[26]

### E. The PSA is not ambiguous.

In a last ditch effort, and with almost no explanation, Grant Meadows argues the PSA is ambiguous.

Grant Meadows's ambiguity arguments should be rejected for the simple reason that they are conclusory and inadequately briefed. *See Edwards v. Belk Dept. Stores, LP*, No. 2:19-CV-00025-KS-MTP, 2020 WL 3259540, at *7 (S.D. Miss. June 16, 2020 ("conclusory argument is insufficient on summary judgment"); *Estate of Esquivel v. Brownsville Indep. Sch. Dist.*, No. 1:16-cv-40, 2018 WL 10150655, at

---

[26] Pl.'s Ex. 6 (Doc. 37-1 at 91–92).

*21 (S.D. Tex. June 27, 2018) ("Inadequately briefed and untimely presented arguments are not properly before the Court."); *Guerrina v. Scottsdale Ins.*, No. Civ.A. H-96-3974, 1997 WL 579197, at *4 n.3 (S.D. Tex. June 24, 1997) ("Plaintiff's conclusory argument, however, is insufficient to create an issue of material fact precluding summary judgment.").

All Grant Meadows says (at 16) is that the PSA is ambiguous because its provisions "have different interpretations by each party." Grant Meadows does not say what parts of the PSA are ambiguous—it does not cite even a single provision.

This argument fails for another reason: "[a]n ambiguity does not arise simply because the parties offer conflicting interpretations." *Am. Mfrs. Mut. Ins. V. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). Grant Meadows does not explain what its interpretation of the PSA is or how it differs from Knighthead's interpretation.

Lastly, the Court should reject Grant Meadows's ambiguity argument because it failed to plead ambiguity as an affirmative defense. *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007). Under Texas law, "a person who wishes to argue contract ambiguity must affirmatively plead it, or else the argument is waived." *Id.* In *Nichols*, the Fifth Circuit rejected an ambiguity argument because it was "raised . . . for the first time in response to [Defendant's] motion for summary judgment; it does not appear in his initial pleading." *Id.*

## CONCLUSION AND PRAYER

For these reasons, Knighthead respectfully asks that the Court grant summary judgment.

Respectfully submitted,

*/s/ Matthew Baumgartner*
**MATTHEW BAUMGARTNER**,
Attorney in Charge
Texas State Bar No. 24062605
Southern District of Texas No. 1626953
mbaumgartner@abaustin.com
(512) 435-2308
**GUILLERMO A. ALARCON**, Of Counsel
Texas State Bar No. 24099176
Southern District of Texas No. 3122674
galarcon@abaustin.com
(512) 435-2383
**DAVID KING,** Of Counsel
Texas State Bar No. 24083310
Southern District of Texas No. 2414517
dking@abaustin.com
(512) 436-2305
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, a true and correct copy of the foregoing was served on all counsel of record.

*/s/ Guillermo A. Alarcón*
Guillermo A. Alarcón